# IN THE UNITED STATES COURT OF INTERNATIONAL TRADE

AXLE OF DEARBORN, INC. D/B/A DETROIT AXLE,

*Plaintiff*,

v.

DEPARTMENT OF COMMERCE; HOWARD LUTNICK, *in his official capacity as Secretary of Commerce*; DEPARTMENT OF HOMELAND SECURITY; KRISTI NOEM, *in her official capacity as Secretary of Homeland Security*; DEPARTMENT OF THE TREASURY; SCOTT BESSENT, *in his official capacity as Secretary of the Treasury*; UNITED STATES CUSTOMS AND BORDER PROTECTION; PETE R. FLORES, *in his official capacity as Acting Commissioner for U.S. Customs and Border Protection*; and the UNITED STATES,

*Defendants.*

Case No. 1:25-cv-00091

**MOTION FOR PRELIMINARY INJUNCTION AND EXPEDITED PARTIAL SUMMARY JUDGMENT**

## MOTION FOR PRELIMINARY INJUNCTION
## AND EXPEDITED PARTIAL SUMMARY JUDGMENT

Plaintiff Detroit Axle moves under U.S. Court of International Trade Rule 65 for a preliminary injunction barring Defendants and others acting in concert or participation with them from taking any action to implement Executive Orders 14194, 14195, 14200, and 14256 insofar as those Orders purport to eliminate, or take steps to eliminate, the de minimis exemption provided by 19 U.S.C. § 1321(a)(2)(C)—for the pendency of this litigation, including any appeals.  The requested preliminary injunction would bar Defendants and others acting in concert or participation with them from collecting tariffs on any goods that would qualify for de minimis treatment but for executive orders issued and agency actions taken since January 20, 2025.

Plaintiff also moves for expedited partial summary judgment under CIT Rule 56 on its claims related to the de minimis exemption, Counts I and II of Plaintiff's complaint and the related requests for relief:  a declaration, permanent injunction, vacatur with respect to the government's rescission of the de minimis exemption, and a refund of any duties paid on goods that otherwise would be protected by the exemption.

Plaintiff respectfully requests expedited consideration of this motion pursuant to CIT R. 3(g) for good cause shown—namely, that Plaintiff is suffering serious irreparable harm from Defendants' actions and is likely to close major facilities and lay off hundreds of workers within the next month if it does not receive prompt relief.  To that end, Plaintiff proposes that the Government's opposition to this Motion be due by June 4 and Plaintiff's reply be due by June 9. The Government consents to these deadlines.  Plaintiff also respectfully requests that the Court hear this Motion on June 10, 11, 16, 17, or at the Court's earliest convenience, and issue a ruling on this Motion by June 27, when Plaintiff expects to run critically low on pre-tariff inventory and will be subjected to even more severe irreparable harm as it is forced to wind down U.S. operations.

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................ 1

BACKGROUND ............................................................................................... 3

    A.    Congress Has Endorsed And Expanded The De Minimis Exemption
        For Nearly A Century .............................................................................. 3

    B.    Detroit Axle Is A Family-Owned American Business That Has
        Relied On The De Minimis Exemption .................................................... 6

    C.    The President's Tariff Orders Have Purported To Eliminate The
        De Minimis Exemption.............................................................................. 8

    D.    The Elimination Of The De Minimis Exemption Threatens
        Detroit Axle's Survival ........................................................................... 11

ARGUMENT ................................................................................................... 12

    I.    Detroit Axle's Legal Claims Are Meritorious ................................... 13

        A.    The Executive Branch Lacks Authority To Eliminate The De Minimis
            Exemption ............................................................................................ 14

            1.    Congress Has Foreclosed Any Executive Branch Authority
                To Reduce The Exemption Below The $800 Statutory Floor ..... 14

            2.    At A Minimum, The Executive Branch Can Alter The
                De Minimis Exemption Only Through Notice-And-Comment
                Rulemaking ................................................................................. 16

            3.    IEEPA Does Not Authorize The President To Nullify
                Section 1321................................................................................ 19

        B.    The Executive Branch's Elimination Of The De Minimis Exemption
            Is Arbitrary And Capricious..................................................................... 22

    II.    The Elimination Of The De Minimis Exemption Is Causing Detroit Axle
        Serious And Imminent Irreparable Harm ............................................. 25

    III.    The Public Interest And Balance Of The Equities Favor Injunctive Relief ........ 29

CONCLUSION................................................................................................. 31

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Am. Signature, Inc. v. United States*,
  598 F.3d 816 (Fed. Cir. 2010).................................................................30

*Armstrong v. Exceptional Child Ctr., Inc.*,
  575 U.S. 320 (2015)...............................................................................13

*AstraZeneca LP v. Apotex, Inc.*,
  633 F.3d 1042 (Fed. Cir. 2010)..............................................................27

*Berman v. Parker*,
  348 U.S. 26 (1954).................................................................................30

*Botany Worsted Mills v. United States*,
  278 U.S. 282 (1929)...............................................................................17

*Bowen v. Georgetown Univ. Hosp.*,
  488 U.S. 204 (1988)...............................................................................18

*California v. Azar*,
  911 F.3d 558 (9th Cir. 2018) .................................................................28

*Celsis in Vitro, Inc. v. CellzDirect, Inc.*,
  664 F.3d 922 (Fed. Cir. 2012)....................................................25, 27, 28

*Chamber of Com. v. Reich*,
  74 F.3d 1322 (D.C. Cir. 1996) .........................................................13, 23

*Cont'l Cas. Co. v. United States*,
  314 U.S. 527 (1942)...............................................................................17

*Dep't of Com. v. New York*,
  588 U.S. 752 (2019)...............................................................................25

*DexCom, Inc. v. Abbott Diabetes Care, Inc.*,
  89 F.4th 1370 (Fed. Cir. 2024) ..............................................................13

*DHS v. Regents of the Univ. of Cal.*,
  591 U.S. 1 (2020)...................................................................................22

*FCC v. Fox Television Stations, Inc.*,
  556 U.S. 502 (2009)...............................................................................23

*FDA v. Brown & Williamson Tobacco Corp.*,
  529 U.S. 120 (2000).........................................................................19, 20

*Harrington v. Purdue Pharma L.P.*,
  603 U.S. 204 (2024)...............................................................................19

*Hartford Underwriters Ins. Co. v. Union Planters Bank, N.A.*,
  530 U.S. 1 (2000)...................................................................................17

## TABLE OF AUTHORITIES

*Hillman v. Maretta*,
    569 U.S. 483 (2013)..............................................................................................17

*hiQ Labs, Inc. v. LinkedIn Corp.*,
    31 F.4th 1180 (9th Cir. 2022)............................................................................26

*Iowa Util. Bd. v. FCC*,
    109 F.3d 418 (8th Cir. 1996)..............................................................................25

*J.W. Hampton, Jr., & Co. v. United States*,
    276 U.S. 394 (1928)............................................................................................20

*League of Women Voters of U.S. v. Newby*,
    838 F.3d 1 (D.C. Cir. 2016)................................................................................29

*Louisiana v. Biden*,
    55 F.4th 1017 (5th Cir. 2022)............................................................................27

*Missouri v. Trump*,
    128 F.4th 979 (8th Cir. 2025).......................................................................28, 29

*Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto. Ins.*,
    463 U.S. 29 (1983).......................................................................18, 22, 23, 24

*Nat'l Customs Brokers & Forwarders Ass'n of Am., Inc. v. United States*,
    59 F.3d 1219 (Fed. Cir. 1995)..............................................................14, 15, 16

*Nebraska v. Su*,
    121 F.4th 1 (9th Cir. 2024)................................................................................23

*Nken v. Holder*,
    556 U.S. 418 (2009)............................................................................................29

*Ohio v. EPA*,
    603 U.S. 279 (2024)............................................................................................22

*Perez v. Mortg. Bankers Ass'n*,
    575 U.S. 92, 101 (2015)......................................................................................18

*Perkins Coie LLP v. Dep't of Just.*,
    2025 WL 1276857 (D.D.C. May 2, 2025)..........................................................28

*Pursuing Am.'s Greatness v. FEC*,
    831 F.3d 500 (D.C. Cir. 2016)...........................................................................29

*RadLAX Gateway Hotel, LLC v. Amalgamated Bank*,
    566 U.S. 639 (2012).....................................................................................19, 20

*Robert Bosch LLC v. Pylon Mfg. Corp.*,
    659 F.3d 1142 (Fed. Cir. 2011)..........................................................................25

*Sanofi-Synthelabo v. Apotex, Inc.*,
    470 F.3d 1368 (Fed. Cir. 2006)..........................................................................27

## TABLE OF AUTHORITIES

*V.O.S. Selections, Inc. v. Trump*,
  No. 1:25-cv-00066 (C.I.T. Apr. 22, 2025) ................................................. 13

