## UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| AXLE OF DEARBORN, INC. D/B/A DETROIT AXLE, <br><br> *Plaintiff,* <br><br> v. <br><br> DEPARTMENT OF COMMERCE; HOWARD LUTNICK, in his official capacity as Secretary of Commerce; DEPARTMENT OF HOMELAND SECURITY; KRISTI NOEM, in her official capacity as Secretary of Homeland Security; DEPARTMENT OF TREASURY; SCOTT BESSENT, in his official capacity as Secretary of the Treasury; UNITED STATES CUSTOMS AND BORDER PROTECTION; PETE R. FLORES, in his official capacity as Acting Commissioner for U.S. Customs and Border Protection; and the UNITED STATES, <br><br> *Defendants.* | Case No. 1:25-cv-00091 |

## BRIEF OF THE ECOMMERCE INNOVATION ALLIANCE
## AS AMICUS CURIAE IN SUPPORT OF PLAINTIFFS

## <u>DISCLOSURE STATEMENT</u>

The Ecommerce Marketers Alliance, Inc. d/b/a Ecommerce Innovation Alliance (EIA) is

a non-profit, non-partisan trade association.  No publicly held entity owns an interest in EIA.

EIA does not have any members who have issued shares or debt securities to the public.

## TABLE OF CONTENTS

DISCLOSURE STATEMENT ....................................................................................... i

TABLE OF CONTENTS............................................................................................... ii

TABLE OF AUTHORITIES ....................................................................................... iii

INTEREST OF *AMICUS CURIAE* ........................................................................... v

INTRODUCTION ......................................................................................................... 1

BACKGROUND ........................................................................................................... 2

    I.   *De Minimis* Has Fostered A Strong American Ecommerce Sector ................................. 2

    II.  Eliminating *De Minimis*:  Impact on Consumers and Businesses ..................................... 7

LEGAL ARGUMENT.................................................................................................. 12

    I.   Plaintiff is Likely to Prevail On the Merits.......................................................... 12

    II.  Ecommerce Businesses are Experiencing Irreperable Harm Today................................ 18

    III.  The Public Interest And Balance of Equities Favors An Injunction........................... 20

CONCLUSION............................................................................................................. 22

## **TABLE OF AUTHORITIES**

**Cases**

*Am. Frozen Food Inst. v. United States*, 855 F. Supp. 388 (1994) ……………………………… 14

*American Coke and Coal Chemicals v. E.P.A.*, 452 F.3d 930 (D.C. Cir. 2006) ........................ 16

*Auto. Parts & Accessories Ass'n v. Boyd*, 407 F.2d 330 (D.C. Cir. 1968) ................................ 17

*Celsis in Vitro, Inc. v. CellzDirect, Inc.*, 664 F.3d 922 (Fed. Cir. 2012) ................................. 20

*Chamber of Commerce of United States v. Reich*, 74 F.3d 1322 (D.C. Cir. 1996) ................... 13

*Detroit Int'l Bridge Co. v. Gov't of Can.*, 189 F. Supp. 3d 85 (D.D.C. 2016) ........................... 13

*Fed. Commc'ns Comm'n v. Fox Television Stations, Inc.*, 556 U.S. 502 (2009) ..................... 17

*In re Section 301 Cases*, 524 F.Supp.3d 1355 (Ct. Int'l Trade 2021) ..................................... 21

*In re Section 301 Cases*, 570 F. Supp. 3d 1306 (Ct. Int'l Trade 2022) ........................ 13, 14, 17

*J. Conrad LTD v. United States*, 457 F. Supp. 3d 1365 (Ct. Int'l Trade 2020) ........................ 20

*J.W. Hampton, Jr. v. U.S.*, 276 U.S. 394 (1928) ........................................................ 14

*Kwo Lee, Inc. v. United States*, 24 F. Supp. 3d 1322 (Ct. Int'l Trade 2014) ...................... 20, 21

*Oakbrook Land Holdings, LLC v. Comm'r*, 28 F.4th 700 (6th Cir. 2022) ................................ 17

*Perez v. Mortgage Bankers Association*, 575 U.S. 92 (2015) ........................................... 16, 17

*Roland Mach. Co. v. Dresser Indus., Inc.*, 749 F.2d 380 (7th Cir. 1984) ................................ 20

*Sherley v. Sebelius*, 689 F.3d 776 (D.C. Cir. 2012) ......................................................... 13

*Tate v. Pompeo*, 513 F. Supp. 3d 132 (D.D.C. 2021) ....................................................... 13

*Touby v. United States*, 500 U.S. 160 (1991) ................................................................... 14

*V.O.S. Selections, Inc., et al. v. United States*, Case No. 25-00066 (Ct. Int'l Trade May 28,
2025) ............................................................................................................. 13, 14, 16

**Statutes**

5 U.S.C. § 553 ................................................................................................... 16

19 U.S.C. § 1321 .......................................................................................... *passim*

50 U.S.C. § 1701 .................................................................................................. 16

International Emergency Economic Powers Act (IEEPA), Pub. L. No. 95-223, §§ 201-08,
91 Stat. 1625, 1626-29 (1977) (codified as amended at 50 U.S.C. §§ 1701-10) .................. 16

Tariff Act of 1930, Section 321(a)(2)(C) ...................................................................... 4

Trade Facilitation and Trade Enforcement Act (TFTEA), § 901.T ....................................... 5

**Constitutional Provisions**

U.S. Const., Art. I, § 8 ......................................................................................... 13

**Federal Register Publications**

Executive Order 14256, Further Amendment to Duties Addressing the Synthetic Opioid Supply
Chain in the People's Republic of China as Applied to Law-Value Imports, 90 Fed. Reg.
14899 (Apr. 2, 2025) ............................................................................................ 1

Notice of Implementation of Additional Duties on Products of the People's Republic of China
Pursuant to President's Executive Order 14256, 90 Fed. Reg. 17608 (Apr. 28, 2025) ......1, 15

Notice of Proposed Rulemaking, Trade and National Security Actions and Low-Value
Shipments, 90 Fed. Reg. 6852 (Jan. 21, 2025) ....................................................... 15

**Other Authorities**

Carmen-Elena Banescu, et al., *The Impact of E-Commerce on the Labor Market*, Sustainability 2022…. ........................................................................................... 3

