UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE:     THE HONORABLE GARY S. KATZMANN, JUDGE
            THE HONORABLE TIMOTHY M. REIF, JUDGE
            THE HONORABLE JANE A. RESTANI, JUDGE

_____

|  |  |  |
|---|---|---|
| AXLE OF DEARBORN, INC. D/B/A DETROIT AXLE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Court No. 25-cv-00091 |
| | ) | |
| DEPARTMENT OF COMMERCE; | ) | **PUBLIC VERSION** |
| HOWARD LUTNICK, in his official capacity as Secretary | ) | |
| SECURITY; KRISTI NOEM, in her official capacity as | ) | |
| Secretary of Homeland Security; DEPARTMENT OF THE | ) | |
| TREASURY; SCOTT BESSENT, in his official capacity | ) | |
| as Secretary of the Treasury; UNITED STATES | ) | |
| CUSTOMS AND BORDER PROTECTION; PETE R. | ) | |
| FLORES, in his official capacity as Acting Commissioner | ) | |
| for U.S. Customs and Border Protection; and the | ) | |
| UNITED STATES, | ) | |
| | ) | |
| Defendants. | ) | |

_____

**DEFENDANTS' MOTION TO DISMISS
COUNTS II AND IV OF PLAINTIFF'S COMPLAINT,
RESPONSE IN OPPOSITION TO PLAINTIFF'S MOTION
FOR PRELIMINARY INJUNCTION AND PARTIAL SUMMARY
JUDGMENT, AND CROSS-MOTION FOR SUMMARY JUDGMENT**

BRETT A. SHUMATE
Assistant Attorney General

ERIC J. HAMILTON
Deputy Assistant Attorney General

PATRICIA M. McCARTHY
Director

/s/ Justin R. Miller
JUSTIN R. MILLER
Attorney-In-Charge
International Trade Field Office

/s/ Liridona Sinani
LIRIDONA SINANI
ALEXANDER VANDERWEIDE
Senior Trial Counsel
U.S. Department of Justice
Civil Division
Commercial Litigation Branch
P.O. Box 480
Ben Franklin Station
Washington, D.C.  20044
Tel: (202) 353-2188
Fax : (202) 307-0972

June 25, 2025                    *Attorneys for Defendants*

UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE:    THE HONORABLE GARY S. KATZMANN, JUDGE
           THE HONORABLE TIMOTHY M. REIF, JUDGE
           THE HONORABLE JANE A. RESTANI, JUDGE
_____
                                                )
AXLE OF DEARBORN, INC. D/B/A DETROIT AXLE,      )
                                                )
            Plaintiff,                          )
                                                )
      v.                                        )        Court No. 25-cv-00091
                                                )
DEPARTMENT OF COMMERCE;                         )
HOWARD LUTNICK, in his official capacity as Secretary )
SECURITY; KRISTI NOEM, in her officialcapacity as    )
Secretary of Homeland Security; DEPARTMENT OF THE )
TREASURY; SCOTT BESSENT, in his official capacity    )
as Secretary of the Treasury; UNITED STATES          )
CUSTOMS AND BORDER PROTECTION; PETE R.               )
FLORES, in his official capacity as Acting Commissioner )
for U.S. Customs and Border Protection; and the      )
UNITED STATES,                                        )
                                                )
            Defendants.                          )
_____     )

## **ORDER**

Upon consideration of plaintiff's motion for preliminary injunction and partial summary

judgment; defendant's response thereto and motion to dismiss; plaintiff's response to defendant's

motion and reply in support of its motion; and all other pertinent papers, it is hereby

ORDERED that plaintiff's motion for a preliminary injunction is DENIED, and it is

further

ORDERED that plaintiff's motion for partial summary judgment is DENIED, and it is

further

ORDERED that judgment is entered in favor defendants on Counts I and III of plaintiff's

complaint, and it is further

ORDERED that defendant's motion to dismiss Counts II and IV of plaintiff's complaint is GRANTED, and it is further

ORDERED that Counts II and IV of plaintiff's complaint are dismissed.


Dated:_____                    _____
      New York, New York                                                    JUDGE

INTRODUCTION ............................................................................................................. 2

BACKGROUND ............................................................................................................... 3

    I.       Legal Background .......................................................................................... 3

           A.      The President's Authority Under IEEPA To Regulate Importation During National Emergencies .............................................................. 3

           B.      History And Purpose Of The *De Minimis* Exemption Under 19 U.S.C. §1321(a)(2)(C) ...................................................................... 5

    III.      Factual Background ....................................................................................... 8

           A.      The President's Declaration Of A National Emergency And The Executive Orders To Deal With The Emergency ................................ 8

           B.      Ministerial Agency Actions Implementing The Executive Orders Based On A Delegation Of The President's Authority ..................................... 10

    II.      Procedural Background ................................................................................ 11

SUMMARY OF ARGUMENT ....................................................................................... 12

ARGUMENT .................................................................................................................. 14

    I.       The Court Should Dismiss Counts II And IV Of Axle's Complaint .................. 14

           A.      Standard Of Review ............................................................................ 14

           B.      The President Is Not An "Agency" Under the APA, And Agency Defendants Acted Under A Delegation Of Presidential Authority .......... 14

    II.      The Court Should Grant Summary Judgment To Defendants ........................... 19

           A.      Standard Of Review ............................................................................ 19

           B.      The President's Lawful Suspension Of The *De Minimis* Exemption Does Not Conflict With 19 U.S.C. §1321's Discretionary Framework ........... 20

                 1.      IEEPA Authorizes The President To Pause The *De Minimis* Exemption During A National Emergency ................................. 21

                 2.      IEEPA Is A Valid Delegation Of Congressional Authority ......... 25

                 3.      Section 1321 Does Not Constrain The President's Emergency Powers Under IEEPA ................................................................. 28

           C.      The Court Should Grant Summary Judgment To Defendants On Count III Because IEEPA Constitutionally Authorizes The President To Impose The IEEPA Tariffs ...................................................................................... 35

III.    Axle Is Not Entitled To An Injunction ............................................................. 37

    A.    Standard of Review................................................................................... 37

    B.    Axle Cannot Establish The Likelihood Of Immediate, Irreparable Harm 37

        1.    Axle's Delay In Seeking Injunctive Relief Implies Lack Of Urgency ...................................................................................... 38

        2.    The *De Minimis* Exemption Has A Negligible Impact On Axle's Duty Liability.............................................................................. 38

        3.    Axle's Alleged Harm Is Speculative........................................... 40

    C.    The Remaining Injunction Factors Do Not Favor Axle.......................... 43

    D.    Any Preliminary Injunction Should Be Limited Only To Axle And Would Require It To Post A Bond .................................................................... 44

CONCLUSION .................................................................................................... 46

# TABLE OF AUTHORITIES

**Cases**                                                                                                          **Page(s)**

*Am. Ass'n of Exps. and Imps-Textile and Apparel Grp. v. United States*,
  751 F.2d 1239 (Fed. Cir. 1985) ..................................................................................... 32

*American Ins. Ass'n v. Garamendi*,
  539 U.S. 396 (2003) ..................................................................................................... 26

*American Power & Light Co. v. SEC*,
  329 U.S. 90 (1946) ....................................................................................................... 27

*Ancient Coin Collectors Guild v. CBP*,
  801 F.Supp.2d 383 (D. Md. 2011) ............................................................................ 15, 16

*Anderson v. Liberty Lobby, Inc.*,
  477 U.S. 242 (1986) ..................................................................................................... 19

*Arthrex, Inc. v. Smith & Nephew, Inc.*,
  880 F.3d 1345 (Fed. Cir. 2018) ................................................................................... 31

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009) ..................................................................................................... 14

*Atari Games Corp. v. Nintendo of Am.*,
  897 F.2d 1572 (Fed. Cir. 1990) ................................................................................... 38

*Bd. of Trs. of Univ. of Ill. v. United States*,
  289 U.S. 48 (1933) ....................................................................................................... 22

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007) ................................................................................................. 14, 22

*Bradford v. U.S. Dep't of Lab.*,
  101 F.4th 707 (10th Cir. 2024) ................................................................................. 16, 17

*Brown v. Davenport*,
  596 U.S. 118 (2022) ..................................................................................................... 31

*B-West Imports, Inc. v. United States*,
  75 F.3d 633 (Fed. Cir. 1996) ....................................................................................... 25

*Canadian Wheat Bd. v. United States*,
  580 F.Supp.2d 1350 (Ct. Int'l Trade 2008) ................................................................. 19

*Chamber of Commerce of the United States v. Reich*,
  74 F.3d 1322 (D.C. Cir. 1996) ......................................................... 18

*City and County of San Francisco v. Trump*,
  897 F.3d 1225 (9th Cir. 2018) ......................................................... 45

*City of Chicago v. Barr*,
  961 F.3d 882 (7th Cir. 2020) ........................................................... 45

*Corus Grp. PLC. v. ITC*,
  352 F.3d 1351 (Fed. Cir. 2003) ....................................................... 19

*Corus Grp. PLC v. Bush*,
  217 F.Supp.2d 1347 (Ct. Int'l Trade 2002) ................................ 40, 41

*Dalton v. Specter*,
  511 U.S. 462 (1994) ................................................................. 15, 17

*Dames & Moore v. Regan*,
  453 U.S. 654 (1981) ................................................................. 24, 37

*Dep't of Agric. Rural Dev. Rural Hous. Serv. v. Kirtz*,
  601 U.S. 42 (2024) ......................................................................... 28

*DHS v. MacLean*,
  574 U.S. 383 (2015) ....................................................................... 32

*FCC v. Prometheus Radio Project*,
  592 U.S. 414 (2021) ....................................................................... 14

*FDA v. Brown & Williamson Tobacco Corp.*,
  529 U.S. 120 (2000) ....................................................................... 34

*Fed. Energy Admin. v. Algonquin SNG, Inc.*,
  426 U.S. 548 (1976) ................................................................. 26, 27

*Florida v. HHS*,
  19 F.4th 1271 (11th Cir. 2021) ....................................................... 45

*Florsheim Shoe Co. v. United States*,
  744 F.2d 787 (Fed. Cir. 1984) ........................................................ 25

*Franklin v. Massachusetts*,
  505 U.S. 788 (1992) ............................................................ 15, 16, 17

*Gemveto Jewelry Co. v. Jeff Cooper Inc.*,
  800 F.2d 256 (Fed. Cir. 1986) ................................................... 44, 45

*Georgia v. Public.Resource.Org*,
  590 U.S. 255 (2020) ....................................................................... 23

*Gundy v. United States*,
    588 U.S. 128 (2019)..........................................................................................26, 27

*Harrington v. Purdue Pharma L.P.*,
    603 U.S. 204 (2024)...................................................................................................33

*Holder v. Humanitarian Law Project*,
    561 U.S. 1 (2010)......................................................................................................36

*Htet v. Trump*,
    2025 WL 522033 (D.D.C. Feb. 18, 2025).................................................................36

*Humane Soc. of U.S. v. Clinton*,
    236 F.3d 1320 (Fed. Cir. 2001) ...............................................................................25

*Inc. v. MercExchange, L.L.C.*,
    547 U.S. 388 (2006)..................................................................................................37

*Indus. Chems., Inc. v. United States*,
    941 F.3d 1368 (Fed. Cir. 2019) ...............................................................................17

*Invenergy Renewables LLC v. United States*,
    482 F. Supp. 3d 1344 (Ct. Int'l Trade 2020)...........................................................16

*J.W. Hampton, Jr., & Co. v. United States*,
    276 U. S. 394 (1928)...........................................................................................26, 27

*Jensen v. Nat'l Marine Fisheries Serv. (NOAA)*,
    512 F.2d 1189 (9th Cir. 1975) ..................................................................................16

*Kellogg Brown & Root Servs., Inc. v. United States*,
    728 F.3d 1348 (Fed. Cir. 2013) ...............................................................................14

*LLC v. Universal Wilde, Inc.*,
    873 F.3d 905 (Fed. Cir. 2017) .................................................................................14

*Lorillard v. Pons*,
    434 U.S. 575 (1978)..................................................................................................23

*Maple Leaf Fish Co. v. United States*,
    762 F.2d 86 (Fed. Cir. 1985) ..............................................................................19, 36

*Marshall Field & Co. v. Clark*,
    143 U.S. 649 (1892)............................................................................................26, 27

*Miller ex rel. NLRB v. Cal. Pac. Med. Ctr.*,
    991 F.2d 536 (9th Cir. 1993)....................................................................................38

*National Customs Brokers & Forwarders Ass'n of America, Inc. v. United States*,
  59 F.3d 1219 (Fed. Cir. 1995) ................................................................ 30

*Nat'l Pork Producers Council v. Ross*,
  598 U.S. 356 (2023) .............................................................................. 31

*Nebraska v. Su*,
  121 F.4th 1 (9th Cir. 2024) ........................................... 19, 20, 22, 23

*Ninestar Corp. v. United States*,
  687 F.Supp.3d 1308 (Ct. Int'l Trade 2024) .......................................... 42

*Nken v. Holder*,
  556 U.S. 418 (2009) .............................................................................. 43

*NLRB v. SW Gen., Inc.*,
  580 U.S. 288 (2017) .............................................................................. 32

*PrimeSource Bldg. Prods., Inc. v. United States*,
  59 F.4th 1255 (Fed. Cir. 2023) ...................................................... 20, 36

*RadLAX Gateway Hotel, LLC v. Amalgamated Bank*,
  566 U.S. 639 (2012) .............................................................................. 33

*Rahmani v. Yellen*,
  No. CV 24-0285 (RC), 2024 WL 1701681 (D.D.C. Apr. 19, 2024) ............ 28

*Regan v. Wald*,
  468 U.S. 222 (1984) ........................................................................ 24, 30

*Retractable Techs., Inc. v. United States*,
  739 F.Supp.3d 1330 (Ct. Int'l Trade 2024) .......................................... 38

*Rodriguez v. Dep't of Veterans, Affs.*,
  8 F.4th 1290 (Fed. Cir. 2021) ............................................................... 25

