## IN THE UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| AXLE OF DEARBORN, INC. d/b/a DETROIT AXLE,<br><br>*Plaintiff,*<br><br>v.<br><br>DEPARTMENT OF COMMERCE; HOWARD LUTNICK, *in his official capacity as Secretary of Commerce*; DEPARTMENT OF HOMELAND SECURITY; KRISTI NOEM, *in her official capacity as Secretary of Homeland Security*; DEPARTMENT OF THE TREASURY; SCOTT BESSENT, *in his official capacity as Secretary of the Treasury*; UNITED STATES CUSTOMS AND BORDER PROTECTION; PETE R. FLORES, *in his official capacity as Acting Commissioner for U.S. Customs and Border Protection*; and the UNITED STATES,<br><br>*Defendants.* | Case No. 1:25-cv-00091 |

## REPLY IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION AND EXPEDITED PARTIAL SUMMARY JUDGMENT

**TABLE OF CONTENTS**

INTRODUCTION ............................................................................................................ 1

ARGUMENT ................................................................................................................... 2

      I.    Elimination Of The De Minimis Exemption Exceeded The Executive's
           Authority. ................................................................................................... 2

           A.    Section 1321 Exclusively Governs How The Executive Branch
                 May Modify The De Minimis Exemption. ................................................. 2

           B.    IEEPA Does Not Authorize The Executive To Impose Tariffs
                 Or Alter The De Minimis Exemption. ....................................................... 8

      II.   The Agency Actions Eliminating The De Minimis Exemption Were
           Arbitrary And Capricious. ........................................................................ 17

      III.  Detroit Axle Is Entitled To Relief....................................................................... 19

           A.    Detroit Axle Is Suffering Significant Irreparable Harm. ........................ 20

           B.    The Public Interest And Balance Of Equities Favor
                 Injunctive Relief..................................................................................... 22

      IV.  The Court Should Not Require More Than A Nominal Bond............................ 23

CONCLUSION............................................................................................................... 23

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Am. Signature, Inc. v. United States*,
   598 F.3d 816 (Fed. Cir. 2010)..........................................................................22

*Biden v. Nebraska*,
   600 U.S. 477 (2023)..........................................................................................10

*Botany Worsted Mills v. United States*,
   278 U.S. 282 (1929)............................................................................................6

*Brown & Williamson*,
   529 U.S. 120 (2000)..........................................................................................13

*Brown v. Gen. Servs. Admin*,
   425 U.S. 820 (1976)....................................................................................12, 13

*Chamber of Com. v. Reich*,
   74 F.3d 1322 (D.C. Cir. 1996)....................................................................18, 19

*Clinton v. City of New York*,
   524 U.S. 417 (1998)..........................................................................................17

*Dep't Agric. Rural Dev. Rural Hous. Serv. v. Kirtz*,
   601 U.S. 42 (2024)............................................................................................14

*eBay v. MercExchange, L.L.C.*,
   547 U.S. 388 (2006)..........................................................................................20

*Epic Sys. Corp. v. Lewis*,
   584 U.S. 497 (2018)..........................................................................................14

*FCC v. Fox Television Stations, Inc.*,
   556 U.S. 502 (2009)..........................................................................................19

*Fourco Glass Co. v. Transmirra Prods. Corp.*,
   353 U.S. 222 (1957)..........................................................................................13

*Franklin v. Massachusetts*,
   505 U.S. 788 (1992)..........................................................................................18

*Harrington v. Purdue Pharma L.P.*,
   603 U.S. 204 (2024)..........................................................................................13

*Hartford Underwriters Ins. Co. v. Union Planters Bank, N.A.*,
   530 U.S. 1 (2000)................................................................................................6

*Heating, Air Conditioning & Refrigeration Distribs. Int'l v. EPA*,
   71 F.4th 59 (D.C. Cir. 2023)...............................................................................8

*J.W. Hampton, Jr., & Co. v. United States*,
   276 U.S. 394 (1928) .................................................................................................16

*League of United Latin Am. Citizens v. Exec. Off. of the President*,
   2025 WL 1187730 (D.D.C. Apr. 24, 2025) ...........................................................23

*Learning Res., Inc. v. Trump*,
   2025 WL 1525376 (D.D.C. May 29, 2025) .........................................................7, 9

*Louisiana v. Biden*,
   55 F.4th 1017 (5th Cir. 2022) .................................................................................22

*Nat'l Customs Brokers & Forwarders Ass'n of Am. v. United States*,
   59 F.3d 1219 (Fed. Cir. 1995) ...................................................................................4

*Nebraska v. Su*,
   121 F.4th 1 (9th Cir. 2024) ......................................................................15, 18, 19

*Orr v. Trump*,
   2025 WL 1145271 (D. Mass. Apr. 18, 2025) ..........................................................18

*Perez v. Mortg. Bankers Ass'n*,
   575 U.S. 92 (2015) ...........................................................................................15, 20

*RadLAX Gateway Hotel, LLC v. Amalgamated Bank*,
   566 U.S. 639 (2012) .........................................................................................4, 12

*Rajah v. Mukasey*,
   544 F.3d 427 (2d Cir. 2008) ......................................................................................8

*Rodriguez v. Compass Shipping Co.*,
   451 U.S. 596 (1981) ..................................................................................................5

*Salix Pharm., Ltd. v. Norwich Pharm., Inc.*,
   98 F.4th 1056 (Fed. Cir. 2024) ................................................................................11

*In re Section 301 Cases*,
   570 F. Supp. 3d 1306 (C.I.T. 2022) .....................................................................7, 8

*TC Heartland LLC v. Kraft Foods Group Brands LLC*,
   581 U.S. 258 (2017) .................................................................................................13

*Toledo, P&W R.R. v. Stover*,
   60 F. Supp. 587 (N.D. Ill. 1945) ...............................................................................6

*United States v. Curtiss-Wright Export Corp.*,
   299 U.S. 304 (1936) .................................................................................................16

*United States v. Yoshida Int'l Inc.*,
   526 F.2d 560 (C.C.P.A. 1975) ..............................................................................5, 9

*USP Holdings, Inc. v. United States*,
   36 F.4th 1359 (Fed. Cir. 2022) ................................................................................19

*V.O.S. Selections, Inc. v. Trump,*
    2025 WL 1514124 (C.I.T. May 28, 2025)................................................................11, 15, 16

*Van Buren v. United States,*
    593 U.S. 374 (2021)..............................................................................................................4

*Wis. Gas Co. v. FERC,*
    758 F.2d 669 (D.C. Cir. 1985).............................................................................................22

