# EXHIBIT B

## IN THE UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| AXLE OF DEARBORN, INC. D/B/A DETROIT AXLE, | |
| *Plaintiff*, | |
| v. | |
| DEPARTMENT OF COMMERCE; HOWARD LUTNICK, *in his official capacity as Secretary of Commerce*; DEPARTMENT OF HOMELAND SECURITY; KRISTI NOEM, *in her official capacity as Secretary of Homeland Security*; DEPARTMENT OF THE TREASURY; SCOTT BESSENT, *in his official capacity as Secretary of the Treasury*; UNITED STATES CUSTOMS AND BORDER PROTECTION; PETE R. FLORES, *in his official capacity as Acting Commissioner for U.S. Customs and Border Protection*; and the UNITED STATES, | Case No. 1:25-cv-~~————————~~-00091<br><br>**FIRST AMENDED** COMPLAINT<br><br>~~THREE-JUDGE COURT REQUESTED~~ |
| *Defendants*. | |

### **FIRST AMENDED** COMPLAINT

Plaintiff Detroit Axle alleges as follows:

### PRELIMINARY STATEMENT

1.      Detroit Axle is a family-run retailer and distributor of auto parts. Through thirty-five years of hard work and ingenuity, and with the help of longstanding U.S. laws and policies promoting free trade, the company has transformed from a local Rust Belt supplier to a national Internet-based dealer with hundreds of millions of dollars in annual sales. But ~~as a result of~~ recent drastic and unlawful changes in ~~trade policy, this American success story—and the jobs of its hundreds of U.S. employees in Michigan—could be wiped out in a matter of months~~tariffs have seriously harmed the business. This Court's ~~immediate~~ intervention is ~~needed to keep the business running~~necessary to remedy that harm.

1

2.      Detroit Axle grew into a nationwide distributor at the turn of the millennium. By leveraging e-marketplaces as a distribution channel, the company has been able to reach a national customer base primarily consisting of individuals who want to make repairs or improvements to their vehicles on a budget.  Detroit Axle's business now depends on delivering auto parts to these cost-conscious customers quickly and at low prices.

3.      Detroit Axle's rapid growth relied on U.S. policy—as reflected in congressional statutes and low-tariff trade agreements—that encouraged mutually beneficial international trade. Detroit Axle has contracted with manufacturers in China that can produce auto parts more cheaply than can American manufacturers and can produce parts that are not made by any American manufacturers—enabling Detroit Axle to reach more customers with lower prices. This arrangement has allowed the company to better serve its U.S. customers and grow its U.S. business.  The company's Michigan facilities now employ hundreds of American workers.

4.      Beginning in 2018, however, the United States began pulling back from its free-trade commitments.   Between 2018 and 2020, for example, the President imposed significant tariffs on Chinese goods, including the Chinese auto parts imported by Detroit Axle.

5.      With limited ability to raise its prices while maintaining its thrifty customer base, Detroit Axle turned to a pillar of U.S. free-trade policy—the statutory de minimis exemption.  19 U.S.C. § 1321(a)(2)(C).  Enacted in 1938, the de minimis exemption spares low-value imports—today, imports of $800 or less—from tariffs.  The exemption "provide[s] significant economic benefits to businesses and consumers in the United States . . . through cost savings and reductions in trade transaction costs."  Trade Facilitation and Trade Enforcement Act (TFTEA), Pub. L. No. 114-125, § 901(a)(2), 130 Stat. 122, 223 (2016).

6.    To achieve those efficiencies and savings, Detroit Axle opened a second distribution facility in Juarez, Mexico. That facility imports auto parts from China and promptly sells them to U.S. customers west of the Mississippi River, while the Detroit facility primarily serves the remainder of the country. Because Detroit Axle only fulfills orders of less than $800 from the Mexico distribution center, all of Detroit Axle's sales from that facility are exempt from tariffs on Chinese goods under the de minimis exemption.

7.    The new facility has been a lifeline for the company. It has allowed Detroit Axle to essentially cut in half the effects of the increased Chinese tariffs by splitting imports between its two facilities, which in turn lets the company maintain lower prices for all of its customers and increase its investments in Michigan. Indeed, since opening the Mexico facility, Detroit Axle has opened a second facility in Michigan and grown its Michigan workforce significantly, while expanding its original Michigan operation.

8.    But Detroit Axle now faces ~~an existential threat~~serious harm. Relying on the International Emergency Economic Powers Act (IEEPA)—a statute traditionally used to impose economic sanctions on pariah nations like North Korea—the President has declared a series of national emergencies and levied unprecedented global tariffs on American companies like Detroit Axle.

9.    ~~Most relevant here, on~~On May 2, 2025, the President purported to eliminate the statutory de minimis exemption for Chinese imports—which has the effect of subjecting Detroit Axle's shipments from its Mexico facility (comprising products from China) to all preexisting tariffs, including certain tariffs under IEEPA. And on July 30, the President issued a new executive order that purports to eliminate the de minimis exemption *worldwide* and supersedes that May 2 executive order.

10.    The impact on Detroit Axle has been swift and ~~catastrophic. Under the~~significant. The now-applicable ~~Chinese~~ tariffs~~, which~~ have reached 72.5%~~, it is cost prohibitive for~~. Detroit ~~Axle to import parts from its suppliers in China to its Detroit factory. Its~~Axle's frugal buyers will not bear ~~the increased prices, and Detroit Axle cannot absorb them.  Nor can Detroit Axle continue to blunt the impact of the tariffs by selling parts from its Mexico facility, given the purported elimination of the de minimis exemption.  Thus, by the end of June, the company will exhaust its existing inventory and will be forced to close the doors of its Michigan facilities and lay off hundreds of employees.~~ an increase in prices to match the tariffs, so the company must take massive hits to its bottom line when it sells its imported products.  Detroit Axle has exhausted its stockpile of pre-tariff inventory and is experiencing severe damage to its profitability as a result of the tariffs.  And because Detroit Axle has been forced to raise prices, it is losing sales that it would have made to customers that now can no longer afford its products.

11.    The government's actions inflicting these  irreparable harms are unlawful on three independent grounds.

12.    *First*, the abrogation of the de minimis exemption exceeds the President's statutory authority.  Congress established an $800 floor for the de minimis exemption by statute, and that statute does not allow the President or any other executive official to suspend or eliminate the exemption by administrative fiat.  Rather, if the $800 floor is alterable at all, it may be changed only through notice-and-comment rulemaking by the Secretary of the Treasury, which has not occurred here.  *See* 19 U.S.C. § 1321(b).  Nor does IEEPA give the President authority to modify the exemption.  Even if IEEPA authorized tariffs—and it does not, as discussed below—that statute's general provisions for dealing with economic emergencies could

not be used to override Section 1321's specific requirements with respect to the de minimis exemption.

13.    *Second*, agency actions purporting to nullify the de minimis exemption—like the final notice that "duty-free *de minimis* ~~treatment~~exemption . . . shall no longer ~~be available for products of the PRC~~apply," 90 Fed. Reg. ~~17,608, 17,609 (Apr~~42,418, 42,419 (Sept. ~~28~~2, 2025)—are arbitrary and capricious in violation of the Administrative Procedure Act. The exemption has been the law of the United States for nearly a century. As such, it has engendered serious, investment-backed reliance interests—as Detroit Axle's investments demonstrate. Yet in reversing course and overriding the de minimis exemption, the government violated bedrock APA principles by failing to consider these significant reliance interests, failing to consider other important aspects of the problem, and offering no reasoned explanation for its actions.

14.    *Third*, as the Federal Circuit recently held, the IEEPA tariffs applicable to Detroit Axle are unlawful. *See V.O.S. Selections, Inc. v. Trump*, 2025 WL 2490634, at *18 (Fed. Cir. Aug. 29, 2025). IEEPA is not a blank check. It grants the President authority to "regulate" the "importation or exportation" of foreign property to respond to emergencies based on "unusual and extraordinary threat[s]." 50 U.S.C. §§ 1701–02. But it does *not* grant the power to levy tariffs on Americans—a highly consequential taxing power that the Constitution textually commits to Congress alone and that Congress has jealously guarded and only narrowly delegated. At a minimum, the kind of unilateral control that the President is asserting over the U.S. economy under IEEPA is of the utmost "economic and political significance" and thus would require clear authorization, which is lacking here. *Util. Air Regul. Grp. v. EPA*, 573 U.S. 302, 324 (2014) (quotation marks omitted). Moreover, any reading of IEEPA that would grant the President the power he claims—power to levy any tariffs he wants, on any country, for any

period of time—would be an unconstitutional delegation of Congress's tariff power. And the implementation of the President's orders is also arbitrary and capricious.

15.    This Court should enjoin the government from enforcing the President's purported abrogation of the de minimis exemption and from implementing the IEEPA tariffs.

**PARTIES**

16.    Plaintiff    Detroit    Axle    is    a    retailer    and    distributor    of original-equipment-remanufactured and new aftermarket auto parts. For more than 30 years, Detroit Axle has brought affordable, first-class products to millions of automotive professionals and enthusiasts in the United States and worldwide. Detroit Axle operates in the United States and Mexico and employs more than 500 people, including more than 230 in Michigan.

