## IN THE UNITED STATES COURT OF INTERNATIONAL TRADE

AXLE OF DEARBORN, INC. D/B/A DETROIT AXLE,

*Plaintiff*,

v.

DEPARTMENT OF COMMERCE; HOWARD LUTNICK, *in his official capacity as Secretary of Commerce*; DEPARTMENT OF HOMELAND SECURITY; KRISTI NOEM, *in her official capacity as Secretary of Homeland Security*; DEPARTMENT OF THE TREASURY; SCOTT BESSENT, *in his official capacity as Secretary of the Treasury*; UNITED STATES CUSTOMS AND BORDER PROTECTION; RODNEY S. SCOTT, *in his official capacity as Commissioner for U.S. Customs and Border Protection*; and the UNITED STATES,

*Defendants*.

Case No. 1:25-cv-00091

## PLAINTIFF DETROIT AXLE'S
## MOTION TO DISSOLVE THE STAY AND
## RENEWED MOTION FOR PARTIAL SUMMARY JUDGMENT

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................. 1

BACKGROUND .................................................................................................. 3

ARGUMENT ...................................................................................................... 9

    I.    The Court Should Now Adjudicate Detroit Axle's Claims To Relief
        From The Unlawful Rescission Of The De Minimis Exemption. ......................... 9

    II.    Detroit Axle Is Entitled To Partial Summary Judgment On Counts I
        And II Of Its Amended Complaint. .................................................................. 13

        A.  The Rescission Of The De Minimis Exemption Exceeds The Executive
           Branch's Authority. ............................................................................... 14

        B. The Agency Actions Eliminating The De Minimis Exemption
           Were Arbitrary And Capricious. ............................................................ 25

    III.    Detroit Axle Is Entitled To Vacatur And A Permanent,
        Party-Specific Injunction. ............................................................................... 27

CONCLUSION .................................................................................................. 30

# TABLE OF AUTHORITIES

Page(s)

## Cases

*AGS Co. Auto. Sols. v. U.S. Customs & Border Prot.*,
  No. 25-cv-255 (Ct. Int'l Trade 2025)..................................................13

*Am. Bioscience, Inc. v. Thompson*,
  269 F.3d 1077 (D.C. Cir. 2001)......................................................27

*Am. Signature, Inc. v. United States*,
  598 F.3d 816 (Fed. Cir. 2010).......................................................30

*Belgium v. United States*,
  452 F.3d 1289 (Fed. Cir. 2006)......................................................29

*Biden v. Nebraska*,
  600 U.S. 477 (2023).........................................................21, 22, 23

*Celsis In Vitro, Inc. v. CellzDirect, Inc.*,
  664 F.3d 922 (Fed. Cir. 2012).......................................................30

*Colorado River Water Conservation Dist. v. United States*,
  424 U.S. 800 (1976)................................................................27

*eBay Inc. v. MercExchange, L.L.C.*,
  547 U.S. 388 (2006)................................................................28

*Federal Communications Comm'n v. Consumers' Research*,
  606 U.S. 656 (2025)................................................................24

*Fourco Glass Co. v. Transmirra Prods. Corp.*,
  353 U.S. 222 (1957)................................................................24

*Harrington v. Purdue Pharma L.P.*,
  603 U.S. 204 (2024)................................................................24

*J.W. Hampton, Jr. & Co. v. United States*,
  276 U.S. 394 (1928)................................................................24

*KPMG LLP v. United States*,
  139 Fed. Cl. 533 (2018)............................................................29

*Learning Resources, Inc. v. Trump*,
  146 S. Ct. 73 (Sept. 9, 2025)........................................................7

*Learning Resources, Inc. v. Trump*,
  2026 WL 477534 (Feb. 20, 2026)..............................................*passim*

*Lindke v. Freed*,
  601 U.S. 187 (2024) .................................................................................................11

*Nebraska v. Su*,
  121 F.4th 1 (9th Cir. 2024) ......................................................................................26

*Ohio v. Env't Prot. Agency*,
  603 U.S. 279 (2024) .................................................................................................27

*Oregon v. United States*,
  No. 25-00077 (Ct. Int'l Trade 2025) .........................................................................1

*Salix Pharm., Ltd. v. Norwich Pharm., Inc.*,
  98 F.4th 1056 (Fed. Cir. 2024) ................................................................................19

*Sumecht NA, Inc. v. United States*,
  923 F.3d 1340 (Fed. Cir. 2019) ...............................................................................28

*TC Heartland LLC v. Kraft Foods Grp. Brands LLC*,
  581 U.S. 258 (2017) .................................................................................................24

*Util. Air Regul. Grp. v. EPA*,
  573 U.S. 302 (2014) .................................................................................................21

*V.O.S. Selections, Inc. v. Trump*,
  149 F.4th 1312 (Fed. Cir. 2025) .........................................................................6, 11

*V.O.S. Selections, Inc. v. United States*,
  No. 25-00066 (Ct. Int'l Trade 2025) .........................................................................1

*West Virginia v. EPA*,
  597 U.S. 697 (2022) .....................................................................................21, 22, 23

*Youngstown Sheet & Tube Co. v. Sawyer*,
  343 U.S. 579 (1952) .................................................................................................22

**Statutes**

5 U.S.C. § 706 ...................................................................................................4, 25, 27

10 U.S.C. § 123 ...............................................................................................................17

19 U.S.C. § 1321 ......................................................................................................*passim*

19 U.S.C. § 2132(a) ........................................................................................................22

46 U.S.C. § 3101 .............................................................................................................17

50 U.S.C. § 1701(a) ........................................................................................................24

50 U.S.C. § 1702(a)(1)(B) ..........................................................................7, 15, 17, 20

50 U.S.C. 1702(b) .............................................................................................................8

First War Powers Act of 1941, § 301, Pub. L. No. 77-354, 55 Stat. 838, 839–40 .......................20

Pub. L. No. 119-21, 139 Stat. 72 (July 4, 2025) .............................................................................5

Trading With the Enemy Act of 1917..................................................................................19, 20

## Orders and Regulations

19 C.F.R. § 10.151 ...........................................................................................................................19

90 Fed. Reg. 17,608 (Apr. 28, 2025) ...........................................................................................4, 6

90 Fed. Reg. 42,418 (Sept. 2, 2025) ..........................................................................................5, 27

Executive Order 14324, 90 Fed. Reg. 37,775 (July 30, 2025) ...............................................5, 6, 8

Executive Order 14389, 91 Fed. Reg. 9,437 (Feb. 20, 2026) ...................................................1, 8

Executive Order 14388, 91 Fed. Reg. 9,433 (Feb. 20, 2026) ................................................ *passim*

## Other Authorities

H.R. Rep. 77-1507 ...........................................................................................................................20

S. Rep. 77-911 (Dec. 15, 1941) .......................................................................................................20

P. Fajgelbaum & A. Khandelwar, *The Value of de Minimis Imports* 1–4, National
    Bureau of Economic Research Working Paper (Feb. 2025),
    https://tinyurl.com/ckvwscv6 ...............................................................................................21

White House, *Fact Sheet: President Donald J. Trump is Protecting the United
    States' National Security and Economy by Suspending the De Minimis
    Exemption for Commercial Shipments Globally* (July 30, 2025),
    https://tinyurl.com/2t82th82.......................................................................................................6

## INTRODUCTION

This Court previously stayed this case pending the resolution of *V.O.S. Selections, Inc. v. United States*, No. 25-00066 (Ct. Int'l Trade 2025), and *Oregon v. United States*, No. 25-00077 (Ct. Int'l Trade 2025).  On February 20, 2026, the Supreme Court resolved those cases by holding that the International Emergency Economic Powers Act ("IEEPA") does not authorize the President to impose tariffs.  *Learning Resources, Inc. v. Trump*, 607 U.S. ---, 2026 WL 477534 at *13 (Feb. 20, 2026).  That same day, the government rescinded the IEEPA tariffs.  *See* Exec. Order 14389, *Ending Certain Tariff Actions*, 91 Fed. Reg. 9,437 (Feb. 20, 2026).  But the government also issued another executive order providing that its revocation of the de minimis exemption for imports from all countries would continue notwithstanding the rescission of the IEEPA tariffs.  *See* Exec. Order 14388, *Continuing the Suspension of Duty-Free De Minimis Treatment for All Countries*, 91 Fed. Reg. 9,433 (Feb. 20, 2026).  Thus, the IEEPA-tariff cases have been resolved by the Supreme Court, but Detroit Axle continues to be irreparably harmed by the rescission of the de minimis exemption, because the company is being forced to pay the remaining, significant *non-IEEPA* tariffs on shipments that it otherwise would ship duty-free under the exemption.