*Washington v. Reno*,
  35 F.3d 1093 (6th Cir. 1994) ..................................................................... 29

*Wis. Gas Co. v. FERC*,
  758 F.2d 669 (D.C. Cir. 1985) ................................................................... 26

*Yakima Valley Cablevision, Inc. v. FCC*,
  794 F.2d 737 (D.C. Cir. 1986) .............................................................. 24, 25

*Yorktown Sys. Grp., Inc. v. Threat Tec LLC*,
  108 F.4th 1287 (11th Cir. 2024) ................................................................ 27

*Youngstown Sheet & Tube Co. v. Sawyer*,
  343 U.S. 579 (1952) ................................................................................... 21

**Constitutional Provisions**

U.S. Const. art. I, § 8 ............................................................................ 3, 20, 21

**Regulations**

19 C.F.R. § 10.151 .................................................................................. 4, 5, 18

19 C.F.R. § 134.1(b) ....................................................................................... 10

83 Fed. Reg. 28,710 (June 20, 2018) ............................................................... 7

83 Fed. Reg. 40,823 (Aug. 16, 2018) ............................................................... 7

83 Fed. Reg. 47,974 (Sept. 21, 2018) .............................................................. 7

84 Fed. Reg. 43,304 (Aug. 20, 2019) ............................................................... 7

90 Fed. Reg. 3,048, 3,072–73 (Jan. 14, 2025) .............................................. 18

90 Fed. Reg. 6,852, 6,873 (Jan. 21, 2025) ..................................................... 18

90 Fed. Reg. 17,608, 17,609 (Apr. 28, 2025) .............................................. 9, 21

Customs & Border Prot., *Executive Order - Tariff on De Minimis Shipments from
  China*, Article No. 000001915 (May 8, 2025), https://tinyurl.com/6kj36jys ......... 21

Exec. Order *Modifying Reciprocal Tariff Rates to Reflect Discussions with the
  People's Republic of China* (May 12, 2025) ........................................... 10, 24

Exec. Order No. 14195, 90 Fed. Reg. 9,121 (Feb. 1, 2025) ...................... 8, 9, 10

Exec. Order No. 14228, 90 Fed. Reg. 11,463, 11,463 (Mar. 3, 2025) ............ 10

Exec. Order No. 14256, 90 Fed. Reg. 14,899, 14,899 (Apr. 2, 2025) ...... 1, 9, 16, 24

## TABLE OF AUTHORITIES

Exec. Order No. 14257, 90 Fed. Reg. 15,041 (Apr. 2, 2025) ....................................................9, 10

Proclamation No. 10908, 90 Fed. Reg. 14,705, 14,706 (Mar. 26, 2025)......................................10

**Statutes**

5 U.S.C. § 706 ....................................................................................................................13, 22, 25

19 U.S.C. § 1321 ........................................................................................4, 5, 7, 14, 15, 17

19 U.S.C. § 2253 ..............................................................................................................21

28 U.S.C. §§ 2643–44 ........................................................................................................14

50 U.S.C. §§ 1701–1702 ..............................................................................................9, 19, 20

Customs Administrative Act of 1938, Pub. L. No. 75-721, § 7, 52 Stat. 1077,
    1081..........................................................................................................................3

Customs Procedural Reform and Simplification Act of 1978, Pub. L. No. 95-410,
    § 205(b)(3), 92 Stat. 888, 900 ..................................................................................4

North American Free Trade Agreement Implementation Act, Pub. L. No. 103-
    182, § 651, 107 Stat. 2057, 2209 (1993)..........................................................4, 14, 15

Trade Facilitation and Trade Enforcement Act, Pub. L. No. 114-125, § 901(a)(2),
    130 Stat. 122, 223 (2016)..................................................................................1, 4, 14, 30

**Other Authorities**

2A Sutherland Statutory Construction § 47:23 (7th ed.) ............................................................17

Christopher A. Casey, Cong. Rsch. Serv., *U.S. Tariff Policy: Overview* 2 (Jan. 31,
    2025) ........................................................................................................................6

Daniel Griswold & Clark Packard, *How Trade Agreements Have Enhanced the
    Freedom and Prosperity of Americans*, CATO Institute (Aug. 27, 2024) ..............6

Harmonized Tariff Schedule, § XVII, ch. 87..............................................................................10

*Imports and the Section 321 (De Minimis) Exemption: Origins, Evolution, and
    Use*, Cong. Rsch. Serv. (Jan. 31, 2025) ........................................................4, 5, 24

Kevin T. Dugan, *The De Minimis Exemption 'Causing Chaos at All Levels,'* Wall
    St. J. (Feb. 3, 2025)..............................................................................................9

Pablo D. Fajgelbaum & Amit Khandelwal, *The Value of de Minimis Imports*,
    National Bureau of Economic Research Working Paper No. 32607
    (Feb. 2025)..............................................................................................................5

U.S. Senate, Committee on Finance, *The President's 2019 Trade Policy Agenda
    and the United States-Mexico-Canada Agreement*, 116th Cong., 1st sess., June
    18, 2019 (Washington: U.S. Government Publishing Office, 2021)........................5

## INTRODUCTION

Since 1938, Congress has exempted low-value imports from tariffs. In repeatedly expanding this statutory "de minimis exemption" over the past 90 years—such that today it protects goods valued at $800 or less—Congress has found that the exemption "provide[s] significant economic benefits to businesses and consumers in the United States . . . through costs savings and reductions in trade transaction costs." Trade Facilitation and Trade Enforcement Act (TFTEA), Pub. L. No. 114-125, § 901(a)(2), 130 Stat. 122, 223 (2016). Today, the de minimis exemption generates billions of dollars of economic benefits annually for U.S. consumers and disproportionately benefits low-income individuals who rely on affordable imported goods.

Yet the President has purported unilaterally to eliminate this statutorily mandated pillar of American free trade. Relying on the International Emergency Economic Powers Act (IEEPA)—the same emergency-powers statute the President has invoked to impose unprecedented tariffs—the President has signed executive orders stating that "duty-free *de minimis* treatment . . . shall no longer be available for products of" China. Exec. Order No. 14256, § 1, 90 Fed. Reg. 14,899, 14,899 (Apr. 2, 2025). The government began enforcing those orders on May 2 by imposing staggeringly high pre-existing tariffs on Chinese imports that previously qualified for de minimis treatment.

The impact on Plaintiff Detroit Axle—a Michigan-based, family-owned-and-operated auto-parts distributor—has been swift and catastrophic. Detroit Axle's e-commerce business has relied on the cost savings and reduced trade transaction costs that Congress provided for in the de minimis exemption. Without the exemption, all of Detroit Axle's imports now are subject to 72.5% tariffs—costs far too high for the company to absorb or pass on to its customers, who can turn to other lower-cost suppliers. To try to stay afloat, the company has strained to fulfill sales from existing inventories. But supplies are quickly running out. Unless the de minimis exemption

is promptly restored, Detroit Axle will be forced to close the doors of its Michigan facilities and lay off hundreds of employees by the end of June.

The government's actions inflicting these irreparable harms are unlawful on two independent grounds.

*First*, the purported abrogation of the de minimis exemption exceeds the President's statutory authority. Congress established an $800 floor for the de minimis exemption by statute, and that statute does not allow the President or any other executive official to eliminate the exemption by administrative fiat. Rather, if the $800 floor is alterable at all, it may be changed only through notice-and-comment rulemaking by the Secretary of the Treasury, which has not occurred here. Nor does IEEPA give the President authority to modify the exemption. Even if IEEPA authorized tariffs—and it does not—that statute's general provisions for dealing with economic emergencies could not be used to circumvent the specific requirements Congress prescribed to prevent the Executive Branch from modifying the exemption at a whim.

*Second*, the government's actions implementing the President's executive orders—including public notices adopting the orders and follow-on tariff collections—are arbitrary and capricious in violation of the Administrative Procedure Act. The de minimis exemption has been the law of the United States for nearly a century. As such, it has engendered serious, investment-backed reliance interests by Detroit Axle and others. Yet in reversing course and overriding the de minimis exemption, the government entirely failed to consider that significant reliance, in violation of blackletter APA requirements. The government also failed to consider other important aspects of the problem, including the substantially increased administrative burdens and competitive distortions caused by its new policy. And it failed to consider reasonable alternatives or to articulate any rational explanation for the policy.

To prevent irreparable harm to Detroit Axle, preserve the status quo, and serve the public interest, this Court at a minimum should preliminarily enjoin the government from imposing tariffs on imports that otherwise would be protected by the de minimis exemption. But because there is no genuine dispute of material fact and Detroit Axle is entitled to judgment as a matter of law, this Court should go further and grant partial summary judgment for Detroit Axle on Counts I and II of its complaint and enter a declaratory judgment, vacatur, and a permanent injunction, as well as a refund of duties paid.[1]

## BACKGROUND

### A.    Congress Has Endorsed And Expanded The De Minimis Exemption For Nearly A Century

The Taxing Clause of the Constitution vests exclusively in Congress the "Power To lay and collect Taxes, Duties, Imposts and Excises." U.S. Const. art. I, § 8, cl. 1. This Clause grants Congress, not the Executive Branch, plenary authority over the imposition and collection of tariffs (another word for "duties" or "imposts").