Charles S. Gascon, Federal Reserve Bank of St. Louis, *Labor Constraints Remain Greatest Challenge for Resurgent Manufacturing Sector* (July 2022) .................................. 10

Christine McDaniel, *Solving The Big Problems That Come In Small Parcels*, Forbes (Jul. 5, 2023) ....................................................................................................... 11

Christopher A. Casey, *Imports and the Section 321 (De Minimis) Exemption: Origins, Evolutions, and Use*, Congressional Research Service, R48380 (Jan. 31, 2025) .................. 3, 6

Colin Grabow, CATO Institute, *The Reality of American "Deindustrialization"* (Oct. 24, 2023) ........................................................................................... 9

Office of Trade, U.S. Customs and Border Protection and Industrial Economics, Inc., *U.S. Customs and Border Protection Rulemaking: Trade and National Security Actions and Low-Value Shipments, Regulatory Analysis and Regulatory Flexibility Act Analysis* (Jan. 15, 2024)........................................................................................ *passim*

Pablo D. Fajgelbaum & Amit Khandelwal, *The Value of De Minimis Imports*, National Bureau of Economic Research (Rev. Feb. 2025) .................................... 11

United States-Mexico-Canada Agreement (USMCA), Art. 7.8 ................................ 6

WTO Agreement on Trade Facilitation art. 7.8.2(d) ................................ 6

## INTEREST OF *AMICUS CURIAE*

The Ecommerce Innovation Alliance (EIA) was formed in 2023 as a nonprofit trade association dedicated to bringing the ecommerce industry together to advocate for common sense policies that strengthen the ecommerce ecosystem while protecting consumers. EIA members are generally small and mid-sized U.S.-based ecommerce businesses or technology providers that directly support these businesses. This includes many sole proprietors, including stay-at-home parents, that start ecommerce businesses to help support their families and keep food on the table, as well as other local businesses that create jobs in communities across the country. While ecommerce businesses come in all shapes and sizes, many have been formed in the past decade, after Congress raised the *de minimis* exception[1] threshold from $200 to $800, and when official U.S. policy was to promote the use of the exemption to open markets to trade and encourage other countries to adopt similar policies. These companies are not "exploiting loopholes" as they are far too often described in media reports and by politicians. Rather, they are prudent businesses, many of which have invented new products, explored and then rationally chosen to have that product manufactured in China, where manufacturing labor and expertise is robust, and then used the tools made available to them by Congress to keep prices down when importing those high-quality goods for sale directly to consumers. As a result, these modern businesses create good-paying jobs that align with America's strength as the world's innovation engine.

On March 24, 2025, EIA filed public comments in response to a January 21, 2025 Notice of Proposed Rulemaking (NPRM) jointly published in the Federal Register by the Department of Homeland Security, U.S. Customs and Border Protection, and Department of the Treasury. *See*

---

[1]     As discussed more fully herein, the *de minimis* exception allows goods valued at $800 or less to be imported duty free. It is codified at 19 U.S.C. § 1321(a).

Comments of the Ecommerce Innovation Alliance Regarding Notice of Proposed Rulemaking, Trade and National Security Actions and Low Value Shipments, Docket No. USCBP-2025-0003, available at:   https://www.regulations.gov/comment/USCBP-2025-0003-0068 (last accessed: May 28, 2025); Notice of Proposed Rulemaking, Trade and National Security Actions and Low-Value Shipments, 90 Fed. Reg. 6852 (Jan. 21, 2025) (NPRM). The NPRM had proposed to eliminate the *de minimis* exception for merchandise that would otherwise be "subject to an *ad valorem* tariff imposed under Section 232, 201, or 301." NPRM, 90 Fed. Reg. at 6855. In its public comments, EIA advocated against the proposed elimination of the *de minimis* exception for goods from China and other countries subject to *ad valorem* tariffs. It explained the impact that this policy would have on ecommerce businesses and consumers and offered substantive and more targeted proposals that it believes would address the Government's concerns without denying law-abiding U.S. businesses the ability to rely on the exception created by Congress and relied on by these businesses.

EIA and its members, therefore, have a vested interest in ensuring that the Government does not abandon the notice-and-comment rulemaking process required by the Administrative Procedures Act and eliminate the *de minimis* exception for goods from China and other affected countries without adequately considering the impact its decision will have on U.S.-based ecommerce companies. The Government has a duty to address the substantial issues raised and evaluate alternative proposals that would be more reasonably tailored to address the concerns that prompted the rulemaking.

## INTRODUCTION

The Ecommerce Innovation Alliance (EIA), a non-profit trade association representing primarily small and mid-sized U.S.-based ecommerce businesses, respectfully submits this brief as Amicus Curiae in support of Plaintiff Axle of Dearborn, Inc. d/b/a Detroit Axle's Motion for Preliminary Injunction and Expedited Partial Summary Judgment.

On April 2, 2025, President Trump issued an Executive Order directing that "duty-free de minimis treatment under 19 U.S.C. 1321(a)(2)(C) shall no longer be available for products of [China] (which include products of Hong Kong) . . . that are entered for consumption, or withdrawn from warehouse for consumption, on or after 12:01 am eastern daylight time on May 2, 2025." Executive Order 14256, Further Amendment to Duties Addressing the Synthetic Opioid Supply Chain in the People's Republic of China as Applied to Law-Value Imports, 90 Fed. Reg. 14899, 14899 (Apr. 2, 2025). On April 28, 2025, the Secretary of Homeland Security and the Customs and Border Patrol Agency issued a public notice confirming that, as of May 2, 2025, the *de minimis* exception, which provides goods valued at less than $800 to be imported duty free, would be eliminated for goods manufactured in China. *See* Notice of Implementation of Additional Duties on Products of the People's Republic of China Pursuant to the President's Executive Order 14256, Further Amendment to Duties Addressing the Synthetic Opioid Supply Chain in the People's Republic of China As Applied to Low-Value Imports, 90 Fed. Reg. 17608 (Apr. 28, 2025).

This brief demonstrates that the Government's purported abrogation of the *de minimis* exemption for goods from China is unlawful and is inflicting immediate and irreparable harm on American businesses and consumers, thereby contravening the public interest and warranting the injunctive relief sought by Plaintiff. As established herein, the Government's actions exceed its statutory authority and are arbitrary and capricious, having been undertaken without concluding

the notice-and-comment rulemaking process mandated by 19 U.S.C. § 1321(b) and the Administrative Procedures Act, and disregarding Congress's clear intent, established reliance interests, and the devastating impacts on the ecommerce sector.