*S. Corp. v. United States*,
  690 F.2d 1368 (Fed. Cir. 1982) ............................................................. 22

*Shandong Huarong General Grp. v. United States*,
  122 F.Supp.2d 143 (Ct. Int'l Trade 2000) ............................................ 40

*Sherley v. Sebelius*,
  689 F.3d 776 (D.C. Cir. 2012) ............................................................... 16

*Shree Rama Enter. v. United States*,
  983 F. Supp. 192 (Ct. Int'l Trade 1997) ............................................... 41

*Silfab Solar, Inc. v. United States*,
    892 F.3d 1340 (Fed. Cir. 2018) ....................................................................... 19

*SmithKline Beecham Corp. v. Apotex Corp.*,
    439 F.3d 1312 (Fed. Cir. 2006) ................................................................ 12, 25

*United States v. Amirnazmi*,
    645 F.3d 564 (3d Cir. 2011) ........................................................................... 27

*United States v. Chase*,
    135 U.S. 255 (1890) ........................................................................................ 33

*United States v. Curtiss-Wright Export Corp.*,
    299 U.S. 304 (1936) ........................................................................................ 26

*United States v. Fausto*,
    484 U.S. 439 (1988) ........................................................................................ 34

*United States v. Great Am. Ins. Co. of New York*,
    738 F.3d 1320 (Fed. Cir. 2013) ....................................................................... 25

*United States v. Mazurie*,
    419 U.S. 544 (1975) ........................................................................................ 26

*United States v. Shih*,
    73 F.4th 1077 (9th Cir. 2023) ......................................................................... 28

*United States v. Sineneng-Smith*,
    590 U.S. 371 (2020) ........................................................................................ 36

*United States v. Yoshida Int'l, Inc.*,
    526 F.2d 560 (C.C.P.A. 1975) ................................................................... passim

*USP Holdings, Inc. v. United States*,
    36 F.4th 1359 (Fed. Cir. 2022) .................................................................. 17, 20

*V.O.S. Selections, Inc. v. United States*,
    No. 25-00066, 2025 WL 1514124 (Ct. Int'l Trade May 28, 2025) ........... 12, 22, 36

*Wayman v. Southard*,
    23 U.S. (10 Wheat.) 1 (1825) .......................................................................... 26

*Winter v. NRDC*,
    555 U.S. 7 (2008) ...................................................................................... 37, 43

*Yakus v. U.S.*,
    321 U.S. 414 (1944) ........................................................................................ 44

*Youngstown Sheet & Tube Co. v. Sawyer*,
    343 U.S. 579 (1952)......................................................................................34, 35

*Zemel v. Rusk*,
    381 U.S. 1 (1965)................................................................................................26

*Zenith Radio Corp. v. United States*,
    710 F.2d 806 (Fed. Cir. 1983) ...........................................................................37

**Constitutional Provisions**

U.S. Const. art. II, §2...............................................................................................44

**Statutes**

5 U.S.C. §553(a)(1) .................................................................................................32

5 U.S.C. §706(2)(A) ................................................................................................14

6 U.S.C. §101 ...........................................................................................................8

6 U.S.C. §203 ...........................................................................................................8

19 U.S.C. §1321 ...............................................................................................passim

19 U.S.C. §1321(a)......................................................................................8, 23, 28

19 U.S.C. §1321(a)(2)(C) ................................................................................passim

19 U.S.C. §1321(b)...........................................................................................passim

28 U.S.C. §§2643-44 .........................................................................................42, 43

50 U.S.C. §1621(a)...............................................................................................3, 4

50 U.S.C. §1702(a)(1)(B) .................................................................................passim

50 U.S.C. §§1701(a)............................................................................................4, 27

First War Powers Act, Pub. L. No. 77-354, 55 Stat. 838 (1941).................................3

Customs Administrative Act of 1938, Pub. L. 75-721, 52 Stat. 1081 (June 25, 1938)...........5, 28

Customs Modernization Act, Title VI of the North American Free Trade Agreement
    Implementation Act, Pub. L. 103-182, 107 Stat. 2057 (1993) ...................................7

Customs Simplification Act of 1953, Pub. L. 83-243, 67 Stat. 515  (Aug. 8, 1953)...............6, 29

Homeland Security Act of 2002, Pub. L. 107-296, 116 Stat. 2135 (2002) ..................................8

National Emergencies Act, Pub. L. No. 94-412, 90 Stat. 1255 (1976)........................................3

Trade Facilitation and Trade Enforcement Act of 2015, Pub. L. No. 114-125, 130 Stat. 122 (2016) ............................................................................................................................7

Trading With the Enemy Act, Pub. L. No. 65-91, 40 Stat. 411 (1917)......................................3

**Regulations**

19 C.F.R. § 10.151 ...........................................................................................................8, 39

**Executive Actions**

Proclamation 4074, 36 Fed. Reg. 15,724 (Aug. 17, 1971)........................................................3

Proclamation 10886, 90 Fed. Reg. 8327 (Jan. 29, 2025)..........................................................8

Exec. Order 14193, 90 Fed. Reg. 9113 (Feb. 1, 2025)...........................................................37

Exec. Order 14194, 90 Fed. Reg. 9117 (Feb. 1, 2025)...........................................................12

Exec. Order 14195, 90 Fed. Reg. 9121 (Feb. 7, 2025)..................................................... passim

Exec. Order 14200, 90 Fed. Reg. 9277 (Feb. 11, 2025)....................................................9, 10

Exec. Order 14227, 90 Fed. Reg. 11371 (Mar. 2, 2025).........................................................12

Exec. Order 14256, 90 Fed. Reg. 14,899 (Apr. 2, 2025)................................................. passim

Exec. Order 14266, 0 Fed. Reg. 15,625 (Apr. 9, 2025)..........................................................44

**Federal Register Notices**

*Implementation of Additional Duties on Products of the People's Republic of China Pursuant to the President's February 1, 2025 Executive Order Imposing Duties To Address the Synthetic Opioid Supply Chain in the People's Republic of China*, 90 Fed. Reg. 9038 (Feb. 5, 2025)... 10

*Amended Notice of Implementation of Additional Duties on Products of the People's Republic of China Pursuant to the President's February 1, 2025 Executive Order Imposing Duties To Address the Synthetic Opioid Supply Chain in the People's Republic of China*, 90 Fed. Reg. 9431 (Feb. 12, 2025)........................................................................................................10

*Notice of Implementation of Additional Duties on Products of the People's Republic of China Pursuant to the President's Executive Order 14256, Further Amendment to Duties Addressing the Synthetic Opioid Supply Chain in the People's Republic of China As Applied to Low-Value Imports*, 90 Fed. Reg. 17,608 (Apr. 28, 2025)...................................................................11

**Rules**

USCIT R. 12(b)(6) ................................................................................ 14

USCIT R. 56(a) ............................................................................... 1, 19

USCIT R. 56(f)(1) ............................................................................... 19

USCIT R. 65(c) .................................................................................. 45

**Other Authorities**

H.R. Rep. No. 95-459 (1977) .......................................................... 3, 5

H.R. Rep. No. 83-760 (1953) ............................................................... 7

H.R. Rep. No. 103-361 (1993) ............................................................. 3

S. Rep. No. 103-189 (1993) ............................................................. 3, 5

NEA: Hr'gs Before the Subcomm. on Admin. Law and Gov't Relations, 94th Cong. 27 (Mar. 6, 1975) ................................................................................. 3, 4

Cong. Research Serv., *Imports and the Section 321 (De Minimis) Exemption: Origins, Evolution, and Use*, R48380 ((Jan. 31, 2025) ......................... 5

Black's Law Dictionary (12th ed. 2024) ............................................. 21

*Legal Authorities Available to the President to Respond to a Severe Energy Supply Interruption or Other Substantial Reduction in Available Petroleum Products*, 6 U.S. Op. Off. Legal Counsel 644, 681 (1982) ......................................................... 24

UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE:    THE HONORABLE GARY S. KATZMANN, JUDGE
           THE HONORABLE TIMOTHY M. REIF, JUDGE
           THE HONORABLE JANE A. RESTANI, JUDGE

_____
                                               )
AXLE OF DEARBORN, INC. D/B/A DETROIT AXLE,      )
                                               )
              Plaintiff,                        )
                                               )
       v.                                       )            Court No. 25-cv-00091
                                               )
DEPARTMENT OF COMMERCE;                         )
HOWARD LUTNICK, in his official capacity as Secretary )
of Commerce; DEPARTMENT OF HOMELAND             )
SECURITY; KRISTI NOEM, in her official capacity as )
Secretary of Homeland Security; DEPARTMENT OF THE )
TREASURY; SCOTT BESSENT, in his official capacity )
as Secretary of the Treasury; UNITED STATES     )
CUSTOMS AND BORDER PROTECTION; PETE R.          )
FLORES, in his official capacity as Acting Commissioner )
for U.S. Customs and Border Protection; and the )
UNITED STATES,                                  )
                                               )
              Defendants.                       )
_____)


**DEFENDANTS' MOTION TO DISMISS
COUNTS II AND IV OF PLAINTIFF'S COMPLAINT,
RESPONSE IN OPPOSITION TO PLAINTIFF'S MOTION
FOR PRELIMINARY INJUNCTION AND PARTIAL SUMMARY
JUDGMENT, AND CROSS-MOTION FOR SUMMARY JUDGMENT**

Under Rule 12(b)(6) of the United States Court of International Trade (USCIT R.),

defendants respectfully request that the Court dismiss Counts II and IV of the complaint filed by

Axle of Dearborn, Inc. d/b/a Detroit Axle (Axle) for failure to state a claim. Pursuant to USCIT

R. 56(a), defendants respectfully request summary judgment in their favor on Counts I and III of

Axle's complaint. Because Axle's Counts II and IV should be dismissed for failure to state a

claim, defendants are entitled to summary judgment on all of Axle's claims, and Axle has failed

to show entitlement to any injunctive relief, defendants respectfully request that the Court deny Axle's motion for preliminary injunction.

INTRODUCTION

The President found that the flood of fentanyl and other synthetic opioids into the United States ravages communities, destroys families, and kills approximately two hundred Americans every day. Synthetic opioid overdose is the leading cause of death for Americans aged 18 to 45.

The President found that many companies in the People's Republic of China (PRC) contribute to this crisis by exporting illegal synthetic opioids and precursor chemicals and using techniques to conceal the true contents of their shipments to hide illicit substances in the flow of legitimate commerce, including by using re-shippers, false invoices, and deceptive packaging. A common technique is to use the low-value or *de minimis* exception to skirt inspection of these shipments. The President found that the PRC has the capacity to blunt this onslaught of tragedy and death, but it is unwilling to do so. Instead, the PRC and Chinese Communist Party (CCP) subsidize and incentivize chemical companies to export fentanyl and precursor chemicals to the United States. They support and protect PRC-origin criminal organizations that profit from the synthetic opioid crisis. And the President found that they actively sustain businesses that poison and kill Americans.

Given the synthetic opioid crisis, the use of apparently legitimate, low-value shipments to import illicit drugs, the PRC's contributions to the crisis, and the PRC's unwillingness to change its behavior, the President declared a national emergency and, as relevant here, directed under his emergency powers pursuant to the International Economic Emergency Powers Act (IEEPA) that "duty-free *de minimis* treatment under 19 U.S.C. 1321 shall not be available" for products of the PRC.

Axle's arguments that the President lacked authority to suspend the *de minimis* exemption for goods from China during a national emergency lack merit, and Axle fails to show any of the additional elements required for an injunction. Accordingly, the Court should deny Axle's motion and grant defendants' motions.

## BACKGROUND

I.    **Legal Background**

A.    **The President's Authority Under IEEPA To Regulate Importation During National Emergencies**

Before IEEPA, the Trading With the Enemy Act (TWEA), Pub. L. No. 65-91, 40 Stat. 411 (1917), authorized the President to "regulate … importation" of foreign goods during wartime and peacetime. *See* First War Powers Act, Pub. L. No. 77-354, 55 Stat. 838, 839-40 (1941). In 1971, President Nixon used TWEA's importation regulation authority to impose tariffs during peacetime. Proclamation 4074, 36 Fed. Reg. 15,724 (Aug. 17, 1971). The Federal Circuit's predecessor upheld those tariffs as a lawful exercise of the President's authority under TWEA, rejecting an argument that TWEA did not authorize the President to impose tariffs. *United States v. Yoshida Int'l, Inc.*, 526 F.2d 560, 575-76 (C.C.P.A. 1975).

Later, Congress modified the TWEA authority through two new laws: the National Emergencies Act (NEA) and IEEPA. *See* H.R. REP. NO. 95-459, at 6-7 (1977). First, the NEA, Pub. L. No. 94-412, 90 Stat. 1255 (1976), "authorized" "the President" "to declare {a} national emergency" "{w}ith respect to Acts of Congress authorizing the exercise, during the period of a national emergency, of any special or extraordinary power." 50 U.S.C. §1621(a). Congress placed no substantive conditions on the President's ability to declare a national emergency. Instead, it committed this determination to the President, because "it would be wrong to try to circumscribe with words with what conditions a President might be confronted." NEA: Hr'gs

Before the Subcomm. on Admin. Law and Gov't Relations, 94th Cong. 27 (Mar. 6, 1975) (statement of Sen. Mathias); *see id.* at 31 ("{W}e didn't attempt to define it specifically because we were afraid we would circumscribe the President's constitutional powers."); *id.* at 27 (statement of Sen. Church) (similar).

Recognizing that emergency declarations would be political questions, Congress gave itself oversight authority over national-emergency declarations. National-emergency declarations must be "immediately … transmitted to the Congress and published in the Federal Register." 50 U.S.C. §1621(a); *see id.* §1641(a)-(c). Congress is authorized to terminate an emergency by enacting a joint resolution. *Id.* §1622(a)(1). Congress also must meet within six months of the national-emergency declaration to consider terminating the emergency. *Id.* §1622(b). And national-emergency declarations automatically terminate after one year unless the President notifies Congress that the emergency "continue{s}." *Id.* §1622(d).