*Yee v. City of Escondido,*
    503 U.S. 519 (1992)............................................................................................................16

*Zenith Radio Corp. v. United States,*
    518 F. Supp. 1347 (C.I.T. 1981).........................................................................................23

**Constitutional Provisions**

U.S. Const. art. I, § 8................................................................................................7, 9, 16

**Statutes**

5 U.S.C. § 553(a)(1)....................................................................................................................7

5 U.S.C. § 553(b)(B)...................................................................................................................5

5 U.S.C. § 704...........................................................................................................................19

5 U.S.C. § 706(2)(A).................................................................................................................20

5 U.S.C. § 706(2)(C).............................................................................................................17, 20

5 U.S.C. § 706(2)(D).................................................................................................................20

19 U.S.C. § 212(a)(1)..................................................................................................................7

19 U.S.C. § 212(a)(2)..................................................................................................................7

19 U.S.C. § 1321................................................................................................................*passim*

19 U.S.C. § 2132(a)...................................................................................................................10

19 U.S.C. § 2253(a)(3)(A)...........................................................................................................9

28 U.S.C. § 2640(e)...................................................................................................................18

50 U.S.C. § 1701(a)...................................................................................................................17

50 U.S.C. § 1702.............................................................................................................9, 10, 13

Customs Administrative Act,
    Pub. L. 75-721, § 7, 52 Stat. 1077, 1081 (1938)................................................................3

Customs Simplification Act,
    Pub. L. 83-243, § 13, 67 Stat. 507, 515 (1953)..................................................................3

North American Free Trade Agreement Implementation Act,
Pub. L. 103-182, § 651, 107 Stat. 2057, 2209 (1993)................................................3

Trade Facilitation and Trade Enforcement Act,
Pub. L. 114-125, § 901(a), 130 Stat. 122, 223 (2016) .............................................2

**Rules**

Fed. R. Civ. P. 56(f)(1) .............................................................................................1

Fed. R. Civ. P. 65(c) ...............................................................................................23

**Regulations**

19 C.F.R. § 10.151 ................................................................................................3, 10

19 C.F.R. § 143.23(j)(3)...........................................................................................21

60 Fed. Reg. 18,983 (Apr. 14, 1995) .........................................................................4

81 Fed. Reg. 58,831 (Aug. 26, 2016)..........................................................................4

90 Fed. Reg. 17,608 (Apr. 28, 2025) .............................................................12, 15, 20

Executive Order 14256 (April 2, 2025) ...............................................................11, 19

**Other Authorities**

2A *Sutherland Statutory Construction* § 47:23 (7th ed. 2024)..................................2

 Pablo D. Fajgelbaum & Amit Khandelwal, *The Value of de Minimis Imports*,
NBER (Feb. 2025)..................................................................................................22

*Black's Law Dictionary* (12th ed. 2024)..............................................................3, 10

*The President & Accounting Offices*, 1 Op. Att'y Gen. 624 (1823)..............................6

North American Free Trade Implementation Act,
S. Rep. 103-189 (1993)..............................................................................................7

Trade Facilitation and Trade Enforcement Act of 2015,
S. Rep. 114-45 (2015)................................................................................................4

# INTRODUCTION

The government's response lays bare the breathtaking power it asserts under IEEPA:  not just the power to impose tariffs on Americans—an extraordinarily consequential authority the Constitution vests in Congress alone—but also the prerogative to rewrite Congress's duly enacted tariff statutes.  IEEPA does not grant the President authority to erase statutes, and Section 1321 and the Constitution preclude it.  If the government wants to alter the de minimis exemption, it must use the specific, comprehensive framework established by Section 1321 and proceed via notice-and-comment rulemaking.  At a minimum, the APA required the government to explain *why* it elected to forgo notice-and-comment rulemaking here given that suddenly revoking a near-century-old tariff exemption was certain to destroy American businesses like Detroit Axle.

Detroit Axle's situation is dire.  The government's own declaration explains that the elimination of the de minimis exemption has caused Detroit Axle's de-minimis-eligible shipments to drop from 580,421 (worth $109,219,035) *to zero* since the government eliminated the exemption for Chinese goods.  Imes Decl. ¶10. Detroit Axle is therefore losing business opportunities and customer goodwill that are unrecoverable even if it eventually receives a refund of unlawfully collected tariffs.  The company is already operating at a loss, has begun firing employees, and is perilously close to going out of business.

Detroit Axle therefore respectfully requests that the Court promptly set a hearing and rule on each of the arguments Detroit Axle has presented.  Although this Court's *V.O.S.* decision entitles Detroit Axle to relief, that decision has been stayed, and Detroit Axle has independent, case-specific grounds for relief.  The company should have its day in court before it is too late.[1]

---

[1] Detroit Axle agrees with the government's request that this Court decide Count III now, in addition to Counts I and II.  Opp.35; *see* Fed. R. Civ. P. 56(f)(1).

**ARGUMENT**

**I.      Elimination Of The De Minimis Exemption Exceeded The Executive's Authority**.

Section 1321 embodies Congress's judgment that tariff-free entry of low-value imports "provide[s] significant economic benefits" to the country.  Pub. L. 114-125, § 901(a), 130 Stat. 122, 223 (2016).  It creates a comprehensive, exclusive scheme governing such imports that requires notice-and-comment rulemaking before the Executive may alter the de minimis exemption.  The government flouted Section 1321's requirements, purporting to rely on IEEPA.  But Congress did not delegate its tariff authority in IEEPA.  And even if it had, Section 1321's specific requirements for how the exemption may be altered would trump IEEPA's general authorization.

**A.      Section 1321 Exclusively Governs How The Executive Branch May Modify The De Minimis Exemption.**

The government argues that IEEPA authorized elimination of the de minimis exemption, but that exemption is governed exclusively by Section 1321's specific and comprehensive scheme.  The government's contrary argument is premised on casting Section 1321 as "discretionary," applicable only in non-emergency situations, and inapplicable to the President.  Opp.28-29.  That is wrong across the board.  Properly construed, Section 1321's mandatory, detailed, and comprehensive scheme "carries with it an implied prohibition against" altering the exemption "in any other way."  2A *Sutherland Statutory Construction* § 47:23 (7th ed. 2024).