17.    Defendant Department of Commerce is a department of the federal government.

18.    Defendant Howard Lutnick is the Secretary and Head of the Department of Commerce. He is sued in his official capacity.

19.    Defendant Department Homeland Security ("DHS") is a department of the federal government.

20.    Defendant Kristi Noem is the Secretary and Head of DHS. She is sued in her official capacity.

21.    Defendant Department of the Treasury is a department of the federal government.

22.    Defendant Scott Bessent is the Secretary and Head of the Department of the Treasury. He is sued in his official capacity.

23.    Defendant United States Customs and Border Protection is an agency of the Department of Homeland Security.

24.     Defendant Pete R. Flores is the Commissioner and Head of the U.S. Customs and Border Protection.  He is sued in his official capacity.

25.     The United States is a statutory defendant under 28 U.S.C. § 1581.

## JURISDICTION AND VENUE

26.     This Court has jurisdiction under  28 U.S.C. § 1581(i)(1) because the suit "arises out of" a statute "providing for" "revenue from imports and tonnage," "tariffs, duties, fees, or other taxes on the importation of merchandise for reasons other than the raising of revenue," and/or "administration and enforcement with respect to" such revenue or tariffs.  28 U.S.C. § 1581(i)(1)(A), (B), (D).

27.     Federal-officer defendants acting beyond the scope of their authority under federal law and the Constitution are not protected by sovereign immunity from suits seeking declaratory or injunctive relief.  *See, e.g.*, *Larson v. Domestic & Foreign Com. Corp.*, 337 U.S. 682, 690–91 (1949); *Pollack v. Hogan*, 703 F.3d 117, 119–20 (D.C. Cir. 2012) (per curiam). Sovereign immunity also has been waived under  5 U.S.C. § 702 and 28 U.S.C. § 1581.

## BACKGROUND

## I.     Detroit Axle Is A Family-Owned American Success Story.

28.     Detroit Axle was founded as a family-owned business in Dearborn, Michigan in 1990.  At that time, it assembled and sold a single automotive part, the CV-joint, to local mechanics.  At first, Detroit Axle had no effective way to reach the broader American consumer: While chain auto-parts stores benefited from locations throughout the country and the name recognition that came with them, Detroit Axle had operations in a single Rust Belt suburb.

29.     Starting in the mid-2000s, however, Detroit Axle was able to increase the size and geographic scope of its business significantly by leveraging e-commerce.  Detroit Axle

started selling its products nationwide on e-marketplaces like Amazon and eBay to small mechanics, car enthusiasts in search of hard-to-find parts, and thrifty do-it-yourself car owners.

30.      In time, the Rust Belt bootstrapper became a genuine competitor to its bigger counterparts, while remaining family-owned and operated.  And Detroit Axle's rising tide lifted other boats—customers across the country enjoyed lower prices, and Dearborn, Michigan benefited from the new jobs Detroit Axle created, many of which the company gave to formerly incarcerated individuals in need of work.

## II.     Detroit Axle's Business Relies On Longstanding U.S. Free-Trade Laws And Policies.

31.      Detroit Axle also owes its success to U.S. policies encouraging international trade.  Since the Smoot-Hawley Act imposed tariffs that contributed to the Great Depression, the Nation's foreign policy has been roundly pro-trade.  *See* Daniel Griswold & Clark Packard, *How Trade Agreements Have Enhanced the Freedom and Prosperity of Americans*, CATO Institute (Aug. 27, 2024), https://tinyurl.com/97vashc6.  In the immediate post-war era, the United States helped negotiate the founding document of the World Trade Organization, the General Agreement on Tariffs and Trade.  *Id.*  And since the mid-twentieth century, the United States has negotiated 20 bilateral free-trade agreements, including 12 since 1992.  *See id.* ("Since NAFTA, the United States has signed and implemented 12 agreements with 17 countries").  The policy of the United States for decades has been one of low (or no) tariffs.  *See id.* (38% of U.S. imports in 2023 came from countries on which the U.S. imposes no tariffs); *see also* Christopher A. Casey, Cong. Rsch. Serv., *U.S. Tariff Policy: Overview* 2 (Jan. 31, 2025) (noting that "[s]ince 1934, the United States has reduced or eliminated many tariffs as part of bilateral and multilateral trade agreements" and that this period has been marked by "[l]ow U.S. tariff rates").

32.    Detroit Axle's business has flourished from free trade.  To better serve its core customers—individuals hoping to improve or repair their vehicles on a budget—Detroit Axle contracted with Chinese factories that produce parts either not made by or made more cheaply than U.S. manufacturers.  Even while doing so, Detroit Axle maintained and increased the size of its American employee base, because with cheaper products came more orders, which required more U.S. workers to ship the parts.

33.    In recent years, however, the Executive Branch began to retreat from the United States' commitment to free trade.  In 2018 and 2020, it imposed tariffs of up to 25% on Chinese-manufactured goods under Section 301 of the Trade Act of 1974, 19 U.S.C. § 2411.  Certain auto parts, in particular, were subject to tariffs of up to 25%.  *See* 83 Fed. Reg. 28,710 (June 20, 2018) (List 1); 83 Fed. Reg. 40,823 (Aug. 16, 2018) (List 2); 83 Fed. Reg. 47,974 (Sept. 21, 2018) (List 3); 84 Fed. Reg. 43,304 (Aug. 20, 2019) (List 4).

34.    With thin margins, Detroit Axle had limited ability to withstand these tariffs.  So in an effort to keep its business viable, the company turned to another mainstay of U.S. free-trade policy—the statutory de minimis exemption.  Through that nearly 90-year-old statute, Congress has eliminated tariffs on certain low-value imports.  Customs Administrative Act of 1938, Pub. L. No. 75-721, § 7, 52 Stat. 1077, 1081 (1938).  Although originally enacted to avoid the administrative inconvenience of collecting tariffs on goods worth less than $1, the de minimis exemption has, at Congress's direction, expanded and evolved over the decades into a powerful tool for enhancing free trade.  Today, the statute requires the government to exempt from tariffs goods worth "not less than" $800 per person per day.  19 U.S.C. § 1321(a)(2)(C).  Congress recently amended Section 1321 to eliminate the de minimis exemption, but Congress provided two years for businesses to adjust their operations by making that change effective only starting

in July 2027.  *See* One Big Beautiful Bill Act, Pub. L. No. 119-21 § 70531(b)(3), 139 Stat. 72, 238 (2025).

35.     As Congress has explained, expanding the de minimis exemption in this way "provide[s] significant economic benefits to businesses and consumers in the United States . . . through costs savings and reductions in trade transaction costs."  TFTEA, § 901(a)(2), 130 Stat. at 223.  It has played an instrumental role in providing Americans easy access to low-cost goods over the Internet.  And American exporters have benefited as well, as the United States has successfully urged other countries to reciprocate and adopt their own de minimis exemptions.  CRS Report, *Imports & Section 321*, *supra*, at 20–21.

36.     In 2020, to utilize this exemption, Detroit Axle opened a distribution center in Juarez, Mexico, just across the U.S.-Mexico border.  From that facility, which also imports auto parts from China, Detroit Axle can sell and deliver goods directly to U.S. customers.  And because Detroit Axle only fulfills orders of less than $800 from the Mexico distribution center, all of Detroit Axle's sales from that facility were, until recently, exempt from tariffs under the de minimis exemption.

37.     Detroit Axle's Mexico facility has been essential to maintaining and growing its business.  In e-commerce, speed and efficiency are paramount, and through this second location, Detroit Axle has been able to better serve its customers and capture market share by shipping more quickly to the western United States.  The Mexico facility also allows Detroit Axle to cushion the financial impact of the tariffs on its Dearborn, Michigan distribution center, which continues to serve customers east of the Mississippi River.  Indeed, the increased revenue from its Mexico location has allowed Detroit Axle to increase the size of its operations in

America—in a virtuous cycle, as shipment sizes went up, the price per unit fell, allowing Detroit Axle to open a re-manufacturing plant and employ even more people in Michigan.

38.     The Mexico facility also has helped Detroit Axle become a top third-party seller on Amazon and eBay.  As a top seller, Detroit Axle consistently appears at or near the top of search results when customers search for auto parts on these marketplaces—which is critical to driving sales and maintaining market share.

39.     The de minimis exemption thus has functioned just as Congress intended by allowing Detroit Axle to keep its prices low, sell more goods to more customers, and expand its business by hiring additional employees.

## III.    The President's Tariff Orders Have Purported To Abrogate The De Minimis Exemption.

40.     Since February 2025, the President has issued numerous executive orders imposing tariffs.  Initially, the President imposed tariffs just on China, Mexico, and Canada, purportedly to deal with the flow of fentanyl; these tariffs remain in force but have been amended several times.  Since then, the President has levied more sweeping tariffs on virtually every country in the world—tariffs he has altered significantly and unpredictably.  These actions have moved markets, reshaped global shipping patterns, and begun to rewire the U.S. and global economies.