In light of the Supreme Court's ruling, this Court's stay pending "the resolution of V.O.S.," ECF 48, has expired by its own terms, because the Supreme Court resolved *V.O.S.* by affirming the Federal Circuit without issuing any instructions for further proceedings.  In any event, given the government's continued rescission of the de minimis exemption, there is no justification for continuing to stay resolution of Counts I and II of Detroit Axle's complaint, which challenge only that rescission.  The plaintiffs in *V.O.S.* and *Oregon* attacked the IEEPA tariffs themselves, not the rescission of the exemption, and none has amended its complaint to challenge the government's later orders rescinding the exemption globally and continuing that rescission after the invalidation of the IEEPA tariffs.  The IEEPA tariffs now have been repealed; all that remains to be done in

1

*V.O.S.* and *Oregon* is for this Court to order refunds of unlawfully paid IEEPA tariffs. Those proceedings will not address the rescission *of the de minimis exemption* or remedy the harm being caused by the government's unlawful collection of *non-IEEPA* tariffs on de-minimis-eligible shipments. And to the extent there is any uncertainty about plaintiffs' entitlement to refunds for unlawfully collected tariffs, that uncertainty cuts in *favor* of adjudicating the lawfulness of the de minimis rescission now to stop the collection of illegal-but-potentially-nonrefundable duties from Detroit Axle. The government has indicated to counsel for Detroit Axle that it takes no position on the motion to dissolve the stay.

On the merits, the Supreme Court's holding and reasoning in *Learning Resources* confirm that Detroit Axle is entitled to relief on Counts I and II. As this Court, the Federal Circuit, and the Supreme Court have now explained, IEEPA does not grant the President the sweeping tariff authority he has asserted. Each word in IEEPA "authorizes a distinct action a President might take in sanctioning foreign actors or controlling domestic actors engaged in foreign commerce—blocking imports, for example, or prohibiting transactions"; "[n]one of IEEPA's authorities includes the distinct and extraordinary power to raise revenue." *Learning Resources*, 2026 WL 477534 at *11. So too here: IEEPA's text plainly does not grant the President the power to impose tariffs and raise revenue by erasing the de minimis exemption that Congress wrote into law. When Congress grants the President the power to suspend the operation of statutes, it does so expressly by naming the statute to be suspended and the precise conditions for doing so. It did no such thing here, and the government has been unable to provide any example of a President using IEEPA to rescind a statutory tariff exemption. Moreover, as three Justices in *Learning Resources* concluded, the President's claimed authority "to unilaterally impose unbounded tariffs" is an "extraordinary assertion of power" for which he must, but cannot, "point to clear congressional authorization." *Id.* at *8–

10 (op. of Roberts, C.J.).  The same reasoning applies to the President's claim that IEEPA grants him the power to rewrite duly enacted statutes and erase the de minimis exemption:  That major power is not hidden in IEEPA's unspecific text.  And even if IEEPA's text could be stretched to encompass that power, it would effect an unconstitutional delegation, and Section 1321's more specific provisions governing the de minimis exemption would control nonetheless.

Independently, Detroit Axle has thoroughly demonstrated that the agency actions implementing the rescission of the de minimis exemption are arbitrary and capricious.  The government has never contested this position on the merits, instead arguing (incorrectly) that the agency actions implementing the President's orders are not subject to arbitrary-or-capricious review.  The unlawfulness of the agency actions rescinding the de minimis exemption requires those actions to be vacated.

Despite the new clarity that the Supreme Court has now provided, Detroit Axle continues to suffer irreparable harm while it awaits the conclusion of other cases that will have nothing to say about the de minimis exemption.  This Court should dissolve the stay (if the stay has not dissolved already) and grant partial summary judgment to Detroit Axle on Counts I and II.

## BACKGROUND

**1.** On May 16, 2025, Detroit Axle filed a four-count complaint challenging the government's elimination, through executive orders and agency actions, of the de minimis exemption for imports from China, as well as its imposition of tariffs under IEEPA.  ECF 2.

Counts I and II of the complaint focused on the de minimis exemption.  Detroit Axle's business model relies on the company's ability to ship some of its products tariff-free to customers in the United States, so the elimination of the de minimis exemption seriously threatens the company's profitability, reputation, and operating model.  Count I alleged that the elimination of the de minimis exemption exceeds the Executive Branch's statutory and constitutional authority.  The

statute creating the exemption, 19 U.S.C. § 1321, establishes a comprehensive and exclusive scheme for altering the de minimis exemption by specifying that the exemption can be changed only through notice-and-comment rulemaking by the Secretary of the Treasury; IEEPA does not (and cannot, consistent with the Constitution) authorize the President to circumvent that scheme. ECF 2 at 14–18, 28–30.  Count II alleged that the agency actions implementing the elimination of the de minimis exemption were arbitrary and capricious in violation of the Administrative Procedure Act, 5 U.S.C. § 706(2)(C), because they failed to account for significant reliance interests and failed to consider the costs of eliminating the de minimis exemption as well as obvious, reasonable alternatives that would combat drug trafficking.  ECF 2 at 19–22, 30–31.  Counts I and II challenged the executive order that finally rescinded the de minimis exemption for products of China, Executive Order 14256, 90 Fed. Reg. 14,899 (Apr. 2, 2025), and earlier Executive Orders (14195 and 14200) insofar as they took steps to rescind the exemption (collectively, the "China De Minimis Orders"), as well as agency actions implementing those orders, *see, e.g.*, *Notice of Implementation of Additional Duties on Products of the People's Republic of China Pursuant to the President's Executive Order 14256*, 90 Fed. Reg. 17,608 (Apr. 28, 2025).

Counts III and IV of the complaint challenge the government's imposition of tariffs under IEEPA.  Count III alleges that the IEEPA tariffs applicable to Detroit Axle's imports exceed the President's statutory and constitutional authority, while Count IV asserts that the agency actions implementing those tariffs were arbitrary and capricious.  *Id.* at 22–28, 32–33.  Detroit Axle sought refunds for all unlawfully collected tariffs.  *Id.* at 33.

**2.**    On May 21, 2025, Detroit Axle moved for a preliminary injunction and partial summary judgment on Counts I and II—the de minimis counts—and sought an expedited hearing. ECF 9.  This Court held argument on that motion on July 10.  *See* ECF 36.  On July 28, the Court

issued an order and opinion denying Detroit Axle's motion for a preliminary injunction and staying the case pending resolution of *V.O.S.*  ECF 38.  The Court did not reject Detroit Axle's merits arguments or find that Detroit Axle was not suffering irreparable harm.  Instead, the Court reasoned that the "injunction this court issued in <u>V.O.S.</u> encompasses the Trafficking [Executive] Orders implicating the <u>de minimis</u> exemption at issue here."  ECF 38 at 2.  Because that injunction, if ultimately affirmed on appeal, would "grant[] all the relief that Axle" sought and be "redundant," the Court stayed this case even though Detroit Axle's challenge "would provide a separate basis upon which Axle could seek relief should the appellate courts come to a different result . . . in <u>V.O.S.</u>"  ECF 38 at 3–4.

**3.**     On July 4, shortly before the July 10 hearing, the President signed into law the One Big Beautiful Bill Act, which amended Section 1321.  *See* Pub. L. No. 119-21, 139 Stat. 72 (July 4, 2025).  Although Congress opted to repeal the de minimis exemption for imports less than $800, Congress did not make that change effective until July 1, 2027, thereby giving businesses notice and time to adjust.  *See id.* § 70531(b), 139 Stat. 283.  The Act did not ratify the Executive's decision to revoke the de minimis exemption immediately nor did it grant the Executive any additional authority to alter the exemption on its own initiative.