In 1938, Congress used this authority to enact what is now known as the "de minimis exemption," which relieves small-value imports from tariffs. As originally enacted, the statute authorized "[c]ollectors of customs . . . under such regulations as the Secretary of the Treasury may prescribe, to disregard" duties on goods whose value did "not exceed . . . $1" when "the expense and inconvenience of collecting the duty accruing thereon would be disproportionate to the amount of such duty." Customs Administrative Act of 1938, Pub. L. No. 75-721, § 7, 52 Stat. 1077, 1081. Since its adoption, Congress has repeatedly expanded the de minimis exemption by raising the

---

[1] Detroit Axle does not seek a preliminary injunction or expedited summary judgment at this time on its claims challenging the imposition of the President's IEEPA tariffs (Counts III and IV of its complaint), but reserves those claims for disposition at a later date.

value of goods on which the Secretary was authorized to disregard duties.  *See, e.g.*, Customs Procedural Reform and Simplification Act of 1978, Pub. L. No. 95-410, § 205(b)(3), 92 Stat. 888, 900 (raising the cap to $5).

In 1993, "Congress fundamentally changed the language of the statute to further make it a tool useful for trade liberalization."  *Imports and the Section 321 (De Minimis) Exemption: Origins, Evolution, and Use* 17, Cong. Rsch. Serv. (Jan. 31, 2025) ("CRS Report").  Before 1993, the statute was a permissive authorization for the Treasury Secretary to admit goods free of tariffs, but specified that the aggregate value of duty-free goods "shall not exceed" certain monetary thresholds.  *See, e.g.*, 19 U.S.C. § 1321(a)(2) (1992).  But in 1993, Congress replaced "shall not exceed" with "shall not exceed an amount specified by the Secretary by regulation, *but not less than*" certain monetary thresholds.  North American Free Trade Agreement Implementation Act, Pub. L. No. 103-182, § 651, 107 Stat. 2057, 2209 (1993) (emphasis added).  Thus, whereas the Secretary before had the authority to exempt from tariffs shipments of goods valued *up to* $5 per importer per day, the amended statute required the Secretary to exempt shipments worth *at least* $200 per importer per day and authorized the Secretary to increase that floor by regulation.  *Id.*

In 2015, Congress further expanded the de minimis exemption by directing the Treasury Secretary to raise the value of duty-free goods to "not less than . . . $800" per importer per day. TFTEA,  § 901(c), 130 Stat. at 223.  In so doing, Congress explained that "[h]igher thresholds for the value of articles that may be entered informally and free of duty provide significant economic benefits to businesses and consumers in the United States and the economy of the United States through costs savings and reductions in trade transaction costs."  *Id.* § 901(a)(2), 130 Stat. at 223. The Treasury Secretary complied with Congress's command.  *See, e.g.*, 19 C.F.R. § 10.151 (2016) (providing that port directors "shall pass free of duty and tax" shipments "not exceeding $800"

"imported by one person on one day"). So today, both the statute and existing regulations require a de minimis exemption that protects from tariffs goods valued up to $800. *See* 19 U.S.C. § 1321(a)(2)(C); 19 C.F.R. § 10.151.

Congress's 1993 and 2015 expansions of the de minimis exemption have enabled the statute to play an instrumental role in providing Americans easy access to low-cost goods, which has been a "great boon to American small businesses, manufacturers, and ecommerce companies." CRS Report, *Imports & Section 321*, *supra*, at 25 (quoting U.S. Senate, Committee on Finance, *The President's 2019 Trade Policy Agenda and the United States-Mexico-Canada Agreement*, 116th Cong., 1st sess., June 18, 2019 (Washington: U.S. Government Publishing Office, 2021), p. 42). According to a recent study, the de minimis exemption generates roughly $13 billion of economic benefits annually for U.S. consumers and disproportionately benefits low-income individuals who rely on affordable imported goods.[2] The exemption has also helped American exporters, as the United States has successfully urged other countries to reciprocate and adopt their own de minimis exemptions. CRS Report, *Imports & Section 321*, *supra*, at 20–21.

Congress has provided only one mechanism by which the Executive Branch may make any changes to the de minimis exemption: "The Secretary of the Treasury is authorized by regulations to prescribe exceptions to any exemption provided for in subsection (a) whenever he finds that such action is consistent with the purpose of subsection (a) or is necessary for any reason to protect the revenue or to prevent unlawful importations." 19 U.S.C. § 1321(b).

---

[2] Pablo D. Fajgelbaum & Amit Khandelwal, *The Value of de Minimis Imports*, National Bureau of Economic Research Working Paper No. 32607 (Feb. 2025) (manuscript at 4), https://www.nber.org/papers/w32607.

**B.**     **Detroit Axle Is A Family-Owned American Business That Has Relied On The De Minimis Exemption**

Detroit Axle was founded as a family-owned business in Dearborn, Michigan in 1990.  At that time, it assembled and sold a single automotive part, the CV-joint, to local mechanics.  At first, Detroit Axle had no effective way to reach the broader American consumer:  While chain auto-parts stores benefited from locations throughout the country and the name recognition that came with them, Detroit Axle had operations in a single Rust Belt suburb.

Starting in the mid-2000s, however, Detroit Axle was able to increase the size and geographic scope of its business significantly by leveraging e-commerce.  Detroit Axle started selling its products nationwide on e-marketplaces like Amazon and eBay to small mechanics, car enthusiasts in search of hard-to-find parts, and thrifty do-it-yourself car owners.  In time, the Rust Belt bootstrapper became a genuine competitor to its bigger counterparts, while remaining family-owned and operated.  And Detroit Axle's rising tide lifted other boats—customers across the country enjoyed lower prices, and local Michigan communities benefited from the new jobs Detroit Axle created, many of which the company gave to formerly incarcerated individuals in need of work.

Detroit Axle also owes its success to U.S. policies encouraging international trade.  Since the Smoot-Hawley Act imposed tariffs that contributed to the Great Depression, the Nation's foreign policy has been roundly pro-trade.  *See* Daniel Griswold & Clark Packard, *How Trade Agreements Have Enhanced the Freedom and Prosperity of Americans*, CATO Institute (Aug. 27, 2024), https://tinyurl.com/97vashc6.  In particular, the policy of the United States for decades has been one of low (or no) tariffs.  *See, e.g.*, Christopher A. Casey, Cong. Rsch. Serv., *U.S. Tariff Policy: Overview* 2 (Jan. 31, 2025) (noting that "[s]ince 1934, the United States has reduced or eliminated

6

many tariffs as part of bilateral and multilateral trade agreements" and that this period has been marked by "[l]ow U.S. tariff rates").

Detroit Axle's business has flourished from free trade. To better serve its core customers—individuals hoping to improve or repair their vehicles on a budget—Detroit Axle contracted with Chinese factories that produce parts either not made by or made more cheaply than U.S. manufacturers. Decl. ¶ 7. Even while doing so, Detroit Axle maintained and increased the size of its American employee base, because with cheaper products came more orders, which required more U.S. workers to ship the parts. *Id.*

In recent years, however, the Executive Branch began to retreat from the United States' commitment to free trade. In 2018 and 2020, the government imposed tariffs of up to 25% on Chinese-manufactured goods under Section 301 of the Trade Act of 1974, 19 U.S.C. § 2411. Certain auto parts, in particular, were subject to tariffs of up to 25%. *See* 83 Fed. Reg. 28,710 (June 20, 2018) (List 1); 83 Fed. Reg. 40,823 (Aug. 16, 2018) (List 2); 83 Fed. Reg. 47,974 (Sept. 21, 2018) (List 3); 84 Fed. Reg. 43,304 (Aug. 20, 2019) (List 4).

With thin margins, Detroit Axle had limited ability to withstand these tariffs. So in an effort to keep its business viable, the company turned to another mainstay of U.S. free-trade policy—the de minimis exemption. As explained above, Congress expanded that exemption to help small businesses like Detroit Axle and their customers by requiring the government to exempt from tariffs goods worth "not less than" $800 per person per day. 19 U.S.C. § 1321(a)(2)(C). In 2020, to utilize this exemption, Detroit Axle opened a distribution center in Juarez, Mexico, just across the U.S.-Mexico border. Decl. ¶ 10. From that facility, which also imports auto parts from China, Detroit Axle sells and delivers goods directly to U.S. customers under an annual shipping contract with FedEx. *Id.* ¶ 9. And because Detroit Axle only fulfills orders of less than $800 from

the Mexico distribution center, all of Detroit Axle's sales from that facility were, until recently, exempt from tariffs under the the de minimis exemption. *Id.* ¶ 10.