The abrupt elimination of a longstanding foreign trade policy tool has already resulted in crushing cost increases and overwhelming administrative burdens for small and mid-sized businesses, threatening their viability, stifling innovation, and forcing costly supply chain disruptions. These harms are irreparable, leading to the likely closure of many businesses, the loss of high-skill, high-paying American jobs, and unrecoverable losses such as diminished business value and loss of goodwill. The public interest and the balance of the equities strongly favor intervention, as the Government's action harms consumers through significant price increases and welfare losses, threatens the existence of U.S. small businesses and the jobs they provide, and undermines the rule of law by circumventing required legal processes established by Congress. Accordingly, a preliminary injunction is necessary and summary judgment is appropriate to prevent further harm.

## **BACKGROUND**

### I.    *DE MINIMIS* **HAS FOSTERED A STRONG AMERICAN ECOMMERCE SECTOR**

The ecommerce sector is a critical part of the American economy that continues to steadily grow in importance.  According to the U.S. Census Bureau, "U.S. retail e-commerce sales for the first quarter of 2025, adjusted for seasonal variation, but not for price changes, was $300.2 billion." Census Bureau of the United States Department of Commerce, Quarterly Retail E-Commerce Sales (May 19, 2025), available at:    https://www.census.gov/retail/mrts/www/data/pdf/ec_current.pdf (last accessed May 28, 2025).  As a percentage of the total retail economy, "E-commerce sales in the first quarter of 2025 accounted for 16.2 percent of total sales." *Id.*  Estimates

are that ecommerce sales will top $1.34 trillion in the U.S. in 2025. Statista, Revenue of the e-commerce industry in the U.S. 2019-2029, https://www.statista.com/statistics/272391/us-retail-e-commerce-sales-forecast/ (last accessed May 28, 2025). An estimated 23% of all retail purchases are expected to be online by 2027. Forbes, 35 Top E-Commerce Statistics, available at: https://www.forbes.com/advisor/business/ecommerce-statistics/ (last accessed May 28, 2025).

The ecommerce sector is a significant driver of inclusive job growth in key sectors of the economy. Carmen-Elena Banescu, et al., The Impact of E-Commerce on the Labor Market, Sustainability 2022, 14, *available at:* https://www.mdpi.com/2071-1050/14/9/5086 (last accessed May 28, 2025) ("e-Commerce can provide the opportunity to work for people with disabilities and others who have been left out of the workforce for various reasons. E-Commerce is an important engine for the labor market, as it is an industry in which the employee does not have to be physically at work."). According to the Bureau of Labor Statistics, in addition to the tech-based jobs, "[t]he expansion of e-commerce is set to drive rapid employment growth across [ ] four industries: couriers and express delivery services, warehousing and storage, local messengers and local delivery, and freight transportation arrangement." U.S. Bureau of Labor Statistics, Industry and occupational employment projections overview and highlights, 2022–32 (October 2023), available at: https://www.bls.gov/opub/mlr/2023/article/industry-and-occupational-employment-projections-overview-and-highlights-2022-32.htm (last accessed May 28, 2025).

The *de minimis* exemption has played a significant role in shaping the modern ecommerce landscape. Currently codified as 19 U.S.C. §1321(a)(2)(C), *de minimis* has undergone a notable evolution since its initial enactment. Christopher A. Casey, *Imports and the Section 321 (De Minimis) Exemption:  Origins, Evolutions, and Use*, Congressional Research Service, R48380 (Jan. 31, 2025) ("CRS Report"), *available at:* https://www.congress.gov/crs_external_products/

R/PDF/R48380/R48380.3.pdf (last accessed:  May 28, 2025). Traced back to 1938 with the passage of Section 321(a)(2)(C) of the Tariff Act of 1930, the original intent was to empower the Secretary of the Treasury to waive or reduce certain duties, fees, and taxes on imported goods with a fair retail value in the country of shipment of $1 or less. *Id.* This was intended "to avoid expense and inconvenience to the Government disproportionate to the amount of revenue that would otherwise be collected." *Id.*, at 1, 13.  In its early stages, therefore, the *de minimis* exemption was a mechanism for administrative efficiency, preventing customs officials from expending resources on collecting negligible amounts of revenue.  *Id.* at 10, 13; *see also* U.S. Congress, *Simplification of Customs Administration*, hearing on H.R. 1535, p. 228. As Assistant Secretary of the Treasury Chapman Rose noted in 1953, the goal was to avoid "spending a dollar to collect 50 cents."  *Id.*, at 6.

Over the ensuing decades, with cost savings being the primary driver, the threshold remained relatively low. While the Treasury Department frequently recommended expanding the exemption, Congress was hesitant due to concerns that increasing the threshold could diminish the protective effect of tariffs for domestic producers.  *Id.*, at 6.  Notably, in the 1950s, during discussions surrounding the Customs Simplification Act, concerns about the expansion of direct-to-consumer mail-order businesses led Congress to refrain from increasing the exemption despite Treasury recommendations. *Id.*, at 9. There was apprehension that a higher threshold could be "subjected to abuses by mail-order businesses engaging in the direct shipment of dutiable articles to purchasers in the United States."  *Id.*, at 11.

As times change, so too did the perspective about the role of tariffs more broadly.  *Id.*, at 1, 16.  As U.S. policy increasingly favored trade liberalization over the use of tariffs as protective measures, *id.*, at 6, 16., Congress began to view the *de minimis* exemption as a potential tool to

reduce trade barriers, *id.* at 1. This change in philosophy was manifested in subsequent legislative amendments. In 1990, the threshold was raised to $5, followed quickly by a more substantial increase to $200 in 1993 as part of the North American Free Trade Agreement (NAFTA) Implementation Act, also known as the Customs Modernization Act (Mod Act). *Id.,* at 16. The House Ways and Means Committee noted that these increased thresholds were "necessitated by inflation and the substantial increases in passenger arrivals and low-value entries." *Id.* Importantly, the 1993 amendments transformed the threshold from a ceiling to a floor, effectively requiring the Secretary of the Treasury to maintain a *de minimis* level of at least $200 rather than having the discretion to set it up to that amount. *Id.* at 16, 27. This fundamentally altered the nature of the provision, making duty-free treatment for low-value goods more assured. *Id.*

The most recent increase occurred in 2015, when Congress raised the *de minimis* threshold from $200 to $800. *Id.* at 1, 6, 17, 18. This adjustment was explicitly framed, not as a cost-saving measure for the government, but rather as a measure to provide "significant economic benefits to businesses and consumers in the United States and the economy of the United States through costs savings and reductions in trade transaction costs." *Id.* at 18. This legislative action clearly cemented the view of the *de minimis* exemption as a tool for trade facilitation and economic benefit. *Id.* (citing Trade Facilitation and Trade Enforcement Act (TFTEA), § 901.T).