Second, IEEPA authorizes the President to exercise those powers during peacetime, "to deal with any unusual and extraordinary threat, which has its source in whole or substantial part outside the United States, to the national security, foreign policy, or economy of the United States." 50 U.S.C. §1701(a). Once the President declares a national emergency relating to such a threat, IEEPA empowers the President to "regulate … importation … with respect to any property, subject to the jurisdiction of the United States." *Id.* §1702(a)(1)(B). Unlike TWEA, IEEPA contains narrow exceptions to this broad grant of authority. *See id.* §1702(b)(1)-(4). But none of IEEPA's exceptions involve the President's authority to regulate (*i.e.*, temporarily suspend) the *de minimis* privilege to deal with a declared national emergency.

Congress gave itself additional oversight authority over exercises of IEEPA powers beyond that afforded by the NEA. *Id.* §1703(d). For example, the President is directed to

"consult regularly with the Congress so long as {IEEPA} authorities are exercised." *Id.* §1703(a). The President also is directed to "immediately transmit to the Congress a report" on the national emergency, to be updated every six months. *Id.* §1703(b)-(c). Even so, the Congress that enacted IEEPA recognized that its "new authorities should be sufficiently broad and flexible to enable the President to respond as appropriate and necessary to unforeseen contingencies." H.R. REP. NO. 95-459, at 10. For instance, Congress rejected a proposal to "place a definite time limit on the duration of any state of national emergency." *Id.*

## B.    History And Purpose Of The *De Minimis* Exemption Under 19 U.S.C. §1321(a)(2)(C)

The origin of the *de minimis* privilege was to codify the Government's existing discretionary "practice of waiving duties when, in the opinion of local customs officials, collecting the duty would be an inefficient use of government resources." Cong. Rsch. Serv., *Imports and the Section 321 (De Minimis) Exemption: Origins, Evolution, and Use*, Cong. Research Serv., R48380 at 5 (Jan. 31, 2025). In 1938, Congress amended the Tariff Act of 1930 by adding Section 321 (now 19 U.S.C. §1321), which authorized collectors of customs "to admit articles free of duty *when the expense and inconvenience of collecting the duty accruing thereon would be disproportionate to the amount of such duty*{.}" Customs Administrative Act of 1938, Pub. L. 75-721, 52 Stat. 1081 (June 25, 1938), ch.679, §7 (emphasis added). Congress placed a value limit on the articles eligible for duty-free admission at $1 per person per day. *Id.*

In 1953, Congress amended Section 321, resulting in substantially the same structure that exists today:

> (a) The Secretary of the Treasury, *in order to avoid expense and inconvenience to the Government disproportionate to the amount of revenue that would otherwise be collected*, is hereby authorized, under such regulations as he shall prescribe, to—

(1) disregard a difference of less than $3 between the total estimated duties or taxes deposited, or the total duties or taxes tentatively assessed, with respect to any entry of merchandise and the total amount of duties or taxes actually accruing thereon; and

(2) admit articles free of duty and of any tax imposed on or by reason of importation, but the aggregate value of articles imported by one person on one day and exempted from the payment of duty shall not exceed—

(A) $10 in the case of articles sent as bona fide gifts from persons in foreign countries to persons in the United States, or

(B) $10 in the case of articles accompanying, and for the personal or household use of, persons arriving in the United States who are not entitled to any exemption from duty or tax under paragraph 1798 (c) (2) of this Act, or

(C) $1 in any other case.

The *privilege* of this subdivision (2) shall not be granted in any case in which merchandise covered by a single order or contract is forwarded in separate lots to secure the benefit of this subdivision (2).

(b) The Secretary of the Treasury is authorized by regulations to diminish any dollar amount specified in subsection (a) and to prescribe exceptions to any exemption provided for in such subsection whenever he finds that such action is consistent with the purpose of such subsection or is necessary for any reason to protect the revenue or to prevent unlawful importations.

Customs Simplification Act of 1953, Pub. L. 83-243, ch. 397, §13, 67 Stat. 515 (Aug. 8, 1953) (emphases added). According to the history of the Customs Simplification Act, "the purpose" of this provision was "to avoid waste of customs manpower in determining and collecting trivial amounts of money," and "{t}he object of the {1953} amendment {was} the same as that of the original section{} … {as it was} necessary in order to minimize the cost of administering the customs service." Simplification of Customs Administration: Hearings on H.R. 1535 Before the Comm. On Ways and Means House of Rep., 82nd Cong., at 19 (1951). In its report

accompanying the amendment, the Ways and Means Committee again noted that Section 321 was "intended to avoid dissipating customs manpower in assessing and collecting duties in trivial amounts." H.R. REP. NO. 83-760, at 123 (1953).

Since then, Congress has periodically adjusted the dollar amounts in §1321. *See* H.R. REP. NO. 103-361, pt.1, at 144-45 (1993). For example, in 1993, Congress determined that amendments to §1321 were needed because "inflation and the substantial increases in passenger arrivals and low-value entries" meant that the statutory amounts that were then in place were "not sufficiently high for the statutorily stated goal of limiting expense to the Government disproportionate to the revenue that is collected." *Id.*; *see* S. REP. NO. 103-189, at 93 (1993). Congress therefore raised the daily value cap for imports that may qualify for the exemption from $5 to $200. Customs Modernization Act, Title VI of the North American Free Trade Agreement Implementation Act, Pub. L. 103-182, §651, 107 Stat. 2057, 2209 (1993). Congress also amended §1321(a)(2) by replacing "shall not exceed" with "shall not exceed an amount specified by the Secretary by regulation, but not less than." *Id.* Similarly, Congress deleted the phrase "to diminish any dollar amount specified in subsection (a)" from the Secretary's authority to reduce or modify any exemptions in §1321(a). *Id.*

In 2016, Congress passed the Trade Facilitation and Trade Enforcement Act of 2015 (TFTEA), which amended §1321(a)(2)(C) to increase the *de minimis* value from $200 to $800. TFTEA, Pub. L. No. 114-125, §901, 130 Stat. 122 (2016). In making this change, Congress found that "{h}igher thresholds for the value of articles that may be entered informally and free of duty provide significant economic benefits to businesses and consumers in the United States and the economy of the United States through costs savings and reductions in trade transaction costs." TFTEA §901(a)(2). But Congress did not otherwise alter the statutory authorization, the

purpose of which remains "to avoid expense and inconvenience to the Government disproportionate to the amount of revenue that would otherwise be collected," 19 U.S.C. §1321(a), the nature of which remains discretionary, *id.* (the Secretary "is authorized" but not required); or the characterization of the *de minimis* exemption as a "privilege," rather than a right, *id.* §1321(a)(2).[1]

## III.    Factual Background

### A.    The President's Declaration Of A National Emergency And The Executive Orders To Deal With The Emergency

On January 20, 2025, pursuant to the NEA,  the President declared a national emergency at the southern border involving, among other matters, the public-health crisis resulting from the flow of illicit narcotics into the United States.  Proclamation 10886, 90 Fed. Reg. 8327 (Jan. 29, 2025).

On February 1, the President issued Executive Order (EO) 14195, expanding the scope of the national emergency declared in Proclamation 10886 to cover the failure of the government of the PRC "to arrest, seize, detain, or otherwise intercept chemical precursor suppliers, money launderers, other {transnational criminal organizations (TCOs)}, criminals at large, and drugs." EO 14195, 90 Fed. Reg. 9121 (Feb. 7, 2025).  The President found that "the sustained influx of synthetic opioids has profound consequences on our Nation, including by killing approximately two hundred Americans per day, putting a severe strain on our healthcare system, ravaging our communities, and destroying our families." *Id.* at 9121.  Further, he found that many PRC-based

---

[1] The Secretary of Homeland Security presently administers the *de minimis* exemption under a transfer of functions to the Department of Homeland Security upon its creation and a statutorily authorized delegation from the Treasury Secretary.  Homeland Security Act of 2002 §§403, 412(a)(1), Pub. L. 107-296, 116 Stat. 2135 (2002), *codified at* 6 U.S.C. §101 *et seq.*; *see* 6 U.S.C. §203; Treasury Order 100-16; Treasury Order 100-20.  The authorization in 19 U.S.C. § 1321(a)(2)(C) is implemented in CBP regulations in 19 C.F.R. § 10.151.

chemical companies use deceptive shipping practices to evade law enforcement; that the CCP "has subsidized and otherwise incentivized PRC chemical companies to export fentanyl and related precursor chemicals that are used to produce synthetic opioids sold illicitly in the United States"; and that the CCP "provides support to and safe haven for PRC-origin {TCOs} that launder the revenues from the production, shipment, and sale of illicit synthetic opioids." *Id.* at 9121.  He found the emergency "constitutes an unusual and extraordinary threat, which has its source in substantial part outside the United States, to the national security, foreign policy, and economy of the United States." *Id.* at 9122.

Citing IEEPA, the President responded to this China-created emergency by imposing an additional 10 percent *ad valorem*[2] duty on, and suspending the *de minimis* exemption on most goods from the PRC, effective February 1, 2025.  *Id.*  The President delegated authority to DHS to implement the order's provisions.  *Id.*

On February 5, the President issued EO 14200, which amended EO 14195 by reinstating the *de minimis* exemption for covered goods from China until "notification by the Secretary of Commerce to the President that adequate systems are in place to fully and expediently process and collect tariff revenue."  EO 14200, 90 Fed. Reg. 9277 (Feb. 11, 2025).

On April 2, the President issued EO 14256, in which he announced that the Commerce Secretary had notified him that these adequate systems are now in place.  EO 14256, 90 Fed. Reg. 14,899, 14,899 (Apr. 2, 2025).  The President continued to find that "{m}any shippers based in the {PRC} hide illicit substances and conceal the true contents of shipments sent to the United States through deceptive shipping practices"; that "{t}hese shippers often avoid detection

---

[2]  The President later amended EO 14195 to increase the tariff on covered PRC goods from 10 to 20 percent *ad valorem*.  EO 14228, 90 Fed. Reg. 11,463 (Mar. 7, 2025).  Defendants refer to these duties as the "IEEPA tariffs."

due to administration of the *de minimis* exemption"; and that "these exports play a significant role in the synthetic opioid crisis in the United States." *Id.* Accordingly, the President suspended *de minimis* treatment for otherwise eligible goods from the PRC (which include products of Hong Kong) effective May 2, 2025. *Id.* The President directed that "{e}xecutive departments and agencies, including the Department of Homeland Security, through CBP, shall take all necessary actions to effectuate the objectives of this order, consistent with applicable law, including through temporary suspension or amendment of regulations or notices in the Federal Register." *Id.* at 14,900.

### B. Ministerial Agency Actions Implementing The Executive Orders Based On A Delegation Of The President's Authority

Soon after, DHS, through CBP, in a Federal Register notice, announced ministerial modifications to the Harmonized Tariff Schedule of the United States (HTSUS) that were necessary to effectuate the directives of EO 14195. 90 Fed. Reg. 9038 (Feb. 5, 2025). Specifically, this notice included an annex modifying subchapter III of chapter 99 of the HTSUS, to add new classification provisions—including heading 9903.01.20, which provided for the additional 10 percent *ad valorem* rate of duty for covered goods from the PRC. *Id.* at 9039. Heading 9903.01.20 included in its article description, that the covered products of PRC "shall not be eligible for the administrative exemption from duty and certain taxes at 19 U.S.C. {§}1321(a)(2)(C)—the so-called '*de minimis*' exemption." *Id.* at 9040 (note 2(s)).

In response to EO 14200, CBP amended its notice implementing EO 14195. 90 Fed. Reg. 9431 (Feb. 12, 2025). In particular, note 2(s) to subchapter III of chapter 99 of the HTSUS, incorporated by reference in the article description for heading 9903.01.20, was modified to provide that: "Products … that are provided for in heading 9903.01.20 and that are otherwise eligible for the administrative exemption from duty and certain taxes at 19 U.S.C. {§}

1321(a)(2)(C)—known as "*de minimis*" exemption—may continue to qualify for the exemption{.}" *Id.* at 9434.

In response to EO 14256, CBP issued another ministerial notice, stating, "{c}onsistent with {EO} 14256, duty-free *de minimis* treatment under 19 U.S.C. {§} 1321(a)(2)(C) shall no longer be available for products of the PRC described in Section 2(a) of {EO} 14195, that are entered for consumption, or withdrawn from warehouse for consumption, on or after 12:01 a.m. eastern daylight time on May 2, 2025." 90 Fed. Reg. 17,608, 17,609 (Apr. 28, 2025). The notice included an annex that modified the HTSUS to reflect, in new subdivision (w) to note 2 to subchapter III of chapter 99, that "{p}roducts of China and Hong Kong are not eligible for the administrative exemption from duty and certain taxes at 19 U.S.C. 1321(a)(2)(C){.}" *Id.* at 17,610. The notice also provided that "{a}ll CBP regulatory provisions that are not consistent with, or that otherwise impede CBP's ability to effectuate, the directives in Executive Order 14256 … are temporarily suspended or amended, as applicable, pursuant to the authorization in {EO} 14256 permitting CBP to take all necessary actions to effectuate the objectives of that order." *Id.*

## II.    Procedural Background

Axle sued on May 16, 2025. Compl., ECF No. 2. Counts I and II allege that the President lacked statutory and constitutional authority to suspend the *de minimis* exemption and that agency actions implementing the President's directive are arbitrary and capricious in violation of the APA. Counts III and IV allege that the IEEPA tariffs that apply to Axle's imported merchandise are unlawful and that agency actions implementing the IEEPA tariffs are arbitrary and capricious. On May 21, Axle moved for a preliminary injunction and partial summary judgment on Counts I and II. Mot. for Prelim. Injunction And Expedited Partial

Summ. J (Mot.), ECF No. 9.[3]

On May 28, 2025, this Court issued *V.O.S. Selections, Inc. v. United State*s, --F. Supp. 3d--, No. 25-00066, 2025 WL 1514124 (Ct. Int'l Trade May 28, 2025), in which it declared invalid and permanently enjoined, among others, EO 14195, and all modifications and amendments thereto.  The Federal Circuit *en banc* stayed the injunction pending the Government's appeal. *En banc* oral argument on the appeal is scheduled for July 31, 2025. *V.O.S. Selections, Inc. v. Trump*, No. 25-1812 (Fed. Cir.), ECF Nos. 51, 53.