**1.**      Section 1321 makes the de minimis exemption mandatory.  It provides that the Secretary "*shall* prescribe" regulations to "admit articles free of duty," and the value of those articles "shall not exceed an amount specified by the Secretary by regulation, *but not less than …* $800 in any other case."  19 U.S.C. § 1321(a) (emphases added).  It thus requires the Secretary to issue regulations that create a de minimis exemption with at least an $800 floor.  Contrast that with

the originally enacted statute, which provided that the Secretary "may prescribe" de minimis regulations, and set a *ceiling* on the exemption. Pub. L. 75-721, § 7, 52 Stat. 1077, 1081 (1938). Congress subsequently restrained the Executive's discretion by changing "may" to "shall," Pub. L. 83-243, § 13, 67 Stat. 507, 515 (1953)—which required the Secretary to promulgate de minimis regulations—and setting a statutory floor for de minimis treatment, Pub. L. 103-182, § 651, 107 Stat. 2057, 2209 (1993).

The government nonetheless argues that it is "not required to promulgate regulations creating a *de minimis* exemption." Opp.28-29. It claims it has complete discretion whether to create a de minimis exemption—but if it does, the exemption must apply to imports worth up to the $800 statutory floor. Opp.30. That interpretation makes little sense: It would allow the government to choose a de minimis threshold of $0 or $800 or more, but nothing in between. It would also be self-defeating because the government *has* issued regulations implementing the exemption. *See* 19 C.F.R. § 10.151. So whether the government once had discretion to forgo the exemption is irrelevant now; any discretion has been exercised to create a mandatory exemption.

The government's interpretation is also wrong. It relies on the phrase "authorized … to … admit free of duty." 19 U.S.C. § 1321(a). But that authorization, which appeared in the original, discretionary version of the statute, now grants discretion to the Secretary only to *increase* the statutory floor. Nor does Section 1321(a)(2)'s term "privilege" suggest the exemption is discretionary, Opp.29, as "privilege" just means a "special legal right," *Black's Law Dictionary* (12th ed. 2024). Neither "authorized" nor "privilege" negates the statute's command that the Secretary "shall prescribe" a de minimis exemption of at least $800.

That is how courts, Congress, and the Executive have understood the statute. The Federal Circuit has recognized that Section 1321 "required Customs, on behalf of the Secretary, to raise

the duty-free limit to the specified level" and left the Executive only the "discretion to set a higher limit." *Nat'l Customs Brokers & Forwarders Ass'n of Am. v. United States*, 59 F.3d 1219, 1220, 1222-23 (Fed. Cir. 1995). Congress likewise has explained that the statute gives "the Secretary of the Treasury the ability to raise the de minimis level by regulation"—not to refuse to implement it at all. *See* S. Rep. 114-45, at 4 (2015). And the government has repeatedly amended its regulations to match Congress's increases to the exemption. *See* 60 Fed. Reg. 18,983 (Apr. 14, 1995); 81 Fed. Reg. 58,831, 58,833 (Aug. 26, 2016).

The government's interpretation also would make nonsense of Congress's amendments to the de minimis exemption. Congress has: (1) replaced "may prescribe" with "shall prescribe," (2) changed the exemption from a ceiling to a floor, (3) raised the floor from $1 to $800, and (4) eliminated the Secretary's authority under Section 1321(b) to "diminish any dollar amount specified in subsection (a)." *See* 67 Stat. at 515; 107 Stat. at 2209; 130 Stat. at 223. "When Congress amends legislation … it intends the change to have real and substantial effect." *Van Buren v. United States*, 593 U.S. 374, 393 (2021). Yet the government's reading would mean that Congress made all those changes merely hoping the government would exercise its discretion to implement them through regulations. That is not a credible reading of the statutory history.

**2.**     Section 1321 is also a "comprehensive scheme" through which Congress "deliberately targeted specific problems with specific solutions." *RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 566 U.S. 639, 645 (2012) (quotation marks omitted). *Only* Section 1321 addresses which low-value imports must be exempt from tariffs. It prescribes baseline rules for categories of goods and creates a single way to deviate from them—notice-and-comment rulemaking. And it establishes specific criteria the government must consider in changing the baseline, like whether an exception would be "consistent with the purpose" of the statute, or is "necessary … to protect

4

the revenue or to prevent unlawful importations." 19 U.S.C. § 1321(b). Congress has continually amended the statute over nearly a century to expand the exemption and restrain the Executive's discretion. "The comprehensive character of the procedures outlined in [Section 1321] precludes the fashioning of" other ways "to deal with … [the] problem that Congress expressly addressed." *Rodriguez v. Compass Shipping Co.*, 451 U.S. 596, 614 (1981).

The government resists this conclusion by artificially narrowing Section 1321. It first claims the statute applies only to "ordinary customs administration during periods when there is no declared national emergency." Opp.31. But Section 1321 contains no such limitation, and its text demonstrates that it *does* encompass emergency situations. Indeed, as the government acknowledges, Congress anticipated the "exact [emergency] circumstance" that purportedly prompted the President to act here, by allowing modifications to the de minimis exemption under Section 1321(b) when "necessary … to prevent unlawful importations." 19 U.S.C. § 1321(b). So the government's reliance on *Yoshida* for the proposition that emergency statutes displace normal trade acts with respect to "unforeseeable events" is misplaced, because Section 1321 expressly contemplates the current purported emergency. Opp.31. The APA also gives the government tools that, when properly invoked, allow it to expeditiously address emergencies. *See, e.g.*, 5 U.S.C. § 553(b)(B) (good-cause exception to notice-and-comment rulemaking). That the government spurned those procedures here does not mean Section 1321 is inapplicable in emergencies.

The government next argues that because Section 1321 mentions only the Secretary, it does not limit the *President's* authority under different statutes to alter the de minimis exemption. Opp.31. It highlights the lack of a "notwithstanding" clause as evidence that Section 1321(b) is not the "sole means of altering" the exemption. Opp.32. But a "notwithstanding" clause is not

necessary to make Section 1321 exclusive.  Rather, it is a long-settled principle of statutory construction that "[w]hen a statute limits a thing to be done in a particular mode, it includes the negative of any other mode." *Botany Worsted Mills v. United States*, 278 U.S. 282, 288-89 (1929); *see Hartford Underwriters Ins. Co. v. Union Planters Bank, N.A.*, 530 U.S. 1, 6 (2000) ("Where a statute names the parties granted the right to invoke its provisions, *such parties only may act*." (cleaned up; emphasis added)).

That principle applies with full force to the President.  "If the laws ... require a particular officer by name to perform a duty"—*e.g.*, modifying the de minimis exception—"no other officer can perform it without a violation of the law; and were the President to perform it, he would not only be not taking care that the laws were faithfully executed, but he would be violating them himself." *The President & Accounting Offices*, 1 Op. Att'y Gen. 624, 625 (1823); *see also Toledo, P&W R.R. v. Stover*, 60 F. Supp. 587, 593-94 (N.D. Ill. 1945) (statute authorizing the President to take action "through the Secretary of War" did not allow him to accomplish that end through other means).  Were the law otherwise, and the President could simply disregard a statutory limitation on an executive official and take action himself, Congress's choice to constrain the exercise of an official's power would count for little.