41.     The President has purported to impose almost all of these tariffs under the International Emergency Economic Powers Act, 50 U.S.C. § 1701 *et. seq.*  Enacted in 1977, IEEPA authorizes the President to take certain actions with respect to foreign property to "deal with" "unusual and extraordinary threat[s]" arising abroad.  *See* 50 U.S.C. §§ 1701–02.  Presidents have historically used IEEPA to impose economic sanctions on state sponsors of

terrorism and pariah nations, such as Iran and North Korea.  Until this year, no President has used IEEPA to impose tariffs.

42.    In these tariff orders, the President also purported to eliminate the statutory de minimis exemption for goods imported from China.  The President initially abrogated the exemption on February 1, 2025, before pausing that order days later until the Secretary of Commerce notified him that "adequate" systems were in place to collect tariffs.  *See* Exec. Order No. 14195, § 2(g), 90 Fed. Reg. 9,121, 9,123 (Feb. 1, 2025); Exec. Order No. 14200, § 1, 90 Fed. Reg. 9,277, 9,277 (Feb. 5, 2025).  After being so notified, the President issued a further order providing that "duty-free *de minimis* treatment under 19 U.S.C. 1321(a)(2)(C) shall no longer be available" for "products of" China starting on May 2, 2025.  Exec. Order No. 14256, § 1, 90 Fed. Reg. 14,899, 14,899 (Apr. 2, 2025).  That order went into effect on May 2.  *See* 90 Fed. Reg. 17,608, 17,609 (Apr. 28, 2025) (notifying the public that DHS would no longer allow the de minimis exemption for products of China beginning May 2).

43.    On July 30, 2025, the President issued a new executive order that purports to eliminate the de minimis exemption worldwide effective August 29, 2025, including by superseding on that date the China-specific elimination of the exemption in Executive Order 14256.  *See* Exec. Order No. 14324 §§ 2, 4, 90 Fed. Reg. 37,775, 37,776 (July 30, 2025).  According to the White House, the worldwide rescission of the de minimis exemption "deliver[s] on [the President's] promise to 'put an end' to the 'big scam' of *de minimis* shipments."  White House, *Fact Sheet: President Donald J. Trump is Protecting the United States' National Security and Economy by Suspending the De Minimis Exemption for Commercial Shipments Globally* (July 20, 2025), https://tinyurl.com/2t82th82.  The President recognized that Congress recently

had enacted a statute repealing the exemption starting in July 2027, but stated that he was "acting more quickly to suspend the *de minimis* exemption than the [statute] requires." *Id.*

44. U.S. Customs and Border Protection implemented Executive Order 14324 effective August 29, 2025, when CBP issued a notice modifying the Harmonized Tariff Schedule of the United States (HTSUS) to eliminate the de minimis exemption and suspending all existing regulations allowing de minimis treatment for imports "entered for consumption . . . on or after 12:01 a.m. eastern daylight time on August 29, 2025." *See* Notice of Implementation of the President's Executive Order 14324, Suspending Duty-Free De Minimis Treatment for All Countries, 90 Fed. Reg. 42,418, 42,419–21 (published Sept. 2, 2025). The notice provides that "[c]onsistent with Executive Order 14324, the duty-free *de minimis* exemption provided under 19 U.S.C. 1321(a)(2)(C) shall no longer apply to any shipment of articles not covered by 50 U.S.C. 1702(b), regardless of value, country of origin, mode of transportation, or method of entry." *Id.* at 42,419. The "Annex" to the notice purports to modify the HTSUS to state that "[p]roducts of all countries are not eligible" for the de minimis exemption. *Id.* at 42,420–21. The notice "supersede[s]" the earlier CBP notice eliminating the de minimis exemption just for products of China. 90 Fed. Reg. at 42,420 (superseding 90 Fed. Reg. 17,608 (Apr. 28, 2025) for goods imported after August 29).

~~43~~45. As a result of the President's purported abrogation of the de minimis exemption ~~for Chinese imports~~, Detroit Axle's direct-to-consumer auto-parts shipments from its Mexico facility ~~are now~~have, since May, been subject to a wide array of burdensome tariffs applicable to Chinese imports.[1] Under IEEPA, the President's fentanyl-related orders have levied a total of

---

[1] Even though many of Detroit Axle's products pass through Mexico, they are tariffed as though they are Chinese goods because they are not "substantially transformed" in Mexico. *See* 19 C.F.R. § 134.1(b) (defining the "Country of origin" and requiring a "substantial transformation" to alter the initial country of origin).

20% tariffs on Chinese goods, including auto parts. *See* Exec. Order No. 14195, § 2(a); Exec. Order No. 14228, § 2, 90 Fed. Reg. 11,463, 11,463 (Mar. 3, 2025). The President has also imposed auto-part-specific tariffs under Section 232 and Section 301. The tariffs under Section 232 place an across-the-board 25% tariff on auto parts, *see* Proclamation No. 10908, § 1, 90 Fed. Reg. 14,705, 14,706 (Mar. 26, 2025), while the Section 301 tariffs from the President's first term vary but can go up to 25%, *see supra* ¶ ~~34~~33 (The worldwide "reciprocal tariffs," by contrast, do not presently apply to auto parts subject to Section 232 tariffs. Exec. Order No. 14257, § 3(b), 90 Fed. Reg. 15,041, 15,045–46 (Apr. 2, 2025).)

~~44~~46. Thus, Detroit Axle is subject to a 72.5% tariff on auto parts that it imports from China, including by way of its Mexico facility: 25% from the Section 232 tariffs; 20% from the IEEPA fentanyl-related tariffs; 25% on China-origin auto parts under Section 301; plus a 2.5% Most Favored Nation duty on auto parts.[2]

## IV. The New Tariff Policies ~~Threaten~~**Have Seriously Harmed** Detroit Axle's ~~Survival~~**Business**.

~~45~~47. As is well-documented by now, the President's actions have significantly impacted global markets. ~~For~~ Detroit Axle~~, these actions threaten financial ruin:  Try as it might, the~~ has not been spared:  The massively increased costs resulting from the tariffs ~~mean that Detroit Axle is likely to be forced to close the doors of its Michigan facilities and lay off its employees by the end of June.~~ have caused significant uncertainty and devastated Detroit Axle's profitability.  Detroit Axle's business model relies on the company's ability to ship some of its

---

[2] The "Most Favored Nation" tariff is a general duty imposed on goods from all countries. *See generally* Harmonized Tariff Schedule, § XVII, ch. 87, https://www.usitc.gov/publications/docs/tata/hts/bychapter/1000c87.pdf (providing the HTSUS table for tariffs applicable to auto parts and certain vehicles).

products tariff-free to customers in the United States, so the elimination of the de minimis exemption seriously threatens the company's profitability, reputation, and operating model.

48.    Yet as a result of the government's actions, all of the goods Detroit Axle ships to customers—including previously tariff-free goods from its Mexico facility—are now subject to 72.5% tariffs.  Detroit Axle has paid more than $19 million in tariffs on shipments from its Mexico facility between May 2 and September 2, 2025, compared to $0 last year—resulting in significantly reduced profits.  Detroit Axle has raised its prices modestly to help offset some of the costs of tariffs.  But that increase, while necessary to keep the business afloat, has harmed Detroit Axle's reputation for providing goods to its customers at reasonable prices.  And Detroit Axle's tariff-induced higher prices have caused it to lose sales that it would have made to customers who no longer are willing or able to purchase its products.

46.    Most immediately, the elimination of the de minimis exemption—and the corresponding imposition of 72.5% tariffs on auto parts shipped from its Mexico facility—have forced Detroit Axle bring its operations in Mexico to a near standstill, trapping tens of millions of dollars of inventory there.  Detroit Axle cannot simply pass 72.5% tariffs onto customers because many of its competitors do not have to raise their prices commensurately:  Many competitors either (1) source their products from countries other than China and therefore are still able to utilize the de minimis exemption; or (2) are Chinese suppliers that utilize the postal service and therefore incur lower tariff rates (*see infra* ¶ 71).  And although Detroit Axles is absorbing the tariffs as a stopgap measure for the few products it continues to sell from Mexico, it cannot continue to do so for long.  Thus, unless the exemption is restored, Detroit Axle's business model will cease to be viable, and its Mexico facility—and Detroit Axle's significant investments in it—will lose much of its value.