On July 30, the President issued Executive Order 14324 (the "Global De Minimis Order"), which went into effect on August 29.  90 Fed. Reg. 37,775; *see also Notice of Implementation of the President's Executive Order 14324, Suspending Duty-Free De Minimis Treatment for All Countries*, 90 Fed. Reg. 42,418, 42,419–21 (published Sept. 2, 2025).  Without providing any new basis for doing so, the Global De Minimis Order purported to rescind the de minimis exemption "on a global basis"—*two years before* Congress decided to end the exemption in the One Big

Beautiful Bill Act—and to supersede Executive Order 14256's China-specific de minimis rescission.  *See* Exec. Order 14324, §§ 1, 4, 90 Fed. Reg. 37,775, 37,777–78 (July 30, 2025); *see also* 90 Fed. Reg. at 42,420 (superseding 90 Fed. Reg. 17,608 (Apr. 28, 2025), which implemented the rescission of the de minimis exemption for all goods from China).

According to the White House, the worldwide rescission of the de minimis exemption "deliver[ed] on [the President's] promise to 'put an end' to the 'big scam' of de minimis shipments." White House, *Fact Sheet: President Donald J. Trump is Protecting the United States' National Security and Economy by Suspending the De Minimis Exemption for Commercial Shipments Globally* (July 30, 2025), https://tinyurl.com/2t82th82.  The order also made the global rescission of the de minimis exemption severable from the President's other executive orders imposing tariffs and provided that the rescission of the de minimis exemption "shall not be affected" if the other IEEPA tariffs "are held to be invalid."  Exec. Order 14324, § 6(b)(i), 90 Fed. Reg. at 37,779.

On August 29, 2025, the Federal Circuit affirmed this Court's holding that the President's "Trafficking and Reciprocal Tariffs . . . exceed the authority delegated to the President by IEEPA's text" and thus are "invalid as contrary to law." *V.O.S. Selections, Inc. v. Trump*, 149 F.4th 1312, 1340 (Fed. Cir. 2025) (quotation marks omitted).  The Federal Circuit also vacated this Court's permanent injunction and remanded for reevaluation of the proper scope of relief. *Id.*  The government promptly petitioned for certiorari.

**4.**    On September 5, soon after the Global De Minimis Order went into effect, Detroit Axle moved to amend its complaint to challenge the Global De Minimis Order.  *See* ECF 39. Because that order purported to make the rescission of the de minimis exemption severable and the government stated its intent to enforce the rescission regardless of the outcome in *V.O.S.*, Detroit Axle simultaneously moved to dissolve the stay and for partial summary judgment as to

Counts I and II.  ECF 40.  Less than a week after Detroit Axle filed its motion, the Supreme Court

granted certiorari in *V.O.S.* and *Oregon*, as well as in a related case (*Learning Resources*), and the

Court consolidated the cases and expedited consideration of the petitions.    *See Learning Re-*

*sources*, *Inc. v. Trump*, 146 S. Ct. 73 (mem.) (Sept. 9, 2025).

On October 20, this Court denied Detroit Axle's motion to dissolve the stay and ordered

that Detroit Axle's motion for partial summary judgment "shall remain stayed until the resolution

of V.O.S."  ECF 48.  The Court also denied Detroit Axle's motion to amend the complaint without

prejudice.  ECF 49.

**5.**    On February 20, 2026, the Supreme Court issued its opinion in the consolidated

cases challenging the IEEPA tariffs.  *See Learning Resources*, 2026 WL 477534.  The Court held

that IEEPA does not authorize the President to impose tariffs.  Absent from IEEPA's "lengthy list

of powers is any mention of tariffs or duties"—a "notable" "omission" given the specific powers

Congress did mention.  *Id.* at *10.  "[H]ad Congress intended to convey the distinct and extraordi-

nary power to impose tariffs, it would have done so expressly—as it consistently has in other tariff

statutes."  *Id.*  While the President relied on the words "regulate . . . importation," the Court inter-

preted that phrase by reference to the other eight verbs in 50 U.S.C. § 1702(a)(1)(B):  "Each au-

thorizes a distinct action a President might take in sanctioning foreign actors or controlling domes-

tic actors engaged in foreign commerce—blocking imports, for example, or prohibiting transac-

tions."  *Id.* at *11.  "*None of IEEPA's authorities,*" the Court held, "includes the distinct and ex-

traordinary power to raise revenue."  *Id.* (emphasis added).  The Court thus affirmed the Federal

Circuit's holding in *V.O.S.  Id.* at *13–14.

While six Justices agreed based on IEEPA's text and the ordinary tools of statutory inter-

pretation that IEEPA does not authorize tariffs, three of those Justices (the Chief Justice, joined by

Justices Gorsuch and Barrett) also concluded that the major-questions doctrine applied to the President's assertion of tariff power, and that doctrine counseled against the President's position.  Here, "the purported delegation involve[d] the core congressional power of the purse" and a question of enormous "economic and political significance."  *Id.* at *8–9 (opinion of Roberts, C.J.) (quotation marks omitted).  Congress would not have granted this "extraordinary power . . . through vague language"; the President therefore needed to "point to clear congressional authorization to justify his extraordinary assertion of the power to impose tariffs."  *Id.* at 8, 10 (quotation marks omitted).  He failed to do so.  *Id.* at 13.

Immediately following the Supreme Court's decision, also on February 20, the government issued two executive orders.  One order rescinded the IEEPA tariffs, providing that the additional duties "imposed pursuant to IEEPA . . . shall no longer be in effect and, as soon as practicable, shall no longer be collected."  Exec. Order 14389, § 1.  That order provided that it would not affect the other order the President issued on the same day, "Continuing the Suspension of Duty-Free De Minimis Treatment for All Countries."  *Id.* § 2(c); *see* Exec. Order 14388 (the "Continuing De Minimis Order").

The Continuing De Minimis Order referred to July's Executive Order 14324 (the "Global De Minimis Order") and reiterated that the Global De Minimis Order would "not be affected" if the IEEPA tariffs "were held to be invalid."  Exec. Order 14388, § 1.  The new order stated that the continued "suspen[sion of] duty-free *de minimis treatment* under 19 U.S.C. 1321(a)(2)(C)" was, in the President's judgment, "necessary and appropriate to deal with the national emergencies" he had previously declared.  *Id.*  The Continuing De Minimis Order revised the Global De Minimis Order to state unequivocally that the "duty-free *de minimis* exemption provided under 19 U.S.C. 1321(a)(2)(C) shall not apply to any shipment of articles not covered by 50 U.S.C. 1702(b)

[IEEPA's enumerated exceptions for, *e.g.*, donations to relieve human suffering], regardless of value, country of origin, mode of transportation, or method of entry." *Id.* § 2.  Thus, all shipments (except those sent through the international postal network, which are subject to different rates) "shall be subject to all applicable duties, taxes, fees, exactions and charges." *Id.*  The Continuing De Minimis Order directed the Secretary of Homeland Security to "to take all necessary actions to implement and effectuate this order—including through temporary suspension or amendment of regulations or through notices in the Federal Register and by adopting rules, regulations, or guidance." *Id.* § 5(b).

The continued global rescission of the de minimis exemption is still causing Detroit Axle significant harm even though the IEEPA tariffs have been invalidated.  The company must pay non-IEEPA tariffs totaling 52.5% on shipments that it would otherwise ship duty-free to U.S. customers under the exemption.  ECF 52-1 ¶ 48.

**6.**     In light of the government's continued global rescission of the de minimis exemption even after the Supreme Court determined that the IEEPA tariffs are unlawful, Detroit Axle has moved for leave to amend its complaint to incorporate the Global De Minimis Order, the Continuing De Minimis Order, and their implementing agency actions—and to update the factual allegations in the original complaint.  ECF 52; *see id.* Ex. A.  Detroit Axle now renews its motion for partial summary judgment on Counts I and II and, if necessary, to dissolve the stay.

## ARGUMENT

## I.     The Court Should Now Adjudicate Detroit Axle's Claims To Relief From The Unlawful Rescission Of The De Minimis Exemption.