Detroit Axle's Mexico facility has been essential to maintaining and growing its business. In e-commerce, speed and efficiency are paramount, and through this second location, Detroit Axle has been able to better serve its customers and capture market share by shipping more quickly to the western United States. Decl. ¶ 11. The Mexico facility also allows Detroit Axle to cushion the financial impact of the tariffs on its Michigan distribution center, which continues to serve customers east of the Mississippi River. *Id.* ¶ 12. Indeed, the revenue from its Mexico location has allowed Detroit Axle to increase the size of its operations in America—in a virtuous cycle, as shipment sizes went up, the price per unit fell, allowing Detroit Axle to open a re-manufacturing plant and employ even more people in Michigan. *Id.*

The Mexico facility also has helped Detroit Axle become a top third-party seller on Amazon and eBay. Decl. ¶ 13. As a top seller, Detroit Axle consistently appears at or near the top of search results when customers search for auto parts on these marketplaces—which is critical to driving sales and maintaining market share. *Id.* The de minimis exemption thus has functioned just as Congress intended by allowing Detroit Axle to keep its prices low, sell more goods to more customers, and expand its business by hiring additional employees.

### C.    The President's Tariff Orders Have Purported To Eliminate The De Minimis Exemption

Since February 2025, the President has issued numerous executive orders imposing tariffs. Initially, the President imposed tariffs just on China, Mexico, and Canada, purportedly to deal with the flow of fentanyl; these tariffs remain in force but have been amended several times. *See, e.g.*, Exec. Order No. 14195, 90 Fed. Reg. 9,121 (Feb. 1, 2025). Since then, the President has levied more sweeping tariffs on virtually every country in the world—tariffs he has altered significantly

and unpredictably. *See, e.g.*, Exec. Order No. 14257, 90 Fed. Reg. 15,041 (Apr. 2, 2025). These actions have moved markets, reshaped global shipping patterns, and begun to rewire the U.S. and global economies.

The President has purported to impose almost all of these tariffs under the International Emergency Economic Powers Act, 50 U.S.C. § 1701 *et seq.* Enacted in 1977, IEEPA authorizes the President to take certain actions with respect to foreign property to "deal with" "unusual and extraordinary threat[s]" arising abroad. *See* 50 U.S.C. §§ 1701–1702. Presidents have historically used IEEPA to impose economic sanctions on state sponsors of terrorism and pariah nations, such as Iran and North Korea. Until this year, no President had used IEEPA to impose tariffs.

In some of these tariff orders, the President also purported to eliminate the statutory de minimis exemption for goods imported from China. The President initially abrogated the exemption on February 1, 2025. Exec. Order No. 14195, § 2(g). But when the order sparked chaos at airports, he paused the order days later until the Secretary of Commerce notified him that "adequate" systems were in place to collect tariffs. *See* Exec. Order No. 14200, § 1, 90 Fed. Reg. 9277, 9277 (Feb. 5, 2025); Kevin T. Dugan, *The De Minimis Exemption 'Causing Chaos at All Levels,'* Wall St. J. (Feb. 3, 2025), https://tinyurl.com/yba2xmap. After being so notified, the President issued a further order providing that "duty-free *de minimis* treatment under 19 U.S.C. 1321(a)(2)(C) shall no longer be available" for "products of" China starting on May 2, 2025. Exec. Order No. 14256, § 1. The sole explanation for the elimination of the de minimis exemption was an unsupported assertion that some shippers "avoid detection [of narcotics] due to administration of the *de minimis* exemption." *Id.*

That order went into effect on May 2, after the Department of Homeland Security issued a notice implementing the order. *See* 90 Fed. Reg. 17,608, 17,609 (Apr. 28, 2025). At the same

time, the President has imposed lower tariffs on de minimis-eligible Chinese imports that are shipped via the U.S. Postal Service. *See* Exec. Order *Modifying Reciprocal Tariff Rates to Reflect Discussions with the People's Republic of China*, § 4(a), (b) (May 12, 2025).

As a result of the President's purported abrogation of the de minimis exemption for Chinese imports, Detroit Axle's direct-to-consumer auto-parts shipments from its Mexico facility are now subject to a wide array of burdensome tariffs applicable to Chinese imports.[3]  Under IEEPA, the President's fentanyl-related orders have levied a total of 20% tariffs on Chinese goods, including auto parts. *See* Exec. Order No. 14195, § 2(a); Exec. Order No. 14228, § 2, 90 Fed. Reg. 11,463, 11,463 (Mar. 3, 2025).  The President has also imposed auto-part-specific tariffs under Section 232 and Section 301.  The tariffs under Section 232 place an across-the-board 25% tariff on auto parts, *see* Proclamation No. 10908, § 1, 90 Fed. Reg. 14,705, 14,706 (Mar. 26, 2025), while the Section 301 tariffs from the President's first term vary but can go up to 25%, *see* Compl. ¶ 33, ECF No. 2.  (The worldwide "reciprocal tariff[s]," by contrast, do not presently apply to auto parts subject to Section 232 tariffs.  Exec. Order No. 14257, § 3(b).)

Thus, Detroit Axle is now subject to a 72.5% tariff on auto parts that it imports from China, including by way of its Mexico facility: 20% from the IEEPA fentanyl-related tariffs; 25% from the Section 232 tariffs; 25% on China-origin auto parts under Section 301; plus a 2.5% Most Favored Nation duty on auto parts.[4]

---

[3] Even though many of Detroit Axle's products pass through Mexico, they are tariffed as though they are Chinese goods because they are not "substantial[ly] transform[ed]" in Mexico. *See* 19 C.F.R. § 134.1(b) (defining the "Country of origin" and requiring a "substantial transformation" to alter the initial country of origin).

[4] The "Most Favored Nation" tariff is a general duty imposed on goods from all countries. *See generally* Harmonized Tariff Schedule, § XVII, ch. 87, https://www.usitc.gov/publications/docs/tata/hts/bychapter/1000c87.pdf (providing the HTSUS table for tariffs applicable to auto parts and certain vehicles).

**D.    The Elimination Of The De Minimis Exemption Threatens Detroit Axle's Survival**

By exposing Detroit Axle to enormous tariffs, the purported abrogation of the de minimis exemption threatens Detroit Axle with financial ruin:  Try as it might, the massively increased costs resulting from the tariffs mean that Detroit Axle is likely to be forced to close the doors of its Michigan facilities and lay off its employees by the end of June.

The elimination of the de minimis exemption—and the corresponding imposition of 72.5% tariffs on auto parts shipped from its Mexico facility—have forced Detroit Axle to bring its operations in Mexico to a near standstill, trapping tens of millions of dollars of inventory there.  Detroit Axle cannot simply pass 72.5% tariffs on to customers because many of its competitors do not have to raise their prices commensurately:  Many competitors either (1) source their products from countries other than China and therefore are still able to utilize the de minimis exemption, or (2) are Chinese suppliers that utilize the postal service and therefore incur lower tariff rates.  Decl. ¶ 20.  And although Detroit Axle is absorbing the tariffs as a stopgap measure for the few products it continues to sell from Mexico, it cannot continue to do so for long.  *Id.*  Thus, unless the exemption is restored, Detroit Axle's business model will cease to be viable, and its Mexico facility—and Detroit Axle's significant investments in it—will lose much of its value.  *Id.*

To try to keep prices low, Detroit Axle has been forced to fill orders almost entirely from the pre-tariff inventory it has stockpiled in its Michigan distribution center.  Decl. ¶ 21.  When the recent tariff increases began and the de minimis exemption was eliminated, Detroit Axle had limited reserve supplies in Michigan that it could use to fill orders.  *Id.*  That stock, however, likely will run critically low by the end of June.  *Id.*  At that point, the economics of its business will no longer make sense.  *Id.* ¶ 22.  Detroit Axle will be forced to close its Michigan operations, lay off hundreds of employees, and try to sell off its remaining inventory in the Mexico facility at higher

prices. *Id.* The company would become a shell of itself. Even if it could eventually find new suppliers outside of China and restart the business, it likely would never achieve its former level of success. *Id.* ¶ 23. Even a short period of dormancy likely would cost Detroit Axle its top-seller status on critical e-marketplaces like Amazon and eBay. *Id.* That in turn would cause the company to drop in the search results, making it exceedingly difficult (if not impossible) to regain its lost market share and support the infrastructure it has built over decades. *Id.*

Moreover, while customer orders continue to arrive and Detroit Axle remains able to fill them with its reserves for the time being, running the entire business out of Michigan is causing substantial harm to the company by delaying deliveries to customers. Decl. ¶ 24. The Michigan facility does not have sufficient employees to keep pace with the flow of orders that used to be handled by the company's two warehouses—even with many existing employees working eighty-hour weeks (and being paid overtime wages). *Id.* And once orders are fulfilled, it takes longer to ship the goods from Michigan to the West Coast. *Id.* These delays have cost Detroit Axle sales and customer goodwill that it has built over decades, which likewise threatens Detroit Axle's position as a top seller on e-marketplaces. *Id.* ¶ 25.