Further, in 2016, Congress expressed its desire for the United States Trade Representative to encourage other countries to establish "commercially meaningful *de minimis* values" in trade negotiations. *Id.* (citing TFTEA §901); *id.* at 19. This push contributed to *de minimis* provisions becoming more prevalent in international trade agreements, such as the United States-Mexico-Canada Agreement (USMCA), negotiated and ratified overwhelmingly by a bi-partisan Congress during President Trump's first term, which included specific *de minimis* thresholds for each

country.  *Id.* at 20 (citing United States-Mexico-Canada Agreement (USMCA), Art. 7.8 (entered into force July 1, 2020); *see also* U.S. Congress, Senate Committee on Finance, *United States-Mexico-Canada Agreement Implementation Act*, report to accompany H.R. 5430, 116th Cong., 2nd Sess. (Oct. 21, 2020), S.Rept. 116-283 (Washington, DC: GPO, 2020), 14.  The WTO Agreement on Trade Facilitation (TFA), which entered into force in 2017, also requires signatories to "provide, to the extent possible, for a *de minimis* shipment value."  CRS Report, at 22 (citing WTO Agreement on Trade Facilitation art. 7.8.2(d)).  To date, 130 countries and customs territories, including the United States, have signed the agreement.  *See* WTO, Members accepting the Protocol of Amendment to insert the WTO Trade Facilitation Agreement into Annex 1A of the WTO Agreement, available at: https://www.wto.org/english/tratop_e/tradfa_e/tradfa_agreeacc_e.htm (last accessed: May 28, 2025).

The evolution of the *de minimis* exemption reflects a dynamic interplay between the practical needs of customs administration, shifting philosophies on trade policy, and the impact of economic factors such as inflation and the growth of ecommerce. The increase in the U.S. *de minimis* threshold to $800 acted as a catalyst for the ecommerce sector by reducing costs, streamlining logistics, and enhancing price competitiveness for online retailers.  By reducing import costs associated with duties, taxes, and administrative fees for shipments valued below $800, cost savings could be passed on to consumers, making online purchases of imported goods more attractive and competitive.  The simplification of customs processes also allowed for faster and more efficient delivery of goods purchased online, enhancing the overall appeal and convenience of ecommerce.  In turn, these American companies were able to create more high-skill, high-paying American jobs, resulting in more businesses and workers paying more American taxes.

Furthermore, the U.S. policy of encouraging trading partners to adopt commercially meaningful *de minimis* thresholds aligned with a broader strategy of trade liberalization and aimed to reduce barriers for cross-border ecommerce. By advocating for similar policies abroad, the U.S. sought to create a more level playing field for U.S. ecommerce businesses looking to export their goods, as other countries lowering their *de minimis* thresholds would reduce costs and complexities for these exports. This two-pronged approach – raising the domestic *de minimis* threshold and promoting its adoption internationally – significantly facilitated the growth of direct-to-consumer online sales and cross-border ecommerce, which are integral components of the modern ecommerce sector in the United States.

## II.    ELIMINATING *DE MINIMIS*:  IMPACT ON CONSUMERS AND BUSINESSES

Eliminating *de minimis* means a significant increase in costs for small and mid-size U.S.-based ecommerce businesses that rely on imported goods valued under $800. These businesses have been able to lawfully import such goods from China without incurring duties and certain administrative fees. With the *de minimis* exception removed, these imports have become subject to the tariff rates applicable to their product category, as well as fees, such as the Merchandise Processing Fee (MPF) and customs broker fees. For businesses operating on tight margins, especially startups and smaller online retailers, these added costs are crushing.

As one representative from Blue Salve Partners noted, without *de minimis*, a $50 imported item could face a merchandise processing fee and a brokerage fee, potentially soaring the total cost. Avi Rosenthal, Managing Partner, Bluesalve Partners, *How a Brewing E-Commerce Fight in Congress Will Impact Buyers and Sellers Online*, The Well News (July 20, 2023), *available at:* https://www.thewellnews.com/opinions/how-a-brewing-e-commerce-fight-in-congress-will-impact-buyers-and-sellers-online/ (last accessed:  May 28, 2025).  This increase in the cost of

goods forces these businesses to either absorb the higher expenses, leading to reduced profitability, or pass them on to consumers through price increases. If they cannot absorb the costs or pass them on to consumers, the business will no longer be viable.

Furthermore, the elimination of the *de minimis* exception increases the administrative burden and regulatory complexities for small and mid-size ecommerce businesses. *De minimis* shipments benefit from simplified customs procedures and documentation requirements. Without this exemption, these businesses are required to navigate more complex import processes, potentially necessitating the use of customs brokers and the completion of more extensive paperwork for each low-value shipment. Small and mid-sized businesses usually lack the dedicated staff and resources to handle such increased administrative burdens efficiently. This will divert valuable time and resources away from core business activities such as product development, marketing, and customer service, thereby hindering growth. For many U.S.-based ecommerce businesses, they lack the time to navigate bureaucratic red tape or the capital to pay extra taxes on foreign imports, making *de minimis* a crucial part of their operations.

The ability to import components, materials, and finished goods efficiently under the *de minimis* exception is also vital for the innovation and product development of many small and mid-size ecommerce businesses. These businesses often source specialized inputs or create unique products that rely on materials from China. *De minimis* facilitates the affordable and rapid import of prototypes, samples, and small batches of these items, allowing businesses to test new product ideas and quickly respond to market trends. Eliminating this benefit could stifle innovation by increasing the cost and time associated with sourcing these essential elements.

Moreover, small and mid-size ecommerce businesses often compete with larger retailers that have established supply chains and resources to better absorb the costs and complexities

associated with traditional import procedures. The *de minimis* exception provides a more level playing field by reducing some of the inherent disadvantages faced by smaller businesses in cross-border trade. Removing it could exacerbate this imbalance, potentially leading to reduced competitiveness and slower growth for these enterprises.