On May 29, 2025, the United States District Court for the District of Columbia issued a decision in a similar case.  *Learning Resources Inc. v. Trump*, No. 25-1248, ECF No. 37 (D.D.C. May 29, 2025).  There, the court held that IEEPA does not permit imposition of any tariffs, so the executive orders (including EOs 14195 and 14228) imposing the IEEPA tariffs are *ultra vires*.  *Id.* at 13-14, 27.  The court granted a preliminary injunction, but stayed the operation of the injunction.  *Id.* at 33 & ECF No. 42.

### SUMMARY OF ARGUMENT

The Court should dismiss Counts II and IV of Axle's complaint.  The decisions Axle challenges are the President's, and the President is not subject to APA review.  Axle's backdoor attempt to attribute the decisions to DHS and CBP fails because the bar on APA review of

---

[3]  In its complaint and brief, Axle references "EO 14194" only once. Compl. ¶ 59; Mot.2.  In relevant part, EO 14194 temporarily suspended the *de minimis* exemption for certain goods from Mexico, 90 Fed. Reg. 9117, 9119 (Feb. 1, 2025); EO 14227 later reinstated it, 90 Fed. Reg. 11371 (Mar. 2, 2025). Yet, in its prayer for relief and proposed order, Axle requests that this Court declare EO 14194 unlawful.  Compl. at 33; Proposed Order at 2, ECF No. 9-2. Axle has waived any challenge to EO 14194 for failing to meaningfully raise it in its complaint and failing to address it in its brief.  *See SmithKline Beecham Corp. v. Apotex Corp.*, 439 F.3d 1312, 1319 (Fed. Cir. 2006) (It "is well established that arguments not raised in the opening brief are waived."); *De Laval Separator Co. v. United States*, 511 F.Supp.810, 812 (Ct. Int'l Trade 1981). ("{I}t is axiomatic that any claim which is not pressed is deemed abandoned.").

actions by the President extends to the ministerial actions of agencies implementing a presidential decision.  DHS posted notices of the EOs in the Federal Register, and CBP collected duties, but those are ministerial actions taken to implement the EOs pursuant to presidential delegation, not the culmination of any agency decisionmaking process subject to APA review in their own right.

The Court should also grant summary judgment to defendants on Counts I and III. Axle's challenge to the temporary, partial suspension of the *de minimis* exemption primarily rests on alleged violations of 19 U.S.C. §1321.  But the President suspended the exemption under IEEPA, a wholly independent statutory authority.  IEEPA authorizes the President himself to "regulate … importation" of foreign goods, which includes suspension of the *de minimis* privilege.  It likewise authorizes the President to "nullify" and "void" preexisting "rights" and "privileges" granted by other authorities, expressly contemplating that IEEPA actions will override privileges, like the *de minimis* exemption, that are created by other statutes and regulations.

Axle's preliminary-injunction request based on Counts I and II should also be denied. Axle's arguments fail on the merits, and the Court need not consider whether a preliminary injunction is warranted.  But if the Court does consider preliminary relief, Axle is unlikely to succeed on the merits of its case for the reasons explained.  It likewise cannot establish irreparable harm, given that it alleges no more than speculative economic loss, the *de minimis* exemption has a negligible impact on Axle's duty liability and, in any event, it would have the possibility of a refund of any duties through the reliquidation of entries.  And the equities and public interest cut against enjoining the President from using his foreign-affairs powers to protect

the United States from unusual and extraordinary threats to the country's economy and national security.

## ARGUMENT

### I.    The Court Should Dismiss Counts II And IV Of Axle's Complaint

#### A.    Standard Of Review

The Court may dismiss a complaint for failure to state a claim upon which relief can be granted.  USCIT R. 12(b)(6).  A complaint must be dismissed if it fails to present a legally cognizable right of action, *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007), or "a claim to relief that is plausible on its face," *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570).  Although "the court must accept well-pleaded factual allegations as true and must draw all reasonable inferences in favor of the claimant," *Kellogg Brown & Root Servs., Inc. v. United States*, 728 F.3d 1348, 1365 (Fed. Cir. 2013), it need not accept legal conclusions, *Twombly*, 550 U.S. at 555.  Nor is this Court bound to "accept as true allegations that contradict matters properly subject to judicial notice or by exhibit" in ruling on a 12(b)(6) motion.  *Secured Mail Sols. LLC v. Universal Wilde, Inc.*, 873 F.3d 905, 913 (Fed. Cir. 2017) (cleaned up).

#### B.    The President Is Not An "Agency" Under the APA, And Agency Defendants Acted Under A Delegation Of Presidential Authority

Counts II and IV allege that agency actions implementing the EOs are arbitrary and capricious.  Compl. ¶¶99-105, 111-14.  Axle argues that the "Executive Branch's" suspension of the *de minimis* exemption for low-value goods from China is arbitrary and capricious.  Mot.22-25.  Under the APA, agency action may be set aside if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. §706(2)(A); *FCC v. Prometheus Radio Project*, 592 U.S. 414 (2021).  Axle's claim fails because (1) the President is not an

"agency" under the APA, and (2) DHS's posting of notices of the EOs in the Federal Register and CBP's modification of the HTSUS to implement the EOs and collect duties in accordance thereof are ministerial actions and not the culmination of an agency decisionmaking process.

In *Franklin v. Massachusetts*, 505 U.S. 788 (1992), the Supreme Court held that "the President is not an agency within the meaning of the Act," so his actions do not constitute "final agency action that may be reviewed under the APA standards." *Id.* at 796. Two years later, the Court reaffirmed *Franklin* and further explained that "{w}here a statute … commits decisionmaking to the discretion of the President, judicial review of the President's decision is not available." *Dalton v. Specter*, 511 U.S. 462, 464, 477 (1994). Here, the President issued the EOs, so they are not a "final agency action" subject to APA review.

Axle recognizes that "the President's actions are not *directly* subject to APA review," so it instead tries to subject them to APA review indirectly by targeting "the agency actions implementing" the EOs. Mot.23 (emphasis added). The only agency actions Axle identifies, though, are DHS's May 2 notice that "it would begin to collect tariffs on goods that otherwise would qualify for de minimis treatment," and "collecting tariffs pursuant to this policy." Mot.22. Axle reveals its strategy to indirectly subject the President's actions to APA review by, for example, attacking EO 14256 for giving a "barebones explanation" for abrogating the *de minimis* exemption that "failed to consider reasonable alternatives." Mot.24. This Court should reject Axle's backdoor attempt to subject presidential actions to APA review.

The "bar on APA review of actions by the President extend{s} to the actions of agencies when they act under a delegation of presidential authority{.}" *Ancient Coin Collectors Guild v. CBP*, 801 F.Supp.2d 383, 402 (D. Md. 2011), *aff'd*, 698 F.3d 171 (4th Cir. 2012). An agency's ministerial action that merely implements the President's decision thus is not subject to APA

review.  *See Invenergy Renewables LLC v. United States*, 482 F. Supp. 3d 1344, 1354 (Ct. Int'l

Trade 2020) (no APA review of the United States Trade Representative's implementation of a

presidential proclamation because "the President is not himself subject to the APA," and "this

attempt to formulate claims under the APA … is too tenuous a connection.") (citing *Franklin*,

505 U.S. at 800-01).  That conclusion is "particularly justified" where, as here, an agency

effectuates a presidential decision "in the realm of foreign affairs."  *Ancient Coin*, 801 F.Supp.2d

at 403 (case challenging import restrictions on certain coins); *see Jensen v. Nat'l Marine

Fisheries Serv. (NOAA)*, 512 F.2d 1189, 1191 (9th Cir. 1975) ("For the purposes of this appeal

the Secretary's actions are those of the President, and therefore by the terms of the APA the

approval of the regulation at issue here is not reviewable.").

     DHS and CBP took only ministerial actions to implement the President's decisions by

posting notices, modifying the applicable HTSUS provisions, and collecting duties announced by

the President.  Therefore, the agencies' actions implementing the EOs remain outside the scope

of APA review.  An agency need not provide separate, APA-compliant explanations for

ministerial actions it takes to implement a presidential decision announced in an EO; otherwise,

the rule that the President's actions are not subject to APA review would lack any practical

significance.  An agency thus cannot "consider reasonable alternatives" to a policy that the

President has mandated—exercising authority that Congress vested specifically in him—and

directed the agency to implement.  *See Bradford v. U.S. Dep't of Lab.*, 101 F.4th 707, 731 (10th

Cir. 2024) (ruling that "it would have been futile for DOL to have considered comments

advocating alternatives that it lacked discretion to adopt.  In other words, to consider and adopt

any such alternatives would require DOL to defy an executive order—which would clearly

constitute an arbitrary and capricious agency action."); *Sherley v. Sebelius*, 689 F.3d 776, 784-85

(D.C. Cir. 2012) (explaining that "an agency under the direction of the executive branch … must implement the President's policy directives to the extent permitted by law," so the agency properly "limited the scope of its" action and did not have to consider issues settled by the Presidential directive).  The relevant authority here is not one delegated to or exercised by CBP or DHS; rather, it is the power that Congress expressly vested in the President.  *See USP Holdings, Inc. v. United States*, 36 F.4th 1359, 1369 (Fed. Cir. 2022) (concluding for Section 232 that the Commerce "Secretary's threat determination is not reviewable under the APA arbitrary and capricious standard" because the determination overlaps with the President's determination made via the President's delegated authority).

Underscoring this, DHS and CBP did not—and could not—engage in a "decisionmaking process," the result of which "will directly affect the parties."  *Franklin*, 505 U.S. at 796-97; *see Dalton*, 511 U.S. at 470 (similar).  Agency action reviewable under the APA requires a non-ministerial agency decisionmaking process that culminates in a final agency decision.  Posting a notice of the President's decision, modifying the HTSUS to reflect that decision, and collecting duties announced by the President neither involves nor requires such a process.  *See, e.g., Franklin*, 505 U.S. at 796 (noting the lack of official administrative record generated when holding the challenge not reviewable under the APA); *Bradford*, 101 F.4th at 731 (stating that when the DOL was compelled by a 2021 EO to rescind a 2018 EO, that recission "could not have been an arbitrary and capricious exercise of agency discretion because the agency had *no discretion* to act otherwise.") (emphasis in original); *cf. Indus. Chems., Inc. v. United States*, 941 F.3d 1368, 1371-72 (Fed. Cir. 2019) (affirming dismissal of the case for lack of jurisdiction when CBP's ministerial actions are not protestable, and discussing other cases which held similarly).

17

The cases Axle cites do not support its position. They involved agencies taking discretionary actions to effectuate presidential goals—not ministerial announcements that merely implemented actions already announced in an EO. In *Chamber of Commerce of the United States v. Reich*, 74 F.3d 1322 (D.C. Cir. 1996), the President announced a new pro-labor "policy" for federal contracting in an EO and charged the Secretary of Labor with "implementing and enforcing" the new policy. *Id.* at 1325. The EO permitted the Secretary, for example, to "make a finding that it is appropriate" to terminate a government contract for convenience, to find facts about whether labor disputes have been resolved, and to evaluate whether there is "a compelling reason" for granting an exception to the government's new contracting policy. *Id.* at 1325. Implementing the new policy required meaningful non-ministerial rulemaking to define terms in the EO and to "set forth the factors to be considered in determining" whether a labor dispute has been resolved. *Id.* at 1324-25. But unlike Axle's suit, the challenge to the EO and the Secretary's rulemaking in *Chamber* was not grounded in the APA. *Id.* at 1326 ("Appellants could not possibly have relied on the APA for a cause of action prior to the Secretary's issuance of regulations implementing the Executive Order because, as the government correctly emphasizes, the President is not an 'agency' under that Act and appellants sued before the Secretary issued his regulations."). The D.C. Circuit, therefore, did not review the Secretary's regulations, which were "necessary to 'flesh out'" the EO, under the APA. *Id.* at 1326-27. If anything, *Chamber* cuts against Axle's arguments here because unlike there, the EOs CBP and DHS implemented were "ripe" from its issuance, the CBP and DHS actions Axle identifies are purely ministerial, and did not "flesh out" policy determinations; these actions merely implemented the President's detailed and fleshed out decision to suspend the *de minimis* privilege.

*Nebraska v. Su*, 121 F.4th 1 (9th Cir. 2024), *petition for reh'g en banc pending,* is similarly inapposite. There, the Ninth Circuit held that a Department of Labor rule implementing an EO, following notice-and-comment rulemaking, was subject to APA review. *Id.* at 4-5, 15. As the Ninth Circuit pointed out, the EO gave the agency "considerable discretion," including determining the definitions of "relevant terms" and identifying "appropriate{} exclusions from the requirements of" the EO. *Id.* at 17. No such discretion was present in the wholly ministerial actions Axle identifies here.

In sum, DHS's posting of notices and CBP's modification of the HTSUS and collection of duties to conform to the President's decisions are not reviewable agency action under the APA.

## II.    The Court Should Grant Summary Judgment To Defendants

### A.    Standard Of Review

Summary judgment is appropriate where there are no genuine disputes as to any material fact. USCIT R. 56(a); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986). Because this case "hinges on pure questions of law," there are no material factual disputes to resolve and "resolution by summary judgment is appropriate." *Canadian Wheat Bd. v. United States*, 580 F.Supp.2d 1350, 1356 (Ct. Int'l Trade 2008), *aff'd*, 641 F.3d 1344 (Fed. Cir. 2011). The Court may grant summary judgment in favor of the nonmovant. USCIT R. 56(f)(1).