Section 1321(b)'s context confirms its exclusivity.  The findings Congress required the government to make before altering the exemption—*e.g.*, that the change is "necessary" "to protect the revenue or to prevent unlawful importations"—fall squarely within the purview of the Treasury Secretary (and now the Secretary of Homeland Security), not the President.  19 U.S.C. § 1321(b); *see* 19 U.S.C. § 212(a)(1), (2) (Treasury Secretary must consult with DHS Secretary on "customs revenue").

Moreover, Congress has made clear that notice-and-comment rulemaking—a process inapplicable to the President—is an essential component of the de minimis scheme. Congress explained that Section 1321(b) "implements the concept of 'informed compliance,' which is premised on the belief that importers have a right to be informed about customs rules ... and to expect certainty that the Customs Service *will not unilaterally change the rules without providing importers proper notice and an opportunity for comment.*" S. Rep. 103-189, at 64 (1993) (emphasis added). A presidential exception to Section 1321(b) would undermine that core notice function.

Finally, the government claims (Opp.32) that even if Section 1321(b) required rulemaking by the Secretary, it would not require *notice-and-comment* rulemaking because of the APA's exception for a "foreign affairs function of the United States." 5 U.S.C. § 553(a)(1). But imposing tariffs is not a "foreign affairs function." It is a "tax." *Learning Res., Inc. v. Trump*, 2025 WL 1525376, at *13 (D.D.C. May 29, 2025); *compare* U.S. Const. art. I, § 8, cl. 1 ("Taxes, Duties, Imposts and Excises"), *with* U.S. Const. art. I, § 8, cl. 3 (power to "regulate Commerce with foreign nations"). The foreign-affairs exception is particularly inappropriate here given Congress's stated intent that the government "will not unilaterally change the [de minimis] rules without providing importers proper notice and an opportunity for comment." S. Rep. 103-189, at 64.

Regardless, the foreign-affairs exception must be "construed narrowly and granted reluctantly." *In re Section 301 Cases*, 570 F. Supp. 3d 1306, 1335-37 (C.I.T. 2022) (holding exception inapplicable to Section 301 tariffs). It does not apply where, as here, the government "fail[s] to explain how the foreign affairs exemption would 'allow more cautious and sensitive consideration.'" *Id.* at 1336-37. Nor does it apply unless "public rulemaking" would "provoke definitely undesirable international consequences." *Rajah v. Mukasey*, 544 F.3d 427, 437 (2d Cir. 2008). If anything, notice-and-comment rulemaking here would have allowed the government the benefit

of additional feedback to inform its negotiations and decisionmaking. And even if notice-and-comment rulemaking *were* optional, the government's discretionary and unexplained decision to forgo it still would be arbitrary and capricious. *Infra* Part II.

*    *    *

Once the government's artificial limitations on Section 1321 are stripped away, it becomes clear that Section 1321's mandatory, specific, and comprehensive scheme occupies the field when it comes to the de minimis exemption. That scheme "implies the preclusion of alternative[]" means of altering the exemption. *Heating, Air Conditioning & Refrigeration Distribs. Int'l v. EPA*, 71 F.4th 59, 67 (D.C. Cir. 2023) (cleaned up).

### B. IEEPA Does Not Authorize The Executive To Impose Tariffs Or Alter The De Minimis Exemption.

At a minimum, if the President seeks to circumvent Section 1321's mandatory and comprehensive scheme, he needs clear statutory authority to that effect. The government purports to find such authority in IEEPA. That is wrong for three independent reasons. *First*, IEEPA does not authorize the President to impose tariffs. *Second*, even if IEEPA granted some tariff-setting authority, it would not authorize the President to abrogate the de minimis exemption. *Third*, if IEEPA authorized these actions, it would be an unconstitutional delegation of Congress's tariff power. This Court should resolve all these issues so Detroit Axle can obtain complete, timely, and durable relief.

1. The government's argument fails at the threshold because IEEPA does not authorize tariffs at all, as the D.C. District Court recently held. *Learning Res.*, 2025 WL 1525376. IEEPA's extensive list of powers does not include the power to impose tariffs—a form of taxes—on Americans. The government contends that IEEPA's authorization to "regulate … importation" of property encompasses that power. *Id.* at *13. But the "plain meaning of 'regulate' is not 'to

8

tax,'" and "historical practice … confirm[s] that the statute is not so capacious" as to authorize tariffs. *Id.* The Constitution itself distinguishes between the power to "regulate" and the power to "tariff," *see* U.S. Const. art. I, § 8, cls. 1, 3, and other statutes use more specific language to authorize changes to tariffs, *see, e.g.*, 19 U.S.C. § 2253(a)(3)(A). *Yoshida*'s contrary interpretation of the Trading With the Enemy Act based on that statute's "broad purposes" should not be extended to IEEPA given the Supreme Court's "clear" instruction "that courts must focus on a statute's text" and its repeated application of the major-questions doctrine. *Learning Res.*, 2025 WL 1525376, at *12.

The government alternatively argues that IEEPA authorizes the President to "nullify" and "void" any "right, power, or privilege." 50 U.S.C. § 1702(a)(1)(B). Those words, it claims, give the President a statutory eraser, allowing him to "override privileges … created by other statutes." Opp.13,20. That novel and alarming argument fails.

*First*, the government's argument is pure semantics. Eliminating a tariff exemption is functionally equivalent to imposing tariffs. Indeed, any imposition of tariffs could alternatively be framed as voiding an importer's "right, power, or privilege" not to be subject to tariffs. The government emphasizes the fact that Section 1321 refers to the de minimis exemption as a "privilege." 19 U.S.C. § 1321(a). But the logic of that argument is not limited to "privileges" labeled as such; it would apply to the "exercising [of] *any* right, power, or privilege" with respect to foreign property. 50 U.S.C. § 1702(a)(1)(B) (emphasis added). If IEEPA does not authorize the President to impose tariffs directly under IEEPA, he cannot do so indirectly by relabeling the action as "voiding" a "privilege."