47.    ~~To try to keep prices low,~~ Detroit Axle ~~has been forced to fill orders almost entirely from the pre-tariff inventory it has stockpiled in its Michigan distribution center. When the recent tariff increases began and the de minimis exemption was eliminated, Detroit Axle had limited reserve supplies in Michigan that it could use to fill orders. That stock, however, likely will be exhausted by the end of June.~~

48.    ~~Once Detroit Axle has depleted its existing U.S. stockpiles, the economics of its business will no longer make sense. Detroit Axle will be forced to close its Michigan operations, lay off hundreds of employees, and try to sell off its remaining inventory in the Mexico facility at higher prices. The company would become a shell of itself.~~

49.    ~~Even if the company could eventually find new suppliers outside of China and restart the business, it likely would never achieve its former level of success. Even a short period of dormancy likely would cost Detroit Axle its top-seller status on critical e-marketplaces like Amazon and eBay. That in turn would cause the company to drop in the search results, making it exceedingly difficult (if not impossible) to regain its lost market share and support the infrastructure it has built over decades.~~

50.    ~~Finally, while customer orders continue to arrive and Detroit Axle remains able to fill them with its reserves for the time being, running the entire business out of Michigan is causing substantial harm to the company by delaying deliveries to customers. The Michigan facility does not have sufficient employees to keep pace with the flow of orders that used to be handled by the company's two warehouses — even with many existing employes working eighty-hour weeks (and being paid overtime wages). And once orders are fulfilled, it takes longer to ship the goods from Michigan to the West Coast. These delays have cost Detroit Axle~~

~~sales and customer goodwill that it has built over decades, which likewise threatens Detroit Axle's position as a top seller on e-marketplaces.~~

~~51.    Thus, while Detroit Axle has remained afloat through a combination of ingenuity and grit, the dramatically increased tariffs and abrogation~~ of the de minimis exemption ~~make it only a matter of time before Detroit Axle's American success story will end.~~

**GROUNDS FOR RELIEF**

## I.    The Executive Branch's Abrogation Of The De Minimis Exemption Is Unlawful.

~~52~~49.    The President's orders purporting to eliminate the de minimis exemption, and the government's implementation of those orders, are unlawful.  *First*, the Executive Branch lacks authority to unilaterally override the $800 floor for the de minimis exemption that Congress has established by statute.  *Second*, the government's actions implementing the President's orders are arbitrary and capricious because, among other reasons, the government failed to consider the reliance interests of those, like Detroit Axle, that have made significant investments based on the de minimis exemption.  The President's orders and the government's actions enforcing them therefore should be declared unlawful, enjoined, and set aside.

### A.    The Executive Branch Lacks Authority To Rescind The De Minimis Exemption.

~~53~~50.  The government's attempt to nullify the de minimis exemption is unlawful because it circumvents the only statutorily prescribed means by which the Executive Branch conceivably could alter the exemption:    notice-and-comment rulemaking.    *See* 19 U.S.C. § 1321(b).

17

### 1.    Congress Has Established A Mandatory $800 Floor For The De Minimis Exemption.

~~54~~51.    The de minimis exemption relieves small-value imports from tariffs.    As originally enacted in 1938, the statute authorized "[c]ollectors of customs . . . under such regulations as the Secretary of the Treasury may prescribe, to disregard" duties on goods whose value did "not exceed . . . $1" when "the expense and inconvenience of collecting the duty accruing thereon would be disproportionate to the amount of such duty."    Customs Administrative Act of 1938, § 7, 52 Stat. at 1081.    Since its adoption, Congress has repeatedly expanded the de minimis exemption.    *See, e.g.*, Customs Procedural Reform and Simplification Act of 1978, Pub. L. No. 95-410, § 205(b)(3), 92 Stat. 888, 900 (1978) (raising the cap to $5).

~~55~~52.    In 1993, "Congress fundamentally changed the language of the statute to further make it a tool useful for trade liberalization by essentially requiring that the Secretary provide de minimis treatment."    CRS Report, *Imports & Section 321*, *supra*, at 17.    Before 1993, the statute authorized the Secretary of the Treasury to admit articles free of tariffs, but specified that the aggregate value of duty-free articles "shall not exceed" certain monetary thresholds.    *See, e.g.*, 19 U.S.C. § 1321 (1992).    But in 1993, Congress replaced "shall not exceed" with "shall not exceed an amount specified by the Secretary by regulation, *but not less than*" certain monetary thresholds.    North American Free Trade Agreement Implementation Act, Pub. L. No. 103-182, § 651, 107 Stat. 2057, 2209 (1993) (emphasis added).    Thus, whereas the Secretary before had the authority to exempt goods *up to* $5 from tariffs per importer per day, the amended statute required the Secretary to exempt *at least* $200 of goods per importer per day and authorized the Secretary to increase that floor by regulation.    *Id.*

~~56~~53.    In 2015, Congress further expanded the de minimis exemption by directing the Treasury Secretary to raise the value of duty-free goods to "not less than . . . $800" per importer

per day.    19 U.S.C. § 1321(a)(2)(C); *see* TFTEA, § 901(a)(2), 130 Stat. at 223; 19 C.F.R. § 10.151 (permitting port directors to allow in shipments "not exceeding $800" duty free).  In so doing, Congress explained that "[h]igher thresholds for the value of articles that may be entered informally and free of duty provide significant economic benefits to businesses and consumers in the United States and the economy of the United States."  TFTEA, § 901(a)(2), 130 Stat. at 223.

        ~~57~~54.    As discussed, this expansion of the de minimis exemption has allowed businesses like Detroit Axle to import more goods without being penalized by tariffs, to the benefit of American workers and consumers. *See supra* ¶¶ 32–40.

        55.    Moreover, although Congress recently repealed the de minimis exemption, it chose to keep the exemption in place until July 2027, giving businesses adequate time to adjust their operations.  *See* Pub. L. No. 119-21, § 70531(b)(3) (2025).  Congress did not ratify the President's decision to end the de minimis exemption immediately, nor did it expand the President's authority to alter the exemption on his own initiative.

        ~~58~~56.    Thus, Section 1321 still provides only one source of exception-making authority: "The Secretary of the Treasury is authorized *by regulations to prescribe* exceptions to any exemption provided for in subsection (a) whenever he finds that such action is consistent with the purpose of subsection (a) or is necessary for any reason to protect the revenue or to prevent unlawful importations."    19 U.S.C. § 1321(b) (emphasis added).    That provision does not authorize the Treasury Secretary to make exceptions *below* the statutorily fixed floor.  *See Nat'l Customs Brokers & Forwarders Ass'n of Am., Inc. v. United States*, 59 F.3d 1219, 1223 (Fed. Cir. 1995) ("section 1321 required Customs to set the dollar limit on duty-free entry at or above the specified minimum level").  But even if it did, any exceptions must be made by the Secretary through notice-and-comment rulemaking.    The Secretary recently initiated two rulemakings

pursuant to his authority under Section 1321(b), neither of which proposes eliminating the de minimis exception for nearly all Chinese goods.  90 Fed. Reg. 3,048, 3,072–73 (Jan. 14, 2025); 90 Fed. Reg. 6,852, 6,873 (Jan. 21, 2025).

### 2.    The Executive Branch Has No Power To Nullify The Mandatory De Minimis Exemption.

~~59~~57.    Notwithstanding the mandatory, statutory nature of the de minimis exemption, the President ~~has~~ decreed by executive order that "duty-free *de minimis* treatment under 19 U.S.C. § 1321(a)(2)(C) shall no longer be available for products of [China]."  Exec. Order No. 14256, § 1.  ~~And he has ordered that the Secretary of Commerce take steps to do the same for imports from Mexico;~~ *see also* Exec. Order No. 14324, §§ 2, 4(b).  And now the President has rescinded the de minimis exemption for *all* countries effective August 29, 2025.  *See* Exec. Order No. ~~14194~~14324, §§ 2~~(g), 90 Fed. Reg. 9,117, 9,119 (Feb. 1, 2025) (purporting to rescind the de minimis exemption for Mexico); Exec. Order No. 14227, § 1, 90 Fed. Reg. 11,371, 11,371 (Mar. 2, 2025) (temporarily pausing the rescission,~~ 4(a).

~~60~~58.    Section 1321 forecloses any Executive Branch authority to abrogate the de minimis exemption.  The statute's $800 floor is mandatory.  Congress specifically changed the exemption in 1993 to make it a floor rather than a ceiling in order to *remove* executive discretion and create a safe harbor for free trade.  The President cannot override that considered judgment.

~~61~~59.    At a minimum, though, the President cannot alter the exemption by executive order.  Section 1321 prescribes one—and only one—source of exception-making authority: notice-and-comment rulemaking.  A "situation in which a statute authorizes specific action and designates a particular party empowered to take it is surely among the least appropriate in which to presume nonexclusivity."  *Hartford Underwriters Ins. Co. v. Union Planters Bank, N.A.*, 530 U.S. 1, 6 (2000); *see Cont'l Cas. Co. v. United States*, 314 U.S. 527, 533 (1942) (a "'legislative

20

affirmative description' implies denial of the nondescribed powers"); 2A Sutherland Statutory Construction § 47:23 (7th ed.) (describing *expressio unius* canon of statutory construction).  So if the Executive Branch has authority at all to disturb the judgment of Congress that the de minimis exemption is beneficial to American consumers and businesses, it must do so through the notice-and-comment rulemaking that Congress specifically authorized.

6260.  Nothing in IEEPA is to the contrary.  IEEPA grants the President the general authority to "regulate . . . importation of" foreign property to "deal with" certain emergencies.  50 U.S.C. §§ 1701–02.  That As the Federal Circuit recently held, this language, read in the context of Congress's universal practice of authorizing tariffs expressly, does not grant the President the power to impose unbounded tariffs, *V.O.S.*, 2025 WL 2490634, at *10–11.  The phrase "regulate . . . importation" similarly does not grant the President the power to impose tariffs on goods that are statutorily eligible for the de minimis exemption.