The Supreme Court's decision holding the IEEPA tariffs unlawful and affirming *V.O.S.* means that this Court's stay of Detroit Axle's case has dissolved by its own terms.  In the alternative, this Court should dissolve the stay.  Either way, the Court should grant Detroit Axle's motion

to amend the complaint and adjudicate Counts I and II of Detroit Axle's amended complaint, which challenge the government's purported rescission of the de minimis exemption. Even after the Supreme Court's decision, the government has doubled down on the rescission of the de minimis exemption, expressly providing that it will continue to use IEEPA to collect tariffs on imports that should receive de minimis treatment under 19 U.S.C. § 1321(a)(2)(C). The government's unlawful collection of tariffs on de minimis imports continues to cause Detroit Axle ongoing irreparable harm. And any further proceedings in *V.O.S.* will not eliminate that harm or even address the de minimis exemption.

This Court stayed this case in July 2025 because its injunction in *V.O.S.* "encompasse[d] the Trafficking Orders implicating the de minimis exemption at issue here" and thus would have rendered a separate injunction for Detroit Axle "redundant" with the then-stayed *V.O.S.* injunction. ECF 38 at 2, 4. The Court reasoned that "V.O.S. grants all the relief Axle seeks here," and that Detroit Axle's de minimis challenge therefore would only provide "a separate basis upon which Axle could seek relief should the appellate courts come to a different result" in *V.O.S. Id.* at 3. The Court noted that it had "already granted, and the Federal Circuit subsequently stayed, all relief Axle requests" and concluded that it would "not grant redundant, contingent relief through a preliminary injunction here." *Id.* at 4. After Detroit Axle moved to dissolve the stay in light of the Global De Minimis Order—which was not subject to the stayed *V.O.S.* injunction—this Court denied that motion and ordered that this case "shall remain stayed until the resolution of V.O.S." ECF 48.

The Supreme Court now has conclusively resolved *V.O.S.*: It held that "the terms of IEEPA do not authorize tariffs" and "affirmed" the Federal Circuit's judgment in *V.O.S.* 2026 WL 477534

at \*13–14.  Unlike other cases where the Supreme Court largely agrees with a lower court's rea-

soning but vacates and "remand[s] the case for further proceedings consistent with [its] opinion,"

*see, e.g.*, *Lindke v. Freed*, 601 U.S. 187, 204 (2024), the Supreme Court's decision in *V.O.S.* was

a straight "affirm[ance]," *Learning Resources*, 2026 WL 477534 at \*14.  The Supreme Court has

given the lower courts in *V.O.S.* nothing further to do.  It is true that the Federal Circuit's now-

affirmed *V.O.S.* decision had remanded the case to this Court to "reevaluate the propriety of grant-

ing injunctive relief and the proper scope of such relief" given the "Supreme Court's holding in

*CASA*."  *V.O.S. Selections*, 149 F.4th at 1340.  But the government now has rescinded the IEEPA

tariffs completely, effectively affording the nationwide relief this Court ordered in *V.O.S.*  In other

words, the IEEPA tariffs are gone; any question that this Court may have faced on remand from

the Federal Circuit in *V.O.S.* with respect to the proper scope of an injunction against enforcement

of those tariffs is now moot.  The "resolution of V.O.S.," ECF 48, means that this Court's stay of

Detroit Axle's case has now dissolved by its own terms.

     Even if this Court's stay has not automatically dissolved, the Court should dissolve it now.

The Supreme Court's *Learning Resources* decision and the government's subsequent actions in

response demonstrate that any prior justification for the stay has dissipated.  This Court's rationale

for staying Detroit Axle's case was that the Court would not grant relief that was "redundant" with

the relief it granted in its *V.O.S.* injunction.  ECF 38 at 4.  But subsequent events have proven that

relief from the IEEPA tariffs does *not* redress Detroit Axle's injuries from the rescission of the de

minimis exemption:  Even though the Supreme Court now has held that IEEPA does not authorize

the President to impose tariffs, and the government has repealed those tariffs, the government has

doubled down on the rescission of the de minimis exemption.  The Continuing De Minimis Order

leaves no doubt that the government is collecting and will continue to collect tariffs on otherwise

de-minimis-eligible imports unless and until this Court intervenes.  And the continued rescission of the de minimis exemption is independently causing irreparable harm to Detroit Axle:  Although the government is no longer collecting the *IEEPA* tariffs on Detroit Axle's de-minimis-eligible shipments, the government is still collecting 52.5% tariffs under *other* statutes—tariffs that would not apply to Detroit Axle's shipments if the de minimis exemption were in force.  Granting Detroit Axle the relief it seeks under Counts I and II of its amended complaint is the only way to provide it with relief from the rescission of the de minimis exemption and consequent collection of those tariffs.

There is no sound justification for delaying that relief.  While *V.O.S.* and *Oregon* have not reached final judgment, those cases will not resolve or even address the rescission of the de minimis exemption:  The plaintiffs in those cases have attacked the tariffs themselves, not the rescission of de minimis exemption.  They have not challenged the Global De Minimis Order or the Continuing De Minimis Order.  All that remains to be done in *V.O.S.* and *Oregon* is to award refunds for duties that were unlawfully collected under IEEPA.  This Court's determination of the proper refunds for the IEEPA tariffs will have no bearing on the lawfulness of the rescission of the de minimis exemption.  And to the extent that there is any uncertainty as to the availability of refunds for unlawfully collected duties under IEEPA, that uncertainty actually *supports* Detroit Axle's case that it is being irreparably harmed by being forced to pay tariffs on de-minimis-eligible shipments. *See infra* Part III.  Moreover, given the July 2027 statutory elimination of the de minimis exemption, Detroit Axle needs urgent relief so that it can resume tariff-free direct-to-consumer shipments from its Mexico facilities as soon as possible and minimize potential losses from its investments there.  This Court should adjudicate the lawfulness of the rescission of the de minimis exemption

now, to stop the government from collecting tariffs on Detroit Axle that will either need to be refunded or constitute irreparable harm to the company.

Finally, allowing Detroit Axle's case to proceed would not open the floodgates to further litigation in the many recently filed cases seeking to enjoin liquidation of tariffs collected under IEEPA. *See, e.g.*, *AGS Co. Auto. Sols. v. U.S. Customs & Border Prot.*, No. 25-cv-255 (Ct. Int'l Trade 2025). Detroit Axle is uniquely positioned as the only plaintiff, to its knowledge, that has challenged the rescission of the de minimis exemption in this Court. Moreover, unlike the new plaintiffs, Detroit Axle has been diligently prosecuting its case since the rescission of the de minimis exemption became effective last May. No other plaintiff is in the same position. The Court should dissolve the stay, grant Detroit Axle's motion to amend the complaint, and grant Detroit Axle's motion for partial summary judgment as to Counts I and I.

## II.    Detroit Axle Is Entitled To Partial Summary Judgment On Counts I And II Of Its Amended Complaint.

The rescission of the de minimis exemption is unlawful for two independent reasons. *First*, the President has no authority to rescind the de minimis exemption. As the Supreme Court's recent decision in *Learning Resources* makes clear, IEEPA does not authorize the President to raise revenue through tariffs; none of the specific, enumerated authorities in IEEPA grants the President that power. That same reasoning applies to the President's attempt to use IEEPA to impose tariffs by rescinding the de minimis exemption: Nothing in IEEPA's text authorizes the elimination of a statutory tariff exemption. That fact—considered in light of Congress's consistent practice to grant statutory-suspension power expressly and the lack of historical precedent for using IEEPA in this way—is enough to resolve Detroit Axle's case. But even if IEEPA's text could be stretched to allow the President to unilaterally rescind the de minimis exception, the Court should reject that interpretation: The elimination of the de minimis exemption presents a major question on which

Congress must speak clearly; IEEPA's general text cannot override Section 1321's more specific, clear commands; and IEEPA would be an unconstitutional delegation if it authorized the President to impose tariffs on imports that Congress decreed should be exempt. *Second*, the agency actions implementing the rescission of the de minimis exemption were arbitrary and capricious in violation of the Administrative Procedure Act—a proposition the government has never contested on the merits.