Thus, while Detroit Axle has remained afloat through a combination of ingenuity and grit, the purported abrogation of the de minimis exemption, combined with dramatically increased tariffs, makes it only a matter of time before Detroit Axle's American success story will end.

## ARGUMENT

A "court considers the following four factors in evaluating a motion for a preliminary injunction: (1) whether the moving party has shown a reasonable likelihood of success on the merits; (2) whether the moving party will suffer irreparable harm in the absence of a preliminary injunction; (3) whether the balance of hardships tips in the moving party's favor; and (4) the impact of a preliminary injunction on the public interest." *DexCom, Inc. v. Abbott Diabetes Care, Inc.*,

89 F.4th 1370, 1375 (Fed. Cir. 2024) (quotation marks omitted). Summary judgment is appropriate on a claim when the "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." CIT R. 56(a).

Here, the Executive Branch's purported elimination of the de minimis exemption exceeds its statutory authority and violates bedrock APA principles while threatening imminently to destroy Detroit Axle's business. At a minimum, therefore, Detroit Axle is entitled to a preliminary injunction. But the Court can and should go further and enter partial summary judgment in favor of Detroit Axle because the claims at issue here are purely legal and there are no material facts in dispute. *See V.O.S. Selections, Inc. v. Trump*, No. 1:25-cv-00066, Order, ECF No. 13 (C.I.T. Apr. 22, 2025) (ordering combined response and hearing on plaintiffs' combined motion for preliminary injunction and summary judgment). Either way, the Court should bar the government from imposing tariffs on Detroit Axle's de minimis-eligible shipments.

## I.    Detroit Axle's Legal Claims Are Meritorious

The Executive Branch's purported abrogation of the de minimis exemption is unlawful for two independent reasons: (a) the Executive Branch lacks the authority to unilaterally abrogate the $800 de minimis exemption that Congress established by statute, and (b) the abrogation of the exemption is arbitrary and capricious. The President's executive orders and the government's actions implementing them should be declared unlawful, enjoined, and set aside. *See* 5 U.S.C. § 706(2); *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 326–27 (2015); *Chamber of Com. v. Reich*, 74 F.3d 1322, 1327–28 (D.C. Cir. 1996). Moreover, because these actions were unlawful, Detroit Axle also is entitled, at summary judgment, to a refund of all unlawfully collected duties it has paid on goods that otherwise would be protected by the de minimis exemption. *See V.O.S. Selections*, *supra*, ECF No. 32, at 41–42 (Apr. 29, 2025) (government committing to provide plaintiffs who pay tariffs "a refund of all duties determined to be unlawfully assessed, with

13

interest"); 28 U.S.C. §§ 2643–44 (authorizing money judgment and interest against the United States).

### A. The Executive Branch Lacks Authority To Eliminate The De Minimis Exemption

The Executive Branch's attempt to abrogate the de minimis exemption exceeded its statutory and constitutional authority because: (1) the Executive Branch has *no* authority to reduce the exemption below the $800 floor that Congress created, and (2) *even if* the Executive Branch could create exceptions that reduce the exemption below the $800 floor, it could do so only through notice-and-comment rulemaking.

### 1. Congress Has Foreclosed Any Executive Branch Authority To Reduce The Exemption Below The $800 Statutory Floor

The Executive Branch cannot override Congress's considered judgment that goods valued less than $800 per importer per day shall be protected by the de minimis exemption. 19 U.S.C. § 1321(a)(2)(C). Congress amended the exemption in 1993 to change it from a statutory authorization for the Treasury Secretary to exempt goods that did "not exceed" certain thresholds, to a *requirement* that the exemption apply to goods worth "not less than" $200. NAFTA Implementation Act, § 651, 107 Stat. at 2209. Congress changed the exemption to a floor rather than a ceiling in order to *remove* executive discretion and create a safe harbor for free trade. Congress then kept the de minimis exemption's mandatory nature the same as it increased the threshold to $800 and explained, in the enacted statute, that doing so would "provide significant economic benefits to businesses and consumers in the United States." TFTEA, § 901(a)(2), 130 Stat. at 223.

The Federal Circuit has properly interpreted Section 1321 in just this way: "Section 1321 requires that the [duty-free] limit be 'not less than' the specified minimum level. . . . *Customs had no discretion to set a lower limit.*" *Nat'l Customs Brokers & Forwarders Ass'n of Am., Inc. v.*

*United States*, 59 F.3d 1219, 1222–23 (Fed. Cir. 1995) (emphasis added; citations omitted).  In-
stead, the *only* discretion "[t]his section" leaves is the "discretion to set a higher limit." *Id.* at 1220.

The Treasury Secretary's authority under Section 1321(b) to "prescribe exceptions" to the
exemptions in Section 1321(a) does not allow him to eliminate the statutory floor.  Instead, it
clarifies that if the Secretary chooses to prescribe regulations that *increase* the value of goods
eligible for de minimis treatment, as Section 1321(a) allows him to do, he may create "exceptions"
to that increased exemption for certain categories of goods.  19 U.S.C. § 1321(b).  In other words,
Section 1321(b) gives the Treasury Secretary discretion to make tailored upward adjustments to
the de minimis exemption rather than forcing him to increase the exemption in a one-size-fits-all
manner.  That is the only way to square Section 1321(b)'s exception-making authority with the
mandatory language of Section 1321(a)(2)(C)'s $800 floor, Congress's enacted purpose, and the
Federal Circuit's *National Customs Brokers* decision.

That understanding also follows from statutory history.  As originally enacted, Section
1321(b) allowed the Treasury Secretary not only to prescribe "exceptions to any exemption" but
also to "diminish any dollar amount specified in subsection (a) of this section."  19 U.S.C.
§ 1321(b) (1958).  In 1993, however, when Congress changed the monetary thresholds in subsec-
tion (a) from a ceiling to a floor, it also deleted the "diminish any dollar amount specified in sub-
section (a)" language.  NAFTA Implementation Act, § 651, 107 Stat. at 2209.  In removing the
Secretary's power under subsection (b) to "diminish" the newly created statutory floor, Congress
made clear its intent to render the floor impervious to Executive Branch discretion.

Before 1993, moreover, the de minimis exemption was purely discretionary—it had no
statutory minimum, and the Secretary was merely authorized to exempt certain goods up to a stat-

15

utory maximum. Thus, the power to create exceptions under subsection (b) historically was necessarily limited to the power to tailor discretionary exemptions. *See Nat'l Customs Brokers*, 59 F.3d at 1220 (noting the Secretary's "discretion to set a higher limit"). Nothing changed when Congress put teeth into the de minimis exemption in 1993. Instead, Section 1321(b) today grants the Secretary the same authority as before: to make exceptions from a discretionary exemption in excess of the $800 statutory floor, not exceptions *to* the statutory floor. It would be passing strange if in transforming the de minimis exemption to advance important free-trade goals, Congress gave the Executive Branch unilateral authority to countermand that congressional judgment under the guise of making "exceptions" to the exemption.

Notwithstanding the mandatory, statutory nature of the de minimis exemption, the President has decreed by executive order that "duty-free *de minimis* treatment under 19 U.S.C. 1321(a)(2)(C) shall no longer be available for products of [China]." Exec. Order No. 14256, § 1. But Section 1321, read in light of the statutory context, history, and Federal Circuit precedent, leaves the Executive Branch no discretion to reduce the floor for de minimis treatment below $800—so *a fortiori*, the Executive Branch may not eliminate the exemption completely for Chinese imports. The President's attempt to completely abrogate the de minimis exemption for Chinese goods and the government's implementing actions thus violate Section 1321.

### 2.    At A Minimum, The Executive Branch Can Alter The De Minimis Exemption Only Through Notice-And-Comment Rulemaking

Even if the Executive Branch could prescribe exceptions to the de minimis exemption's $800 floor, the President could not do so by executive order. Rather, Section 1321 prescribes one—and only one—avenue by which the Executive Branch may create exceptions to the de minimis exemption: "The *Secretary of the Treasury* is authorized *by regulations to prescribe* excep-

tions to any exemption provided for in subsection (a) whenever he finds that such action is consistent with the purpose of subsection (a) or is necessary for any reason to protect the revenue or to prevent unlawful importations." 19 U.S.C. § 1321(b) (emphases added). The statute thus specifies *who* may create exceptions to the de minimis exemption (the Secretary), *how* he must do so (through notice-and-comment rulemaking), and the *conditions* under which he may do so (*e.g.*, to protect revenue or prevent unlawful importations).