Elimination of *de minimis* will force many businesses to change their supply chains. As with the addition of new burdens for reporting, small businesses often lack the dedicated staff and resources necessary to quickly investigate options and change their supplies. The cost of identifying alternative providers of goods that meet their specifications, as well as negotiating new contracts and ensuring the product is produced with comparable quality, is a complex and costly process. It requires a clear understanding of tariff policies in order to undertake the substantial planning required, and substantial time to implement these changes. In the face of a series of Executive Orders, implementing, increasing, decreasing, and withdrawing various tariffs, the critical time necessary to plan and implement changes has been denied to these businesses. The chaotic and constantly shifting trade environment that has rankled the U.S. economy since January 2025 has been particularly destructive to small and mid-sized U.S.-based ecommerce businesses that relied on the *de minimis* policies when establishing their supply chains.

For small and mid-size businesses, pivoting to manufacturing their products in the United States is not a practical response to the elimination of *de minimis*. As the focus of American manufacturing has shifted over the past few decades, it has been increasingly difficult to find facilities that have sufficient workers to staff manufacturing facilities here. Colin Grabow, CATO Institute, *The Reality of American "Deindustrialization"*, *available at:* https://www.cato.org/publications/reality-american-deindustrialization (Oct. 24, 2023) (last accessed: May 28, 2025) (explaining that manufacturing is alive in well in America but has shifted

towards the manufacturing of more complex products). Indeed, labor constraints have been identified as the greatest challenge for manufacturing in America.  Charles S. Gascon, Federal Reserve Bank of St. Louis, *Labor Constraints Remain Greatest Challenge for Resurgent Manufacturing Sector*, *available at:* https://www.stlouisfed.org/publications/regional-economist/2022/jul/labor-constraints-challenge-resurgent-manufacturing-sector (last accessed: May 28, 2025).  Thus, even if ecommerce companies could find the right manufacturing facilities in America, the combined costs of raw materials, as well as staffing costs would make their products prohibitively expensive if produced domestically.  *See id.* (raising prices though tariffs on raw materials "perversely harms most American manufacturers").

The net result is that small and mid-sized ecommerce businesses are disproportionally impacted by the abrupt elimination of *de minimis* for goods imported from China.  CBP's own analysis support these conclusions. In describing the effects on small businesses, CBP reports that "a substantial number of small entities are likely to be affected. Prices for an individual affected low-value shipment could increase by 12.2 to 31.2 percent depending on whether only tariffs or tariffs plus broker fees are incurred, the type of carrier transporting the shipment into the United States, and the underlying value of the shipment."  Office of Trade, U.S. Customs and Border Protection and Industrial Economics, Inc., *U.S. Customs and Border Protection Rulemaking: Trade and National Security Actions and Low-Value Shipments, Regulatory Analysis and Regulatory Flexibility Act Analysis*, at 17 (Jan. 15, 2024) ("CBP Regulatory Analysis"), *available at:* https://www.regulations.gov/document/USCBP-2025-0003-0013 (last accessed:  May 28, 2025).  CBP acknowledged that the rule changes it proposed in the NPRM would lead to net job losses of between 97,000 and 136,000 jobs. *Id.*, 13-14 (in the "low impact scenario," "On net, the U.S. economy would have 97,000 fewer jobs in year 1, due to an increase in job separations and a

reduction in new hires."; in the "high impact scenario," "On net, the U.S. economy would have 136,000 fewer jobs in year 1, due to an increase in job separations and a reduction in new hires.").

In addition to the direct impact on U.S.-based ecommerce business, the sudden elimination of the *de minimis* exemption is creating billions of dollars in additional annual costs for consumers. *Id.* Setting aside the unlawful tariffs that this Court just enjoined in *V.O.S. Selections*, CBP has acknowledged that consumers would experience cost shocks due to the elimination of *de minimis*. *Id.*, 37-47. The Mercatus Center at George Mason University estimated that a consumer purchasing a $50 item online from an overseas vendor would have prices nearly double due to the imposition of fees and tariffs by eliminating *de minimis*, and this was before tariff rates were significantly increased. Christine McDaniel, *Solving The Big Problems That Come In Small Parcels*, Forbes (Jul. 5, 2023), *available at:* https://www.forbes.com/sites/christinemcdaniel/2023/07/05/solving-the-big-problems-that-come-in-small-parcels/ (last accessed: May 28, 2025).

The elimination of the *de minimis* disproportionately affects lower-income consumers because those households are more likely to import *de minimis* shipments. Pablo D. Fajgelbaum & Amit Khandelwal, *The Value of De Minimis Imports*, National Bureau of Economic Research (Rev. Feb. 2025), at 2, *available at:* https://www.nber.org/system/files/working_papers/w32607/w32607.pdf (last accessed May 2, 2025) ("73% of direct shipments imported by the poorest zip codes are de minimis compared to 52% for the richest zip codes. The share of de minimis shipments from China also declines with income: 48% for the poorest zip codes compared to 22% for the richest."). Consequently, the average tariff impact felt by the poorest zip codes will be far greater than the impact felt by wealthier households. *Id.* at 2-3 ("If §321 were eliminated. the poorest zip codes would face average tariffs of 11.8% compared with 6.5% for the richest zip

codes. This regressive impact will exacerbate the financial pressures already faced by low-income families, especially at a time when inflation and the cost of living are major concerns.

A significant reduction in aggregate consumer welfare will result from the *de minimis* exemption be eliminated. Fajgelbaum & Khandelwal estimated that aggregate welfare will be reduced by $10.9 to $13.0 billion annually. **Fajgelbaum & Khandelwal, at 4.** CBP's own analysis bolsters the conclusion. According to CBP, consumer welfare losses will be between $9.5 and $16.5 billion annually, and that the country's GDP will decrease at least 0.03% in every year. CBP Regulatory Analysis, 13-14. Thus, any suggestion that eliminating the *de minimis* exception will leave American consumers better off is belied by CBP's own data.