 "In international trade controversies of this highly discretionary kind—involving the President and foreign affairs—this court and its predecessors have often reiterated the very limited role of reviewing courts." *Maple Leaf Fish Co. v. United States*, 762 F.2d 86, 89 (Fed. Cir. 1985). "For a court to interpose, there has to be a clear misconstruction of the governing statute, a significant procedural violation, or action outside delegated authority." *Id.* (emphasis added); *see, e.g.*, *Corus Grp. PLC. v. ITC*, 352 F.3d 1351, 1361 (Fed. Cir. 2003); *Silfab Solar,*

*Inc. v. United States*, 892 F.3d 1340, 1346 (Fed. Cir. 2018); *USP Holdings*, 36 F.4th at 1365;

*PrimeSource Bldg. Prods., Inc. v. United States*, 59 F.4th 1255, 1260 (Fed. Cir. 2023).

    **B.**    **The President's Lawful Suspension Of The *De Minimis* Exemption Does Not Conflict With 19 U.S.C. §1321's Discretionary Framework**

Section 1321 applies to ordinary customs administration under ordinary circumstances and confers discretionary power on the Treasury Secretary. IEEPA, by contrast, is an emergency statue that authorizes the President to "nullify" and "void" preexisting "privileges" granted by other authorities (like the privilege of the *de minimis* exemption) when necessary to address an unusual and extraordinary threat to U.S. national security, foreign policy, or economy. There is no conflict between the two statues; §1321 remains the mechanism for customs administration absent a declared emergency, whereas IEEPA operates as a separate, emergency override.

Axle argues that the President's EO suspending the *de minimis* exemption for goods from China violates §1321(a)(2)(C), which Axle contends leaves no authority to suspend the *de minimis* exemption. Mot.14-16. According to Axle, even if the Executive Branch can alter the *de minimis* exemption, it can only do so through notice-and-comment rulemaking, as required by §1321(b). *Id.* at 17-19. Both of these arguments are irrelevant because the President acted pursuant to a wholly independent *emergency* statutory authority: IEEPA. EO 14256, 90 Fed. Reg. 14,899. IEEPA authorizes the President to suspend the *de minimis* exemption during a period of national emergency. *See* 50 U.S.C. §1702(a)(1)(B). The President has properly declared a national emergency, and IEEPA authorizes the President to regulate (*i.e.*, temporarily suspend) the exemption. Axle's arguments about §1321 mischaracterize the purpose and operation of §1321 and misapprehend the relationship between §1321 and IEEPA.

1.    **IEEPA Authorizes The President To Pause The *De Minimis* Exemption During A National Emergency**

IEEPA's text, history, and purpose confirm that it empowers the President to temporarily suspend the *de minimis* exemption during a national emergency.  Axle's contrary arguments are unpersuasive.

i.    **IEEPA's Text, History, And Purpose Demonstrate This Authority**

First, IEEPA's text authorizes the President to temporarily suspend duty-free treatment for low-value goods.  When a national emergency is declared:

> {T}he President may, under such regulations as he may prescribe, by means of instructions, licenses, or otherwise … investigate, block during the pendency of an investigation, *regulate*, direct and compel, nullify, void, prevent or prohibit, any acquisition, holding, withholding, use, transfer, withdrawal, transportation, *importation* or exportation of, or dealing in, *or exercising any right, power, or privilege* with respect to, or transactions involving, *any property* in which any foreign country or a national thereof has any interest by any person, or with respect to any property, subject to the jurisdiction of the United States.

50 U.S.C. §1702(a)(1)(B) (emphases added).  Temporary suspension of a statutory privilege, such as the *de minimis* exemption, falls within the power to "regulate … importation" of foreign low-value goods and to "nullify" or "void" any "right … or privilege with respect to" that property.  *Id.*

To start, the power to suspend the *de minimis* exception is consistent with the definition of "regulate," both now and when IEEPA was enacted.  *See, e.g.*, *Regulate*, Black's Law Dictionary (12th ed. 2024) ("To control (an activity or process) esp. through the implementation of rules"); *Regulate*, Black's Law Dictionary 1156 (5th ed. 1979) ("{F}ix, establish or control; to adjust by rule, method, or established mode; to direct by rule or restriction; to subject to governing principles or laws").  CBP or Treasury regulations affording *de minimis* treatment to

certain goods are clearly regulations of importation. IEEPA authorizes the President himself to regulate importation in an emergency. That authority straightforwardly contemplates the suspension of existing import regulations.

In any event, other language in the statute separately supports the same conclusion. IEEPA also authorizes the President to "nullify" or "void" "any … right" or "privilege with respect to" covered property. 50 U.S.C. §1702(a)(1)(B). That language again expressly permits the President to override preexisting privileges, such as duty-free treatment granted by existing statutes and regulations.

Precedent confirms this straightforward reading of IEEPA's language. *Yoshida* interpreted the substantively identical statutory text of IEEPA's predecessor statute—the power "to 'regulate importation'"—and held that it includes the power to "impos{e} an import duty surcharge." 526 F.2d at 576; *see id.* at 575. That interpretation controls here. *See S. Corp. v. United States*, 690 F.2d 1368, 1370 (Fed. Cir. 1982) (Federal Circuit adopting holdings of the Court of Customs and Patent Appeals (CCPA)). Courts have likewise long held that tariffs are a form of regulation of commerce. *See, e.g.*, *Bd. of Trs. of Univ. of Ill. v. United States*, 289 U.S. 48, 58 (1933) (recognizing that it is "well established" that import duties may be imposed "in the exercise of the power to regulate commerce"). And this Court did not say otherwise in its recent decision addressing the issue. *See V.O.S. Selections*, 2025 WL 1514124, at *10 ("{W}e do not read IEEPA to delegate an *unbounded* tariff authority to the President. We instead read IEEPA's provisions to impose meaningful limits *on any such authority* it confers.") (emphasis added); *id.* at 12 (discussing *Yoshida*'s holding that the identical language in TWEA "'is broad' and includes the power to 'impos{e} an import duty surcharge'") (citations omitted).

22

Thus, if IEEPA authorizes the President to impose at least some tariffs during a national emergency under the President's authority to "regulate" importation, then it certainly authorizes the President to temporarily suspend a duty-free privilege, the purpose of which is "to avoid expense and inconvenience to the Government." 19 U.S.C. §1321(a). Especially here, where the suspension is limited only to low-value goods from China and Hong Kong, and is done to address the public health emergency caused in part by many PRC-based shippers "hid{ing} illicit substances and conceal{ing} the true contents of shipments sent to the United States through deceptive shipping practices" and being able to "avoid detection" through low-value shipments exempt from tariffs, as well as to impose pressure on China to address its contributions to the fentanyl crisis. *Id.* at 14,899.[4]

Second, IEEPA's history further confirms that it authorizes the President to suspend duty-free treatment on low-value goods from China. "Congress is presumed to be aware of an administrative or judicial interpretation of a statute," *Lorillard v. Pons*, 434 U.S. 575, 580 (1978), and "when Congress 'adopt{s} the language used in {an} earlier act,'" courts "presume that Congress 'adopted also the construction given'" to that language, *Georgia v. Public.Resource.Org*, 590 U.S. 255, 270 (2020). Key language in IEEPA, "regulate … importation," was taken verbatim from TWEA. *See* Dec. 18, 1941, ch. 593, title III, §301, 55 Stat. 839 (authorizing the President to "investigate, regulate, direct and compel, nullify, void, prevent or prohibit, any acquisition holding, withholding, use, transfer, withdrawal, prevent or prohibit, any acquisition holding, withholding, use, transfer, withdrawal, transportation, importation or exportation of, or dealing in …"); 50 U.S.C. §1702(a)(1)(B); *see*

---

[4] In fact, Section 321 contemplates suspension of the *de minimis* privilege in the exact circumstance the President directed: "The Secretary of the Treasury is authorized by regulations to prescribe exceptions to any exemption provided for in subsection (a) whenever he finds that such action is consistent with the purpose of subsection (a) or is necessary for any reason to protect the revenue or *to prevent unlawful importations*." 19 U.S.C. §1321(b) (emphasis added).

*also Dames & Moore v. Regan*, 453 U.S. 654, 671-72 (1981) (the pertinent section of IEEPA's language was "directly drawn" from TWEA); *Regan v. Wald*, 468 U.S. 222, 227-28 (1984) ("{T}he authorities granted to the President {under} IEEPA are essentially the same as those {under} TWEA.").  During the legislative process for IEEPA, Congress also knew of *Yoshida*'s interpretation of TWEA when it chose to use the same language in IEEPA.  The House Report on IEEPA cited *Yoshida* and explained its holding.  H.R. REP. NO. 95-459, at 5.  Thus, Congress removed any doubt about the President's authority to impose tariffs by incorporating the "regulate importation" language into IEEPA after *Yoshida*.  If this history confirms the President's authority to impose tariffs during a national emergency, then it certainly confirms the President's authority to suspend duty-free treatment of low-value goods from a particular country.

Third, IEEPA's evident purpose confirms that it includes the power to regulate tariffs. The purpose of emergency statutes, like IEEPA, is to give the President broad and flexible powers to effectively address problems associated with a national emergency.  As the CCPA explained, "the primary implication of an emergency power is that it should be effective to deal with a national emergency successfully."  *Yoshida*, 526 F.2d at 573.  "The delegation in {TWEA} is broad and extensive; it could not have been otherwise if the President were to have, within constitutional boundaries, the flexibility required to meet problems surrounding a national emergency with the success desired by Congress."  *Id.*  Indeed, "the legislative history of {IEEPA} notes that the authorities available to the President should be sufficiently broad and flexible to enable the President to respond as appropriate and necessary to unforeseen contingencies."  6 U.S. Op. Off. Legal Counsel 644, 681 (1982) (cleaned up).  Interpreting IEEPA to include the power to temporarily suspend the *de minimis* exemption furthers

Congress's purpose to give the President the necessary tools and flexibility to effectively handle emergencies.

Especially in this context. When it comes to foreign affairs, "broad grants by Congress of discretion to the Executive are common." *Florsheim Shoe Co. v. United States*, 744 F.2d 787, 795 (Fed. Cir. 1984). IEEPA "is intimately involved with foreign affairs, an area in which congressional authorizations of presidential power should be given a broad construction and not hemmed in or cabined, cribbed, confined by anxious judicial blinders." *Id.* at 793 (cleaned up); *see, e.g.*, *B-West Imports, Inc. v. United States*, 75 F.3d 633, 636 (Fed. Cir. 1996) (reiterating "the principle that statutes granting the President authority to act in matters touching on foreign affairs are to be broadly construed"). When foreign affairs and national security are involved, "the President plays a dominant role," and "it is generally assumed that Congress does not set out to tie the President's hands; if it wishes to, it must say so in clear language." *Humane Soc. of U.S. v. Clinton*, 236 F.3d 1320, 1329 (Fed. Cir. 2001).

## 2. IEEPA Is A Valid Delegation Of Congressional Authority

In only a single sentence, Axle asserts that "*if* IEEPA purported to grant the President unilateral power to change tariff rates, it would be an unconstitutional delegation because it provides no 'intelligible principle' to constrain the quintessentially legislative power." Mot.21. That perfunctory argument is thus forfeited. *See, e.g.*, *United States v. Great Am. Ins. Co. of New York*, 738 F.3d 1320, 1328 (Fed. Cir. 2013) (undeveloped arguments may be deemed forfeited); *SmithKline*, 439 F.3d at 1319-20; *Rodriguez v. Dep't of Veterans Affs.*, 8 F.4th 1290, 1305 (Fed. Cir. 2021) ("An issue that is merely alluded to and not developed as an argument in a party's brief is deemed waived.").

In any event, the nondelegation doctrine provides no basis to invalidate or cabin IEEPA. First, the Supreme Court has long held that the nondelegation doctrine is inapplicable in the

foreign-affairs context, especially delegations to the President. *See United States v. Curtiss-Wright Export Corp.*, 299 U.S. 304, 314-29 (1936). Article II gives the President the "lead role in foreign policy." *American Ins. Ass'n v. Garamendi*, 539 U.S. 396, 415 (2003) (cleaned up). And any "limitations" on Congress's authority to delegate are "less stringent in cases where the entity exercising the delegated authority itself possesses independent authority over the subject matter." *United States v. Mazurie*, 419 U.S. 544, 556-57 (1975). When Congress delegates "authority over matters of foreign affairs," therefore, it "must of necessity paint with a brush broader than that it customarily wields in domestic areas." *Zemel v. Rusk*, 381 U.S. 1, 17 (1965).

Particularly salient here, the Supreme Court has long approved broad congressional delegations to the President to regulate international trade, including through tariffs. *E.g.*, *Fed. Energy Admin. v. Algonquin SNG, Inc.*, 426 U.S. 548, 558-560 (1976); *J.W. Hampton, Jr., & Co. v. United States*, 276 U. S. 394, 406, 409 (1928); *Marshall Field & Co. v. Clark*, 143 U.S. 649, 680 (1892); *Cargo of Brig Aurora v. United States*, 7 Cranch 382, 384-88 (1813); *see Gundy v. United States*, 588 U.S. 128, 158-59 (2019) (Gorsuch, J., dissenting). As the Court admonished in *Curtiss-Wright*: "It is important to bear in mind that we are here dealing not alone with an authority vested in the President by an exertion of legislative power, but with such an authority plus the very delicate, plenary and exclusive power of the President as the sole organ of the federal government in the field of international relations—a power which does not require as a basis for its exercise an act of Congress." 299 U.S. at 319-20.

Even if the nondelegation doctrine applied to this foreign-affairs context, IEEPA easily satisfies its requirements. Congress in IEEPA did not delegate legislative power to another branch or grant an agency unbounded discretion to regulate private parties. Congress, at most, "commit{ted} something to the discretion" of the Executive, *Wayman v. Southard*, 23 U.S. (10

Wheat.) 1, 46 (1825), which is perfectly permissible so long as Congress sets forth "an intelligible principle to which the person or body authorized to {act} is directed to conform," *Hampton*, 276 U.S. at 409.  Though the nondelegation standard is "not demanding," *Gundy*, 588 U.S. at 146, it is not a toothless requirement:  Congress must delineate both "the general policy" and "the boundaries of th{e} delegated authority."  *American Power & Light Co. v. SEC*, 329 U.S. 90, 105 (1946); *see Gundy*, 588 U.S. at 157 (Gorsuch, J., dissenting) ("{A}s long as Congress makes the policy decisions when regulating private conduct, it may authorize another branch to 'fill up the details.'").