*Second*, IEEPA does not authorize the government to erase a federal statutory "right, power, or privilege" related to tariffs. That is *less* plausible and raises *greater* nondelegation concerns than the proposition that IEEPA authorizes tariffs generally. It would allow the government not only to impose tariffs where Congress has remained silent, but to rewrite tariff statutes that Congress duly enacted. If, for example, Congress enacted a statute exempting Canadian imports from tariffs, the government apparently believes the President could "override" that judgment under IEEPA. Opp.13. So too for rights and privileges in other tariff-related statutes—like Section 122's 15%, 150-day limit on tariffs. 19 U.S.C. § 2132(a). It is implausible that Congress authorized the President to contravene its statutory judgments on a matter as economically important as tariffs "without a clear statement to that effect." *Biden v. Nebraska*, 600 U.S. 477, 506 (2023). The government's splicing together two of the seven verbs in Section 1702(a)(1)(B) ("nullify," and "void") with one of that provision's eleven subjects ("exercising any right, power or privilege") doesn't cut it.

*Third*, the government misconstrues the scope of IEEPA's nullification power. IEEPA does not allow the government to nullify privileges simpliciter, but rather the "exercising" of a privilege—meaning the "use of" the privilege. 50 U.S.C. §1702(a)(1)(B); Exercise, *Black's Law Dictionary* (12th ed. 2024). The de minimis exemption, however, operates not as a privilege to be invoked by individual importers, but as a command restraining the government from collecting tariffs: Customs officials "*shall* pass free of duty and tax any shipment of merchandise … not exceeding $800." 19 C.F.R. § 10.151 (emphasis added). Individual importers need not "exercise" any right to the de minimis exemption because Section 1321 and its implementing regulations issue a general command to the government that applies regardless of any individual's choice to invoke the exemption. IEEPA's language about regulating or nullifying the *exercise of* a privilege

does not authorize the government to abrogate this categorical command. The government's interpretation ignores the statutory term "exercising" and thereby fails to "give effect … to every clause and word of the statute." *Salix Pharm., Ltd. v. Norwich Pharm., Inc.*, 98 F.4th 1056, 1067 (Fed. Cir. 2024) (cleaned up).

**2.** Even if IEEPA authorized the President to impose *some* tariffs, it does not authorize him to eliminate the de minimis exemption. That follows directly from *V.O.S.* There, this Court held that IEEPA does not authorize the trafficking tariffs because they do not "deal with" the opioid-trafficking emergency—they instead "aim to create leverage to 'deal with' those objectives." *V.O.S. Selections, Inc. v. Trump*, 2025 WL 1514124, at *20 (C.I.T. May 28, 2025). The government does not dispute that *V.O.S.*'s reasoning applies with equal force to the elimination of the de minimis exemption, which was part of the trafficking orders. *See* Exec. Order 14256. It instead attempts to relitigate that decision. Opp.36-37. Thus, if *V.O.S.* is upheld on appeal, Detroit Axle is entitled to full relief. *See* ECF 13 at 6 (government conceding Court's decision in *V.O.S.* invalidates elimination of de minimis exemption).

But critically, the government's elimination of the de minimis exemption cannot stand even if that aspect of *V.O.S.* is reversed on appeal. When a "general authorization" like IEEPA and "a more limited, specific authorization" like Section 1321 both exist, it is a "commonplace of statutory construction that the specific governs the general"—particularly where, as here, Congress created a "comprehensive scheme" that "deliberately targeted specific problems with specific solutions." *RadLAX*, 566 U.S. at 645 (quotation marks omitted). Section 1321's specific, comprehensive scheme requires the government to alter the exemption only through notice-and-comment rulemaking, which the government failed to do. The government's scattershot attempts to avoid the specific-general rule are meritless.

The government principally argues that its broad interpretation of IEEPA does not conflict with Section 1321. Opp.20,28. In its telling, the former applies to the President in emergencies, and the latter to the Secretary in non-emergencies. But, as discussed, Section 1321 *does* apply in emergencies. *See supra* 5. And the President's IEEPA order squarely conflicts with the Secretary's de minimis regulations—as the government's own actions demonstrate: In order to "effectuate" the President's IEEPA proclamation, the Secretary of Homeland Security issued a notice that "suspended or amended" the conflicting de minimis regulations. 90 Fed. Reg. 17,608, 17,610 (Apr. 28, 2025). The government itself asserts that IEEPA "overrides" Section 1321. Opp.13. That conflict triggers the specific-general rule.

Application of the specific-general rule also is warranted because interpreting IEEPA to intrude into Section 1321's domain would make Section 1321(b)'s procedural requirements a practical nullity. The government could avoid notice-and-comment rulemaking simply by issuing an emergency IEEPA proclamation—which the government has argued elsewhere is "judicially unreviewable." *V.O.S.*, ECF 32 at 9. That would rob businesses like Detroit Axle of the time Congress recognized is needed to adjust their operations in the face of tariff changes. *See supra* 7. By requiring notice and comment to alter the de minimis exemption, Congress created a scheme with "balance, completeness, and structural integrity." *Brown v. Gen. Servs. Admin*, 425 U.S. 820, 832 (1976). The government may not "drive[] out of currency" Section 1321's more "rigorous" scheme for a "less demanding" one "by the simple expedient of putting a different label" on its actions. *Id.* at 833 (quotation marks omitted).

The government alternatively resists the specific-general rule by erroneously attempting to cabin it to provisions within a single statute. Opp.33. But the Supreme Court has repeatedly held that "[s]pecific terms prevail over the general in the same *or another* statute which otherwise might

be controlling." *Fourco Glass Co. v. Transmirra Prods. Corp.*, 353 U.S. 222, 228-29 (1957) (emphasis added). In *Brown & Williamson*, for example, the Court noted that Congress created "a distinct regulatory scheme for cigarettes and smokeless tobacco," and this "tobacco-specific legislation" demonstrated that the FDA did not have authority to regulate tobacco using its general power to regulate drug devices. 529 U.S. 120, 155-56 (2000). In *Harrington v. Purdue Pharma L.P.*, the Court held that a general authorization to order "appropriate" relief did not authorize non-debtor releases that were expressly authorized by a separate, narrower statute. 603 U.S. 204, 222 (2024). And in *TC Heartland LLC v. Kraft Foods Group Brands LLC*, the Court held that the specific patent venue statute controlled over the separate "general venue statute." 581 U.S. 258, 262 (2017). The rule equally applies across statutes here.

Next, the government feebly claims that IEEPA, not Section 1321, is the more specific statute here. Opp.34. A glance at the statutory text dispatches that argument. IEEPA broadly lists seven categories of action ("regulate," "direct," etc.) that the government may take with respect to eleven categories of activity ("acquisition," "withdrawal," etc.). 50 U.S.C. § 1702. It says nothing about tariffs or the de minimis exemption. Section 1321, by contrast, creates the de minimis exemption and details how to create exceptions. Section 1321 is doubtless more specific as to the lawful means of modifying the de minimis exemption.