61.    Moreover, IEEPA's general grant of authority cannot be interpreted to give the President power to create at will new exceptions to the de minimis exemption, because it is a "commonplace of statutory construction that the specific governs the general."  *RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 566 U.S. 639, 645 (2012) (quotation marks omitted).  That rule of construction has "particula[r]" force "where . . . 'Congress has enacted a comprehensive scheme and has deliberately targeted specific problems with specific solutions.'"  *Id.*

63.    Here, Section 1321 creates a specific and comprehensive scheme governing the de minimis exemption; IEEPA speaks generally about regulating imports.  So even if IEEPA authorized the President to impose tariffs or revoke tariff exemptions—which it does not, as

explained below—Congress's clear instructions in Section 1321 would control. The Executive Branch cannot use IEEPA to circumvent Section 1321's limitations.

64 62. Because the executive orders purporting to rescind the de minimis exemption are "incompatible with the expressed or implied will of Congress," the President's power is at its "lowest ebb," and the President can claim to overcome the will of Congress only if his power over tariff exemptions is "conclusive and preclusive." *Youngstown Sheet & Tube Co.*, 343 U.S. 579, 637–38 (Jackson, J., concurring). It is not. *Congress*, not the President, has the constitutional authority "to lay and collect Taxes, Duties, Imposts and Excises." U.S. Const. art. I, § 8, cl. 1.

**B. The Executive Branch's Abrogation Of The De Minimis Exemption Was Arbitrary And Capricious.**

65 63. The Administrative Procedure Act forbids "arbitrary" and "capricious" agency action. 5 U.S.C. § 706(2)(A). To satisfy the arbitrary-and-capricious standard, agency action must be "reasonable and reasonably explained." *Ohio v. Env't Prot. Agency*, 603 U.S. 279, 292 (2024) (quotation marks omitted). Agency action is not reasonable or reasonably explained if the agency "entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n of U.S.. v. State Farm Mut. Auto. Ins.*, 463 U.S. 29, 43 (1983). In considering "important aspect[s]" of a problem, it "would be arbitrary and capricious to ignore" the impact that a change in "longstanding policies may have" on "serious reliance interests." *DHS v. Regents of the Univ. of Cal.*, 591 U.S. 1, 30 (2020) (quotation marks omitted). The government also must consider "alternative way[s] of achieving" its objectives and give "adequate reasons" to reject them. *State Farm*, 463 U.S. at 48.

6664.  Although the President's actions are not directly subject to APA review, agency action implementing an executive order is not "insulate[d] . . . from judicial review under the APA, even if the validity of the Order were thereby drawn into question."  *Chamber of Com. v. Reich*, 74 F.3d 1322, 1327 (D.C. Cir. 1996).  Rather, courts "have subjected agency actions that incorporate a presidential directive to APA review (and specifically to arbitrary-or-capricious review)."  *State v. Su*, 121 F.4th 1, 15–16 (9th Cir. 2024).

6765.  On April 28, 2025, DHS issued a notice that it would begin to collect tariffs on goods that otherwise would qualify for de minimis treatment on May 2, including goods from China valued less than $800.  *See* 90 Fed. Reg. 17,608, 17,609 (Apr. 28, 2025).  ~~This~~On August 29, 2025, to give effect to Executive Order 14324, the Secretary issued a superseding notice providing that the "duty-free *de minimis* exemption provided under 19 U.S.C. 1321(a)(2)(C) shall no longer apply to any shipment of articles not covered by 50 U.S.C. 1702(b), regardless of value, country of origin, mode of transportation, or method of entry" if the goods were "entered for consumption . . . on or after 12:01 am eastern daylight time on August 29, 2025."  90 Fed. Reg. at 42,419.  These and other final agency actions implementing the rescission of the de minimis exemption are arbitrary and capricious.  *See, e.g.*, Customs & Border Prot., *Executive Order – Tariff on De Minimis Shipments from China*, Article No. 000001915 (May 8, 2025), https://tinyurl.com/6kj36jys~~.~~; Customs & Border Prot., *E-Commerce Frequently Asked Questions – Executive Order 14324* (Aug. 28, 2025), https://tinyurl.com/4pvny752.

6866.  The Executive Branch has provided a barebones explanation for its abrogation of the de minimis exemption:  "[S]hippers often avoid detection [of narcotics] due to administration of the *de minimis* exemption."  Exec. Order No. 14256, § 1.  ~~That explanation is~~The more recent executive order rescinding the de minimis exemption worldwide contains a similarly threadbare

explanation:  The order simply states the recission is "still necessary and appropriate" and that "the risks of evasion, and deception, are particularly high for low-value articles."  Exec. Order. No. 14324, § 1.  Those explanations are insufficient for at least four reasons.

6967.  *First*, the government changed its longstanding position on the de minimis exemption without considering "serious reliance interests."  *Regents*, 591 U.S. at 30 (quotation marks omitted); *see FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009).  Businesses like Detroit Axle have made large investments in international supply chains to provide their U.S. customers with the best goods at the lowest prices.  Detroit Axle's Mexico facility is a case in point:  The company leased the facility using long-term contracts, signed contracts with suppliers in China, hired and trained employees to work in its facilities, made capital investments in its physical plant and equipment, and partnered with shippers to move its products into the United States—all in reliance on the availability of the de minimis exemption that would enable it to sell goods from that facility in a cost-effective way.  In addition, U.S. *consumers*—like individual car owners and local repair shops that use Detroit Axle's parts—have relied on the continued availability of low-cost goods from companies like Detroit Axle.  The sudden abrogation of the de minimis exemption upset all of these significant reliance interests.  Yet neither the President nor any implementing agency has said anything about this "important aspect of the problem."  *State Farm*, 463 U.S. at 43.

7068.  *Second*, the government failed to consider other important aspects of the problem.  For example, it did not consider all the economic costs and benefits of eliminating the exemption, which Congress has repeatedly concluded benefits U.S. businesses and consumers.  It did not address the effect that abrogating the de minimis exemption might have for U.S. *exporters*, who rely on other countries' de minimis exemptions, and the Americans employed by

24

such companies.  *See* CRS Report, *Imports & Section 321*, *supra*, at 22–23.  It did not grapple with the substantially increased burden on customs officials who will have to collect small-dollar tariffs on millions of additional imports.  Nor did it consider that it was putting American businesses like Detroit Axle at a competitive disadvantage relative to ~~Chinese~~international counterparts that import through the postal service and are subject to lower effective tariff rates.  *See* Exec. Order ~~*Modifying Reciprocal Tariff Rates to Reflect Discussions with the People's Republic of China*, § 4 (May 12, 2025)~~No. 14298, § 4, 90 Fed. Reg. 21,831, 21,832–33 (May 12, 2025); *see also* Exec. Order No. 14324, § 3(b)-(c) (allowing international carriers to collect a "duty equal to the effective IEEPA tariff rate" *or* one of three specified flat rates).

~~71~~69.   *Third*, the government failed to consider reasonable alternatives to eliminating the de minimis exemption.  *State Farm*, 463 U.S. at 48, 50–52.  Again, the government's sole explanation was that "shippers often avoid detection [of narcotics] due to administration of the *de minimis* exemption."  Exec. Order No. 14256, § 1; *see also* Exec. Order No. 14324, § 1 ("The risks of evasion, deception, and illicit-drug importation are particularly high for low-value articles that have been eligible for duty-free *de minimis* treatment.")  But if smuggling opioids were the problem, the obvious solution would be simply to inspect packages entering the United States regardless of declared value.  The government can inspect packages without levying tariffs on them—or at the very least, it could inspect packages while charging no more than a nominal fee the recoup the government's costs of inspection.  At a minimum, the government had to consider that alternative (among others) and explain why it was infeasible.  *See Yakima Valley Cablevision, Inc. v. FCC*, 794 F.2d 737, 746 n.36 (D.C. Cir. 1986) ("The failure of an agency to consider obvious alternatives has led uniformly to reversal.").

72<u>70</u>.  *Fourth*, the government's explanation is arbitrary because there is no rational connection between means and ends.  The imposition of tariffs on items worth less than $800 has no articulated or apparent link to the problem the government cited as justification.  Moreover, the availability of an "obvious alternative[]"—inspecting packages for narcotics—suggests that the government's explanation is pretextual.  *Yakima Valley*, 794 F.2d at 746 n.36; *see Dep't of Com. v. New York*, 588 U.S. 752, 785 (2019) (the "reasoned explanation requirement of administrative law" requires "genuine justifications," not "contrived reasons").

**II.      The IEEPA Tariffs Applicable To Detroit Axle Are Unlawful.**

~~73~~71.  Even if the de minimis exemption were restored, Detroit Axle's imports to its Michigan facility still would remain subject to the 20% tariffs the President has recently imposed under IEEPA.  Exec. Order No. 14195, § 2(a); Exec. Order No. 14228, § 2.  Those IEEPA tariffs are unlawful, as the Federal Circuit recently held.  IEEPA gives the President certain authorities to respond to national emergencies, but it does *not* authorize the President to impose whatever tariffs he wants.  *See V.O.S.*, 2025 WL 2490634, at *15–16.  That is both the best interpretation of the statutory text, and the only interpretation that is consistent with the Constitution.  The IEEPA tariffs also are arbitrary and capricious because, in implementing the tariffs, the government failed to consider important aspects of the problem, including reliance interests and obvious alternatives, and did not reasonably explain its actions.