### A.  The Rescission Of The De Minimis Exemption Exceeds The Executive Branch's Authority.

As Detroit Axle has explained in prior briefing and oral argument, the Executive Branch lacks the constitutional and statutory authority to rescind the de minimis exemption, which it now purports to eliminate through the Global De Minimis Order, the Continuing De Minimis Order, and their implementing agency actions. *See* ECF 9, 29, 40. In short, 19 U.S.C. § 1321 is a comprehensive and exclusive scheme creating and governing the de minimis exemption. That scheme *requires* duty-free entry for low-value imports and provides the exclusive means—notice-and-comment rulemaking by the Secretary of the Treasury—for the Executive to create exceptions to the exemption, and only for statutorily specified reasons. *See* ECF 9 at 14–19; ECF 29 at 3–8; ECF 40 at 8.

IEEPA does not authorize the Executive to rewrite and "override" (as the government has put it, ECF 28 at 13, 20) Section 1321's carefully calibrated scheme. The best reading of IEEPA's text—particularly in light of the Supreme Court's holding in *Learning Resources*—is that it does not authorize the President to impose tariffs or eliminate statutory tariff exemptions. *See* ECF 9 at 20–21; ECF 29 at 8–11, 16–17; ECF 40 at 8–9. Nothing beyond "the ordinary tools of statutory interpretation"—including attention to the manner in which Congress typically expressly authorizes the President to suspend the operation of statutes—is required to resolve this case in Detroit

Axle's favor.  *Learning Resources*, 2026 WL 477534 at *36 (Kagan, J., concurring in part and concurring in the judgment).  But even if IEEPA's text were ambiguous or could be stretched to encompass the rescission of a statutory tariff exemption, this Court still should hold that the President lacks authority here because:  (i) the major questions doctrine demands particular clarity before finding a delegation of such an important congressional power; (ii) even if IEEPA's general language purported to authorize the President to suspend the exemption, Section 1321's prohibition of other means of altering the exemption besides notice-and-comment rulemaking is controlling because Section 1321 is the more specific statute governing the exemption, *see* ECF 9 at 19–20, ECF 29 at 11–15; ECF 40 at 8; and (iii) if IEEPA did allow the President to rewrite and override Section 1321 it would be an unconstitutional delegation of legislative power, *see* ECF 29 at 16–17.

1.     IEEPA, interpreted based on the ordinary tools of statutory interpretation, does not authorize the President to impose tariffs by rescinding a statutory tariff exemption like the de minimis exemption.  In a section of *Learning Resources* joined by six Justices, the Supreme Court held that "the terms of IEEPA do not authorize tariffs."  2026 WL 477534 at *13.  The Court looked to IEEPA's "lengthy list of powers" and found absent "any mention of tariffs or duties"— a "notable" "omission in light of the significant but specific powers Congress *did* go to the trouble of naming."  *Id.* at 10.  The Court therefore reasoned "that had Congress intended to convey the distinct and extraordinary power to impose tariffs, it would have done so expressly—as it consistently has in other tariff statutes."  *Id.*  But none of the powers listed in IEEPA—including the phrase "regulate . . . importation," on which the government relied—authorized tariffs.  Instead, the word "regulate" and the other verbs in 50 U.S.C. § 1702(a)(1)(B) "each authorizes a distinct action a President might take in *sanctioning* foreign actors or *controlling* domestic actors engaged

in foreign commerce—*blocking imports*, for example, or *prohibiting transactions*." *Id.* at 11 (emphasis added). "None of IEEPA's authorities," the Court held, "includes the distinct and extraordinary power to raise revenue." *Id.*

The holding and reasoning of *Learning Resources* applies with full force to the President's attempt to impose tariffs by rescinding the de minimis exemption; *Learning Resources* refutes the government's unbounded claim that it may use IEEPA at will to rewrite or "override" statutory tariff exemptions like the de minimis exemption. ECF 28 at 13, 20; ECF 40 at 9–10. As Detroit Axle has explained, rescinding the de minimis exemption is functionally equivalent to *imposing tariffs*—here, 52.5% tariffs—on imports heretofore statutorily exempted from duties, with the practical effect of "rais[ing] revenue." *Learning Resources*, 2026 WL 477534 at *11; *see* ECF 29 at 9. There is no practical difference between imposing a new tariff and rescinding an existing tariff exemption; both subject goods like Detroit Axle's to duties not authorized by Congress. But, as explained, the Supreme Court was clear that "*[n]one of IEEPA's authorities*" includes the power to raise revenue or impose tariffs. *Id.* (emphasis added). So under *Learning Resources*, the President cannot rely on IEEPA to impose tariffs on and raise revenue from de-minimis-eligible imports.

A closer look at IEEPA's text and history confirms this conclusion. The government has relied on two phrases from IEEPA's long list of verbs and nouns to justify rescission of the de minimis exemption: the phrases "regulate . . . importation" and "nullify [or] void . . . exercising any right, power, or privilege" with respect to "any property in which any foreign country or a

national thereof has any interest." 50 U.S.C. § 1702(a)(1)(B); *see* ECF 28 at 21. But the government's reliance on these phrases hits the same two obstacles that the Supreme Court identified in *Learning Resources*.

*First*, when Congress grants the President the power to rescind or suspend the operation of a statute, it "does so separately and expressly." *Learning Resources*, 2026 WL 477534 at *11. For example, many tariff and import statutes "authorize[] the President to 'suspen[d] and discontinu[e]' statutory duties upon his determination that discriminatory duties imposed by other nations had been abolished." *Clinton v. City of New York*, 524 U.S. 417, 444 (1998) (citing statutes); *see also, e.g.*, *id.* at 444–45 (discussing statute that provided that "duties on foreign ships 'shall be repealed' upon the same no-discrimination determination by the President"). The express nature of congressional authorizations to suspend the operation of statutes is apparent in other contexts as well. *See, e.g.*, 46 U.S.C. § 3101 (with respect to ship inspections, "[w]hen the President decides that the needs of foreign commerce require, the President may suspend a provision of this part for a foreign-built vessel registered as a vessel of the United States on conditions the President may specify"); 10 U.S.C. § 123(a) ("In time of war, or of national emergency declared by Congress or the President . . . the President may suspend the operation of any provision of law relating to the promotion, involuntary retirement, or separation of commissioned officers"). Because Congress has "consistently" in "other . . . statutes" granted the power to rescind or suspend a statute *expressly*—identifying with precision what statute may be suspended and under what conditions— it "stands to reason that had Congress intended to convey [that] distinct and extraordinary power" in IEEPA, "it would have done so expressly" as well. *Learning Resources*, 2026 WL 477534 at *10; *accord id.* at *37 (Kagan, J., concurring in part and concurring in the judgment) ("reading

text in context . . . includes consideration of whether Congress ever has before, or likely would, delegate the power the Executive asserts").

*Second*, notably absent from the government's briefing in this case is *any* prior use of IEEPA to rescind a statutory tariff exemption and impose tariffs on otherwise exempt goods. *See generally* ECF 28 at 21–25. The "fact that no President has ever found such a power in IEEPA is strong evidence that it does not exist." *Learning Resources*, 2026 WL 477534 at *11; *accord id.* at *39 (Kagan, J., concurring in part and concurring in the judgment) (finding relevant that no "President until now understood IEEPA to authorize imposing tariffs"). Thus, as the Supreme Court held in *Learning Resources*, the absence of historical precedent for using IEEPA to override statutory tariff exemptions coupled with the fact that Congress usually grants similar powers expressly should make this Court very "skeptical that Congress enacted IEEPA with an eye toward granting that novel power." *Id.* at *12 (majority opinion).

Neither of the government's statutory phrases is sufficient to overcome these contextual hurdles. *Learning Resources* conclusively forecloses the government's reliance on the power to "regulate . . . importation." The word "'regulate' in IEEPA does not include taxation" or the "extraordinary power to raise revenue"; it allows the President to "block[] imports" or "prohibit[] transactions," but tariffs "are different in kind, not degree" from those regulatory actions. *Id.* at *10–12. While the term "regulate" has "facial breadth," the Supreme Court refused to interpret it so broadly as to include the power to tax or tariff. *Id.* at *10. The Court's interpretation of "regulate . . . importation" is controlling here: That phrase does not grant the President the power to impose tariffs on imports previously protected by the de minimis exemption.