Because Congress expressly provided just one avenue to create exceptions, it impliedly foreclosed all other potential mechanisms. "When a statute limits a thing to be done in a particular mode, it includes the negative of any other mode." *Botany Worsted Mills v. United States*, 278 U.S. 282, 288–89 (1929) (holding that a statute authorizing the IRS to compromise tax cases "under specific limitations as to the method to be pursued . . . . prescribe[d] the exclusive method by which tax cases could be compromised"); *see Hillman v. Maretta*, 569 U.S. 483, 496 (2013) ("[W]here Congress explicitly enumerates certain exceptions to a general prohibition, additional exceptions are not to be implied, in the absence of evidence of a contrary legislative intent."). And a situation like this one "in which a statute authorizes specific action and designates a particular party empowered to take it is surely among the least appropriate in which to presume nonexclusivity." *Hartford Underwriters Ins. Co. v. Union Planters Bank, N.A.*, 530 U.S. 1, 6 (2000); *see Cont'l Cas. Co. v. United States*, 314 U.S. 527, 533 (1942) (a "'legislative affirmative description' implies denial of the nondescribed powers"); 2A Sutherland Statutory Construction § 47:23 (7th ed.) (describing *expressio unius* canon of statutory construction). So if the Executive Branch has authority at all to disturb the judgment of Congress that the de minimis exemption is beneficial to American consumers and businesses, it must do so through the notice-and-comment rulemaking that Congress specifically authorized.

17

Congress's choice to require notice-and-comment rulemaking for any exceptions to the de minimis exemption makes perfect sense. The rulemaking process is designed to give affected parties fair notice and an opportunity to minimize impacts to their businesses through the government announcing its intent to create a new rule, taking public comment on that rule, and codifying new standards that apply only prospectively. *See, e.g.*, *Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 208 (1988). Requiring notice-and-comment rulemaking therefore helps ensure that the Executive Branch will consider—as it failed to do here, *see infra*—every "important aspect of the problem" before changing the de minimis exemption on which so many U.S. businesses and consumers rely. *Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto. Ins.*, 463 U.S. 29, 43 (1983).

Here, the Executive Branch indisputably has not purported to abrogate the de minimis exemption through a notice-and-comment rulemaking under Section 1321(b). Although it has initiated Section 1321(b) rulemakings to propose *other* changes to Section 1321(b), the President here elected to proceed by executive decree—in plain violation of Section 1321's requirements.[5] Moreover, the President's executive orders disregard *existing* regulations implementing the de minimis exemption. *See, e.g.*, 19 C.F.R. § 10.151 (providing that port directors "shall pass free of duty and tax" shipments "not exceeding $800" "imported by one person on one day"). So the President's attempts to abrogate the de minimis exemption by executive order violate not just the statute, but existing regulations and the principle that legislative rules can be repealed only through notice and comment. *See Perez v. Mortg. Bankers Ass'n*, 575 U.S. 92, 101 (2015) (the definition of "rule

---

[5] The government recently initiated two rulemakings pursuant to its authority under Section 1321(b), neither of which proposes eliminating the de minimis exception entirely and exclusively for Chinese goods as the President's executive orders purport to do. 90 Fed. Reg. 3,048, 3,072–73 (Jan. 14, 2025); 90 Fed. Reg. 6,852, 6,873 (Jan. 21, 2025).

making" in the APA "mandate[s] that agencies use the same procedures when they amend or repeal a rule as they used to issue the rule in the first instance").

### 3.    IEEPA Does Not Authorize The President To Nullify Section 1321

The President's invocation of IEEPA does not allow him to countermand or circumvent Section 1321(b)'s requirements. IEEPA grants the President the general authority to "regulate . . . importation of" foreign property to "deal with" certain emergencies. 50 U.S.C. §§ 1701–1702. That general grant of authority cannot be interpreted to give the President power to create at will new exceptions to the de minimis exemption, because it is a "commonplace of statutory construction that the specific governs the general." *RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 566 U.S. 639, 645 (2012) (quotation marks omitted). When a "general authorization and a more limited, specific authorization exist," "[t]he terms of the specific authorization must be complied with." *Id.* This rule holds "particularly true where . . . Congress has enacted a comprehensive scheme and has deliberately targeted specific problems with specific solutions." *Id.* (quotation marks omitted).

The Supreme Court has repeatedly applied the specific-general rule to hold that a general authorization did not grant power that would override or circumvent limitations in more specific provisions. *See, e.g.*, *RadLAX*, 566 U.S. at 646–47 (rejecting attempt to use residual provision of Bankruptcy Code to circumvent specific rule applicable to sale of property free and clear of liens); *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 127, 156 (2000) (rejecting FDA's attempt to regulate cigarettes under its general authority to regulate "drug delivery devices" because Congress "created a distinct scheme to regulate the sale of tobacco products," which "preclude[d]" such regulation); *Harrington v. Purdue Pharma L.P.*, 603 U.S. 204, 218, 222 (2024)

(rejecting bankruptcy court authority to order non-debtor releases under a general provision authorizing other "appropriate" relief, because the Bankruptcy Code specifically allows non-debtor releases only in asbestos-related bankruptcies).

Here, Section 1321 creates a specific and comprehensive scheme governing the de minimis exemption—which, as discussed, either precludes the Executive Branch from reducing the statutory floor or requires exceptions to be made through notice-and-comment rulemaking by the Treasury Secretary. IEEPA, by contrast, speaks generally about regulating imports. IEEPA therefore grants the Executive Branch no authority to modify the de minimis exemption "in a manner that is inconsistent with the administrative structure that Congress enacted into law," and that is true "[r]egardless of how serious the problem [it] seeks to address." *Brown & Williamson*, 529 U.S. at 125. Even if the "general language" of IEEPA were "broad enough to include" the power to impose tariffs (or revoke tariff exemptions), Congress's clear instructions in Section 1321 *still* would control, and IEEPA's language would "not be held to apply to a matter specifically dealt with" by Section 1321(b). *RadLAX*, 566 U.S. at 646 (quotation marks omitted).

In fact, however, the President's invocation of IEEPA is on even weaker footing because IEEPA does not authorize the President to impose tariffs (or revoke tariff exemptions) at all. Nowhere in IEEPA's extensive list of enumerated powers is any mention of the power to impose (or reimpose) tariffs. 50 U.S.C. § 1702(a)(1)(B). The closest IEEPA comes is the power to "regulate . . . importation or exportation of . . . property in which any foreign country or a national thereof has any interest." *Id*. But "regulating the importation of property" would be an exceedingly oblique way to describe the power to impose or reimpose tariffs. The Constitution itself distinguishes between the power to regulate and the power to tariff. *See* U.S. Const. art. I, § 8, cls. 1, 3

(providing separate powers to "lay and collect Taxes, Duties, Imposts and Excises" and to "regulate Commerce with foreign Nations").  Congress also uses specific language to authorize changes to tariffs.  *See, e.g.*, 19 U.S.C. § 2253(a)(3)(A) (President may, in certain cases, "proclaim an increase in, or the imposition of, any duty on the imported article").  And *if* IEEPA purported to grant the President unilateral power to change tariff rates, it would be an unconstitutional delegation because it provides no "intelligible principle" to constrain the use of that quintessentially legislative power.  *J.W. Hampton, Jr., & Co. v. United States*, 276 U.S. 394, 409 (1928).

To be clear, the Court need not reach the question whether IEEPA authorizes tariffs to resolve this case.  The President's invocation of IEEPA to obliterate the mandatory de minimis exemption in Section 1321 is unlawful either way.  But if the Court holds in other cases that IEEPA does *not* authorize tariffs, the President's invocation of IEEPA here would be unlawful *a fortiori*.

Finally, no inherent executive power authorized the President's use of executive orders to abrogate the de minimis exemption.  The executive orders purporting to rescind the de minimis exemption are "incompatible with the expressed or implied will of Congress" because Section 1321(b) proscribed any Executive Branch attempts to modify the exemption except through notice-and-comment rulemaking by the Secretary.  *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 637–38 (1952) (Jackson, J., concurring).  So the President's power here is at its "lowest ebb," and the President can claim to overcome the will of Congress only if his power over tariff exemptions is "conclusive and preclusive."  *Id.*  It is not.  *Congress*, not the President, has the constitutional authority "[t]o lay and collect Taxes, Duties, Imposts and Excises."  U.S. Const. art. I, § 8, cl. 1.  The Executive Branch's defiance of Section 1321(b) both violates the statute and threatens to arrogate to the Executive Congress's constitutional power over tariffs.