Eliminating the *de minimis* exception would impose significant financial and operational burdens on small and mid-size ecommerce businesses. It would increase the cost of imported goods, raise administrative complexities, potentially stifle innovation, reduce competitiveness against larger businesses, and lead to the loss of high-skilled, high-paid American jobs. As an association that champions the interests of these vital contributors to the economy, EIA asserts that maintaining the *de minimis* exemption, while addressing legitimate concerns through targeted enforcement measures, is essential for supporting the continued growth and success of the American economy.

## LEGAL ARGUMENT

### I.    PLAINTIFF IS LIKELY TO PREVAIL ON THE MERITS

The Government has acted in a manner that is *ultra vires* and arbitrary and capricious by eliminating the *de minimis* exception on goods imported from China without concluding a notice-and-comment rulemaking process as required by 19 U.S.C. § 1321(b) and the Administrative Procedures Act. For this reason, Plaintiff Detroit Axel is likely to prevail on the merits and a

preliminary injunction blocking the Government from continuing to deprive ecommerce businesses of the benefits of the *de minimis* exception for goods imported from China is warranted.

The U.S. Constitution grants Congress the exclusive power to regulate foreign commerce, including the ability to set tariffs and negotiate trade agreements. U.S. Const., Article I, Section 8. Because Congress controls international trade, actions taken by executive branch agencies related to international trade – even those undertaken at the direction of the President – are reviewable under the Administrative Procedures Act. *In re Section 301 Cases,* 570 F. Supp. 3d 1306, 1324 (Ct. Int'l Trade 2022) ("[C]ourts review agency action taken to implement Presidential proclamations and Executive orders—each of which are forms of presidential direction—pursuant to the APA.") (*citing Sherley v. Sebelius*, 689 F.3d 776, 402 U.S. App. D.C. 178 (D.C. Cir. 2012); *Chamber of Commerce of United States v. Reich*, 74 F.3d 1322, 1326-27, 316 U.S. App. D.C. 61 (D.C. Cir. 1996); *Tate v. Pompeo*, 513 F. Supp. 3d 132 (D.D.C. 2021)); *see also V.O.S. Selections, Inc., at al. v. United States*, Case No. 25-00066, Opinion, 23-24 (May 28, 2025). Indeed, this Court has recognized that when a decision related to international trade "involve[es] authority delegated by Congress to an agency," the action cannot escape review merely because it was undertaken at the direction of the President. *Section 301 Cases,* 570 F. Supp. at 1324 (citing *Detroit Int'l Bridge Co. v. Gov't of Can.*, 189 F. Supp. 3d 85, 98-105 (D.D.C. 2016)).

Here, Congress has declared that any exceptions to the *de minimis* exemption must be created by the Secretary of the Treasury and prescribed "by regulations." 19 U.S.C. § 1321(b). Further, those exceptions to the exemption must be based on a specific finding by the Secretary of the Treasury that "such action is consistent with the purpose of subsection (a) or is necessary for any reason to protect the revenue or to prevent unlawful importations." *Id.* Accordingly, if the *de minimis* exemption is going to be denied, it must be pursuant to a regulation that is adopted by the

Secretary of the Treasury after consideration of the relevant factors.  Specifically, the Secretary of

must not determine merely that elimination could be a helpful tool to prevent *some* "unlawful

importations," but rather that elimination of the exception in its entirety for all goods from China

is "necessary".  *Id.* In establishing this as the bar that must be cleared, Congress has "la[id] down

by legislative act an intelligible principle to which the person or body authorized" to make

exceptions to the *de minimis* exclusion "is directed to conform."  *V.O.S. Selections*, 27 (*quoting

J.W. Hampton, Jr. v. U.S.,* 276 U.S. 394, 409 (1928)).  For this Congressional delegation of

authority to "meaningfully constrain" the Secretary's discretion, it follows that the Secretary is

required to meaningfully evaluate alternative actions that could accomplish the stated objective

before concluding that elimination of the *de minimis* exemption is *necessary*.  *Id.* (*quoting Touby

v. United States,* 500 U.S. 160, 166 (1991)).

        Elimination of the *de minimis* exemption for goods from China constitutes a legislative

rule, because it seeks to "change the standards of conduct, and have force of law."  *Am. Frozen

Food Inst. v. United States*, 18 Ct. Int'l Trade 565, 573, 855 F. Supp. 388, 396 (1994).  Therefore,

it can only be accomplished by notice-and-comment rulemaking.  *See id.*  A Presidential Executive

Order cannot override the command from Congress protecting the *de minimis* exception unless

and until the Secretary of the Treasury makes applicable findings and formally adopts

"regulations."  19 U.S.C. § 1321(b); *see also In re Section 301 Cases,* 570 F. Supp. 3d at 1335-37

(foreign affairs exception to notice and comment rulemaking does not apply "simply because a

rule relates to ongoing negotiations" particularly "when, as here, some form of notice, opportunity

to comment, and explanation is otherwise required").

        The Government acknowledged notice and comment rulemaking was a necessity when, on

January 21, 2025, the Department of Homeland Security, U.S. Customs and Border Protection,

and Department of the Treasury jointly published the NPRM inviting public comment on whether it should be eliminated for goods from China and any other country subject to certain *ad valorem* tariffs.  *See* NPRM, 90 Fed Reg. at 6852. The NPRM sought "to make merchandise that is subject to specified trade or national security actions ineligible for this [*de minimis*] administrative exemption and to require that certain shipments claiming this exemption provide the 10-digit Harmonized Tariff Schedule of the United States (HTSUS) classification of the merchandise." *Id.* at 6852.  As part of the NPRM, the Government clearly stated that 19 U.S.C. § 1321(b) was the legal basis for the proposal to deny the *de minimis* exemption to goods from countries that are subject to subject to *ad valorem* tariffs under Section 232, 201, and 301, including China.  *Id.* at 6871.

Despite initiating the public comment process, when the Department of Homeland Security and CBP subsequently proceeded with eliminating the *de minimis* exception for goods from China, it did so not on the authority provided by 19 U.S.C. § 1321(b), but in spite of it.  *See* Notice of Implementation of Additional Duties on Products of the People's Republic of China Pursuant to the President's Executive Order 14256, Further Amendment to Duties Addressing the Synthetic Opioid Supply Chain in the People's Republic of China As Applied to Low-Value Imports, 90 Fed. Reg. 17608 (Apr. 28, 2025).  Homeland Security and CBP acted solely based on a series of Executive Orders: 14185, 14200, and 14256, 14259, 14266.  *Id.*  The Public Notice makes no mention of the rulemaking that been opened, makes no mention of 19 U.S.C. § 1321(b), and includes no findings by the Secretary of the Treasury that the "action is consistent with the purpose of subsection (a) or is necessary for any reason to protect the revenue or to prevent unlawful importations." 19 U.S.C. § 1321(b).  It is as if the rulemaking never existed.