And in IEEPA, the general policy is obvious:  "to deal with any unusual and extraordinary {foreign} threat … to the national security, foreign policy, or economy of the United States" during a "national emergency" by authorizing the President personally to, among a litany of other powers, "regulate … importation" of property.  50 U.S.C. §§1701(a), 1702(a)(1)(B).  IEEPA's boundaries are likewise plain and far from unbounded:  the President may exercise his authorities only "to deal with an unusual and extraordinary threat with respect to which a national emergency has been declared," and may not exercise those authorities to "regulate or prohibit, directly or indirectly," an enumerated list of items.  *Id.* §§1701(b), 1702(b).  Moreover, Congress itself oversees the President's exercise of authority in this area.  *See United States v. Amirnazmi*, 645 F.3d 564, 577 (3d Cir. 2011) ("In effecting the shift of peacetime authority from TWEA to IEEPA, Congress 'placed several procedural restrictions on the President's exercise of the national-emergency powers, including congressional consultation, review, and termination.'").  As noted, this Court has repeatedly upheld multiple statutes granting the President broad authority to set or change tariffs.  *See Algonquin*, 426 U.S. at 558-60; *Hampton*, 276 U.S. at 409; *Marshall Field*, 143 U.S. at 683-89.  And every court of appeals

to have considered the question has upheld IEEPA against nondelegation challenges.  *See United States v. Shih*, 73 F.4th 1077, 1092 (9th Cir. 2023) (collecting cases), *cert. denied*, 144 S. Ct. 820 (2024).

### 3.    Section 1321 Does Not Constrain The President's Emergency Powers Under IEEPA

Because the President suspended the *de minimis* exemption pursuant to IEEPA, and IEEPA authorizes the President to do so under his broad authority to "regulate" imports and "nullify" or "void" privileges in covered property during a national emergency, Axle's §1321 arguments fail.

Although §1321 and IEEPA address privileges and tariffs, Courts "approach federal statutes touching on the same topic with a 'strong presumption' they can coexist harmoniously. Only by carrying a 'heavy burden can a party" establish "that one statute 'displaces' a second." *Dep't of Agric. Rural Dev. Rural Hous. Serv. v. Kirtz*, 601 U.S. 42, 63 (2024); *see also Rahmani v. Yellen*, No. CV 24-0285 (RC), 2024 WL 1701681, at *12 (D.D.C. Apr. 19, 2024) (rejecting argument that a statute specifically dealing with corruption limited President's power to impose corruption-related sanctions under IEEPA because the statutes did not "irreconcilably conflict). That burden is not satisfied here.

Congress enacted §1321 to streamline customs processing for low-value shipments, not to override or constrain the President's emergency powers under IEEPA.  The provisions of §1321 apply to "the Secretary of the Treasury."  19 U.S.C. §1321(a), (b).  Since its enactment in 1938, the exemption's purpose has always expressly been "to avoid expense and inconvenience to the Government disproportionate to the amount of revenue that would otherwise be collected." *Id.* §1321(a); Pub. L. 75-721, 52 Stat. 1081, c. 679, §7.  And the Secretary's authority under §1321 has always been discretionary.  19 U.S.C. §1321(a) (the Secretary "is authorized" but not

required to promulgate regulations creating a *de minimis* exemption); Pub. L. 83-243, c. 397, §13, 67 Stat. 515.  Plus, the duty-free treatment that the Secretary is "authorized" to prescribe has always been characterized as a "privilege," rather than a right, of those receiving it.  19 U.S.C. §1321(a)(2)(C).  Nothing in the language or history of §1321 suggest that any of its provisions are meant to cabin the *President's* authority under IEEPA.

Axle overreads §1321(a)(2)'s "not less than" language—which sets a floor for any *de minimis* exemption the Treasury Secretary (and now the Homeland Security Secretary) chooses, in his or her discretion, to implement during normal customs operations—and the 1993 amendment to §1321(b), which deleted the phrase "to diminish any dollar amount specified in subsection (a)" from the Secretary's authority to reduce or modify any exemptions in §1321(a).  *See* Mot.15-16.  Nothing in those provisions, which impose requirements for any *de minimis* privilege created by the Secretary, requires the Secretary to create a *de minimis* privilege, immunizes low-value goods from otherwise being "regulate{d}" by the President pursuant to IEEPA, or purports to create a "right" or "privilege" that the President cannot "nullify" or "void" pursuant to IEEPA.  The amendment to §1321(b) simply narrowed the scope of the Secretary's regulatory discretion under §1321 itself; it did not curtail or repeal the President's emergency powers under IEEPA.

Moreover, as the CCPA in *Yoshida* explained, "{t}he existence of limited authority under certain trade acts does not preclude the execution of other, broader authority under a national emergency powers act."  526 F.2d at 578.  As in *Yoshida*, "Congress has said what may be done with respect to foreseeable events in the {19 U.S.C. §1321} and has said what may be done with respect to unforeseeable events in {IEEPA}. In the latter, Congress necessarily intended a grant of power adequate to deal with national emergencies."  *Id.*  It is "unreasonable to suppose that

Congress passed {IEEPA}, delegating broad powers to the President for periodic use during national emergencies, while intending that the President, when faced with such an emergency, must follow limiting procedures prescribed in other acts designed for continuing use during normal times." *Id.*

Indeed, the Supreme Court has confirmed that the President's emergency powers are broad and the exercise of those powers may necessarily impact longstanding entitlements. In *Regan v. Wald*, for example, the Supreme Court rejected a claim that restrictions on travel-related transactions with Cuba, imposed pursuant to section 5(b) of TWEA that was grandfathered into IEEPA, violated that right. 468 U.S. at 240-43. The Court reasoned that "the Fifth Amendment right to travel, standing alone, {is} insufficient to overcome the foreign policy justifications supporting the restrictions." *Id.* at 242.

Plaintiff claims that the Federal Circuit in *National Customs Brokers & Forwarders Ass'n of America, Inc. v. United States*, 59 F.3d 1219 (Fed. Cir. 1995), already interpreted §1321 to mandate the *de minimis* privilege for imports under $800. *See* Mot.14-15. But the court did nothing of the sort. In that case, the Federal Circuit addressed the question whether if the Secretary used his discretion to activate the *de minimis* exception, the Secretary could set a floor lower than Congress's specified amount (then, $200, and now $800). After twice observing that §1321 "authorizes" the Secretary (*i.e.*, gives the Secretary discretion) to create a *de minimis* exemption, *id.* at 1220, 1221, the court concluded that once the Secretary used his discretion to activate the *de minimis* privilege, his "discretion" was "limit[ed]" by the "the specified minimum level" (*i.e.*, the floor) Congress set, *id.* at 1223. In other words, the court concluded that once the Secretary uses his discretion to trigger the *de minimis* privilege, he could not limit that privilege to imports below the congressionally set floor but he could "set a higher limit." *Id.* at 1220.

Nowhere did the court decide that Congress revoked the Secretary's discretion to activate the *de minimis* privilege in the first place, mandating *that the Secretary create* a *de minimis* privilege. Nor did the court decide the President's authority under IEEPA.  *See Arthrex, Inc. v. Smith & Nephew, Inc.*, 880 F.3d 1345, 1349 (Fed. Cir. 2018) ("When a prior decision does not squarely address an issue, a court remains free to address the issue on the merits" in a subsequent case.") (cleaned up).  To read *National Customs Brokers* otherwise, as Axle does, would require wrenching statements from their context and unreasonably reading the decision to decide issues clearly not presented. *See Nat'l Pork Producers Council v. Ross*, 598 U.S. 356, 373-74 (2023) ("opinions dispose of discrete cases and controversies and they must be read with a careful eye to context"); *Brown v. Davenport*, 596 U.S. 118, 141 (2022) ("We neither expect nor hope that our successors will comb these pages for stray comments and stretch them beyond their context—all to justify an outcome inconsistent with this Court's reasoning and judgments and with Congress's instructions.").  That is no way to read precedent.

Axle's claim that §1321(b) provides the sole means of altering the *de minimis* exemption also fails.  Section 1321(b)'s "authoriz{ation}" of the Secretary "to prescribe exceptions to any exemption" in §1321(a) through regulations does not foreclose presidential action under IEEPA. *Expressio unius* arguments may be relevant to whether the *Secretary* can alter the exemption other than through regulations, but nothing in §1321 speaks to the President's different authority under IEEPA's entirely different provisions.  Section 1321 and IEEPA are two separate, distinct statutory schemes with different statutory purposes, making the *expressio unius* canon especially inapposite here.  Section 1321 applies to ordinary customs administration during periods when there is no declared national emergency and confers discretionary power on the Treasury Secretary.  IEEPA, by contrast, is an emergency statue that authorizes the President to override

otherwise applicable statutory exemptions where necessary to address a national emergency. *See* 50 U.S.C. § 1702(a)(1)(B) (the President may "nullify" or "void" "any … right" or "privilege"). And if Congress really wanted to make the sole means of altering the *de minimis* privilege, it could have, such as with a notwithstanding clause. *See, e.g.*, *NLRB v. SW Gen., Inc.*, 580 U.S. 288, 303-04 (2017). Congress knows how to ensure a statutory provision is the exclusive means when it wishes to do so. *DHS v. MacLean*, 574 U.S. 383, 394 (2015). That it did not in §1321 further confirms that §1321 does not control over IEEPA.

In any event, even if §1321 did require promulgation of a regulation to suspend or narrow the *de minimis* exemption, it would not require *notice-and-comment* rulemaking as Axle claims. Mot.16-18. That is because a decision that involves "a military or foreign affairs function of the United States" need not proceed through notice-and-comment rulemaking. 5 U.S.C. §553(a)(1). The purpose of this foreign-affairs exemption is to "allow more cautious and sensitive consideration of those matters which 'so affect relations with other Governments that, for example, public rule-making provisions would provoke definitely undesirable international consequences.'" *Am. Ass'n of Exps. and Imps.-Textile and Apparel Grp. v. United States*, 751 F.2d 1239, 1249 (Fed. Cir. 1985).

This case concerns one of those matters. The President has not abrogated the *de minimis* exemption; the exemption in 19 U.S.C. §1321(a)(2)(C), remains in effect, but has been suspended, under the authority committed to the President by IEEPA, with respect to goods from China and Hong Kong only during the national emergency. The United States is currently in sensitive trade negotiations with many countries, including China, and "the President's power to conduct foreign policy would plainly be hampered" should implementation of the President's suspension of the *de minimis* privilege to swiftly deal with the emergency on synthetic opioids

from China require a protracted public notice-and-comment rulemaking process. *Id.*; *V.O.S. Selections, Inc. v. Trump*, No. 25-00066, ECF No. 53, Notice of Additional Exhibits (including declarations from the Secretaries of State, Commerce, and the Treasury and the U.S. Trade Representative, discussing "sensitive negotiations with trading partners and describe the catastrophic harm to American foreign policy and national security that would ensue from granting the relief requested in plaintiffs' motions").

In yet another attempt to show that §1321 limits the President's authority under IEEPA, Axle misapplies the canon of statutory interpretation "that the specific governs the general." Mot.19 (quoting *RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 566 U.S. 639, 645 (2012)). Axle argues that §1321 "creates specific and comprehensive scheme governing the *de minimis* exemption," and this specific statutory scheme must govern rather than IEEPA's general grant of broad powers to deal with emergency situations. Mot.19-20. Axle both misapplies this canon and asks this Court to disregard the very purpose of IEEPA.

The canon applies within a statutory scheme, not across distinct statutes enacted for different purposes. *RadLAX*, 566 U.S. at 646 ("where there is, *in the same statute*, a particular enactment, and also a general one, … the particular enactment must be operative") (quoting *United States v. Chase*, 135 U.S. 255, 260 (1890)) (emphasis added). Although "not an absolute rule," the canon provides "a strong indication of statutory meaning," so as to avoid "violating the cardinal rule that, if possible, effect shall be given to every clause and part of a statute." *Id.* at 645-646 (cleaned up). Indeed, two cases on which Axle relies dealt with interpreting provisions in the same enactment. *See RadLAX*, 566 U.S. at 645 (interpreting two provisions of the Bankruptcy Code that existed "side-by-side"); *Harrington v. Purdue Pharma L.P.*, 603 U.S. 204,

217 (2024) (interpreting a "catchall phrase tacked on at the end of a long and detailed list of specific directions" in the same statute).[5]

Moreover, the principle that courts should interpret statutes to give effect to every clause and part is not violated here. For one, the *de minimis* exemption still applies for non-PRC goods and is merely suspended for PRC goods until the end of the emergency. For another, IEEPA and §1321 are different statutes that serve fundamentally different purposes. IEEPA is an emergency statute that is intimately involved with foreign affairs and national security, intended to give the President broad and flexible powers to address national emergencies. *See* H.R. REP. NO. 95-459, at 10. Section 1321, by contrast, is a customs administration statute whose primary purpose is rooted in administrative efficiency. Reading §1321 as impliedly repealing or constraining IEEPA's broad emergency powers would frustrate IEEPA's purpose. Courts avoid such implied repeals absent clear evidence of congressional intent, *see United States v. Fausto*, 484 U.S. 439, 452 (1988), something that is clearly lacking here.

Nor, in any event, is §1321 the specific statute in this context. Instead, it applies in ordinary circumstances; IEEPA, by contrast, is the more specific statute in this context, as it applies solely in the event of an emergency.