The government's suggestion (Opp.34) that Section 1321 should not be interpreted to impliedly repeal IEEPA is nonsensical. Section 1321's notice-and-comment requirement was enacted in 1953—*before* IEEPA was enacted in 1977. *See* 67 Stat. at 515. So it is the *government* that must defeat the "strong presumption that repeals by implication are disfavored and that Congress will specifically address preexisting law when it wishes to suspend its normal operations in

a later statute." *Epic Sys. Corp. v. Lewis*, 584 U.S. 497, 510 (2018) (cleaned up). Yet IEEPA does not mention tariffs, the de minimis exemption, or Section 1321.

Equally unavailing is the government's invocation (Opp.28) of the "strong presumption" that "federal statutes touching on the same topic … can coexist harmoniously." *Dep't Agric. Rural Dev. Rural Hous. Serv. v. Kirtz*, 601 U.S. 42, 63 (2024). That principle means courts should "giv[e] effect to both" statutes "touching on the same topic" rather than "prefer[] one over another." *Id.* But there is a simple way to give effect to both Section 1321(b) and IEEPA: Section 1321(b) provides the exclusive mechanism to alter the de minimis exemption, and IEEPA's authorization to regulate importation gives the President a host of other, non-tariff powers in emergencies—*e.g.*, good-specific embargoes or country-of-origin requirements. Neither statute displaces the other on that understanding.

By contrast, the *government's* interpretation would run afoul of *Kirtz* by having IEEPA "override" Section 1321. Opp.13. The government's view is that in a declared emergency, the President simply can order the Secretary to suspend the de minimis exemption without notice and comment, notwithstanding the contrary requirements of Section 1321 and its implementing regulations. That is exactly what the government did here: The President issued Executive Order 14256, and the DHS Secretary issued an order stating that "[a]ll CBP regulatory provisions that are not consistent with, or that otherwise impede CBP's ability to effectuate" EO 14256—including existing de minimis regulations—are "suspended or amended." 90 Fed. Reg. at 17,610. The Secretary's order violated Section 1321(b)'s notice-and-comment requirement—and the APA requirement that agencies only may "amend or repeal a rule" using the "same procedures … used to issue the rule in the first instance." *Perez v. Mortg. Bankers Ass'n*, 575 U.S. 92, 101 (2015). Under

*Kirtz*, the government at a minimum had to effectuate *both* statutes by having the Secretary implement the President's IEEPA order through the notice-and-comment rulemaking required by Section 1321 and the APA. *See, e.g.*, *Nebraska v. Su*, 121 F.4th 1, 5 (9th Cir. 2024) ("Following notice and comment, the Department of Labor issued a rule implementing the executive order.").

This Court therefore should apply the specific-general rule—and give effect to Section 1321's requirements—in the same way that the Court applied that rule in *V.O.S.* There, this Court invalidated the worldwide-tariff orders because Congress's enactment of Section 122—a separate statute specifically addressing balance-of-trade issues—"indicates that even 'large and serious United States balance-of-payments deficits' do not necessitate the use of emergency powers and justify only the President's imposition of limited remedies subject to enumerated procedural constraints." 2025 WL 1514124, at *14. Thus, Section 122 "removes the President's power to impose remedies in response to balance-of-payments deficits, and specifically trade deficits, from the broader powers granted to a president during a national emergency under IEEPA by establishing an explicit non-emergency statute with greater limitations." *Id*.

That analysis applies equally here. Section 1321 comprehensively governs changes to the de minimis exemption and reflects Congress's judgment that any alteration must be "subject to enumerated procedural constraints"—namely, notice-and-comment rulemaking. *V.O.S.*, 2025 WL 1514124, at *14. And the government *concedes* that Section 1321 "contemplates" rulemaking to address "the exact circumstance" the President relied on when invoking IEEPA to abrogate the de minimis exemption for Chinese goods: "to prevent unlawful importations." Opp.23 n.4 (quoting 19 U.S.C. § 1321(b)). So just as the Executive must comply with Section 122's "greater limitations" in imposing balance-of-trade tariffs, so too must the Executive comply with Section 1321's limitations when revoking the de minimis exemption.

**3.**    If IEEPA authorized the President to impose tariffs and nullify a tariff-related stat-
ute whenever he declares an emergency, it would be an unconstitutional delegation of the tariff
power that the Constitution vests in Congress. *See* U.S. Const. art. I, § 8, cl. 1.[2] The government
cites *Curtiss-Wright* for the proposition that the nondelegation doctrine is inapplicable in the for-
eign-affairs context. Opp.25. *Curtiss-Wright*, however, dealt with a power that was "not alone …
vested in the President by an exertion of legislative power," but that was part of the President's
inherent power to conduct "international relations" without congressional authorization. 299 U.S.
304, 320 (1936). The power to tariff is *not* part of the President's inherent Article II powers; the
Constitution commits it *to Congress*. And the government wisely does not suggest that the Presi-
dent could impose tariffs without congressional authorization.

In cases like this one, where Congress has delegated one of its legislative powers to the
President, Congress must provide an "intelligible principle" to which the Executive must "con-
form." *J.W. Hampton, Jr., & Co. v. United States*, 276 U.S. 394, 409 (1928) (applying intelligible-
principle test to President's imposition of customs duties). There is no intelligible principle in
IEEPA to constrain the President's exercise of the legislative tariff power: So long as the President
declares there is an "unusual and extraordinary threat," 50 U.S.C. § 1701(a)—a declaration the
government argues is unreviewable—IEEPA provides no standards for him to determine when
*tariffs* are an appropriate response, what tariff level (from 1%-10,000%) should be imposed, or
how broadly such tariffs might sweep. And the lack of an intelligible principle is even more severe
when it comes to the purported power to nullify preexisting statutory rights: In that case, Congress

---

[2] The government's suggestion (Opp.25) that Detroit Axle forfeited this argument is frivolous.
Detroit Axle raised the argument in its complaint and opening brief. The government thus had
ample notice of the argument and has fully responded. Regardless, Detroit Axle "properly pre-
sented" its "federal claim" here, so it is "not limited to the precise *arguments* it previously made."
*Yee v. City of Escondido*, 503 U.S. 519, 534-35 (1992) (emphasis added).

would have given the President carte blanche to effectively repeal any of its statutes whenever he feels appropriate. *But see Clinton v. City of New York*, 524 U.S. 417, 437-39 (1998) (President's ability to "practical[ly] … repeal[]" a statute undermines the Constitution's "finely wrought" law-making procedures). This Court either should interpret IEEPA narrowly to avoid the nondelegation issue or hold IEEPA unconstitutional as applied here.