**A.      IEEPA Does Not Authorize The Executive Branch To Impose Tariffs.**

~~74~~72.  IEEPA's text and context make clear that it does not grant the Executive Branch any authority to impose tariffs.

~~75~~73.  The Taxing Clause of the Constitution vests exclusively in Congress the "Power To lay and collect Taxes, Duties, Imposts and Excises."  U.S. Const. art. I, § 8, cl. 1.  As the clause's name suggests, tariffs (another word for "duties" or "imposts") are a form of taxation.  Indeed, tariffs were a major revenue source for the federal government until the ratification of the Sixteenth Amendment in 1913.  *See* Daniel K. Tarullo, *Law and Politics in Twentieth Century Tariff History*, 34 UCLA L. Rev. 285, 285 (1986); *Michelin Tire Corp. v. Wages*, 423 U.S. 276, 285 (1976) (explaining that the Framers intended for "import revenues . . . to be the major source of revenue of the Federal Government").

76~~74~~.  Unsurprisingly, then, Congress has jealously guarded its tariff authority through the centuries.  For nearly 150 years, Congress set tariff rates directly.  *See* Tarullo, *supra*, at 285–86.  Since then, Congress has delegated to the President authority to impose or adjust tariffs only in narrow circumstances.  Congress generally has delegated this authority expressly and imposed stringent procedural or substantive safeguards to ensure that the power is not abused.  For example, Section 122 of the Trade Act of 1974, 19 U.S.C. § 2132, permits the President in narrow circumstances to impose a tariff "for a period not exceeding 150 days" at an amount "not to exceed 15 percent ad valorem."  *Id.* § 21132(a)(A).

77~~75~~.  IEEPA is a different animal altogether.  IEEPA authorizes the President to exercise certain authorities "to deal with any unusual and extraordinary threat, which has its source in whole or substantial part outside the United States, to the national security, foreign policy, or economy of the United States."  50 U.S.C. § 1701(a).  As relevant here, those authorities include the power to:

> (B) investigate, block during the pendency of an investigation, regulate, direct and compel, nullify, void, prevent or prohibit, any acquisition, holding, withholding, use, transfer, withdrawal, transportation, importation or exportation of, or dealing in, or exercising any right, power, or privilege with respect to, or transactions involving, any property in which any foreign country or a national thereof has any interest by any person, or with respect to any property, subject to the jurisdiction of the United States

50 U.S.C. § 1702(a)(1)(B).

7876.   Nowhere in Section 1702's extensive list of enumerated powers is any mention of the power to impose tariffs.  Nor does the list contain any of the most common alternative ways one might describe the imposition of tariffs:  There is no mention of "taxes," "duties," "imposts," or "excises," or the ability to "lay," or "collect" them.  *See* U.S. Const. art. I, § 8, cl. 1.  The most natural conclusion to draw from that absence is that IEEPA does not authorize the imposition of tariffs.

7977.   The closest IEEPA comes to tariffs is the power to "regulate . . . importation or exportation of . . . property in which any foreign country or a national thereof has any interest." 50 U.S.C. § 1702(a)(1)(B).   But "regulating the importation of property" would be an exceedingly oblique way to describe the imposition of tariffs.  To "regulate" means "to govern or direct according to rule."  *Webster's Third New International Dictionary* 1913 (1961).  So the most natural reading of "regulate" in IEEPA is that it allows the President to create rules that restrict or limit the importation of property or set special conditions for such importation (*e.g.*, quotas).

80 78.   By contrast, imposing a tariff—requiring the payment of money equal to some percentage of an imported good's value—no more "regulates" imports than income taxes "regulate" incomes.  That is simply not how ordinary English speakers use the word "regulate." And it is not how generations of lawmakers and lawyers have used it either.  *See, e.g.*, U.S. Const. art. I, § 8, cl. 1 (providing separate powers to "lay and collect Taxes, Duties, Imposts, and Excises" and to "regulate Commerce with foreign Nations"); *Diginet, Inc. v. W. Union ATS, Inc.*, 958 F.2d 1388, 1399 (7th Cir. 1992) ("The legal power to regulate is not necessarily the legal power to tax.").

81 79.   Conversely, Congress knows how to enact statutes authorizing tariffs and often does so expressly, using language that leaves no doubt as to the power granted.  *See, e.g.*, 19 U.S.C. § 2132(a)(A) (the President "shall proclaim . . . a temporary import surcharge, not to exceed 15 percent ad valorem, in the form of duties . . . on articles imported into the United States"); *id.* § 2253(a)(3)(A) (President may "proclaim an increase in, or the imposition of, any duty on the imported article"); *id.* § 2411(c)(1)(B) (U.S. Trade Representative may "impose duties or other import restrictions").  That other statutes expressly grant the Executive Branch the authority to impose tariffs in limited circumstances makes it implausible that IEEPA's general language about regulating imports granted an unlimited power to impose tariffs in purported emergencies.

80.     The President's imposition of tariffs under IEEPA is unlawful for the additional reason that IEEPA applies only to property in which a "foreign country or a national thereof has any interest," and yet it is commonplace that no foreign country or national has any interest in tariffed property.  50 U.S.C. § 1702(a)(1)(B).  The lack of foreign interest in imported property is particularly clear here, where Detroit Axle purchases goods from China and owns those goods when those goods enter its Mexico facility; because Detroit Axle is an American company, no foreign entity has any ownership interest in its goods when it imports them from Mexico to the United States.

82 81.   The implausibility of IEEPA granting tariff authority obliquely is buttressed by the enormity and novelty of the power the President now claims.  Since IEEPA was enacted 50 years ago, no President has ever purported to impose tariffs—let alone massive, global tariffs—under that Act.  When the Executive Branch "claims to discover in a long-extant statute an unheralded power to regulate a significant portion of the American economy," the Supreme Court has instructed courts to greet that "announcement with a measure of skepticism."  *Util. Air*, 573 U.S. at 324 (quotation marks omitted); *see also Nat'l Fed'n of Indep. Bus. v. OSHA*, 595 U.S. 109, 119 (2022).   In those circumstances, courts will not "assume that Congress entrusted that task to [the Executive] without a clear statement to that effect."  *Biden v. Nebraska*, 600 U.S. 477, 506 (2023) (quotation marks omitted).  "[M]odest words, vague terms, or subtle devices" will not suffice.  *West Virginia v. EPA*, 597 U.S. 697, 723 (2022) (quotation marks and alteration omitted).

8382.  The President's attempt to use IEEPA to impose his tariffs is the paradigm major-questions case.  The authority to "regulate" imports, 50 U.S.C. § 1702(a)(1)(B), is a classic "vague term[]."  *West Virginia*, 597 U.S. at 723 (quotation marks omitted).  And it is hard to imagine a power with greater consequences for the U.S. economy and system of government than the President's purported authority to *unilaterally* impose tariffs at *any* level on *any* country.  In fact, the power to control the raising of revenue through tariffs and taxes has long been viewed by English and American authorities as the Legislature's most powerful check on the Executive, enabling it to "reduc[e] . . . all the overgrown prerogatives of the other branches of the government."  The Federalist No. 58 (James Madison).  Given the historic importance of the legislative power to raise revenue, it is even more unlikely that Congress gave the Executive a blank check to exercise that power using equivocal language.  So the "most natural interpretation" of IEEPA is that it does not grant the tariff authority that the President has purported to exercise.  *Biden*, 600 U.S. at 508 (Barrett, J., concurring).

83.    This Court recognized these principles when it interpreted IEEPA in *V.O.S. Selections* and *Oregon*. *See V.O.S. Selections, Inc. v. United States*, 772 F. Supp. 3d 1350 (Ct. Int'l Trade 2025).  The Court acknowledged that "[b]oth the nondelegation and major questions doctrines . . . . indicate[d] that an unlimited delegation of tariff authority would constitute an improper abdication of legislative power," and that "any interpretation of IEEPA that delegates unlimited tariff authority is unconstitutional."  *Id.* at 1372.  And to save IEEPA from that unconstitutionality, this Court read IEEPA's grant of authority narrowly "to avoid constitutional infirmities and maintain the 'separate and distinct exercise of different powers of government' that is 'essential to the preservation of liberty.'"  *Id.* at 1373 (quoting The Federalist No. 51 (Alexander Hamilton or James Madison)).  The Court therefore held that IEEPA "does not . . . authoriz[e] the President to impose whatever tariff rates he deems desirable."  *Id.* at 1373.