Nor does the government's other purported authority—to "nullify" or "void" the "exercising [of] any right, power, or privilege"—grant the power to impose tariffs on statutorily exempt

imports.  As Detroit Axle has explained, IEEPA does not allow the government to nullify or void

rights, powers, or privileges *simpliciter*, as though the government could erase a privilege from

the statute books.  ECF 29 at 10–11.  Rather, IEEPA authorizes the government to nullify or void

the "*exercising*" of a privilege—i.e., the "use of" a privilege.  50 U.S.C. §1702(a)(1)(B) (emphasis

added); Exercise, Black's Law Dictionary (12th ed. 2024).  The de minimis exemption is not a

privilege to be invoked by individual importers, but a command restraining the government from

collecting tariffs:  The Secretary of the Treasury shall "admit articles free of duty" when the retail

value of the imports is less than $800, 19 U.S.C. § 1321(a)(2)(C); customs officials "shall pass

free of duty and tax any shipment of merchandise … not exceeding $800."  19 C.F.R. § 10.151

(emphasis added).  In other words, individual importers need not "exercise" a privilege under the

de minimis exemption because Section 1321 and its implementing regulations issue a general com-

mand to the government that applies regardless of any importer's choice to invoke the exemption.

The government reads the word "exercising" out of IEEPA, violating the fundamental principle of

statutory interpretation to "give effect . . . to every clause and word of the statute."  *Salix Pharm.,*

*Ltd. v. Norwich Pharm., Inc.*, 98 F.4th 1056, 1067 (Fed. Cir. 2024) (quotation marks and alterations

omitted).  Given the "skeptic[ism]" with which the Court should treat the government's "novel"

assertion of power here, the government's strained interpretation of this phrase is insufficient.

*Learning Resources*, 2026 WL 477534 at *12.

Moreover, IEEPA's "nullify . . . privileges" language, like the rest of IEEPA, applies only

to right and privileges "with respect to . . . property."  50 U.S.C. 1702(a)(1)(B).  That language is

best understood to refer to rights and privileges governing the ownership and control of property,

which is generally governed by common law and state statutes, not federal statutory rights and

privileges.  In fact, this language in IEEPA traces back to a 1941 amendment to the Trading With

the Enemy Act of 1917 (TWEA).  *See* First War Powers Act of 1941, § 301, Pub. L. No. 77-354, 55 Stat. 838, 839–40.  The 1941 act, which was enacted a week after Pearl Harbor to broaden presidential authority against wartime enemies, was intended to authorize the President to *seize* (not just freeze, as he could before) alien property:  While existing law "permit[ted] the Government to prevent transactions," the new law would enable the government "to affirmatively compel the use and application of foreign property in a manner consistent with the interests of the United States."  S. Rep. 77-911, at 2 (1941); *see* H.R. Rep. 77-1507, at 3 (1942) (explaining that the new law would enable the Government to "take, administer, control, use, liquidate, etc. such foreign-owned property").  To do so, the government might need to "nullify" or "void" the common-law "rights" or "privileges" that property owners otherwise might assert to defend their property from U.S. government seizure and use—for example, the common-law right to control one's property and prevent others from touching or taking it.  Nothing in IEEPA's statutory language or history suggests that Congress intended to grant the President the additional authority to unilaterally abrogate more-specific federal statutes that Congress enacted to create exemptions from tariffs.[1]

Thus, IEEPA's text—interpreted using the ordinary tools of statutory interpretation in line with the Supreme Court's analysis in *Learning Resources*—does not authorize the imposition of tariffs on imports otherwise shielded from duties by a statute.  It does not authorize the President to unilaterally rescind or suspend the de minimis exemption.

---

[1] Detroit Axle reserves the right to argue that IEEPA cannot authorize the rescission of the de minimis exemption and imposition of tariffs on Detroit Axle because IEEPA's grant of authority only extends to "property in which any foreign country or a national thereof has any interest."  50 U.S.C. § 1702(a)(1)(B).  No foreign country or national has any interest in the property that Detroit Axle imports from China through its Mexico facilities:  Detroit Axle, a U.S. company, owns the property as soon as it is shipped from China to Mexico and continues to exercise sole ownership over the property as it moves from Mexico to the United States.  *See* ECF 52-1 ¶ 37.

**2.**      Even if IEEPA's language could be stretched to encompass the rescission of a statutory tariff exemption, this Court should still reject that interpretation—for three reasons.

*First*, as three Justices held in *Learning Resources*, the major questions doctrine applies here: "[T]he President must point to clear congressional authorization to justify his extraordinary assertion of the power to impose tariffs." 2026 WL 477534 at *10 (op. of Roberts, C.J.). As a majority of the *Learning Resources* Court held, the "power to impose tariffs is very clearly a branch of the taxing power," and the Framers "did not vest any part of the taxing power in the Executive Branch." *Id.* at *7 (majority op.) (quotation marks and alterations omitted). Given this constitutional backdrop, "'[b]oth separation of powers principles and a practical understanding of legislative intent'" suggest that "Congress would not have delegated 'highly consequential power'" like the power to impose tariffs "through ambiguous language." *Id.* at *7 (op. of Roberts, C.J.) (quoting *West Virginia v. EPA*, 597 U.S. 697, 723–24 (2022)). If "'Congress were to relinquish'" its "core congressional power of the purse . . . to another branch, a 'reasonable interpreter' would expect it to do so 'clearly.'" *Id.* at *8 (quoting *Biden v. Nebraska*, 600 U.S. 477, 514–15 (2023) (Barrett, J., concurring)).

Given that eliminating a statutory tariff exception has the same practical effect as imposing a tariff, it is clear that the President's asserted authority to rescind the de minimis exemption also implicates the major questions doctrine. Rescinding a statutory tariff exemption exercises the same "core congressional power of the purse" that imposing tariffs does. *Learning Resources*, 2026 WL 477534 at *8 (opinion of Roberts, C.J.). And like the IEEPA tariffs themselves, tariff exemptions affect "a significant portion of the American economy." *Util. Air Regul. Grp. v. EPA*, 573 U.S. 302, 324 (2014) (quotation marks omitted); *see, e.g.*, P. Fajgelbaum & A. Khandelwar, *The Value of de Minimis Imports* 1–4, National Bureau of Economic Research Working Paper

(Feb. 2025), https://tinyurl.com/ckvwscv6 (explaining that de minimis imports totaled $54.5 billion over 1 billion shipments in 2023 alone; eliminating the exemption will cost U.S. consumers between $10.9 billion and $13 billion). Thus, it is just as implausible that Congress granted the President the major power to unilaterally abrogate tariff exemptions using IEEPA's "vague terms." *West Virginia*, 597 U.S. at 723. This Court should greet the government's assertion of authority here "with a measure of skepticism." *Util Air.*, 573 U.S. at 324.

Skepticism under the major questions doctrine is particularly appropriate here because the government is asserting even greater power under IEEPA in this case than it did in *Learning Resources*: the power not only to impose tariffs where Congress has remained silent, but to *rewrite* tariff statutes, like Section 1321's de minimis exemption, that Congress duly enacted. ECF 29 at 10. The government's interpretation here thus arrogates to the President the unilateral power to *contravene* the enacted will of Congress, on a subject that Article I expressly vests in Congress—where we would expect the President's power to be at its "lowest ebb." *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 637–38 (1952) (Jackson, J., concurring). In fact, the government's interpretation of IEEPA would enable it to "override" the rights and privileges granted by other tariff-related statutes beyond the de minimis exemption, like Section 122's 15%, 150-day limit on tariffs. *See* 19 U.S.C. § 2132(a). That would enable the government to circumvent the *Learning Resources* decision by imposing tariffs under other, more-limited statutes and "nullifying" or "voiding" the limits imposed by those statutes. *See Learning Resources*, 2026 WL 477534 at *8 (op. of Roberts, C.J.) (noting the existence of rate caps, time limits, and "demanding procedural prerequisites" in statutes where Congress explicitly "delegated its tariff powers").