21

### B.    The Executive Branch's Elimination Of The De Minimis Exemption Is Arbitrary And Capricious

Detroit Axle's claims are meritorious for the independent reason that the agency actions implementing the purported abrogation of the de minimis exemption are arbitrary and capricious. The APA instructs courts to hold unlawful and set aside "arbitrary" and "capricious" final agency action. 5 U.S.C. § 706(2)(A). The government has implemented the President's unlawful executive orders through final agency actions: As noted above, DHS recently issued a notice that on May 2 it would begin to collect tariffs on goods that otherwise would qualify for de minimis treatment, including goods from China valued less than $800. *See* 90 Fed. Reg. 17,608, 17,609 (Apr. 28, 2025). And since May 2, the government has started collecting tariffs pursuant to this policy, including from Detroit Axle. Decl. ¶ 17; *see also* Customs & Border Prot., *Executive Order – Tariff on De Minimis Shipments from China*, Article No. 000001915 (May 8, 2025), https://ti-nyurl.com/6kj36jys.

To satisfy the arbitrary-or-capricious standard, agency action must be "reasonable and reasonably explained." *Ohio v. EPA*, 603 U.S. 279, 292 (2024) (quotation marks omitted). Agency action is not reasonable or reasonably explained if the agency "entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *State Farm*, 463 U.S. at 43. In considering "important aspect[s]" of a problem, it "would be arbitrary and capricious to ignore" the impact that a change in "longstanding policies may have" on "serious reliance interests." *DHS v. Regents of the Univ. of Cal.*, 591 U.S. 1, 30 (2020) (quotation marks omitted). The government also must consider "alternative way[s] of achieving" its objectives and give "adequate reasons" to reject them. *State Farm*, 463 U.S. at 48.

Although the President's actions are not directly subject to APA review, agency action implementing an executive order is not "insulate[d] . . . from judicial review under the APA, even if the validity of the Order were thereby drawn into question." *Reich*, 74 F.3d at 1327. Rather, courts "have subjected agency actions that incorporate a presidential directive to APA review (and specifically to arbitrary-or-capricious review)." *Nebraska v. Su*, 121 F.4th 1, 15–16 (9th Cir. 2024). Here, the agency actions implementing the President's abrogation of the de minimis exemption are arbitrary and capricious because they are neither "reasonable [nor] reasonably explained"—for at least four reasons. *Ohio*, 603 U.S. at 292.

*First*, the government changed its longstanding position on the de minimis exemption without considering "serious reliance interests." *Regents*, 591 U.S. at 30 (quotation marks omitted); *see FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009). Businesses like Detroit Axle have made large investments in international supply chains to provide their U.S. customers with the best goods at the lowest prices. Decl. ¶ 7. Detroit Axle's Mexico facility is a case in point: The company leased the facility using long-term contracts, signed contracts with suppliers in China, hired and trained employees to work in its facilities, made capital investments in its physical plant and equipment, and partnered with shippers to move its products into the United States—all in reliance on the availability of the de minimis exemption that would enable it to sell goods from that facility in a cost-effective way. *See id.* ¶¶ 9–10. In addition, U.S. *consumers*—like individual car owners and local repair shops that use Detroit Axle's parts—have relied on the continued availability of low-cost goods from companies like Detroit Axle. The sudden abrogation of the de minimis exemption upset all of these significant reliance interests. Yet neither the President nor any implementing agency has said anything about this "important aspect of the problem." *State Farm*, 463 U.S. at 43.

*Second*, the government failed to consider other important aspects of the problem. For example, it did not consider all the economic costs and benefits of eliminating the exemption, which Congress has repeatedly concluded aids U.S. businesses and consumers. It did not address the effect that abrogating the de minimis exemption might have for U.S. *exporters*, who rely on other countries' de minimis exemptions, and the Americans employed by such companies. *See* CRS Report, *Imports & Section 321*, *supra*, at 22–23. It did not grapple with the substantially increased burden on customs officials who will have to collect small-dollar tariffs on millions of additional imports. Nor did it consider that it was putting American businesses like Detroit Axle at a competitive disadvantage relative to Chinese counterparts that import through the postal service and are subject to lower effective tariff rates. *See* Exec. Order *Modifying Reciprocal Tariff Rates to Reflect Discussions with the People's Republic of China*, § 4 (May 12, 2025).

*Third*, the government failed to consider reasonable alternatives to eliminating the de minimis exemption. *State Farm*, 463 U.S. at 48, 50–52. The Executive Branch's barebones explanation for its abrogation of the de minimis exemption was that "shippers often avoid detection [of narcotics] due to administration of the *de minimis* exemption." Exec. Order No. 14256, § 1. But if smuggling opioids were the problem, the obvious solution would be simply to inspect packages entering the United States regardless of declared value. The government can inspect packages without levying tariffs on them—or at the very least, it could inspect packages while charging no more than a nominal fee to recoup the government's costs of inspection. At a minimum, the government had to consider that alternative (among others) and explain why it was infeasible. *See Yakima Valley Cablevision, Inc. v. FCC*, 794 F.2d 737, 746 n.36 (D.C. Cir. 1986) ("The failure of an agency to consider obvious alternatives has led uniformly to reversal.").

*Fourth*, the government's narcotics-smuggling explanation is unreasonable because there is no rational connection between means and ends. The imposition of tariffs on items worth less than $800 has no articulated or apparent link to the problem the government cited as justification. Moreover, the availability of an "obvious alternative[]"—inspecting packages for narcotics—suggests that the government's explanation is pretextual. *Yakima Valley*, 794 F.2d at 746 n.36. A pretextual explanation cannot satisfy the "reasoned explanation requirement of administrative law," which requires "genuine justifications," not "contrived reasons." *Dep't of Com. v. New York*, 588 U.S. 752, 785 (2019).

Because the agency actions implementing the abrogation of the de minimis exemption are arbitrary and capricious, the APA requires this Court to "hold unlawful and set aside" these actions. 5 U.S.C. § 706(2).

## II. The Elimination Of The De Minimis Exemption Is Causing Detroit Axle Serious And Imminent Irreparable Harm

Detroit Axle is suffering, and will continue to suffer, irreparable harm as a result of the government's unlawful abrogation of the de minimis exemption; injunctive relief now is necessary to stop that harm. "As its name implies, the irreparable harm inquiry seeks to measure harms that no damages payment, however great, could address." *Celsis in Vitro, Inc. v. CellzDirect, Inc.*, 664 F.3d 922, 930 (Fed. Cir. 2012). And even if a plaintiff's injury could be measured in money damages, the injury is still irreparable if the "damage remedy" is not "a meaningful one" because the plaintiff is unable to recover it. *Robert Bosch LLC v. Pylon Mfg. Corp.*, 659 F.3d 1142, 1155 (Fed. Cir. 2011) (damages remedy may be inadequate if it cannot be recovered from the defendant); *see, e.g.*, *Iowa Util. Bd. v. FCC*, 109 F.3d 418, 426 (8th Cir. 1996) ("The threat of unrecoverable economic loss, however, does qualify as irreparable harm."). The elimination of the de minimis exemption is inflicting multiple irreparable injuries on Detroit Axle.

*First*, the elimination of the exemption has caused and will continue to cause Detroit Axle devastating economic losses that "threaten[] the very existence of [its] business"—an injury multiple Courts of Appeals have held to be "irreparable." *Wis. Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985) (per curiam); *see, e.g.*, *hiQ Labs, Inc. v. LinkedIn Corp.*, 31 F.4th 1180, 1188 (9th Cir. 2022) (the destruction of "an ongoing business representing many years of effort and the livelihood of its . . . owners" is "irreparable harm"). The withdrawal of the exemption has subjected Detroit Axle's shipments from its Mexico facility to staggering 72.5% tariffs—in addition to the 72.5% tariffs that Detroit Axle pays on imports directly to its Michigan facilities. Decl. ¶ 18. Detroit Axle cannot substantially raise its prices in response without being undercut by competitors: Many competitors need not raise their prices commensurately because they either (1) source their products from countries other than China and therefore are still able to utilize the de minimis exemption; or (2) are Chinese suppliers that utilize the postal service and therefore incur lower tariff rates. *Id.* ¶ 20. Nor can Detroit Axle simply absorb the costs of the tariffs, because its margins are not large enough to cover those additional costs. *Id.* ¶¶ 20, 26. So without the de minimis exemption, Detroit Axle's business model no longer makes sense; the company will be forced to shut down instead of operating at a perpetual loss. *Id.* ¶ 20.

That day of reckoning is rapidly approaching. While Detroit Axle has staved off the loss of its customers and profits by using inventory it stockpiled in Michigan before the recent tariff increases and elimination of the de minimis exemption, that inventory will run critically low by the end of June. Decl. ¶ 21. At that point, Detroit Axle will need to shut down its operations in Michigan, lay off hundreds of employees, and seek to offload its remaining inventory in Mexico. *Id.* ¶ 22. Detroit Axle needs relief now to prevent this irreparable harm.