Instead, the Executive Order and the Public Notice rely on presumed powers under the International Emergency Economic Powers Act (IEEPA), Pub. L. No. 95-223, §§ 201-08, 91 Stat. 1625, 1626-29 (1977) (codified as amended at 50 U.S.C. §§ 1701-10). As this Court just explained in *V.O.S. Selections* in invalidating the Trafficking Tariffs, including those imposed on China, "IEEPA powers are available only" in limited circumstances in which all of the relevant conditions contained in 50 U.S.C. § 1701 are met. *V.O.S. Selections,* at 36. Those conditions include a threat to the national security, foreign policy or economy of the United States that is "unusual and extraordinary," the declaration of a national emergency, and actions that "deal with" that unusual and extraordinary threat. *Id*. The Court rejected the Government's argument that it can impose tariffs on goods from China and other countries to create "leverage" or "apply pressure" to address the trafficking of narcotics. *Id.* at 44-48.

The Government's elimination of the *de minimis* exception for goods imported from China is unlawful because it rests on IEEPA and fails to comply with the requirements established by Congress in 19 U.S.C. § 1321(b). CBP's elimination of the *de minimis* exception is a substantive change affecting the rights and obligations of regulated parties. It falls squarely within the scope of 5 U.S.C. § 553. The APA's procedural requirements are not empty formalities. As the D.C. Circuit explained in *American Coke and Coal Chemicals v. E.P.A.*, 452 F.3d 930, 939 (D.C. Cir. 2006), notice requirements "ensure that agency regulations are tested via exposure to diverse public comment, ensure fairness to affected parties, and give affected parties an opportunity to develop evidence in the record to support their objections to the rule and thereby enhance the quality of judicial review." In *Perez v. Mortgage Bankers Association*, 575 U.S. 92, 109 (2015), the Supreme Court reinforced the importance of notice-and-comment procedures: "The Act guards against excesses in rulemaking by requiring notice and comment." It explained that an agency

16

must not only "notify the public of the proposal [and] invite them to comment on its shortcomings," but it must also "consider and respond to [the public's] arguments, and explain its final decision in a statement of the rule's basis and purpose." *Id.*

Further, in cases like *Perez* and *Fed. Commc'ns Comm'n v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009), the Supreme Court has consistently underscored that agencies must consider reliance interests engendered by prior policy.  The existence of reliance interests compels the Government to provide "a more detailed justification than what would suffice for a new policy created on a blank slate," because it would be "arbitrary and capricious to ignore such matters." 556 U.S. at 515.  Accordingly, the Government most not only solicit public comment (which it did here), but must also respond to the significant issues raised.  *In Section 301 (China) Litigation*, 570 F.Supp.3d at 1341 ("the final determinations do not explain whether or why the President's direction constituted the only relevant consideration nor do those determinations address the relationship between significant issues raised in the comments and the President's direction. Having requested comments on a range of issues, the USTR had a duty to respond to the comments in a manner that enables the court to understand 'why the agency reacted to them as it did.'") (citing *Auto. Parts & Accessories Ass'n v. Boyd*, 407 F.2d 330, 338 (D.C. Cir. 1968)); *see also Oakbrook Land Holdings, LLC v. Comm'r*, 28 F.4th 700, 714 (6th Cir. 2022) ("if an agency could ignore every comment regardless of its content, then the process of soliciting public input would be pointless.")  The procedural harm is not merely technical; it strikes at the heart of administrative legitimacy.

Here, the plaintiffs and scores of similarly situated ecommerce businesses nationwide relied on the *de minimis* exception when establishing their business and their supply chains.  They relied on long-standing U.S. foreign trade policy, and they relied on Congress's assurance that the

*de minimis* exception would not be denied to them absent regulations adopted in accordance with the APA's notice-and-comment rulemaking process.  These American businesses also relied on the NPRM and the expectation of a fair process that required consideration of the public comments received. The abrupt elimination of the *de minimis* exception for China in the face of substantial evidence of the detrimental impact it would have on U.S.-based businesses and consumers disregarded all of these reliance interests.  For this reason, elimination of the *de minimis* exception for goods from China is arbitrary and capricious and should be set aside.

## II.  ECOMMERCE BUSINESSES ARE EXPERIENCING IRREPERABLE HARM TODAY

Small and mid-sized U.S.-based ecommerce businesses**,** including sole proprietors, are suffering immediate and irreparable harm due to the Government's unlawful elimination of the *de minimis* exception for goods imported from China. These businesses have prudently utilized the *de minimis* exemption and many built their businesses and supply chains in reliance on this longstanding U.S. foreign trade policy.  The abrupt removal of this exemption has inflicted severe and potentially irreversible harm.  Without the *de minimis* exception, goods valued under $800 imported by EIA members are now subject to standard tariff rates, Merchandise Processing Fees (MPF), and customs broker fees.  This exposes businesses to increased costs and complexities right now.

The irreparable harms manifested by this action are numerous.  They include crushing cost increases that threaten business viability.   These increased costs necessitate either absorbing expenses, which reduces profitability, or passing them on to consumers through price increases. If businesses cannot absorb costs or pass them on, the business will no longer be viable. The threat to the "very existence" of a business, as described in the context of Plaintiff Detroit Axle's

situation, constitutes irreparable harm. These are devastating economic losses that no damages payment can fully address.

Part of the increased costs is from the fact that the *de minimis* exemption facilitated simplified customs procedures. Its elimination requires small and mid-size businesses to navigate more complex import processes, potentially necessitating customs brokers and extensive paperwork for each low-value shipment. EIA members typically lack the dedicated staff and resources to handle these increased burdens efficiently, diverting valuable time away from core business activities like product development, marketing, and customer service. This ongoing drain on limited resources hinders growth potential. Small businesses lack the time and capital for this bureaucracy.

The elimination of the *de minimis* exception also impacts innovation. The ability to import components, materials, and finished goods efficiently under *de minimis* is vital for innovation and product development. Eliminating *de minimis* forces many businesses to entirely reengineer their supply chains, a complex and costly process requiring substantial planning and time. Identifying alternatives, negotiating contracts, and ensuring quality require resources that EIA members often lack.