Finally, Axle unpersuasively invokes *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 637-638 (1952), arguing that "the President's power is at its 'lowest ebb'" because he acted in defiance of Congress. Mot.21. But as explained above, there is no "expressed or implied will of Congress" anywhere in §1321 forbidding the President to temporarily suspend the *de minimis*

---

[5] The other case that Axle cites is inapposite. Mot.19. *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120 (2000), concerned an agency—the Food and Drug Administration— exercising authority inconsistent with the administrative structure created by Congress, whereas, here, the President is exercising authority as intended under IEEPA, not DHS under §1321.

exemption pursuant to his emergency powers under IEEPA. To the contrary, IEEPA specifically authorizes the President to himself regulate importation, and to "void" and "nullify" preexisting rights and privileges in covered goods during an emergency. Nor does IEEPA itself include any "expressed or implied" exceptions to the President's emergency powers for goods otherwise eligible for duty-free treatment under §1321(a)(2)(C). And to be clear, the President is not abrogating the *de minimis* exemption. The exemption still exists under §1321(a)(2)(C). The President temporarily suspended that exemption as to covered products of China and Hong Kong only, due to national security reasons, in a manner expressly contemplated by IEEPA. Because he acted pursuant to express congressional authorization in IEEPA, his presidential power is at its "maximum." *Youngstown*, 343 U.S. at 637.

### C. The Court Should Grant Summary Judgment To Defendants On Count III Because IEEPA Constitutionally Authorizes The President To Impose The IEEPA Tariffs

Although Axle has not moved for summary judgment on Count III of its complaint, defendants respectfully request that the Court address all counts at once and grant summary judgment to defendants on Count III.

For the reasons in Section II.B.1-2 above, defendants are entitled to judgment in their favor on Count III. In particular, IEEPA authorizes the President to "regulate … importation" of foreign goods. 50 U.S.C. §1702(a)(1)(B). Imposing tariffs falls within the power to "regulate … importation" of foreign goods. *Id.* Tariffs set terms on which foreign goods enter the United States. That is consistent with the definition of "regulate," both now and when IEEPA was enacted. *See* Argument Section II.B.1. Indeed, the Federal Circuit's predecessor held that the phrase "regulate importation" authorizes the President to "impos{e} an import duty surcharge." *Yoshida*, 526 F.2d at 576. Congress knew of *Yoshida's* interpretation of "regulate … importation" when it chose to use this language in IEEPA. *See* Argument Section II.B.1.

Interpreting IEEPA to include the power to impose tariffs furthers Congress's purpose to give the President the necessary tools and flexibility to effectively handle national emergencies. And Congress's delegation to the President in IEEPA does not violate the nondelegation principle. *See* Argument Section II.B.2.

Axle does not allege or argue that the IEEPA tariffs fail to "deal with" the declared national emergency, and the Court should not unilaterally inject that argument into Axle's case. *See United States v. Sineneng-Smith*, 590 U.S. 371, 375-76 (2020). To the extent the Court were nonetheless inclined to do so, defendants respectfully disagree with the Court's recent conclusion to that effect. *V.O.S.*, 2025 WL 1514124, at *19-21. Courts cannot scrutinize "{w}hether the President's chosen method of addressing perceived risks is justified from a policy perspective." *Trump v. Hawaii*, 585, U.S. 667, 686 (2018). Such scrutiny is "inconsistent with the broad statutory text and the deference traditionally accorded the President in this sphere." *Id.*; *accord Holder v. Humanitarian Law Project*, 561 U.S. 1, 34 (2010). Thus, the Federal Circuit refused to "second guess the facts found and measures taken by the President" under Section 232, which "empowers and directs the President to act to alleviate threats to national security from imports.'" *PrimeSource*, 59 F.4th at 1257-58; *see id.* at 1263; *Htet v. Trump*, 2025 WL 522033, at *5-7 (D.D.C. Feb. 18, 2025) (finding unreviewable whether a President's IEEPA's action dealt with an emergency). And where the Federal Circuit has entertained statutory challenges to a presidential action "{i}n international trade controversies of this highly discretionary kind" implicating foreign affairs," it limited the scope of those challenges and emphasized that "'the President's findings of fact and the motivations for his action are not subject to review.'" *Maple Leaf*, 762 F.2d at 89. In *V.O.S.*, this Court held that the tariffs "do not 'deal with' their stated objectives" because they merely "aim to create leverage to 'deal with' those objectives." 2025

WL 1514124, at *20.  But creating leverage "in negotiating the resolution of a declared national

emergency," *Dames & Moore*, 453 U.S. at 673, is a central purpose of IEEPA.

Moreover, the President has explained that illicit drugs entered the United States through

both illegal networks and through traditional import systems.  *See, e.g.*, EO 14256 ("Many

shippers based in the People's Republic of China (PRC) hide illicit substances and conceal the

true contents of shipments sent to the United States through deceptive shipping practices."); EO

14193, 90 Fed. Reg. 9113 (Feb. 1, 2025) ("[t]he flow of illicit drugs like fentanyl to the United

States [occurred] through both illicit distribution networks and international mail").  The

President's action not only incentivizes the countries to address the emergency but also deters

importation of illicit drugs concealed within seemingly lawful imports.

## III.    Axle Is Not Entitled To An Injunction

### A.    Standard of Review

A plaintiff seeking preliminary or permanent injunctive relief must satisfy a four-factor

test.  *See eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006); *Winter v. NRDC*, 555

U.S. 7, 20 (2008).  A plaintiff must show likely or actual success on the merits for a preliminary

or permanent injunction (respectively), as well as irreparable harm absent the requested relief,

that the balance of equities favors the plaintiff, and that the public interest favors an injunction.

*Winter*, 555 U.S. at 20.

### B.    Axle Cannot Establish The Likelihood Of Immediate, Irreparable Harm

Axle is not entitled to injunctive relief because it cannot show that it "will be

immediately and irreparably injured" before the Court can decide the case on the merits.

*Asociacion Colombiana de Exportadores de Flores v. United States*, 717 F.Supp.847, 851 (Ct.

Int'l Trade 1989).  An injunction "will not issue simply to prevent a mere possibility of injury …

A presently existing, actual threat must be shown."  *Zenith Radio Corp. v. United States*, 710

F.2d 806, 809 (Fed. Cir. 1983) (citation omitted).  Put another way, "{a} movant must show that the harm is certain to occur and that it is a direct result of the action it is challenging." *Retractable Techs., Inc. v. United States*, 739 F.Supp.3d 1330, 1340 (Ct. Int'l Trade 2024).  The Court "should be wary of issuing an injunction based solely upon allegations and conclusory affidavits submitted by plaintiff." *Atari Games Corp. v. Nintendo of Am.*, 897 F.2d 1572, 1575 (Fed. Cir. 1990).  Axle cannot make this showing for three independent reasons.

### 1.    Axle's Delay In Seeking Injunctive Relief Implies Lack Of Urgency

Axle could have filed this lawsuit when EO 14195 was issued on February 1, 2025.  That was when the President first removed products of China from eligibility for *de minimis* treatment under 19 U.S.C. §1321 and imposed additional duties (tariffs) pursuant to IEEPA.  *See* EO 14195, 90 Fed. Reg. at 9123.  It likewise could have sued after April 2, 2025, when EO 14256 reimposed tariffs on low-value imports from China.  Axle instead waited until May 16 to sue, and did not seek a preliminary injunction until May 21, 2025.  Axle is thus hard-pressed to argue that it is suffering actual and immediate hardship when it neglected to swiftly challenge the EOs in question.  This delay alone warrants denying a preliminary injunction.  *See, e.g., Miller ex rel. NLRB v. Cal. Pac. Med. Ctr.*, 991 F.2d 536, 544 (9th Cir. 1993) (A "long delay before seeking a preliminary injunction implies a lack of urgency and irreparable harm.").

### 2.    The *De Minimis* Exemption Has A Negligible Impact On Axle's Duty Liability

Axle represents that it "only fulfills orders of less than $800 from {its} Mexico distribution center," such that "all of {Axle's} sales from that facility were, until recently, exempt from tariffs under the *de minimis* exemption."  Mot.7-8.  Axle thus asserts that "without the *de minimis* exemption, Detroit Axle's business model no longer makes sense; the company will be forced to shut down instead of operating at a perpetual loss."  Mot.26.

Basic arithmetic contradicts that claim.  The *de minimis* exemption permits duty-free importation "by one person on one day" of goods "having a fair retail value … in the country of shipment not exceeding $800."  19 C.F.R. §10.151.  Even if Axle imported goods of China on every day of a given calendar year, and even if all other applicable conditions for the exemption were met, the *de minimis* exemption would apply to just $292,000 ($800 x 365) worth of imports of Chinese goods.

That is a drop in the bucket compared to the total entered value of Axle's annual imports. In 2024, Axle made 1309 entries of merchandise, with a total entered value of $47,395,523.00— an average of $129,850.75 if the imports were evenly distributed across each calendar day.  Ex. A, Imes Decl. ¶4.  Of that average $129,850.75 daily amount, only $800 – *less than 0.62 percent* – could possibly be eligible for duty-free treatment under the *de minimis* exemption.  That cannot be enough to tank Axle's entire business model.

Daily examples show that even 0.62% is a substantial overstatement of the effects of *de minimis* treatment for Axle.  On May 3, 2025, Axle made nine entries of merchandise with a total entered value of $289,224.00.  Imes Decl. ¶11-12.  The *de minimis* exemption could have applied to up to $800 of the $289,224.00 worth of goods imported that day, but the remaining 99.72% of the day's imports would be ineligible for the exemption.

In the past 12 months, Axle deposited with CBP approximately $17.7 million in estimated duties, taxes, and fees.  *Id.* ¶6.  And thus far in 2025, Axle has made more than 874 entries of imported merchandise, with a total entered value of more than $31 million.  *Id.* ¶5.  The *de minimis* exemption, applicable to less than $292,000 worth of those entries, cannot possibly be the cause for any imminent and irreparable harm to Axle.

In addition to imports that Axle enters directly from China for consumption in the United States, Axle also imports PRC goods through the Port of Long Beach, California, and arranges for their in-bond transportation and exportation to Mexico through ports on the southern border. *Id.* ¶¶7-10. The goods are then shipped back to the United States from Axle's Mexico facility in individual boxes addressed to Axle's customers—meaning that Axle's customers are liable for the duties, and each box can potentially qualify for duty free treatment. *Id.* Axle argues that removing the *de minimis* exemption has made these shipments cost-prohibitive, but Axle has never been liable for duties on these shipments; instead, the direct benefit of these low-value entries has always accrued to Axle's customers, who formerly did not have to pay duties on the parts sent from Axle's Mexican shipper.

### 3.    Axle's Alleged Harm Is Speculative

Axle's speculative statements from its motion and declaration fall short of the credible risk of immediate extinction required to justify a preliminary injunction. *See*, *e.g.*, *Corus Grp. PLC v. Bush*, 217 F.Supp.2d 1347, 1355 (Ct. Int'l Trade 2002) (plaintiff failed to establish irreparable harm because there was no evidence the plant was "in danger of imminent closure" despite testimony that "sound business principles would require {the company} to close the plant rather than operate at a loss"); *Shandong Huarong General Grp. v. United States*, 122 F.Supp.2d 143, 147 (Ct. Int'l Trade 2000) ("affidavits submitted by interested parties are weak evidence, unlikely to justify a preliminary injunction," and no independent evidence "indicat{ed} exactly how and when these lost sales would force {plaintiff} out of business.") (cleaned up).

The theme is clear: as explained in *Corus*, "{e}very increase in duty rate will necessarily have an adverse effect on foreign producers and importers," but if "the court were to find irreparable harm under these facts," it "would likely be required to do so in any challenge to a duty increase because every plaintiff could argue that increased tariffs would cause revenue

shortfalls possibly resulting in either operating at a loss or plant closure at some future date." 217 F.Supp.2d at 1355. Thus, the mere threat of an "adverse economic impact" cannot establish irreparable harm because it would "effectively create a *per se* irreparable harm rule in similar challenges—a result likely contrary to the extraordinary nature of the remedy." *Id.*

Like in *Corus* and *Shandong Huarong* Axle cannot establish irreparable harm, as it fails to provide any "hard evidence" that it faces immediate extinction absent injunctive relief. *See Shree Rama Enter. v. United States*, 983 F. Supp. 192, 195 (Ct. Int'l Trade 1997). Instead, Axle's unsupported representations and declaration reflect speculative concerns as to the effects of the removal of the *de minimis* exemption on goods from China on aspects of its businesses. *See, e.g.*, Mot.27-28 (speculating, without support, that Axle would be unable to rehire laid-off employees or regain its top position on e-commerce sites); Mot.26 (representing that Axle's margins are not large enough to cover the costs of the tariffs). These generalized and speculative allegations come nowhere close to establishing that Axle is at real and immediate risk of extinction, and do not constitute "hard" or "independent" evidence of serious, imminent harm.

Beyond potential economic loss, Axle claims that it will experience loss of goodwill and reputational harm, but it provides no concrete evidence or additional detail beyond conclusory, unsupported statements. *See, e.g.*, Mot.27. Along this line, Axle – without any specific support – asserts that business impacts from its loss of the *de minimis* exemption have increased Axle's negative feedback on eBay from 2% over the last year to 4% over the last month. Musheinesh Decl. ¶25. Without more, this Court should not conclude that a 2% increase in negative feedback on one selling platform resulted from the effects of losing the *de minimis* exemption when there are countless reasons that customers may be incentivized to post negative feedback regarding a company on eBay or other e-commerce platform. These vague and unspecific allegations do not

41

include evidence as to *how* exactly the removal of the *de minimis* exemption on goods from China poses an immediate threat to Axle's reputation and goodwill, and do not establish the required enduring, irreparable reputational harm. *See Ninestar Corp. v. United States*, 687 F.Supp.3d 1308, 1340-41 (Ct. Int'l Trade 2024) (no irreparable harm based on claimed reputational harms, even though plaintiff provided multiple pieces of evidence showing that businesses intended to distance themselves due to allegations of forced labor).