## II.    The Agency Actions Eliminating The De Minimis Exemption Were Arbitrary And Capricious.

The agency actions eliminating the de minimis exemption should be set aside for the independent reason that they violated the APA's arbitrary-or-capricious requirement. 5 U.S.C. § 706(2)(C). The government does not dispute that DHS's notice rescinding the exemption and CBP's tariff collections are final agency actions. Nor does it deny that those actions were arbitrary and capricious because the government failed to consider reliance interests, the costs of eliminating the exemption, and obvious alternatives that could have addressed trafficking. *See* ECF 9 at 22-25. It instead solely contends that the agency actions eliminating the exemption are not reviewable for compliance with the APA's arbitrary-or-capricious requirement. That is wrong.

All agree that the *President's* actions are not reviewable under the APA because the President is not an "agency." *Franklin v. Massachusetts*, 505 U.S. 788, 800-01 (1992). Courts, however, have appropriately limited *Franklin* to "cases in which the President has final constitutional or statutory responsibility for the *final step* necessary for the agency action directly to affect the parties." *Chamber of Com. v. Reich*, 74 F.3d 1322, 1327 (D.C. Cir. 1996) (cleaned up). "No language in the APA prevents or excepts review of an agency action that implements a presidential action." *Su*, 121 F.4th at 15. So "expanding *Franklin* to cover" agency actions that "adopt policy decisions issued by the President in executive orders" would "contradict[] the text of the APA."

*Id.* That "would shockingly allow Presidents to insulate any desired rulemaking from judicial review" simply by ordering an agency to issue a rule. *Id.*

Here, federal agencies have implemented the executive orders, and "[t]he final step of executive action that directly affected" Detroit Axle was the DHS notice rescinding the exemption and CBP's collection of tariffs, not the executive orders. *Orr v. Trump*, 2025 WL 1145271, at *15-16 (D. Mass. Apr. 18, 2025). The mere fact that those agency actions "are based on the President's Executive Order" does not "insulate them from judicial review under the APA, even if the validity of the Order [is] thereby drawn into question." *Reich*, 74 F.3d at 1327. Agency actions eliminating the de minimis exemption therefore are subject to APA review, including for compliance with the arbitrary-or-capricious requirement. *See* 28 U.S.C. § 2640(e) (CIT "shall review the matter as provided in section 706"); *Su*, 121 F.4th at 16-17 (agency "acted arbitrarily and capriciously" when it implemented executive order); *Orr*, 2025 WL 1145271, at *17-18 (applying "arbitrary and capricious" standard).

The government argues that "ministerial actions to implement" executive orders are not reviewable under the APA. Opp.16. But it cites no authority for a "ministerial actions" exception to APA review, and the APA's plain text "applies to *any* 'final agency action.'" *Su*, 121 F.4th at 15 (emphasis added) (quoting 5 U.S.C. § 704). It cites *USP Holdings, Inc. v. United States*, but that case dealt with a statute authorizing the President and Commerce Secretary to jointly determine a threat exists—two actions "reviewed together as a single step." 36 F.4th 1359, 1369 (Fed. Cir. 2022). So there, unlike here, the President *was* responsible for the "'*final* step necessary … to affect the parties.'" *Reich*, 74 F.3d at 1327.

The government contends agencies have no choice but to implement executive orders and therefore need not provide APA-compliant explanations or consider reasonable alternatives.

Opp.16.  But that is a non-sequitur:  There is "nothing untenable about analyzing the impacts, costs, and benefits of alternative policy options when issuing a rule that implements an executive order."  *Su*, 121 F.4th at 16.  While the government attempts to distinguish *Reich* and *Su* based on the discretion agencies retained in those cases, Opp.18-19, their holdings did not turn on agencies retaining discretion.  *See Reich*, 74 F.3d at 1327 (criticizing government's "unsupported interpretation of the APA"); *Su*, 121 F.4th at 15 (relying on APA's plain language).

Nor were the agency actions here purely ministerial.  The relevant executive order charged DHS to take "all necessary actions to effectuate the objectives of this order, consistent with applicable law, including through temporary suspension *or amendment of regulations*."  Exec. Order 14256 (emphasis added).  DHS thus *could have* complied with Section 1321 by conducting notice-and-comment rulemaking before suspending the de minimis exemption.  In choosing not to do so, it violated the APA by entirely failing to justify that choice or consider the serious reliance interests the de minimis regulations have engendered.  *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009).

The government's abrogation of the de minimis exemption is also procedurally defective because the government "suspended or amended" its de minimis regulations as applied to Chinese goods, 90 Fed. Reg. at 17,610, without complying with the notice-and-comment "procedure required by" Section 1321(b) and the APA, 5 U.S.C. § 706(2)(D); *see Perez*, 575 U.S. at 101.

Because the agency actions eliminating the de minimis exemption are reviewable under the APA and the government has waived any defense to Detroit Axle's arbitrary-or-capricious claims on the merits, those actions should be held unlawful and set aside.  5 U.S.C. § 706(2)(A).

## III.    Detroit Axle Is Entitled To Relief

Because the elimination of the de minimis exemption for Chinese goods exceeded the government's statutory authority and was arbitrary and capricious, and the imposition of IEEPA tariffs

was unlawful, Detroit Axle is entitled to summary judgment on Counts I, II, and III.  Detroit Axle's

success on the merits entitles it to: (1) a declaratory judgment, and (2) vacatur under the APA of

all implementing agency actions.  *See* 5 U.S.C. § 706(2)(A), (C).  No further showing is needed.

Detroit Axle also is entitled to a party-specific preliminary or permanent injunction that

prevents the government from imposing tariffs on its de minimis-eligible shipments.  An injunction

requires, in addition to success on the merits, a showing that the company has suffered irreparable

injury with no adequate remedy at law, and the equities and public interest favor such relief.  *eBay*

*v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006).

> **A.    Detroit Axle Is Suffering Significant Irreparable Harm.**

Since the elimination of the de minimis exemption, Detroit Axle has been suffering irrep-

arable harm: lost business opportunities, damage to reputation and customer goodwill, layoffs, and

the threat of imminent closure.  *See* ECF 9 at 25-29.  The government faults Detroit Axle for

waiting until May 16 to sue, but on the government's own theory, the company could not have

sued before there was final agency action.  *See* Opp.14-19.  There was no agency action finally

revoking the exemption until April 28, and that action did not become effective until May 2.