84.     The Federal Circuit affirmed on appeal, holding that "IEEPA's grant of presidential authority to 'regulate' imports does not authorize the tariffs imposed by" the trafficking and reciprocal tariff orders. *V.O.S. Selections*, 2025 WL 2490634, at *1. The court of appeals reasoned that "the Government's interpretation of IEEPA as providing the President power to impose unlimited tariffs . . . runs afoul of the major questions doctrine." *V.O.S. Selections*, 2025 WL 2490634, at *13. And the court concluded that the tariffs imposed by the trafficking and reciprocal tariffs orders were "unbounded" because they "apply to nearly all articles imported into the United States (and, in the case of the Reciprocal Tariffs, apply to almost all countries), impose high rates which are ever-changing and exceed those set out in the HTSUS, and are not limited in duration." *Id.* at *17. IEEPA's "regulate . . . importation" language, the Federal Circuit explained, "'cannot authorize the kind of exhaustive rewriting of the statute that has taken place here.'" *Id.* at *15 (quoting *Biden v. Nebraska*, 600 U.S. 477, 500 (2023)).

84 85.     Thus, IEEPA's text, statutory context, and the major-questions doctrine all make clear that IEEPA does not grant any authority to impose tariffs.

**B.     If IEEPA Purported To Authorize Tariffs, It Would Be An Unconstitutional Delegation Of Congressional Power.**

85 86.     Even if a court's "initial skepticism" of the government's expansive interpretation of IEEPA were "overcome by text directly authorizing" the imposition of tariffs, the attempted "statutory delegation [would] exceed[] constitutional limits." *Biden*, 600 U.S. at 516–17 & n.4 (Barrett, J., concurring). That is because IEEPA lacks any "intelligible principle" to constrain the Executive's exercise of the legislative power to impose tariffs. *J.W. Hampton Jr., & Co. v. United States*, 276 U.S. 394, 409 (1928).

86<u>87</u>.   As noted above, the Constitution expressly grants *Congress*, not the President, the "Power To lay and collect Taxes, Duties, Imposts and Excises."  U.S. Const. art. I, § 8, cl. 1. "Accompanying that assignment of power" comes a concomitant "bar on its further delegation." *Gundy v. United States*, 588 U.S. 128, 135 (2019).  Thus, before Congress may delegate its tariff power to the Executive Branch, it must "lay down by legislative act an intelligible principle to which the person or body authorized to exercise the delegated authority is directed to conform." *Mistretta v. United States*, 488 U.S. 361, 372 (1989) (quotation marks and alteration omitted).

87<u>88</u>.   The "nondelegation inquiry"—"whether Congress has supplied an intelligible principle to guide the delegee's use of discretion"—"always begins (and often almost ends) with statutory interpretation."  *Gundy*, 588 U.S. at 135.  That is true here.  As discussed above, IEEPA does not discuss tariffs, *see supra* ¶¶ 78–82<u>76–81</u>, so, *a fortiori*, it does not supply any principle to guide the President's use of any tariff authority.  Even if the power to impose tariffs were somehow encompassed within the power to "regulate" imports,  50 U.S.C. § 1702(a)(1)(B), there would still be no intelligible principle here.  While that statutory power is authorized only to respond to an "unusual and extraordinary threat," *id.* § 1701(a), IEEPA says nothing about when *tariffs* (as opposed to some other measure) are an appropriate response to such a threat, what tariff level (from 1% to 10,000%) might be appropriate, or how broadly the tariffs might sweep in terms of countries and products.  If the President were authorized to impose any tariffs he wanted with no better compass than the phrase "unusual and extraordinary threat," then he would have at least as much unbridled authority as the Federal Trade Commission did when Congress unconstitutionally instructed it to "regulate the entire economy on the basis of no more precise a standard than stimulating the economy by assuring 'fair competition.'"  *Whitman v. Am.*

*Trucking Ass'ns, Inc.*, 531 U.S. 457, 474 (2001) (citing *A.L.A. Schechter Poultry Corp. v. United States*, 295 U.S. 495 (1935)).

88 89.  Moreover, a court "choosing between competing plausible interpretations of a statutory text" should "presum[e] that Congress did not intend the alternative which raises serious constitutional doubts."  *Clark v. Martinez*, 543 U.S. 371, 381 (2005).  Here, there is an alternative interpretation of IEEPA that does not raise constitutional nondelegation problems: IEEPA does not authorize the Executive Branch to impose tariffs.  That interpretation is *at least* "plausible," so this Court should choose it based on the "reasonable presumption that Congress did not intend the alternative"—a massive, standardless grant of Congress's tariff power—"which raises serious constitutional doubts."  *Clark*, 543 U.S. at 381.

### C.    Agency Action Implementing The IEEPA Tariffs Is Arbitrary And Capricious.

89 90.  The government's implementation of the IEEPA tariffs is arbitrary and capricious because it effectuates a policy that is neither "reasonable [nor] reasonably explained."  *Ohio*, 603 U.S. at 292 (quotation marks omitted).

90 91.  The executive orders and the agency notices implementing the tariffs suffer from largely the same flaws as the orders and agency actions eliminating the de minimis exemption. The government has claimed that the tariffs are necessary to combat the flow of synthetic opioids from China.  *See* Exec. Order No. 14195, § 1(a); 90 Fed. Reg. 9,038, 9,038 (Feb. 5, 2025); *see also* Exec. Order No. 14324, § 1.  But it has not explained why tariffs, as opposed to any other mechanism, are necessary for this purpose; it has not even explained *how* tariffs would serve that goal.  *See generally* Exec. Order No. 14195.  Nor has the government considered reasonable alternatives (such as inspections), or the "serious reliance interests" that decades of low tariffs have inured in the public.  *Regents*, 591 U.S. at 30 (quotation marks omitted).

**COUNT I**
**Lack of Statutory and Constitutional Authority—De Minimis Exemption**
(APA and Equitable Causes of Action—All Defendants)

~~91~~92.   Plaintiff incorporates all the above allegations by reference.

~~92~~93.   Congress required a de minimis exemption for goods totaling less than $800 per person per day.  19 U.S.C. § 1321(a)(2)(C).  Congress thereby precluded any Executive Branch authority to: (1) reduce the de minimis exemption below the $800 floor, or (2) modify the exemption in any way except through notice-and-comment rulemaking.  *Id.* § 1321(b).

~~93~~94.   The executive orders purporting to rescind the de minimis exemption are therefore ineffective and unlawful because they defy Congress's commands with respect to Congress's power over tariffs.  They also unconstitutionally seek to exercise a power over tariffs that Congress has not granted, arrogating to the Executive Branch a power belonging to Congress.

~~94~~95.   The rescission of the de minimis exemption is causing Detroit Axle irreparable harm ~~through unrecoverable damages~~, including lost business opportunities and the loss of customer goodwill, and ~~will soon force the company to close its Michigan facilities and lay off its employees~~is imposing significant financial costs including lost profits.

~~95~~96.   This Court possesses "all the powers in law and equity of, or as conferred by statute upon, a district court of the United States."  28 U.S.C. § 1585.  That includes the power to declare an executive order and agency actions implementing it unlawful.  *See* 28 U.S.C. § 2201. This Court also has power under the APA to hold unlawful and set aside the final agency actions implementing unlawful executive orders based on their lack of statutory authority or violation of the Constitution.  5 U.S.C. § 706(2).

~~96~~97.  Detroit Axle also has an equitable cause of action to enjoin "violations of federal law by federal officials," including to enjoin "unconstitutional actions." *Armstrong v. Exceptional Child Ctr.*, 575 U.S. 320, 327 (2015); *see Am. Sch. of Magnetic Healing v. McAnnulty*, 187 U.S. 94, 110 (1902).  Judicial "[r]eview for ultra vires acts rests on the longstanding principle that if an agency action is unauthorized by the statute under which [the agency] assumes to act, the agency has violate[d] the law and the courts generally have jurisdiction to grant relief." *Nat'l Ass'n of Postal Supervisors v. U.S. Postal Serv.*, 26 F.4th 960, 970 (D.C. Cir. 2022) (alterations in original; quotation marks omitted).  When a "statutory provision plainly delineates the outer limits of agency authority and Congress has not expressly precluded judicial review," plaintiffs have a cause of action to enjoin *ultra vires* acts.  *Id.* at 971.

~~97~~98.  This Court should declare the executive orders purporting to rescind the de minimis exemption unlawful, enjoin Defendants from implementing those orders, and hold unlawful and set aside all final agency action implementing those orders.

## COUNT II
### Arbitrary and Capricious Rescission of De Minimis Exemption
(APA Cause of Action—Agency Defendants)

~~98~~99.  Plaintiff incorporates all the above allegations by reference.

~~99~~100. The final agency actions implementing the unlawful rescission of the de minimis exemption are arbitrary and capricious because they are neither reasonable nor reasonably explained.

~~100~~101.    Defendants DHS, CBP, Noem, and Flores issued notices in the Federal Register that effectuate the elimination of the de minimis exemption, including the final notice that "[c]onsistent with Executive Order 14324, the duty-free *de minimis* ~~treatment~~exemption provided under 19 U.S.C. §1321(a)(2)(C) shall no longer ~~be available for products of the PRC~~

described in Section 2(a) of Executive Order 14195, that are apply to any shipment of articles not covered by 50 U.S.C. 1702(b), regardless of value, country of origin, mode of transportation, or method of entry, that is entered for consumption, or withdrawn from warehouse for consumption, on or after 12:01 a.m. eastern daylight time on May 2 August 29, 2025." 90 Fed. Reg. at 42,419; *see id.* at 42,420–21 (modifying the HTSUS to eliminate the de minimis exemption from the official tariff schedule). This notice superseded the notice originally suspending de minimis treatment for products of China. *See* 90 Fed. Reg. 17,608, 17,609 (Apr. 28, 2025); *see also* Customs & Border Prot., *E-Commerce Frequently Asked Questions – Executive Order Tariff on De Minimis Shipments from China*, Article No. 000001915 (May 8 14324 (Aug. 28, 2025), https://tinyurl.com/6kj36jys4pvny752. These notices constituted final agency action because they "mark the consummation of the agency's decisionmaking process" and give rise to "legal consequences." *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997) (quotation marks omitted). Upon information and belief, CBP has not been applying the de minimis exemption since May 2, 2025, at 12:01 am.