The government lacks any "clear statement" that Congress intended to delegate the extraordinary power to rewrite its tariff statutes. *Biden*, 600 U.S. at 506. As noted above, "regulate

. . . importation" does not suffice given the holding of *Learning Resources*.  And the government's alternative source of authority fares no better, splicing together two of the seven verbs in Section 1702(a)(1)(B) ("nullify" and "void") with one of that provision's eleven subjects ("exercising any right, power or privilege").  ECF 29 at 10.  But Congress does not delegate such massive power to "make a radical or fundamental change to a statutory scheme" using "oblique or elliptical language."  *West Virginia*, 597 U.S. at 723 (quotation marks omitted).  And as explained above, the general, vague "nullify [or] void . . . exercising any right, power, or privileges" language is a poor fit for the rescission or suspension of a statutory tariff exemption, which does not need to be *exercised* by individual importers; that language, given its history, more likely refers to the power to nullify the assertion of state common-law privileges.  The government's Frankenstein monster therefore is far from the "clear statement" the major question doctrine requires.  *Biden*, 600 U.S. at 506.

*Second*, even if IEEPA standing alone did clearly authorize the rescission of statutory tariff exemptions, Section 1321(b)'s notice-and-comment requirement still would control here because Section 1321 is the more specific statute governing how the de minimis exemption may be altered—as Detroit Axle has explained.  *See* ECF 29 at 11–15.  When a "general authorization" like IEEPA and "a more limited, specific authorization" like Section 1321 both exist, it is a "commonplace of statutory construction that the specific governs the general"—particularly where, as here, Congress created a "comprehensive scheme" that "deliberately targeted specific problems with specific solutions."  *RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 566 U.S. 639, 645 (2012) (quotation marks omitted).  Section 1321 is a specific, comprehensive scheme creating the de minimis exemption and elaborating one—and only one—way for the government to alter that exception:  through notice-and-comment rulemaking by the Secretary of the Treasury.  The Supreme

Court has repeatedly applied and reaffirmed the principle that "[s]pecific terms prevail over the general in the same or another statute which otherwise might be controlling." *Fourco Glass Co. v. Transmirra Prods. Corp.*, 353 U.S. 222, 228–29 (1957); *see also, e.g.*, *Harrington v. Purdue Pharma L.P.*, 603 U.S. 204, 222 (2024); *TC Heartland LLC v. Kraft Foods Grp. Brands LLC*, 581 U.S. 258, 262 (2017). So even if IEEPA's general language could be interpreted to authorize the rescission or suspension of a tariff exemption, Section 1321(b)'s more specific requirements would prevail and bar the President from unilaterally altering the de minimis exemption.

*Finally*, IEEPA would effect an unconstitutional delegation of Congress's legislative power if it authorized the President to rescind statutory tariff exemptions whenever he deems appropriate in his (purportedly unreviewable) discretion. Contrary to the government's assertions, the non-delegation doctrine and intelligible-principle test apply with full force to statutes governing tariffs. *See J.W. Hampton, Jr. & Co. v. United States*, 276 U.S. 394, 409 (1928) (applying intelligible-principle test in context of tariffs). Article I vests the power of the purse, including the power to impose taxes like tariffs, exclusively in Congress. *See Learning Resources*, 2026 WL 477534 at *6–7.

Interpreting IEEPA to allow the President to rescind any tariff exemption he chooses, for however long and with respect to whichever country or countries he determines, would delegate "boundless authority" to the President without "sufficient standards to enable both the courts and the public to ascertain" whether he "has followed the law." *Federal Communications Comm'n v. Consumers' Research*, 606 U.S. 656, 673, 687 (2025) (quotation marks and alterations omitted). IEEPA places no constraints on the exercise of this purported power except that the President must declare that there is an "unusual and extraordinary threat," 50 U.S.C. § 1701(a)—declarations the government has argued are unreviewable. Brief of the United States 41–42, *V.O.S. Selections*

24

(Nos. 24-1287 & 25-250). Nor does IEEPA provide any standards for determining when, for how long, and to what degree the elimination of a tariff exemption is appropriate. So under IEEPA, the President, by exercising unconstrained authority with respect to statutory tariff exemptions, would wield the quintessential legislative power to determine when, where, and in what amounts tariffs should be levied. Moreover, the President's asserted authority under IEEPA to "practical[ly] . . . repeal[]" statutory tariff exemptions is tantamount to the line-item veto that the Supreme Court held unconstitutional in *Clinton*: Both undermine the Constitution's "finely wrought" lawmaking procedures. *Clinton*, 524 U.S. at 437–39. Thus, IEEPA would unconstitutionally delegate Congress's power if it authorized the President to eliminate the de minimis exemption. This Court should either interpret IEEPA narrowly to avoid that unconstitutional outcome or hold IEEPA unconstitutional as applied here.

In sum, the Supreme Court's decision in *Learning Resources*, ordinary principles of statutory interpretation, the major questions doctrine, the specific-general canon, and the nondelegation doctrine all point in the same direction: The President lacks authority to unilaterally rescind the de minimis exemption. IEEPA is not a blank check for the President to arrogate Congress's constitutional powers and disregard its statutory commands.

## B.  The Agency Actions Eliminating The De Minimis Exemption Were Arbitrary And Capricious.

The agency actions implementing the Global De Minimis Order, the Continuing De Minimis Order (and the China De Minimis Orders, to the extent any of their implementing actions remain effective) should also be set aside for the independent reason that they were arbitrary and capricious. *See* 5 U.S.C. § 706(2)(A).

As Detroit Axle has explained, the Executive Branch utterly failed to consider the serious reliance interests that the de minimis exemption created, the significant costs to U.S. consumers

and businesses of eliminating the exemption, and obvious, reasonable alternatives, like inspecting low-value packages without levying tariffs on them.  *See* ECF 9 at 23–25; ECF 29 at 17; ECF 40 at 10–11.  The government has never tried to defend these actions on the merits—instead, it has argued only that these actions are not subject to review because they were merely "ministerial actions" that implemented the President's executive orders.  ECF 28 at 16.  But the APA "'applies to *any* final agency action'"; there is no "ministerial actions" exemption to APA review.  ECF 29 at 18 (quoting *Nebraska v. Su*, 121 F.4th 1, 15 (9th Cir. 2024) (quotation marks omitted; emphasis added)).

The government has had ample time in which it could have undertaken notice-and-comment rulemaking to attempt to explain its decision to rescind the de minimis exemption.  More than a year has passed since the President first ordered the rescission of the de minimis exemption and more than eight months have come and gone since Detroit Axle first filed suit.  But the government has yet to meaningfully explain its actions or consider the obvious reliance interests at stake, economic costs of eliminating the exemption, or reasonable alternatives.  Nor has the government explained, in this case or through agency action, why it could not have conducted notice-and-comment rulemaking to obtain public input on these issues before taking such drastic action.

Indeed, even in revising the rescission the de minimis exemption to apply globally and to make it severable from the imposition of tariffs, the government did not attempt to explain its decision.  The Global De Minimis Order itself merely reiterated the government's claim that eliminating the exemption is necessary to stop drug trafficking.  *See* Exec. Order 14324, § 1, 90 Fed. Reg. at 37,775–77.  And the government's notice implementing the order restated the same Executive Branch conclusions about drug trafficking.  *See* 90 Fed. Reg. at 42,418–19.  Similarly, the Continuing De Minimis Order provided no new reasoning; the President simply asserted that it "is

still necessary and appropriate to suspend duty-free *de minimis* treatment." Continuing De Minimis Order, § 1. The government's elimination of the de minimis exemption—now on a global basis, with no time limit, and two years before Congress chose to end the exemption—therefore remains neither "reasonable" nor "reasonably explained." *Ohio v. Env't Prot. Agency*, 603 U.S. 279, 292 (2024) (quotation marks omitted).

## III.    Detroit Axle Is Entitled To Vacatur And A Permanent, Party-Specific Injunction.

Detroit Axle faces ongoing and irreparable harm from the rescission of the de minimis exemption and is entitled to prompt, standalone relief: vacatur of the agency actions implementing the China De Minimis Orders (to the extent they remain effective), the Global De Minimis Order, and the Continuing De Minimis Order, and an order from this Court declaring unlawful and permanently enjoining the government from enforcing the China De Minimis Orders, Global De Minimis Order, and Continuing De Minimis Order against Detroit Axle.