26

*Second*, and relatedly, the elimination of the de minimis exemption threatens imminently to force Detroit Axle to lay off hundreds of key employees in its Michigan facilities after its pre-tariff stockpiles run critically low by the end of June. Decl. ¶ 22. That kind of "potential reduction in work force" constitutes irreparable harm to a company. *See Sanofi-Synthelabo v. Apotex, Inc.*, 470 F.3d 1368, 1382–83 (Fed. Cir. 2006); *AstraZeneca LP v. Apotex, Inc.*, 633 F.3d 1042, 1063 (Fed. Cir. 2010) (same). If Detroit Axle is forced to lay off those employees, it will lose their "institutional knowledge and experience" after years spent "finding the right people, investing in their training, doing professional development, and mentoring them." *Yorktown Sys. Grp., Inc. v. Threat Tec LLC*, 108 F.4th 1287, 1296–97 (11th Cir. 2024) (brackets and quotation marks omitted); *see* Decl. ¶ 22. Even if Detroit Axle ultimately were to prevail on the merits and restart its Michigan operations, the loss of human capital from the initial layoffs would be irreparable; the company would be unlikely to be able to rehire all the experienced employees it lost. *See Louisiana v. Biden*, 55 F.4th 1017, 1034 (5th Cir. 2022) (loss of even "one percent" of employees is irreparable harm).

*Third*, the elimination of the de minimis exemption has inflicted and will continue to inflict on Detroit Axle "loss of goodwill, damage to reputation, and loss of business opportunities," which "are all valid grounds for finding irreparable harm." *CellzDirect*, 664 F.3d at 930. The elimination of the de minimis exemption is harming Detroit Axle's reputation by causing delays in shipping and longer customer wait times: The company must try to source all its orders from existing stock at its Michigan facility because new imports from Mexico would be subject to massive tariffs instead of receiving the longstanding protection of the de minimis exemption. Decl. ¶¶ 24–25. The increase in order fulfillment times has frustrated Detroit Axle's customers and caused many to take their business elsewhere. *See id.* ¶ 25. For example, the percentage of negative feedback

ratings for Detroit Axle on eBay doubled over the last month. *Id.* These lost business opportunities in turn have resulted in large opportunity costs for Detroit Axle, which already has experienced a significant decrease in sales since the de minimis exemption was eliminated at the beginning of May. *See id.* (eBay sales data).

These injuries are magnified by Detroit Axle's reliance on e-commerce sites like Amazon and eBay. The search functions on those sites give primacy to distributors who successfully fill a high volume of orders with consistent, positive customer feedback—and Detroit Axle's hard work selling on those sites over the last decade and a half have earned it top billing. Decl. ¶ 13. But even a short period of reduced sales or customer dissatisfaction risks causing Detroit Axle to lose its crucial top-seller status, as its competitors who do not source products from China start to supplant it. *Id.* ¶ 23. Once Detroit Axle's competitors have displaced it atop the search results, it will be extremely difficult for Detroit Axle to regain its former position because lower search rankings will make it less likely for consumers to find Detroit Axle going forward.

All of these injuries are irreparable. Injury to customer goodwill and reputation is irreparable because it is unquantifiable. *CellzDirect*, 664 F.3d at 930–31. And none of these harms— including from lost business opportunities—are recoverable from the United States, because sovereign immunity bars the recovery of money damages caused by the elimination of the de minimis exemption (other than recovery of tariffs paid). *See, e.g.*, *Missouri v. Trump*, 128 F.4th 979, 996 (8th Cir. 2025) (financial losses that are unrecoverable due to sovereign immunity constitute irreparable harm); *California v. Azar*, 911 F.3d 558, 581 (9th Cir. 2018) (same); *Perkins Coie LLP v. Dep't of Just.*, 2025 WL 1276857, at *48 (D.D.C. May 2, 2025) (collecting cases).

28

*Finally*, Detroit Axle is suffering irreparable harm in the form of additional significant economic losses that are unrecoverable against the United States. At present, Detroit Axle's facility in Mexico is operating at severely diminished capacity, fulfilling only orders for which the company does not have stockpiled parts in Michigan. Decl. ¶¶ 9–11, 20. Detroit Axle invested significantly in that facility—buying equipment, signing long-term leases, and hiring, training, and developing employees. And while the Michigan facilities presently remain operational, they will be forced to close if the government's unlawful elimination of the de minimis exemption continues unabated. *Id.* ¶ 21. Moreover, the elimination of the de minimis exemption has forced Detroit Axle to rely exclusively on its employees in Michigan to distribute its products, and the company has had to pay significant overtime to those employees. *Id.* ¶ 24. These economic losses likewise constitute irreparable injury where, as here, damages cannot be recovered from the government. *See, e.g.*, *Missouri*, 128 F.4th at 996.

The elimination of the de minimis exemption is inflicting multiple irreparable injuries on Detroit Axle, and it is likely to cause even more serious injuries—including the shutdown of facilities and mass layoffs—in the near future. Injunctive relief is required to prevent these harms.

## III.    The Public Interest And Balance Of The Equities Favor Injunctive Relief

The public interest and balance of the equities decisively favor enjoining the elimination of the de minimis exemption. Where, as here, the government opposes the issuance of an injunction, "[t]hese factors merge," *Nken v. Holder*, 556 U.S. 418, 435 (2009), because "the government's interest *is* the public interest," *Pursuing Am.'s Greatness v. FEC*, 831 F.3d 500, 511 (D.C. Cir. 2016). The Executive Branch's actions here contravene that interest, for two reasons.

*First*, the public has an overriding interest in the Executive Branch operating within the confines of law; the government has no cognizable interest exceeding its statutory authority or otherwise violating statutes. "There is generally no public interest in the perpetuation of unlawful

agency action." *League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016). Conversely, "there is a substantial public interest 'in having governmental agencies abide by the federal laws that govern their existence and operations.'" *Id.* (quoting *Washington v. Reno*, 35 F.3d 1093, 1103 (6th Cir. 1994)). "The public interest is served by ensuring that governmental bodies comply with the law, and interpret and apply trade statutes uniformly and fairly." *Am. Signature, Inc. v. United States*, 598 F.3d 816, 830 (Fed. Cir. 2010). Because the Executive Branch's attempt to abrogate the de minimis exemption exceeds the statutory limits imposed by 19 U.S.C. § 1321 and is arbitrary and capricious in violation of the APA, the public interest and equities favor Detroit Axle.

*Second*, the elimination of the de minimis exemption would contravene Congress's repeated, considered, and clear support for that exemption over the course of nearly a century. Congress has repeatedly expanded the exemption and changed it from an authorized ceiling to a required floor. This history, and Congress's enacted judgment that the exemption "provide[s] significant economic benefits to businesses and consumers in the United States . . . through costs savings and reductions in trade transaction costs," TFTEA, § 901(a)(2), 130 Stat. at 223, establishes that the public interest favors enjoining its elimination. "[W]hen the legislature has spoken, the public interest has been declared in terms well-nigh conclusive." *Berman v. Parker*, 348 U.S. 26, 32 (1954). That is particularly true here because the de minimis exemption is an exercise of a core legislative power that the Constitution textually commits to Congress. U.S. Const. art. I, § 8, cl. 8. Given the exemption's importance, Congress provided a single narrow mechanism—notice-and-comment rulemaking—to create any exceptions. *See* 19 U.S.C. § 1931(b). The Executive Branch's flouting of that statutory requirement further demonstrates its disregard of the public interest and Congress's judgment.

On the other side of the ledger, as explained above, Detroit Axle will suffer grave irrepa-rable harm without relief, including the likely closure of its business. That injury, plus the public interest in the Executive Branch's compliance with the law and the continuation of the de minimis exemption, cause the public interest and equities decisively to favor a preliminary injunction.

## CONCLUSION

Plaintiff's motion for a preliminary injunction should be granted and this Court should grant Plaintiff partial summary judgment on Counts I and II of its complaint challenging the un-lawful abrogation of the de minimis exemption.

May 21, 2025                                              Respectfully submitted,

                                              */s/ Thomas H. Dupree Jr.*

                                              Thomas H. Dupree Jr.
                                              Samantha Sewall
                                              Nick Harper
                                              Connor P. Mui
                                              Luke J.P. Wearden
                                              GIBSON, DUNN & CRUTCHER LLP
                                              1700 M Street, N.W.
                                              Washington, D.C. 20036-4504
                                              (202) 955-8500
                                              TDupree@gibsondunn.com
                                              SSewall@gibsondunn.com
                                              NHarper@gibsondunn.com
                                              CMui@gibsondunn.com
                                              LWearden@gibsondunn.com

                                              *Counsel for Plaintiff Detroit Axle*

31

**CERTIFICATE OF COMPLIANCE WITH WORD LIMIT**

Pursuant to CIT Standard Chambers Procedure 2(B), I certify that this brief, including headings, footnotes, and quotations (but excluding the motion, table of contents, table of authorities, signature blocks, and this certificate) contains 9,791 words.


/s/ *Thomas H. Dupree Jr.*

*Counsel for Plaintiff Detroit Axle*