The combination of these impacts means small and mid-sized ecommerce businesses will be disproportionally impacted, and many will not survive. CBP's own analysis supports this conclusion, predicting substantial impact on small entities and net job losses of between 97,000 and 136,000 jobs in the first year. CBP Regulatory Analysis, 13-14, 17. The closure of businesses and the loss of jobs represent profound, immediate, and irreparable harm. These harms are irreparable not only because of the existential threat to businesses and jobs, but also because many of the costs are unrecoverable. *Kwo Lee, Inc. v. United States*, 24 F. Supp. 3d 1322, 1327 (Ct. Int'l

Trade 2014) ("immediate threat of bankruptcy" and potential "loss of business" are irreparable harms that weigh in favor of granting a preliminary injunction); *J. Conrad LTD v. United States*, 457 F. Supp. 3d 1365, 1377 (Ct. Int'l Trade 2020) (irreparable injury exists when "judicial relief 'may come too late to save the plaintiff's business. He may go broke while waiting, or may have to shut down his business but without declaring bankruptcy.'" (quoting *Roland Mach. Co. v. Dresser Indus., Inc.*, 749 F.2d 380, 386 (7th Cir. 1984) (Posner, J.)). Unlike potential recovery of paid duties, losses such as diminished business value, loss of goodwill, damage to reputation, and lost business opportunities constitute irreparable harm. *Celsis in Vitro, Inc. v. CellzDirect, Inc.*, 664 F.3d 922, 930 (Fed. Cir. 2012) ("[p]rice erosion, loss of goodwill, damage to reputation, and loss of business opportunities are all valid grounds for finding irreparable harm").

The Government's action disregarded the significant reliance interests of these companies who built their operations based on the *de minimis* exception and long-standing U.S. policy promoting its use. The arbitrary and capricious elimination of the exemption, without completing the required notice-and-comment process, ignores the detrimental impact on U.S.-based ecommerce companies and the broader economy.  For these reasons, EIA respectfully submits that its members are facing immediate and irreparable harm, justifying the relief sought by the Plaintiff.

## III.    THE PUBLIC INTEREST AND BALANCE OF EQUITIES FAVORS AN INJUNCTION

The public interest and the balance of the equities strongly favor granting a preliminary injunction against the Government's elimination of the *de minimis* exemption for goods imported from China. The elimination of the *de minimis* exception contravenes the public interest in at least three material ways.

*First*, elimination of the *de minimis* exception directly translates into significantly increased costs for imported goods valued under $800 imported from China. For many consumers,

particularly those with lower incomes, these goods were previously more affordable due to the exemption. Elimination of *de minimis* has a regressive impact that exacerbates financial pressures on low-income families. CBP's own analysis supports the conclusion that the elimination will result in significant aggregate consumer welfare losses, estimated between $9.5 and $16.5 billion annually. CBP Regulatory Analysis, 13-14. Issuing an injunction preserves consumers' access to affordable goods and mitigates this disproportionate financial burden.

*Second*, the public has an interest in safeguarding U.S.-based small and mid-sized businesses and the jobs that they provide. Many of these businesses were formed after Congress raised the de minimis threshold, relying on the exemption as a tool to keep prices down and create jobs. The loss of these businesses will directly lead to the loss of American jobs. CBP's own analysis predicted net job losses of between 97,000 and 136,000 jobs in the first year due to the proposed rule changes. *Id.* Protecting these businesses protects high-skill, high-paying American jobs and the taxes they contribute. It also protects the livelihoods of families and the economic vitality of local communities across the country.

*Third*, the public has a substantial interest in ensuring that governmental agencies abide by the federal laws that govern their operations and the accurate and effective enforcement of the trade laws established by Congress. *Kwo Lee*, 24 F. Supp.3d at 1332 ("Preserving Plaintiff's access to meaningful judicial review, a public interest in itself, protects against unchecked and unchallenged enforcement by preserving Plaintiff's opportunity to litigate a potentially meritorious claim."); *In re Section 301 Cases*, 524 F.Supp.3d 1355, 1372 (Ct. Int'l Trade 2021) ("The public interest is served by ensuring that governmental bodies comply with the law."). Congress has repeatedly endorsed and expanded the *de minimis* exemption over nearly a century, finding that it provides significant economic benefits to U.S. businesses and consumers. Congress specifically

required that any exceptions to the de minimis exemption be prescribed "by regulations" by the Secretary of the Treasury after specific findings. The Government's elimination of the exemption without completing notice-and-comment rulemaking, as required by 19 U.S.C. § 1321(b) and the APA, disregards significant reliance interests and is arbitrary and capricious. The public interest is served by preventing unlawful agency action that exceeds statutory authority and ignores established procedural requirements.

Therefore, the public interest and the balance of the equities strongly support granting a preliminary injunction.

<u>**CONCLUSION**</u>

EIA respectfully urges the Court to grant the Plaintiff's motion for a preliminary injunction and further vacate the orders eliminating the *de minimis* exception for goods manufactured in China for failure to comply with the APA and the express requirements of 19 U.S.C. § 1321(b). Any relief granted by this Court should extend not only to Plaintiff but also to similarly situated U.S.-based ecommerce companies.

May 30, 2025                                    Respectfully submitted,


                                               */s/ James K. Kearney*
                                               James K. Kearney
                                               (Member of the Bar of this Court)
                                               WOMBLE BOND DICKINSON (US) LLP
                                               8350 Broad Street
                                               Suite 1500
                                               Tysons, VA 22102
                                               (703) 394-2214
                                               james.kearney@wbd-us.com

                                               *Counsel for Amicus Curiae*
                                               *Ecommerce Innovation Alliance*

G. David Carter, Esq.
Ecommerce Innovation Alliance
303 W. Broad Street
Richmond, VA 22320
david@ecomm-alliance.org

*Of Counsel for Amicus Curiae*
*Ecommerce Innovation Alliance*

23

**CERTIFICATE OF COMPLIANCE WITH WORD LIMIT**

Pursuant to CIT Standard Chambers Procedure 2(B), I certify that this brief, including headings, footnotes, and quotations (but excluding the motion, table of contents, table of authorities, signature blocks, and this certificate) contains 7093 words.

*/s/ James K. Kearney*
James K. Kearney