Moreover, any auto-parts supplier to the U.S. market that relies on Chinese-origin products will experience the same effects as Axle. And Axle does not assert that it *cannot* procure auto parts from foreign suppliers whose products continue to benefit from the *de minimis* exemption and send them to its Mexican facility for shipment to the United States; Axle simply asserts that Chinese suppliers are cheaper than U.S. manufacturers and that U.S. manufacturers do not produce some of the parts it sells to its U.S. customers. Musheinesh Decl. ¶7. Axle further averts mention of whether and how procuring auto parts that are not Chinese-origin or manufactured in the United States could impact its ability to continue to competitively sell in the U.S. market; rather, it makes only a speculative assertion that even if it "could eventually find new suppliers outside of China … it likely would never achieve its former level of success." *Id.* ¶23. These omissions and unsupported speculations underscore Axle's inability to meet the high threshold for irreparable harm.

Finally, Axle fails to explain how monetary compensation would be inadequate here. Mot.28. Were Axle to ultimately prevail, it could receive a refund of duties paid that would otherwise be eligible for duty-free treatment under the *de minimis* exemption. 28 U.S.C. §§2643-44. To the extent any future entries are liquidated, the Court may order reliquidation of entries that would have otherwise qualified for the *de minimis* exemption, but for

the challenged EOs, if the duties paid by Axle are, in a final and unappealable decision, found to have been unlawfully collected. Such reliquidation would result in a refund of all duties determined to be unlawfully assessed, with interest, and would redress the only non-speculative harms Axle has identified. *Id.*

### C. The Remaining Injunction Factors Do Not Favor Axle

Even if Axle could establish that it would suffer irreparable harm absent a preliminary injunction (which it cannot), that showing would still be "outweighed" by the remaining injunctive factors. Because two of Axle's four counts in its Complaint are subject to dismissal for failure to state a claim and the remaining two warrant summary judgment in the Government's favor, Axle cannot show likely success on the merits. The remaining factors—the balance of hardships and the public interest, which "merge when the Government is the opposing party," *Nken v. Holder*, 556 U.S. 418, 435 (2009)—likewise favor the Government. It is not in the public's interest for the President's response to a national emergency and exercise of foreign-affairs powers to be enjoined; nor does the balance of hardships favor Axle.

Courts must "pay particular regard for the public consequences" when "employing the extraordinary remedy of injunction." *Winter*, 555 U.S. at 24 (cleaned up). Indeed, in *Winter*, the Supreme Court vacated the lower court's injunction, concluding that, even if the petitioners had shown irreparable harm, the public interest and balance of equities weighed decisively against injunctive relief. *Id*. at 23-32.

Axle's purported irreparable harm is far outweighed by the public interest in maintaining the challenged executive actions. The President has declared a national emergency in light of threats to the United States' economy, military preparedness, and national security. In these circumstances, the NEA and IEEPA authorize the President to take appropriate and feasible

action to address this emergency, as he did here. The equities and public interest lie there, not with Axle.

Moreover, where, as here, the President is acting with Congress's authorization, adding its constitutional authority to regulate trade to the President's constitutional authority over foreign affairs, the "public interest" is the policy underlying the specific legislation. *Yakus v. U.S.*, 321 U.S. 414, 442 (1944). Injunctive relief interfering with action authorized by Congress and taken by the President, after following all applicable procedures, would contravene the public interest.

As for the balance of hardships, Axle's proposed injunction would be an enormous intrusion on the President's conduct of foreign affairs and efforts to protect national security under IEEPA and the Constitution. *See* U.S. Const. art. II, §2. This is particularly so given that the United States is currently in sensitive trade negotiations with a multitude of countries— discussions that would grind to a halt should a preliminary injunction issue. *See* EO 14266, 90 Fed. Reg. 15,625 (Apr. 9, 2025) (discussing negotiations); *V.O.S. Selections, Inc. v. Trump*, No. 25-00066, ECF No. 53, Notice of Additional Exhibits (declarations providing "up-to date information on sensitive negotiations").

Axle's request to import merchandise without paying the applicable tariffs would undermine the President's goals, and the requested injunction would weaken the effectiveness of the President's chosen action. By contrast, Axle has not shown any hardship beyond extremely limited, compensable economic harm.

### D.     Any Preliminary Injunction Should Be Limited Only To Axle And Would Require It To Post A Bond

If this Court were to issue a preliminary injunction, its order must be limited in scope to Axle only. Injunctive relief must be narrowly tailored and limited to the harm shown. *See*

*Gemveto Jewelry Co. v. Jeff Cooper Inc.*, 800 F.2d 256, 259 (Fed. Cir. 1986). Moreover, nationwide injunctions are only available in "exceptional cases." *City and County of San Francisco v. Trump*, 897 F.3d 1225, 1244 (9th Cir. 2018); *see Florida v. HHS*, 19 F.4th 1271, 1282 (11th Cir. 2021) (appropriate circumstances for issuing a nationwide injunction "are rare"); *City of Chicago v. Barr*, 961 F.3d 882, 916 (7th Cir. 2020) ("{s}uch injunctions present real dangers, and will be appropriate only in rare circumstances."). Here, Axle cannot show why a preliminary injunction is necessary at all, let alone a nationwide one. Certainly, it cannot show that it will be deprived of complete relief without a nationwide injunction. *Cf. Florida*, 19 F.4th at 1281.

The Court should also order Axle to quantify its harm—for instance, specify what tariffs that it would otherwise have paid, which must not be speculative—and post a bond in that amount. USCIT R. 65(c) (requiring "the movant {to} give{} security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained").

Here, if the Court enter a preliminary injunction, (i) any order should be limited to Axle; (ii) as a condition of relief, Axle should identify the entries, by entry number, importer name, importer number, and the aggregate fair retail value of the imported articles in each entry, that would be covered by any such order; and (iii) the Court should order Axle to post Single Transaction Bonds for all such identified entries during the pendency of any injunctive order in an amount equal to the total entered value, plus all applicable duties, taxes, and fees, including the duties that would otherwise have been deposited pursuant to the challenged EOs. Such an order would ensure that the Court follow the directive that it "must narrowly tailor an injunction

to fit the specific adjudged violations," *Gemveto*, 800 F.2d at 259, while ensuring at least minimal protection of the United States' interests.

## CONCLUSION

The Court should grant defendants' motion to dismiss Counts II and IV, deny plaintiff's motions for a preliminary injunction and partial summary judgment, and enter judgment in favor of defendants as to Counts I and III.


DATED: June 25, 2025                 Respectfully submitted,

                                     BRETT A. SHUMATE
                                     Assistant Attorney General

                                     ERIC J. HAMILTON
                                     Deputy Assistant Attorney General

                    By:              PATRICIA M. McCARTHY
                                     Director

                                     /s/ Justin R. Miller
                                     JUSTIN R. MILLER
                                     Attorney-In-Charge
                                     International Trade Field Office

                                     /s/ Liridona Sinani
                                     LIRIDONA SINANI
                                     ALEXANDER VANDERWEIDE
                                     Senior Trial Counsel
                                     U.S. Department of Justice
                                     Civil Division
                                     Commercial Litigation Branch
                                     P.O. Box 480
                                     Ben Franklin Station
                                     Washington, D.C.  20044
                                     Tel: (202) 353-2188
                                     Fax : (202) 307-0972

                                     *Attorneys for Defendants*

## CERTIFICATE OF COMPLIANCE

I hereby certify, pursuant to section 2(B)(1) of the Standard Chambers Procedures of this Court and this Court's June 5, 2025 order, that this brief contains 13,996 words, excluding the table of contents, table of authorities, any addendum containing statutes, rules or regulations, any certificates of counsel, and counsel's signature, as calculated by the word processing system used to prepare this brief (Microsoft Word).

/s/ Liridona Sinani
LIRIDONA SINANI

# EXHIBIT A

UNITED STATES COURT OF INTERNATIONAL TRADE

AXLE OF DEARBORN, INC. D/B/A
DETROIT AXLE,

Plaintiff,

v.

DEPARTMENT OF COMMERCE *ET AL.*,

Defendants.

**PUBLIC VERSION**

Before:  Hon. Gary S. Katzamann, Judge
Hon. Timothy M. Reif, Judge
Hon. Jane A. Restani, Judge

Ct. No. 25-00091

### DECLARATION OF LILLIAN IMES

I, Lillian Imes, pursuant to 28 U.S.C. § 1746, and based upon my personal knowledge and information made known to me in the course of my employment, hereby make the following declaration with respect to the above-captioned matter:

1.      I am the Acting Assistant Director for Enforcement at the Automotive & Aerospace Center of Excellence and Expertise ("A&A Center"), Office of Field Operations, U.S. Customs and Border Protection ("CBP").  I have held this position since April of 2025.  Previously, I served as Supervisory Import Specialist, Supply Chain Security Specialist, Program Manager, Import Specialist and CBP Officer.  I have been employed by CBP since February of 2003.

2.      As the Acting Assistant Director for Enforcement at the A&A Center, my responsibilities include (among other things) overseeing the A&A Center's enforcement activities relating to importers and commodities assigned this Center.

3.      The A&A Center is the CBP Center assigned to process entries of imported merchandise that include parts of automobiles, and is also the Center assigned to process entries of imported

merchandise that are made by Importer of Record (IOR) number [[█████████]], which is the IOR number associated with Axle of Dearborn Inc. ("Axle").

4.    CBP's records reflect that IOR number [[█████████]], which is associated with Axle ("Axle as IOR"), began importing in 2009.  The total number of entries made by this IOR, and the total annual entered value of merchandise imported by this IOR, is reflected in the chart below for the years of 2009 through 2024, inclusive:

|  | Total # of entries | Total entered value |
|---|---|---|
| **2009** | 5 | $ 365,525.00 |
| **2010** | 14 | $ 1,234,304.00 |
| **2011** | 20 | $ 2,179,908.00 |
| **2012** | 19 | $ 2,203,560.00 |
| **2013** | 28 | $ 2,150,163.00 |
| **2014** | 78 | $ 6,175,030.00 |
| **2015** | 131 | $ 9,493,674.00 |
| **2016** | 172 | $ 14,284,139.00 |
| **2017** | 203 | $ 15,379,209.00 |
| **2018** | 311 | $ 34,556,953.00 |
| **2019** | 310 | $ 40,010,648.00 |
| **2020** | 596 | $ 44,465,245.00 |
| **2021** | 430 | $ 27,046,514.00 |
| **2022** | 699 | $ 33,619,727.00 |
| **2023** | 981 | $ 42,717,663.00 |
| **2024** | 1309 | $ 47,395,523.00 |

5.    CBP records reflect that thus far in 2025, Axle as IOR has made more than 874 entries of imported merchandise, with a total entered value of more than $31 million.

6.    CBP records reflect that Axle as IOR deposited with CBP approximately $17.7 million in estimated duties, taxes, and fees in the past 12 months.

7.    CBP records reflect that in 2021, Axle of Dearborn Inc., as consignee, began to enter various auto parts from China for transportation through the United States and exportation to Mexico.  Most of these shipments were unladed in the Port of Long Beach, California, and then transported in-bond and exported to Mexico through ports along the southern land border.

8.    In April of 2022, CBP detained at the Port of Santa Teresa, New Mexico, certain shipments of various auto parts, country of origin China, that were shipped from Mexico by [[████████████████████████████████████████]], and consigned to more than 1,600 individual consignees, for which entry and release was requested from the manifest pursuant to 19 C.F.R. § 143.23(j)(3) ( "April 2022 Detained Shipments").

9.    Although Axle of Dearborn, Inc., d/b/a Detroit Axle ("Detroit Axle") was not identified in the documentation associated with the April 2022 Detained Shipments, it was Detroit Axle that responded to CBP's detention notices sent to [[███████████]].  Detroit Axle was the only company that CBP communicated with concerning the April 2022 Detained Shipments.  Detroit Axle representatives told CBP that the merchandise in the April 2022 Detained Shipments consisted of auto parts that Detroit Axle sold to the individual consignees.  Although the auto parts were packaged in individual boxes addressed to the individual consignees (Detroit Axle's customers), they were shipped from Mexico to the Port of Santa Teresa, New Mexico, as a consolidated shipment by [[███████████]], which Detroit Axle identified to CBP as its Mexican warehouse and shipper.

10.     CBP records reflect that, since 2022, more than 3 million Detroit Axle/[[██████]] Mexico shipments of Chinese origin auto parts imported from Mexico have been entered and released from manifest under 19 C.F.R. § 143.23(j)(3).  In 2024, the total number of such shipments was 1,320,376 with a total value of $239,166,575.00, and in 2025, prior to May 1, 2025, the total number of such shipments was 580,421 with a total value of $109,219,035.00.  No such "release from manifest" shipments have been made since May 1, 2025.

11.     CBP records further reflect that Axle as IOR has made formal entries for consumption after May 2, 2025 that include entry lines covering merchandise valued at less than $800 on which duties were paid.  For example, entry no. 8E5-25224896, made on May 3, 2025, included on entry line 1 merchandise for which the declared value is $78.00, country of origin China and country of export Mexico, and which is declared as classified in subheading 4016.99.60 of the HTSUS, with secondary classifications in headings 9903.01.24, 9903.01.63, and 9903.88.03; the total estimated duties deposited for this merchandise is $134.55.   On entry line 6 of the same entry no. 8E5-25224896, the declared value is $96.00, country of origin China and country of export Mexico, and the merchandise is declared as classified in subheading 8413.60.00 of the HTSUS, with secondary classifications in headings 9903.01.24, 9903.01.63, and 9903.88.01; the total estimated duties deposited for this merchandise is $163.20.  The total entered value on this entry is $30,453.00, but 7 of the 15 lines on this entry cover merchandise that is valued at less than $800.  The aggregate total value of merchandise covered by this entry that is individually valued at less than $800 is $539.00.

12.     However, CBP records also reflect that on the same day, May 3, 2025, Axle of Dearborn Inc., IOR number [[████████]], made 8 additional entries, in addition to entry no. 8E5-

25224896, with a total entered value of $289,224.00 declared for the imported merchandise covered by the 9 entries made on May 3, 2025.

I declare under penalty of perjury that the foregoing is true and correct.

LILLIAN A IMES

Digitally signed by LILLIAN A IMES
Date: 2025.06.25
12:32:15 -05'00'

Lillian Imes
Assistant Director, Enforcement
Automotive & Aerospace Center
Office of Field Operations
U.S. Customs and Border Protection