Opp.11.

The government claims that the elimination of the exemption has only a "negligible im-

pact" on Detroit Axle because at most, it could be eligible for de minimis treatment with respect

to $800 of goods per day as the importer of record.  Opp.38-39.  That misses the point.  The

elimination of the exemption harms Detroit Axle because it can no longer sell goods from its Mex-

ico facility without *its customers* being subject to massive tariffs—tariffs that would increase

prices beyond those customers' willingness to pay.  Musheinesh Decl. ¶20; 2d Musheinesh

Decl. ¶4.

The government calls that harm "speculative" (Opp.40), but its own declarant proves otherwise. As she explains, in 2024 Detroit Axle shipped roughly 1.3 million de minimis packages to U.S. customers worth nearly $240 million. Imes Decl. ¶10 (citing the de minimis regulation, 19 C.F.R. § 143.23(j)(3)). From the beginning of 2025 through the elimination of the exemption in May, the company shipped about 580,000 de minimis packages worth almost $110 million. *Id.* After May 1, however, those de minimis shipments—and the revenue and profit that come with them—fell to *zero*. *Id.* Detroit Axle thus has been harmed not just by the additional tariffs it has paid directly, but by its newfound inability to *ship* hundreds of millions of dollars of goods to its customers tariff-free. 2d Decl. ¶4.

That harm is enterprise-threatening. To keep prices low, Detroit Axle has tried to fill customer orders from its pre-tariff inventory in Michigan. ECF 9 at 26. But it has been unable to sell that inventory to customers across the country as quickly and cheaply as when it could ship goods from Mexico, hurting its reputation. *Id.* at 27-28. And when it runs out of pre-tariff inventory, likely by the end of June, the economics of its business no longer make sense: It cannot profitably pay the tariffs itself, lower its prices enough for its cost-conscious customers to be willing to purchase products subject to significant tariffs, or feasibly switch to non-Chinese suppliers. 2d Decl. ¶4,5. It will be forced to shut down and lay off its employees rather than operate at a significant loss.

Detroit Axle already has laid off ten people, and this week notified Michigan of about 100 additional planned layoffs. 2d Decl. ¶6. This loss of human capital is an irreparable injury. *See, e.g.*, *Louisiana v. Biden*, 55 F.4th 1017, 1034 (5th Cir. 2022) (loss of even "one percent" of employees is irreparable injury). The layoffs also demonstrate the serious and immediate risk that Detroit Axle will go out of business before its case is resolved on the merits—a risk warranting

immediate relief. *See, e.g.*, *Wis. Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985) (per curiam). A refund of just the tariffs Detroit Axle paid directly will be too little too late if it is forced to shut down in the meantime.

### B.    The Public Interest And Balance Of Equities Favor Injunctive Relief.

The government cannot refute Detroit Axle's showing that the equities and public interest favor injunctive relief. It claims an injunction would harm the public interest by preventing the President from responding to an emergency. Opp.43-44. But the government has no legitimate interest in acting unlawfully; the "public interest is served by ensuring that governmental bodies comply with the law." *Am. Signature, Inc. v. United States*, 598 F.3d 816, 830 (Fed. Cir. 2010). Congress spoke expressly to the public interest served by Section 1321's de minimis exemption and notice-and-comment requirement. Eliminating the exemption would cost U.S. consumers more than $10 billion annually, disproportionately affect low-income and minority households, and destroy jobs across the country—including for Detroit Axle's many formerly incarcerated employees. Pablo D. Fajgelbaum & Amit Khandelwal, *The Value of de Minimis Imports*, NBER (Feb. 2025) (manuscript at 4), https://www.nber.org/papers/w32607. The government's violation of Section 1321 frustrates those interests.

Nor would granting an injunction undermine the President's ongoing negotiations over tariffs. To the extent that a ruling would expose the President's lack of authority to impose tariffs under IEEPA, this Court's earlier holding in *V.O.S.*, as well as *Learning Resources*, already have made that clear. There would be minimal incremental harm from an injunction here, particularly a party-specific one. And regardless, the President cannot properly claim harm from judicial interference with negotiations about tariffs that he lacks statutory authority to impose.

IV.    **The Court Should Not Require More Than A Nominal Bond.**

Finally, if the Court grants Detroit Axle partial summary judgment, the bond question becomes moot, because the bond condition is applicable only to *preliminary* relief.  *See* Fed. R. Civ. P. 65(c).  In any event, the Court should not require Detroit Axle to post a bond, or at most should require a nominal bond.  *See Zenith Radio Corp. v. United States*, 518 F. Supp. 1347, 1349-50 (C.I.T. 1981) (prohibitive security should not be required because Congress intended customs decisions to be reviewed); *League of United Latin Am. Citizens v. Exec. Off. of the President*, 2025 WL 1187730, at *62 (D.D.C. Apr. 24, 2025) (collecting recent cases where no bond was required against government).

## CONCLUSION

This Court should grant Detroit Axle summary judgment on Counts I, II, and III.  It should hold unlawful and set aside the agency actions eliminating the de minimis exemption and implementing the IEEPA trafficking tariffs.  The Court also should enter a preliminary or permanent injunction enjoining Defendants from enforcing the executive orders eliminating the exemption and imposing the IEEPA trafficking tariffs.  The Court should deny Defendants' motion to dismiss and cross-motion for summary judgment.


June 26, 2025                                    Respectfully submitted,


                                                 */s/ Thomas H. Dupree Jr.*

                                                 Thomas H. Dupree Jr.
                                                 Samantha Sewall
                                                 Nick Harper
                                                 Connor P. Mui
                                                 Luke J.P. Wearden
                                                 GIBSON, DUNN & CRUTCHER LLP
                                                 1700 M Street, N.W.
                                                 Washington, D.C. 20036-4504

(202) 955-8500
TDupree@gibsondunn.com
SSewall@gibsondunn.com
NHarper@gibsondunn.com
CMui@gibsondunn.com
LWearden@gibsondunn.com


*Counsel for Plaintiff Detroit Axle*

**CERTIFICATE OF COMPLIANCE WITH WORD LIMIT**

Pursuant to CIT Standard Chambers Procedure 2(B), I certify that this brief, including headings, footnotes, and quotations (but excluding the table of contents, table of authorities, signature blocks, and this certificate) contains 7,000 words.


/s/ *Thomas H. Dupree Jr.*

*Counsel for Plaintiff Detroit Axle*