101 102.    With respect to Defendant Lutnick and the Department of Commerce, Defendant Lutnick notified the President that adequate systems were in place to rescind the de minimis exemption, pursuant to an executive order charging him with that duty. *See* Exec. Order No. 14200, § 1; Exec. Order No. 14256, § 2.

102 103.    With respect to Secretary Bessent and the Department of the Treasury, the Secretary of the Treasury alone has statutory authority to promulgate rules to create exceptions to the de minimis exemption, and even he cannot modify the $800 floor. *See* 19 U.S.C. § 1321(b).

103 104.    Because the rescission of the de minimis exemption was arbitrary and capricious, final agency action implementing that policy is arbitrary and capricious as well. *See*

39

*Reich*, 74 F.3d at 1326–27.  The government has failed to consider important aspects of the problem, such as reliance interests like Detroit Axle's.  It did not offer reasonable explanations for its decisions and ignored obvious alternatives.  Moreover, the agency actions to rescind the de minimis exemption are arbitrary and capricious because no agency "reasonably explained" (i) the lawful basis for stopping the application of the de minimis exemption to products of China or (ii) the adequate systems in place to rescind the exemption.  *Ohio*, 603 U.S. at 292 (quotation marks omitted).

~~104~~105.    The agency actions nullifying the de minimis exemption are causing Detroit Axle irreparable harm ~~through unrecoverable damages~~, including lost business opportunities and the loss of customer goodwill, and ~~will soon force the company to close its Michigan facilities and lay off its employees~~are imposing significant financial costs including lost profits.

~~105~~106.    This Court should "hold unlawful and set aside" the arbitrary and capricious agency actions rescinding the de minimis exemption.  5 U.S.C. § 706(2)(A); *see* 90 Fed. Reg. ~~17,608, 17,608–10 (Apr. 28, 2025); Customs & Border Prot., *Executive Order — Tariff on De Minimis Shipments from China*, Article No. 000001915 (May 8, 2025), https://tinyurl.com/6kj36jys.~~42,418.

## COUNT III
## Lack of Statutory and Constitutional Authority—IEEPA Tariffs
### (APA and Equitable Causes of Action—All Defendants)

~~106~~107.    Plaintiff incorporates all the above allegations by reference.

~~107~~108.    IEEPA grants the President certain authorities to "deal with" "unusual and extraordinary threat[s]."  50 U.S.C. § 1701(a).  But the text, statutory context, and the

major-questions doctrine make clear that IEEPA does not grant the President authority to impose tariffs.

108109.       Thus, the President's imposition of the IEEPA tariffs and all actions taken by the Defendants to implement the tariffs exceed the Executive Branch's statutory authority under IEEPA.  And if IEEPA in fact purported to authorize the imposition of tariffs, it would be an unconstitutional delegation, and tariffs imposed pursuant to IEEPA would be unconstitutional.

109110.       The tariffs are causing Detroit Axle irreparable harm through unrecoverable damages, including lost business opportunities and the loss of customer goodwill, and will soon force the company to close its Michigan facilities and lay off its employeesare imposing significant financial costs including lost profits.

110111.       The Court should declare the tariffs unlawful, 28 U.S.C. § 2201, enjoin their enforcement as *ultra vires*, *Armstrong*, 575 U.S. at 327, and "set aside" all final agency actions implementing them, 5 U.S.C. § 706(2); *see* 90 Fed. Reg. 11,426, 11,426–29 (Mar. 6, 2025) (implementing 20% tariff).

## COUNT IV
### Arbitrary and Capricious Imposition of IEEPA Tariffs
(APA Cause of Action—Agency Defendants)

111112.       Plaintiff incorporates all the above allegations by reference.

112113.       The agency Defendants have arbitrarily and capriciously imposed the tariffs that the President ordered pursuant to IEEPA.  The tariff policy that the agencies are implementing is neither "reasonable [nor] reasonably explained," *Ohio*, 603 U.S. at 292 (quotation marks omitted), because the government failed to consider obvious alternatives, did not explain why its chosen course of action serves its goal of combatting fentanyl trafficking, and

ignored an important aspect of the problem—the significant reliance interests of U.S. businesses like Detroit Axle and their customers.

~~113~~114.        The agency actions implementing the IEEPA tariffs are causing Detroit Axle irreparable harm ~~through unrecoverable damages~~, including lost business opportunities and the loss of customer goodwill, and ~~will soon force the company to close its Michigan facilities and lay off its employees~~are imposing significant financial costs including lost profits.

~~114~~115.        This Court should "hold unlawful and set aside" the arbitrary and capricious agency actions imposing the IEEPA tariffs.  5 U.S.C. § 706(2)(A); *see* 90 Fed. Reg. 11,426, 11,426–29 (Mar. 6, 2025) (implementing 20% tariff); 90 Fed. Reg. 9,038, 9,038–40 (Feb. 5, 2025) (implementing original 10% tariff).

## PRAYER FOR RELIEF

For these reasons, Plaintiff respectfully requests an order:

a.    Declaring that Executive Orders ~~14194 (Mexico de minimis rescission),~~ 14195 (China initial de minimis rescission; China fentanyl initial tariff), and 14200 (China de minimis pause), 14228 (China fentanyl tariff increase), 14256 (China de minimis rescission), 14324 (worldwide de minimis recission) and all actions taken to implement those orders, are unlawful because they exceed the Executive Branch's statutory and constitutional authority;

b.    Preliminarily and permanently enjoining Defendants and all persons acting in concert with them from taking any action to implement Executive Orders 14194, 14195, 14200, 14228, ~~and~~ 14256, and 14324 with respect to Detroit Axle—including collecting any tariffs on de-minimis-eligible shipments that Detroit Axle makes to its customers;

c.    Holding unlawful and setting aside all final agency actions implementing Executive Orders 14194, 14195, 14200, 14228, ~~and~~ 14256, and 14324;

d.    Declaring that any and all actions taken to implement those orders are unlawful because they exceed the Executive Branch's statutory and constitutional authority;

e.    Directing Defendants to refund, with interest, any duties paid by Plaintiff pursuant to the actions identified above and any future actions imposing tariffs in reliance on IEEPA, and to pay other such damages as are appropriate;

f.    Entering judgment in favor of Plaintiff;

g.    Awarding Plaintiff its reasonable costs and attorney's fees in accordance with law; and

h.    Issuing any other relief that the Court deems just and proper.

42

~~May 16~~September 5, 2025                              Respectfully submitted,


                                                        /s/ ~~Samantha Sewall~~Thomas H. Dupree Jr.

                                                        Thomas H. Dupree Jr.
                                                        ~~(D.C. Bar No. 467195)*~~Samantha Sewall
                                                        ~~Samantha Sewall (D.C. Bar No. 1015889)~~
                                                        Nick Harper ~~(D.C. Bar No. 144707)*~~
                                                        Connor P. Mui ~~(D.C. Bar No. 90009004)*~~
                                                        Luke J.P. Wearden ~~(D.C. Bar No. 90022656)*~~
                                                        GIBSON, DUNN & CRUTCHER LLP
                                                        1700 M Street, N.W.
                                                        Washington, D.C. 20036-4504
                                                        (202) 955-8500
                                                        TDupree@gibsondunn.com
                                                        SSewall@gibsondunn.com
                                                        NHarper@gibsondunn.com
                                                        CMui@gibsondunn.com
                                                        LWearden@gibsondunn.com
                                                        *applications for admission pending

| Summary report: Litera Compare for Word 11.10.1.2 Document comparison done on 9/5/2025 4:19:18 PM | |
|---|---|
| **Style name:** GDCv11Rendering | |
| **Intelligent Table Comparison:** Active | |
| **Original filename:** C:\Users\24470\AppData\Roaming\iManage\Work\Recent\23700-00001 - De minimis challenge (Detroit Axle)\DRAFT - Detroit Axle Complaint(109044189.19).docx | |
| **Modified DMS:** iw:/aldmsweb.gibsondunn.net/AL/109297469/11 | |
| **Changes:** | |
| Add | 139 |
| Delete | 143 |
| Move From | 3 |
| Move To | 3 |
| Table Insert | 0 |
| Table Delete | 0 |
| Table moves to | 0 |
| Table moves from | 0 |
| Embedded Graphics (Visio, ChemDraw, Images etc.) | 0 |
| Embedded Excel | 0 |
| Format changes | 0 |
| **Total Changes:** | 288 |