*First*, the APA entitles Detroit Axle to vacatur of all agency actions implementing these orders because those actions exceed the government's statutory authority and are arbitrary or capricious. 5 U.S.C. § 706(2)(A), (C). Those actions include the Customs and Border Protection notice implementing the Global De Minimis Order, s*ee* 90 Fed. Reg. 42,418 (Sept. 2, 2025), and the CBP's Cargo Systems Messaging Service Bulletin # 6784548 (Feb. 23, 2026), which implemented the Continuing De Minimis Order. Detroit Axle need not establish irreparable harm to obtain vacatur of those actions. *See* 5 U.S.C. § 706(2) (the reviewing court "*shall* . . . hold unlawful and set aside agency action" that is arbitrary, capricious, or in excess of statutory authority (emphasis added)); *Am. Bioscience, Inc. v. Thompson*, 269 F.3d 1077, 1084 (D.C. Cir. 2001) ("[W]hether or not appellant has suffered irreparable injury, if it makes out its case under the APA it is entitled to a remedy."). This Court therefore has a responsibility under the APA to "hold

unlawful and set aside" those agency actions because they are "arbitrary, capricious," and "in excess of statutory . . . authority" and "limitations." 5 U.S.C. § 706(2); *cf. Colorado River Water Conservation Dist. v. United States*, 424 U.S. 800, 817 (1976) (noting the "virtually unflagging obligation of the federal courts to exercise the jurisdiction given them").

*Second*, in addition to vacatur, a party-specific permanent injunction is warranted here because the rescission of the de minimis exemption is inflicting irreparable injuries on Detroit Axle for which it has no adequate remedy at law. *See eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006). Most notably, Detroit Axle has been forced to pay massive tariffs for shipments to customers from its Mexico facility that it otherwise would have shipped tariff-free under the de minimis exemption. ECF 40-1 (Musheinesh 3d Decl.) ¶ 4. Before the rescission of the de minimis exemption, Detroit Axle shipped auto parts valued at $800 or less from its Mexico facility to U.S. customers tariff-free under the de minimis exemption. After the government's rescission of the exemption, however, Detroit Axle was forced to import in its own name—and pay tariffs on—auto parts valued at $800 or less that it shipped from its Mexico facility to U.S. customers. Since the de minimis rescission first took effect on May 2, Detroit Axle has paid tens of millions of dollars in tariffs on shipments that it otherwise would have entered duty-free. *See id.* ($19 million in additional tariffs between May and September 2025).

The tariffs Detroit Axle continues to pay on de-minimis-eligible shipments might not constitute irreparable harm if the government assured Detroit Axle that it would be entitled to refunds of those tariffs should it prevail on Counts I or II. *See Sumecht NA, Inc. v. United States*, 923 F.3d 1340, 1348 (Fed. Cir. 2019). But so far, the government has refused to do so. The government appears to take the position that, even if Detroit Axle prevails on Counts I and II, the company would be entitled to refunds of tariffs on only one shipment of $800 or less per day—in other

words, refunds for tariffs paid on about $200,000 worth of goods since May. *See* ECF 27 at 38–40 (government arguing that Detroit Axle would only be eligible for tariff-free imports of $800 per day). But Detroit Axle in fact is entitled to refunds of tariffs it paid on *each* shipment of $800 or less per day to each of its customer—the tariffs it has paid on all goods that it would have shipped duty-free to its customers under the de minimis exemption. *See* ECF 29 at 20–21. The value of Detroit Axle's shipments that would have been eligible for the de minimis exemption is in the *hundreds of millions* of dollars. *See id.* at 21 (government's declarant explained that between January 1 and May 2, 2025, Detroit Axle shipped about 580,000 de minimis packages worth almost $110 million). Detroit Axle has therefore paid tens of millions of dollars in additional tariffs as a result of the unlawful rescission of the exemption. ECF 40-1 (Musheinesh 3d Decl.) ¶ 4.

The Federal Circuit and this Court have held that the payment of tariffs constitutes irreparable harm when the government refuses to concede that refunds will be available and the legal question "is not clear." *See, e.g.*, *Belgium v. United States*, 452 F.3d 1289, 1297 (Fed. Cir. 2006); *see also In re Section 301 Cases*, 524 F. Supp. 3d 1355, 1362 (Ct. Int'l Trade 2021) ("The potential unavailability of reliquidation or refund in this case sufficiently demonstrates irreparable harm."). Here, because the government refuses to concede that Detroit Axle is entitled to refunds for duties on *all* of its otherwise-de-minimis-eligible shipments, and the government's legal basis for its refusal "is not clear at this juncture," the company's millions of dollars in additional tariff costs are irreparable injuries that warrant an injunction. *Belgium*, 452 F.3d at 1296–97.

Detroit Axle also is facing other irreparable injuries. The company has been forced to raise its prices to account for the massively increased costs that it is facing due to the elimination of the de minimis exemption. *See* ECF 40-1 (Musheinesh 3d Decl.) ¶ 7. As a result, Detroit Axle has lost sales that it otherwise would have realized. *See id*. The company likely has no way to recover

damages for these lost business opportunities because of the government's sovereign immunity. *See, e.g.*, *KPMG LLP v. United States*, 139 Fed. Cl. 533, 537 (2018) ("As a general principle, where plaintiff has no ability to recoup lost profits against the United States, the harm to the plaintiff is irreparable.").  Moreover, the price increases necessitated by the government's actions have harmed Detroit Axle's reputation for providing high-quality auto parts at low prices.  *See* ECF 40-1 (Musheinesh 3d Decl.) ¶ 7; *Celsis In Vitro, Inc. v. CellzDirect, Inc.*, 664 F.3d 922, 930 (Fed. Cir. 2012) ("Price erosion, loss of goodwill, damage to reputation, and loss of business opportunities are all valid grounds for finding irreparable harm.").  On the other side of the equitable equation, the government has no interest in enforcing unlawful executive actions.  *See Am. Signature, Inc. v. United States*, 598 F.3d 816, 830 (Fed. Cir. 2010) ("The public interest is served by ensuring that governmental bodies comply with the law.").  And it has offered no reason why it cannot inspect low-value shipments to stop drug trafficking without levying tariffs on them.

Detroit Axle therefore is also entitled to a permanent, party-specific injunction protecting it from the government's unlawful elimination of the de minimis exemption.  To provide Detroit Axle any meaningful relief, that injunction must prevent the government from collecting tariffs on de minimis-eligible shipments that Detroit Axle makes from outside the United States to individual U.S. customers.

## CONCLUSION

This Court should dissolve the stay and grant Detroit Axle summary judgment on Counts I and II.  The Court should hold unlawful and set aside all the agency actions that have purported to effectuate the China De Minimis Orders, Global De Minimis Order, and the Continuing De Minimis Order by eliminating or taking steps to eliminate the de minimis exemption.  And the Court should enter a permanent injunction enjoining Defendants from enforcing the China De Minimis Orders, Global De Minimis Order, and Continuing De Minimis Order against Detroit

Axle and from collecting tariffs on Detroit Axle's shipments to its customers that would otherwise qualify for Section 1321(a)(2)(C)'s de minimis exemption.

February 26, 2026

Respectfully submitted,

*/s/ Thomas H. Dupree Jr.*

Thomas H. Dupree Jr.
Samantha Sewall
Nick Harper
Connor P. Mui
Luke J.P. Wearden
GIBSON, DUNN & CRUTCHER LLP
1700 M Street, N.W.
Washington, D.C. 20036-4504
(202) 955-8500
TDupree@gibsondunn.com
SSewall@gibsondunn.com
NHarper@gibsondunn.com
CMui@gibsondunn.com
LWearden@gibsondunn.com

*Counsel for Plaintiff Detroit Axle*

**CERTIFICATE OF COMPLIANCE WITH WORD LIMIT**

Pursuant to CIT Standard Chambers Procedure 2(B), I certify that this brief, including headings, footnotes, and quotations (but excluding the table of contents, table of authorities, signature blocks, and this certificate) contains 9,896 words.

/s/ *Thomas H. Dupree Jr.*

*Counsel for Plaintiff Detroit Axle*