**UNITED STATES COURT OF INTERNATIONAL TRADE**

BEFORE:    THE HONORABLE GARY S. KATZMANN, JUDGE
               THE HONORABLE TIMOTHY M. REIF, JUDGE
               THE HONORABLE JANE A. RESTANI, JUDGE

|  |  |
|---|---|
| AXLE OF DEARBORN, INC. D/B/A DETROIT AXLE, <br><br> Plaintiff, <br><br> v. <br><br> DEPARTMENT OF COMMERCE; HOWARD LUTNICK, in his official capacity as Secretary of Commerce; DEPARTMENT OF HOMELAND SECURITY; KRISTI NOEM, in her official capacity as Secretary of Homeland Security; DEPARTMENT OF THE TREASURY; SCOTT BESSENT, in his official capacity as Secretary of the Treasury; UNITED STATES CUSTOMS AND BORDER PROTECTION; PETE R. FLORES, in his official capacity as Acting Commissioner for U.S. Customs and Border Protection; and the UNITED STATES, <br><br> Defendants. | Court No. 25-cv-00091 |

**DEFENDANTS' RESPONSE IN OPPOSITION TO PLAINTIFF'S RENEWED MOTION FOR PARTIAL SUMMARY JUDGMENT AND RENEWAL OF PARTIAL MOTION TO DISMISS AND CROSS-MOTION FOR SUMMARY JUDGMENT**

BRETT A. SHUMATE
Assistant Attorney General
Civil Division

ERIC J. HAMILTON
Deputy Assistant Attorney General

By:    PATRICIA M. McCARTHY
Director

CLAUDIA BURKE
Deputy Director

/s/ Justin R. Miller

JUSTIN R. MILLER
Attorney-In-Charge
International Trade Field Office

/s/ Alexander Vanderweide
ALEXANDER VANDERWEIDE
Senior Trial Counsel

/s/ Mathias Rabinovitch
MATHIAS RABINOVITCH
Trial Attorney
International Trade Field Office
Department of Justice, Civil Division
Commercial Litigation Branch
26 Federal Plaza, Room 346
New York, New York 10278

*Attorneys for Defendants*

April 9, 2026

**TABLE OF CONTENTS**

BACKGROUND ..................................................................................................................2

ARGUMENT......................................................................................................................5

I.  IEEPA Clearly Authorizes the President to Suspend the *De Minimis* Privilege ..................................................................................................................7

    A.  *Learning Resources* has limited relevance and does not control the outcome here.........................................................................................................................7

    B.  IEEPA authorizes the suspension of the *de minimis* privilege because it empowers the President to "nullify", "void", "prevent", or "prohibit" the "exercising" of "any … privilege with respect to … any property" and to "regulate", "prevent", or "prohibit" the "importation" of "any property" ...........................................................8

II.  The OBBB Has No Impact on the Panel's Interpretation of IEEPA ..............................25

III.  Axle's Challenge to CBP's Implementation of the President's Action Fails .................26

    A.  CBP's implementation of the suspension of the *de minimis* privilege is not reviewable under the APA and in any event, is not arbitrary or capricious.................................27

    B.  The implementing procedures for collecting duties pursuant to the challenged Executive Orders are irrelevant here but in any event, are reasonable......................31

CONCLUSION..................................................................................................................34

## TABLE OF AUTHORITIES

**Cases**

*A Classic Time v. United States,*
123 F.3d 1475 (Fed. Cir. 1997)..................................................................................... 10

*The Abby Dodge v. United States,*
223 U.S. 166 (1912)...................................................................................................... 10

*Am. Ass'n of Exporters & Importers–Textile & Apparel Grp. v. United States,*
751 F.2d 1239 (Fed. Cir. 1985).............................................................................. 10, 19

*American Insurance Association v. Garamendi,*
539 U.S. 396 (2003)...................................................................................................... 22

*B-W. Imports, Inc. v. United States,*
75 F.3d 633 (Fed. Cir. 1996)........................................................................................ 19

*Biden v. Nebraska,*
600 U.S. 477 (2023)...................................................................................................... 21

*Bradford v. U.S. Dep't of Labor,*
101 F.4th 707 (10th Cir. 2024) ..................................................................................... 29

*Clinton v. City of New York,*
524 U.S. 417 (1998)................................................................................................ 19, 24

*Detroit Int'l Bridge Co. v. Gov't of Can.,*
189 F. Supp.3d 85 (D.D.C. 2016) ............................................................................. 6, 28

*Euro-Notions Florida, Inc. v. United States et al.,*
Court No. 25-00595 (Ct. Int'l Trade) ............................................................................. 8

*FCC v. Consumers' Research,*
145 S. Ct. 2482 (2025)...................................................................................... 19, 22, 23

*Florsheim Shoe Co., Div. of Interco v. United States,*
744 F.2d 787 (Fed. Cir. 1984)...................................................................................... 19

*Franklin v. Massachusetts,*
505 U.S. 788 (1992)........................................................................................... 27, 28, 30

*Gundy v. United States,*
588 U.S. 128 (2019)...................................................................................................... 22

*HMTX Indus. LLC v. United States,*
156 F.4ᵗʰ 1236 (Fed. Cir. 2025) .................................................................... 6, 27, 29

*Humane Soc. of U.S. v. Clinton,*
236 F.3d 1320 (Fed. Cir. 2001) .............................................................................. 19

*Int'l Custom Prods., Inc. v. United States,*
791 F.3d 1329 (Fed. Cir. 2015) .............................................................................. 10

*J.W. Hampton, Jr.,& Co. v. United States,*
276 U.S. 394 (1928) ................................................................................................ 23

*Landgraf v. USI Film Prods.,*
511 U.S. 244 (1994) ................................................................................................ 26

*Learning Resources, Inc. v. Trump,*
146 S. Ct. 628 (2026) ......................................................................................*passim*

*Marks v. United States,*
430 U.S. 188 (1977) ............................................................................................ 8, 19

*Marshall Field & Co. v. Clark,*
143 U.S. 649 (1892) ...................................................................................... 23, 24, 25

*Trump v. Orr,*
146 S. Ct. 44 (2025) ............................................................................................ 7, 29

*Trump v. Hawaii,*
585 U.S. 667 (2018) ................................................................................................ 30

*United States v. Shih,*
73 F.4th 1077 (9th Cir. 2023) ................................................................................ 22

*United States v. Curtiss-Wright Export Corp.,*
299 U.S. 304 (1936) ................................................................................................ 22

*United States v. Quinn,*
401 F.Supp.2d (D.D.C. 2005) ................................................................................ 30

*USP Holdings, Inc. v. United States,*
36 F.4th 1359 (Fed. Cir. 2022) .............................................................................. 28

*Wayman v. Southard,*
10 Wheat. 1 (1825) ................................................................................................. 23

*West Virginia v. Environmental Protection Agency,*
597 U.S. 697 (2022) ................................................................................................ 22

*Zemel v. Rusk,*
381 U.S. 1 (1965)......................................................................................................22

**Statutes**

5 U.S.C. § 553(a)(1)...............................................................................................30

5 U.S.C. § 553(b)....................................................................................................30

5 U.S.C. § 701(b)(1) ...............................................................................................27

5 U.S.C. § 704.........................................................................................................27

5 U.S.C. § 705.........................................................................................................28

5 U.S.C. § 706(2)(A)...............................................................................................29

19 U.S.C. § 1321.................................................................................................*passim*

19 U.S.C. § 1321(a) ...........................................................................................18, 20

19 U.S.C. § 1321(a)(2)..............................................................................................6

19 U.S.C. § 1321(a)(2)(C) ................................................................................3, 5, 14

19 U.S.C. § 1321(b)...........................................................................................3, 18, 21

19 U.S.C. § 1321(c).................................................................................................25

19 U.S.C. § 1484.....................................................................................................14

19 U.S.C. § 1498.....................................................................................................14

21 U.S.C. § 360bbb–3(b)(1)(B) ..............................................................................24

50 U.S.C. § 1622 .....................................................................................................23

50 U.S.C. § 1641 .....................................................................................................23

50 U.S.C. § 1701......................................................................................................5

50 U.S.C. § 1701(a) .................................................................................................23

50 U.S.C. § 1701(b) ..................................................................................................8

50 U.S.C. § 1702(a)(1)(B) ...................................................................................*passim*

50 U.S.C. § 1702(b)............................................................................................23, 31

50 U.S.C. § 1703 .....................................................................................................23

Homeland Security Act of 2002, Pub. L. 107–296, 116 Stat. 2142 ............................................. 3

International Emergency Economic Powers Act of 1977 (IEEPA) ..................................... *passim*

National Emergencies Act ......................................................................................................... 5

Administrative Procedure Act ......................................................................................... *passim*

One Big Beautiful Bill Act of 2025, Pub. L. No. 119-21, 139 Stat. 72 (July 4, 2025) ......... *passim*

The Tarriff Act of Oct. 1, 1890, § 3, 26 Stat. 612 ...................................................................... 25

Section 504 (a) of the Trade Act of 1974 ................................................................................... 19

**Regulations and Executive Orders**

19 C.F.R. § 10.151 ........................................................................................................... 3, 12, 13

19 C.F.R. § 10.153(g) .......................................................................................................... 11, 16

19 C.F.R. § 128.24 ................................................................................................................... 12

19 C.F.R. Part 141 .................................................................................................................... 31

19 C.F.R. Part 142 .............................................................................................................. 13, 31

19 C.F.R. Part 143 .................................................................................................................... 31

19 C.F.R. Part 143 subpart C .................................................................................................. 12

19 C.F.R. § 143.23 .................................................................................................................... 13

19 C.F.R. § 143.23(j)(3) ...................................................................................................... 12, 13

19 C.F.R. § 143.26 (a) .............................................................................................................. 13

19 C.F.R. § 145.31 .................................................................................................................... 12

19 C.F.R. § 148.12 .................................................................................................................... 12

19 C.F.R. § 148.62 .................................................................................................................... 12

Executive Order 14256, *Further Amendment to Duties Addressing the Synthetic Opioid Supply Chain in the People's Republic of China as Applied to Low-Value Imports,*
90 Fed. Reg. 14,899 (Apr. 2, 2025) ................................................................................ *passim*

Executive Order 14324, *Suspending Duty-Free De Minimis Treatment for All Countries,*
90 Fed. Reg. 37,775 (Jul. 30, 2025) .............................................................................. *passim*

Executive Order 14388, *Continuing the Suspension of Duty-Free De Minimis Treatment for All Countries,*
91 Fed. Reg. 9,433 (Feb. 20, 2026) ....................................................................................*passim*

Executive Order 14257, *Regulating Imports With a Reciprocal Tariff To Rectify Trade Practices That Contribute to Large and Persistent Annual United States Goods Trade Deficits,*
90 Fed. Reg. 15,041 (Apr. 7, 2025) ............................................................................. 4

Proclamation 11012*, Imposing a Temporary Import Surcharge to Address Fundamental International Payments Problems,*
91 Fed. Reg. 9, 339 (Feb. 25, 2026) ...................................................................... 4,5, 34

*U.S. Customs and Border Protection, Test Concerning Entry of Section 321 Low-Value Shipments Through the Automated Commercial Environment (ACE); Republication With Modifications,*
89 Fed. Reg. 2630 (Jan. 16, 2024) .................................................................... 11, 14, 16

Executive Order 14068, *Prohibiting Certain Imports, Exports, and New Investment With Respect to Continued Russian Federation Aggression,*
87 Fed. Reg. 14,381 (Mar. 11, 2022).......................................................................... 21

Executive Order 13651, *Prohibiting Certain Imports of Burmese Jadeite and Rubies,*
78 Fed. Reg. 48,793 (Aug. 6, 2013).......................................................................... 21

Executive Order 13348, *Blocking Property of Certain Persons and Prohibiting the Importation of Certain Goods from Liberia,*
69 Fed. Reg. 44,885 (Jul. 22, 2004).......................................................................... 21

Executive Order 13194, *Prohibiting the Importation of Rough Diamonds From Sierra Leone,*
66 Fed. Reg. 7389 (Jan. 18, 2001) ........................................................................... 21

*Authorization of Emergency Use of Anthrax Vaccine Adsorbed for Prevention of Inhalation Anthrax by Individuals at Heightened Risk of Exposure Due to Attack With Anthrax; Extension; Availability,*
70 Fed. Reg. 5,450 (Feb. 2, 2005) ............................................................................ 24

*Authorizations of Emergency Use of Two Biological Products During the COVID-19 Pandemic; Availability,*
86 Fed. Reg. 5,200 (Jan. 19, 2021)........................................................................... 24

*Notice of Implementation of the President's Executive Order 14324, Suspending Duty-Free De Minimis Treatment for All Countries,*
90 Fed. Reg. 42,418 (Sep. 2, 2025) ..................................................................... 32, 33

*Notice of Implementation of Additional Duties on Products of the People's Republic of China Pursuant to the President's Executive Order 14256, Further Amendment to Duties Addressing the Synthetic Opioid Supply Chain in the People's Republic of China As Applied to Low-Value*

*Imports,*
90 Fed. Reg. 17,608 (Apr. 28, 2025) ......................................................................... 33

Executive Order 14194 .............................................................................................. 5

Executive Order 14195 .............................................................................................. 5

Executive Order 14200 .............................................................................................. 5

Executive Order 14228 .............................................................................................. 5

Executive Order 14357 .............................................................................................. 5

**Other Authorities**

Treasury Order 100-20 (Oct. 30, 2024), *available at* https://home.treasury.gov/about/general-information/orders-and-directives/treasury-order-100-20 ................................................... 3

Elena Kagan, *Presidential Administration*, 114 Harv. L. Rev. 2245 (2001) ........................... 6, 27

*Nullify,* Black's Law Dictionary (12th ed. 2024) ................................................................. 9

*Void,* Black's Law Dictionary (12th ed. 2024) .................................................................... 9

*Void,* Black's Law Dictionary (Rev. 4th ed. 1968) .............................................................. 9

*Prevent, Merriam-Webster Dictionary*
available at https://www.merriam-webster.com/dictionary/prevent .......................................... 9

*Prevent,* Black's Law Dictionary (Rev. 4th ed. 1968) .......................................................... 9

*Prohibit, Merriam-Webster Dictionary*
available at  https://www.merriam-webster.com/dictionary/prohibit ......................................... 9

*Prohibit,* Black's Law Dictionary (Rev. 4th ed. 1968) ......................................................... 9

*Exercise,* Black's Law Dictionary (12th ed. 2024; Rev. 4th ed. 1968) ..................................... 9

*Privilege, Merriam-Webster Dictionary*
available at https://www.merriam-webster.com/dictionary/privilege .......................................... 9

*Privilege,* Black's Law Dictionary (Rev. 4th ed. 1968) ...................................................... 9, 10

De Minimis Value – Express Shipment Exemptions, Department of Commerce, International Trade Administration, available at https://www.trade.gov/de-minimis-value ........................... 18

Global Express Ass'n, *De Minimis Thresholds*, https://global-express.org/index.php?id=271&act=101&profile_id=-1&countries%5B%5D=-

2&search_terms=&question-
filter=&qid_34=1&qid_34_optid=1&qid_35=1&qid_36=1&qid_92=1 ..................................... 18

CSMS # 65934463 – GUIDANCE: Payment of Duty on International Mail Shipments pursuant
to Executive Order 14324 "Suspending Duty-Free De Minimis Treatment for All Countries"
(Aug. 15, 2025) ........................................................................................................................ 33

CSMS # 65990231 - Parties Qualified for the Payment of Duty on International Mail Shipments
pursuant to Executive Order 14324 "Suspending Duty-Free De Minimis Treatment for All
Countries" (Aug. 21, 2025) .................................................................................................... 33

CSMS # 66311990 - UPDATED GUIDANCE: Payment of Duty on International Mail
Shipments pursuant to Executive Order 14324 "Suspending Duty-Free De Minimis
Treatment for All Countries" (Sep. 22, 2025) ......................................................................... 33

**UNITED STATES COURT OF INTERNATIONAL TRADE**

BEFORE:    THE HONORABLE GARY S. KATZMANN, JUDGE
THE HONORABLE TIMOTHY M. REIF, JUDGE
THE HONORABLE JANE A. RESTANI, JUDGE

| | |
|---|---|
| AXLE OF DEARBORN, INC. D/B/A DETROIT AXLE, ) | |
| Plaintiff, ) | |
| v. ) | Court No. 25-cv-00091 |
| DEPARTMENT OF COMMERCE; ) HOWARD LUTNICK, in his official capacity as Secretary ) of Commerce; DEPARTMENT OF HOMELAND ) SECURITY; KRISTI NOEM, in her official capacity as ) Secretary of Homeland Security; DEPARTMENT OF THE ) TREASURY; SCOTT BESSENT, in his official capacity ) as Secretary of the Treasury; UNITED STATES ) CUSTOMS AND BORDER PROTECTION; PETE R. ) FLORES, in his official capacity as Acting Commissioner ) for U.S. Customs and Border Protection; and the ) UNITED STATES, ) | |
| Defendants. ) | |

**DEFENDANTS' RESPONSE IN OPPOSITION TO PLAINTIFF'S RENEWED MOTION FOR PARTIAL SUMMARY JUDGMENT AND RENEWAL OF PARTIAL MOTION TO DISMISS AND CROSS-MOTION FOR SUMMARY JUDGMENT**

Defendants respectfully file this response in opposition to plaintiff's renewed motion for partial summary judgment, ECF No. 53, and to address the topics that the Panel requested the parties brief in its paperless order of March 5, 2026, ECF No. 54. We also renew the arguments from our partial motion to dismiss and cross-motion for summary judgment, ECF No. 27, 28, and the relief sought therein, without extensively repeating those arguments here.

## BACKGROUND

After the Supreme Court issued its decision in *Learning Resources, Inc. v. Trump*, 146 S. Ct. 628 (2026) (*Learning Resources*), Axle of Dearborn, Inc. d/b/a Detroit Axle (Axle) filed motions to dissolve the stay previously ordered by the Panel and to amend its complaint. The Panel granted Axle's motions and ordered the parties to brief the following, none of which serves as an impediment to judgment for the Defendants:

> (1) the opinion of the Supreme Court in Learning Res., Inc. v. Trump, Nos. 24-1287, 25-250, 2026 WL 477534 (U.S. Feb. 20, 2026), as it may apply to the Executive Orders at issue;
>
> (2) whether the Congressionally specified effective date for termination of the de minimis exemption, One Big Beautiful Bill Act of 2025, Pub. L. No. 119-21, 139 Stat 72 (to be codified at 19 U.S.C. § 1321(c)), has any impact on the Panels interpretation of IEEPA in relation to the Executive Orders at issue; and
>
> (3) the implementation of the special procedures for collection of duties as specified in the Executive Orders at issue.

ECF No. 54.

> 1.    Relevant here, the statutory authorization for the *de minimis* privilege provides:
>
> (a) The Secretary of the Treasury, in order to avoid expense and inconvenience to the Government disproportionate to the amount of revenue that would otherwise be collected, is authorized, under such regulations as he shall prescribe, to—
>     …
>     (2) admit articles free of duty and of any tax imposed on or by reason of importation, but the aggregate fair retail value in the country of shipment of articles imported by one person on one day and exempted from the payment of duty shall not exceed an amount specified by the Secretary by regulation, but not less than—
>         …
>     (C) $800 in any other case.

2

19 U.S.C. § 1321(a)(2)(C). The Secretary of the Treasury has delegated this authority to the Secretary of Homeland Security pursuant to the Homeland Security Act of 2002. *See* Pub. L. 107–296, 116 Stat. 2142 and Treasury Order 100-20 (Oct. 30, 2024), https://home.treasury.gov/about/general-information/orders-and-directives/treasury-order-100-20. The Secretary of Homeland Security has implemented this authorized administrative exemption in the Customs regulations at 19 C.F.R. § 10.151 and the regulatory provisions referenced therein.

Importantly, the statute also authorizes the Secretary of the Treasury to "prescribe exceptions to any exemption provided for in subsection (a) whenever he finds that such action is consistent with the purpose of subsection (a) or is necessary for any reason to protect the revenue or to prevent unlawful importations." 19 U.S.C. § 1321(b). Indeed, a forthcoming new rulemaking was recently transmitted by the Department of Homeland Security to the Office of Management and Budget for approval to publish in the Federal Register, which would suspend the regulatory provisions for the *de minimis* exemption pursuant to the authority in 19 U.S.C. § 1321(b). Declaration of Carl S. Campbell (Campbell Decl.) ¶ 11.

2.      This case involves two types of national emergencies: (1) contraband drugs and (2) the trade deficit and the consequences of that deficit. To deal with those emergencies, the President suspended the *de minimis* privilege. Axle does not dispute that those emergencies are valid. Nor does Axle dispute that the suspension of the *de minimis* privilege deals with those emergencies. Instead, Axle challenges whether the International Emergency Economic Powers Act of 1977 (IEEPA) authorizes the actions that concededly deal with concededly valid national emergencies. Specifically, the "Executive Orders at issue" that Axle continues to challenge can be grouped into three categories: (1) the China *De Minimis* Orders, most notably Executive

3

Order (EO) 14256, Further Amendment to Duties Addressing the Synthetic Opioid Supply Chain in the People's Republic of China as Applied to Low-Value Imports, 90 Fed. Reg. 14,899 (Apr. 2, 2025); (2) the Global *De Minimis* Order, EO 14324, Suspending Duty-Free De Minimis Treatment for All Countries, 90 Fed. Reg. 37,775 (July 30, 2025); and (3) the Continuing *De Minimis* Order, EO 14388, Continuing the Suspension of Duty-Free De Minimis Treatment for All Countries, 91 Fed. Reg. 9,433 (Feb. 25, 2026).

The Government presumes the Panel's familiarity with the China *De Minimis* Orders, which the parties have previously briefed and argued.

In the Global *De Minimis* Order, the President suspended the *de minimis* privilege for certain imports from Canada and Mexico to deal with "[t]he risks of evasion, deception, and illicit-drug importation," which "are particularly high for low-value articles that have been eligible for duty-free *de minimis* treatment." 90 Fed. Reg. at 37,777. For similar reasons, the Global *De Minimis* Order continued to suspend the *de minimis* exemption for certain goods from China and Hong Kong, as previously set forth in the China *De Minimis* Orders. *Id*. The Global *De Minimis* Order also suspended the *de minimis* privilege for goods from all countries to deal with the emergency declared in EO 14257, Regulating Imports With a Reciprocal Tariff To Rectify Trade Practices That Contribute to Large and Persistent Annual United States Goods Trade Deficits, 90 Fed. Reg. 15,041, 15,044 (Apr. 7, 2025), to wit, "large and persistent annual U.S. goods trade deficits."

The Continuing *De Minimis* Order maintained the Global *De Minimis* Order and, following *Learning Resources* and the issuance of Proclamation 11012, which imposed new tariffs under Section 122, updated the duty-rates and procedures for imports that would have otherwise qualified for *de minimis* treatment. *See* Proclamation 11012, Imposing a Temporary

4

Import Surcharge to Address Fundamental International Payments Problems, 91 Fed Reg. 9,339 (Feb. 25, 2026).

3.      In its first amended complaint, Axle renews and amends Counts I-III and removes Count IV from its original complaint.  *See* ECF Nos. 2, 55.  In Counts I and II of the original complaint, Axle alleged that the President lacked statutory and constitutional authority to suspend the *de minimis* exemption authorized by 19 U.S.C. § 1321(a)(2)(C) for goods from the People's Republic of China (China), and that agency actions implementing the President's directive are arbitrary and capricious in violation of the Administrative Procedure Act (APA). Relevant to those Counts, Axle asked the Court to declare that EOs 14194, 14195, 14200, 14228, and 14256 "are unlawful because they exceed the Executive Branch's statutory and constitutional authority" and to enjoin the Government from implementing those orders.  ECF No. 2, Prayer for Relief (a)–(c).

In its first amended complaint, Axle deletes EO 14194 from, and adds EOs 14324, 14357, and 14388 to, Counts I and II.  ECF No. 55, Prayer for Relief (a)–(c).  Count III has been updated to allege that "the President's imposition of the [International Economic Emergency Powers Act] tariffs and all actions taken by the Defendants to implement the tariffs exceeded the Executive Branch's statutory authority under IEEPA."  *Id*. ¶ 96.

## ARGUMENT

Axle does not dispute that the trade-deficit-related emergency or the contraband-drug emergencies are valid emergencies under the National Emergencies Act and IEEPA.  Nor does Axle dispute that the suspension of the *de minimis* privilege "deal[s] with" those emergencies. 50 U.S.C. § 1701.  Instead, Axle argues that even though the suspension of the *de minimis* privilege deals with the national emergencies, the President nevertheless lacks the authority

5

under IEEPA to take the very action the President has determined is necessary and appropriate to address the concededly valid national emergencies. Axle also argues that CBP's ministerial implementation of the President's order violates the APA because the agency's implementation is arbitrary and capricious.

Axle is wrong. ***First,*** IEEPA empowers the President to "nullify, void, prevent[,] or prohibit … exercising any right, power, or privilege with respect to … any property." 50 U.S.C. § 1702(a)(1)(B). Section 1321 plainly stipulates that the *de minimis* exemption is a "privilege." 19 U.S.C. § 1321(a)(2). The suspension of the *de minimis* privilege is nothing more than a nullification, voiding, prevention, or prohibition on the exercise of that privilege. IEEPA also empowers the President to "regulate, … prevent[,] or prohibit … importation" of "any property." 50 U.S.C. § 1702(a)(1)(B). The suspension of the *de minimis* privilege is functionally equivalent to a quota or embargo, which everyone agrees is a power in the heartland of IEEPA. It is also the same as regulating the procedures for how products may enter the United States.

***Second,*** CBP's implementation of the President's decision to suspend the *de minimis* privilege is Presidential action unchallengeable under the APA. *See, e.g.*, *HMTX Indus. LLC v. United States*, 156 F.4th 1236, 1250 (Fed. Cir. 2025); *Detroit Int'l Bridge Co. v. Gov't of Can.*, 189 F. Supp. 3d 85, 98-105 (D.D.C. 2016). Regardless, CBP does not violate the APA's prohibition on arbitrary-and-capricious action by following the President's orders, especially when the statute delegates authority to the President—not an agency—to take the action. *See, e.g.*, Elena Kagan, *Presidential Administration*, 114 Harv. L. Rev. 2245, 2351 (2001). As the Supreme Court recently explained, an agency does not "act[] arbitrarily and capriciously by declining to depart from Presidential rules that Congress expressly required it to follow." *Trump*

6

*v. Orr*, 146 S. Ct. 44, 46 (2025).  So too for CBP's failure to decline to depart from the President's decision issued pursuant to the President's own statutory authority in IEEPA.

## I.    IEEPA Clearly Authorizes the President to Suspend the *De Minimis* Privilege

The first issue that the Panel ordered the parties to brief is how the Supreme Court's decision in *Learning Resources* "may apply to the Executive Orders at issue."  ECF No. 54. *Learning Resources* has little relevance here.  And even in light of *Learning Resources*, the President's suspension of the *de minimis* privilege is clearly a valid exercise of IEEPA.  Nor does IEEPA violate the nondelegation doctrine.

### A.    *Learning Resources* has limited relevance and does not control the outcome here.

In *Learning Resources*, the Supreme Court held that the phrase "regulate … importation" in IEEPA does not authorize the President to impose new additional duties or tariffs on imports. 146 S. Ct. at 637.  The Supreme Court made clear, however, that it did "not attempt to set forth the metes and bounds of the President's authority to 'regulate importation' under IEEPA."  *Id.* at 643 (alteration omitted).  That is because "[t]hat 'interpretive question' [wa]s 'not at issue' in th[e] case, and any answer would be 'plain dicta.'"  *Id.* at 644.  So the Supreme Court decided only "whether the power to 'regulate importation,' as granted to the President in IEEPA, embraces the power to impose tariffs" and only answered that it "does not."  *Id.* (alternation omitted).

The discussion of the major-questions doctrine in *Learning Resources* is not controlling or binding on lower courts.  Three justices of the majority concluded that the major-questions doctrine applied, while three justices in the majority did not join the major-questions analysis and would not have relied on the major-questions doctrine.  And the three dissenting justices concluded that the major-questions doctrine was inapplicable to IEEPA.  The Supreme Court's

major-questions analysis is thus not controlling or binding on lower courts.  *See Learning Res.*,

146 S. Ct. at 720 n.24 (Kavanaugh, J., dissenting); *Marks v. United States*, 430 U.S. 188, 193

(1977).

The only way the Supreme Court's decision in *Learning Resources* applies is that any

*new additional* duties or tariffs imposed under IEEPA are invalid.[1]  But whether the President

can impose new additional duties or tariffs is an entirely separate question from whether the

President has the authority under IEEPA to suspend the *de minimis* privilege.  That is because

suspending the *de minimis* privilege markedly differs from the imposition of new additional

tariffs at issue in *Learning Resources*.  Thus, the Supreme Court's decision does not control the

outcome here.

> **B.** **IEEPA authorizes the suspension of the *de minimis* privilege because it empowers the President to "nullify," "void," "prevent," or "prohibit" the "exercising" of "any … privilege with respect to … any property" and to "regulate," "prevent," or "prohibit" the "importation" of "any property."**

IEEPA provides the President with clear and precise authority to suspend the *de minimis*

privilege.  Specifically, "to deal with an unusual and extraordinary threat with respect to which a

national emergency has been declared," 50 U.S.C. § 1701(b), IEEPA specifies that

> the President may, under such regulations as he may prescribe, by means of instructions, licenses, or otherwise … investigate, block during the pendency of an investigation, *regulate*, direct and compel, *nullify, void, prevent or prohibit*, any acquisition, holding, withholding, use, transfer, withdrawal, transportation, *importation* or exportation of, or dealing in, or *exercising any* right, power, or *privilege with respect to*, or transactions involving, any property in which any foreign country or a national thereof has any interest by

---

[1] When the President initially suspended the *de minimis* privilege, the President also imposed new additional duties on these imports under IEEPA.  *See* China and Global *De Minimis* Orders. Under *Learning Resources*, those new additional duties are invalid.  But that is separate to whether ordinary duties collected after the suspension of the *de minimis* privilege are valid.  Any claims for refunds of the new additional duties are currently being handled separately by this Court.  *See Euro-Notions Florida, Inc. v. United States et al.*, Court No. 25-00595 (Ct. Int'l Trade).

>     any person, or with respect to *any property*, subject to the
>     jurisdiction of the United States.

50 U.S.C. § 1702(a)(1)(B) (emphases added).

IEEPA clearly authorizes the suspension of the *de minimis* privilege for at least two reasons.  And Axle's counterarguments are unpersuasive.

**1.**  Suspending a statutory privilege, such as the *de minimis* privilege, to deal with national emergencies, falls squarely within the President's power to "nullify, void, prevent or prohibit" "exercising any … privilege with respect to" "any property."  The basic legal meaning of these terms amply demonstrates this conclusion.

 "Nullify" means "[t]o make void; to render invalid," Black's Law Dictionary (12th ed. 2024); "void" means "[t]o render of no validity or effect; to annul," Black's Law Dictionary (12th  ed. 2024); "prevent" means "to keep from happening or existing," Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/prevent (last visited Apr. 7, 2026); and "prohibit" means "to forbid by authority," Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/prohibit (last visited Apr. 7, 2026).  These definitions have remained consistent since the enactment of IEEPA in 1977.  *See*, *e.g.*, Black's Law Dictionary (Rev. 4th ed. 1968) (defining "void" as "having no legal force or binding effect"; "prevent" as "[t]o hinder, frustrate, prohibit, impede, or preclude"; and "prohibit" as "[t]o forbid by law; to prevent").  All are variations of the same action: to legally foreclose.

The "exercising" of a "privilege" means broadly "[t]o make use of," Black's Law Dictionary (12th ed. 2024; Rev. 4th ed. 1968), "a right, exemption, or immunity granted as a particular benefit, advantage, or favor."  Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/privilege (last visited Apr. 7, 2026); *see also* Black's Law Dictionary (Rev. 4th ed. 1968) (defining "privilege" as "[a]n exceptional or extraordinary power or

exemption" and "[a] right, power, franchise, or immunity held by a person or class, against or beyond the course of the law."). Section 1321 describes the *de minimis* exemption in terms that fit precisely with that definition—as a "privilege" and an "exemption" from otherwise applicable tariffs. And even if the *de minimis* exemption itself were not specifically created as a privilege, it is well established that importing merchandise at all, let alone doing so free of duty, is a privilege. *See Int'l Custom Prods., Inc. v. United States*, 791 F.3d 1329, 1337 (Fed. Cir. 2015) ("As we noted, 'the Constitution does not provide a right to import merchandise under a particular classification or rate of duty,'…or even afford 'a protectable interest to engage in international trade.'") (quoting, respectively, *A Classic Time v. United States,* 123 F.3d 1475, 1476 (Fed. Cir. 1997), and *Am. Ass'n of Exporters & Importers–Textile & Apparel Grp. v. United States,* 751 F.2d 1239, 1250 (Fed. Cir. 1985)); *see also The Abby Dodge v. United States*, 223 U.S. 166, 176-77 (1912) ("[N]o one can be said to have a vested right to carry on foreign commerce with the United States.").

Taken together here, to "nullify, void, prevent or prohibit" "exercising any … privilege with respect to" "any property" means to legally foreclose someone from making use of a duty exemption with respect to imported merchandise. That is exactly what the President did when suspending the *de minimis* privilege, as IEEPA authorized him to do so.

**2.** IEEPA also authorizes the President to "regulate," "prevent," and "prohibit" "importation" of "any property in which any foreign country or a national thereof has any interest by any person, or with respect to any property, subject to the jurisdiction of the United States." 50 U.S.C. §1702(a)(1)(B). The suspension of the *de minimis* privilege is functionally equivalent to a quota/embargo or a regulation on the terms of importation. First, current regulations dictate that certain imports subject to a quota do not get the benefit of the *de minimis*

10

privilege.  *See* 19 C.F.R. § 10.153(g); U.S. Customs and Border Protection, *Test Concerning Entry of Section 321 Low-Value Shipments Through the Automated Commercial Environment (ACE) (Also Known as Entry Type 86); Republication With Modifications*, 89 Fed. Reg. 2630, 2631 (Jan. 16, 2024).  But no one would say that a quota imposed under IEEPA—which everyone agrees IEEPA authorizes—would be a revenue-raising measure because it would mean those products subject to the quota no longer get the benefit of the *de minimis* privilege.  Second, the President's action is effectively a qualified embargo on the importation of goods receiving the benefit of the *de minimis* privilege insofar as low-value imports are now foreclosed from entry *unless* the entries are filed under pre-existing formal or informal procedures, and estimated duties are deposited.  Yet no one disputes that the President has the authority to impose an embargo under IEEPA.  Indeed, the President merely prevented or prohibited importation through the previous relaxed special entry procedures unique to *de minimis* entries.  Put another way, the President regulated how low-value imports may be imported into the United States and did so in a way that under existing regulations, the importer could not take advantage of the *de minimis* privilege. IEEPA clearly authorizes that.

**3.**  Axle's arguments to the contrary are unpersuasive.

***First,*** although Axle concedes that IEEPA empowers the President to nullify state laws and common-law rights, Axle argues that IEEPA does not expressly grant the President the power to rescind or suspend a federal statute.  ECF No. 53 at 17.  Axle also cites legislative history to propose an atextual and artificially narrow reading of "nullify" and "void," claiming that those terms merely permit the government to "'nullify' or 'void' the common-law 'rights' or 'privileges' that property owners otherwise might assert to defend their property from U.S. government seizure and use."  ECF No. 53 at 20.

11

The text of IEEPA in no way suggests that the terms "nullify" and "void" apply only to "common-law 'rights' or 'privileges.'" *Id.* To the contrary, IEEPA's text specifies that it applies to "*any* right, power, or privilege with respect to" covered property, not just some unspecified subset of rights, powers, or privileges, thus expressly foreclosing Axle's reading. 50 U.S.C. § 1702(a)(1)(B) (emphasis added). Indeed, IEEPA expressly permits the President to nullify or void the exercise of "*any* privilege" with respect to property, or to prevent or prohibit an importer from exercising that privilege, without regard to whether that privilege is statutorily derived or otherwise. 50 U.S.C. §1702(a)(1)(B) (emphasis added). Authority to "nullify" or "void" the exercise of a privilege, or to "prevent or prohibit" an importer from exercising such a privilege, must be given its plain meaning and application. Thus, the operative terms of IEEPA, as Congress sought fit to include, authorize the President to suspend the *de minimis* privilege.

Regardless, the President does not rescind or suspend a federal statute when he prohibits or prevents a particular method of importing into the United States or regulates how the products must be imported into the United States. So Axle's argument does not show that IEEPA does not authorize the suspension of the *de minimis* privilege.

**Second**, Axle contends that no privilege is *exercised* with respect to property when importing goods that qualify for the *de minimis* exemption. ECF No. 53 at 19. But Axle's own conduct undercuts this claim. Before the suspension, Axle and other importers enjoyed the privilege of duty-free treatment for their low-value imports every time they arranged for their merchandise to be entered using the special entry procedures permitted only for eligible merchandise qualifying for the privilege. *See* 19 C.F.R. § 10.151 (requiring merchandise claiming the benefit of the *de minimis* exemption to be entered under the special informal entry procedures in 19 C.F.R. part 143 subpart C, or §§ 128.24, 145.31, 148.12, or 148.62, as

12

applicable).  For example, before the *de minimis* privilege was suspended, 19 C.F.R §

143.23(j)(3), with certain exceptions, set forth the regulatory special entry procedure for

merchandise qualifying for the exemption in accordance with 19 C.F.R. § 10.151.  But importers

were not required to claim the *de minimis* privilege by using this special entry procedure, and

nothing prevented them from choosing to pay duties on their low-value imports by using the

regular formal or informal entry procedures for dutiable merchandise, and many importers

including Axle in fact did so.  Campbell Decl. ¶8.  Thus, Axle and other importers exercised the

privilege of the *de minimis* privilege when they chose to use the special entry procedures

specifically for merchandise claiming this privilege and not by filing (or hiring a customs broker

to file on their behalf) regular formal or informal entries.

　　　　Moreover, the change in Axle's own conduct before and after suspension of the *de*

*minimis* privilege illustrates that an importer has a choice whether and how to exercise the

privilege of making *de minimis* entries.  Previously, Axle chose to structure its imports to

exercise the privilege of *de minimis* treatment.  In particular, Axle imported Chinese-origin auto

parts through the Port of Long Beach, California, not as consumption entries, but as goods to be

transported in-bond to another U.S. port on the southern border for export to Mexico, where the

parts would be repackaged and shipped from Axle's Mexico facility in individual boxes

addressed to Axle's customers in the United States, all without the payment of duties.  These

Mexican-based shipments only qualified for the *de minimis* privilege because they were

"imported" not by Axle, but rather by each of Axle's individual customers.  It was only because

the individual consignee (Axle's customer) is treated as the "one person on one day" importer,

13

19 U.S.C. § 1321(a)(2)(C), that the "release from manifest" shipments from Axle's Mexican warehouse could qualify for the *de minimis* privilege at all.[2]

Accordingly, when Axle structured each import transaction so that a purchase order of merchandise imported from overseas would fall within the *de minimis* privilege, it exercised the privilege of claiming duty-free treatment. Axle could have made its entries in a different manner that would not have claimed duty-free *de minimis* treatment. But Axle chose specifically to export to Mexico and re-import to its U.S. customers those goods valued at $800 or less—an exercise of the *de minimis* privilege with respect to its property—as that was the means it sought to make its business more cost-effective and competitive. Axle would thus be hard-pressed to argue that it was a mere passive participant in receiving the benefits of the *de minimis* privilege when it made careful and intentional choices to enable it to exercise the privilege of *de minimis* entry for as many entries as possible.

The complexity of how Axle had structured its business to take advantage of the *de minimis* privilege underscores the difficulty in providing the refunds it seeks in its Amended Complaint should judgment be entered in its favor. *See* ECF No. 52-1 at ¶¶ 85, 83, 98, Prayer for Relief (e)-(g). After all, to the extent that Axle's business model involves claiming the *de minimis* duty-free privilege on behalf of its customers who are the ultimate purchasers of the auto

---

[2] 19 C.F.R. § 143.23(j)(3) provides, as pertinent here, that "a shipment of merchandise that qualifies for informal entry under 19 U.S.C. 1498 may be entered … by presenting the bill of lading or a manifest listing each bill of lading when … [t]he value of the shipment does not exceed $800 and the shipment satisfies the requirements in § 10.151." These special informal entry procedures for shipments that qualify for the *de minimis* privilege are known as "release from manifest." *See* 89 Fed. Reg. at 2631. Unlike imports subject to the formal entry process— *see* 19 U.S.C. § 1484; 19 C.F.R. Part 142—or the informal entry process for shipments not exceeding $2,500 in value but not eligible for the *de minimis* privilege—*see* 19 U.S.C. § 1498; 19 C.F.R. §§ 143.23; 143.26(a)—*de minimis* shipments are released from CBP custody based solely on the information provided on the manifest or bill of lading.

parts shipped from Axle's Mexican facility, the benefit of the privilege is to that ultimate purchaser, not to Axle. In other words, it was Axle's customers who did not pay duties on any *de minimis* release from manifest entries, not Axle. At best, Axle would be able to receive refunds, if ordered, only on any *de minimis* entries that it imported directly—that is, importations valued at less than $800 per day for which Axle itself was listed as the owner, purchaser or consignee claiming the *de minimis* privilege. And even then, Axle would only be able to claim the duty exemption up to the maximum daily value of $800 for its entire daily imports, which generally far exceed $800 per day. Campbell Decl. ¶10.

**Third,** Axle incorrectly maintains that "[t]here is no practical difference between imposing a new tariff and rescinding an existing tariff exemption; both subject goods like Detroit Axle's to duties not authorized by Congress." ECF No. 53 at 16. Not so. Suspending the *de minimis* privilege imposes no new duties. It merely renders goods valued at $800 or less subject to the same duties that would apply to the same goods if they were valued at more than $800— duties Congress imposed or whose imposition Congress otherwise authorized. That raises no concerns whatsoever about "unbounded tariffs," ECF No. 53 at 2, or an unconstitutional delegation, *id.* at 22-23. Again, exercising the power to "nullify" or "void" the exercise of a privilege, or to "prevent or prohibit" importers from exercising a privilege, by suspending the *de minimis* privilege merely subjects covered goods to the tariffs that would otherwise apply to them. Suspending the privilege curtails revenue loss on *de minimis* entries, but in any event, the suspension is first and foremost the mechanism deployed by the President under the authority conferred to him by IEEPA to prevent clandestine fentanyl shipments in low-value goods and to

15

rectify trade deficits (and the consequences of those deficits), two types of national emergencies that the President declared and then addressed in the challenged EOs.[3]

To that point, before the suspension of the *de minimis* exemption, smugglers of illicit substances, such as fentanyl, had to clear few administrative hurdles when entering low-value goods under the lax "release from manifest" regime. But suspending the *de minimis* privilege inserts multiple layers of friction when entering low-value goods (*e.g.*, the deposit and collection of estimated duties; the use of established formal or informal entry procedures; submission of additional entry data), which serves to both dissuade would-be smugglers and to assist CBP in detecting and seizing dangerous and prohibited items.

CBP data clearly exhibits that "[t]he risks of evasion, deception, and illicit-drug importation are particularly high for low-value articles that have been eligible for duty-free *de minimis* treatment," which the challenged EOs sought to address by suspending the *de minimis* exemption. EO 14324, 90 Fed. Reg. at 37,777. The chart below provides a breakdown of the type and number of seizures by postal and non-postal *de minimis* entries and formal (ET01) and informal (ET11) entries for fiscal year 2024 (FY 2024), the fiscal year *before* the *de* minimis privilege suspension. The data plainly reveals vastly higher seizures per million entries for postal *de minimis* entries, in particular illicit narcotics like fentanyl, than for all other entry types. Campbell Decl. ¶4.

---

[3] The quota/embargo context further underscores how suspending the *de minimis* privilege is not an imposition of tariffs. For example, current regulations dictate that imports subject to a quota do not get the benefit of the *de minimis* privilege. 19 C.F.R. § 10.153(g); 89 Fed. Reg. at 2631. But no one would say that a quota imposed under IEEPA—which everyone agrees IEEPA authorizes—would be a revenue-raising tariff measure because it would mean those products subject to the quota no longer get the benefit of the *de minimis* privilege.

**Seizures per Million Entries, FY 2024**

| Seizure Type | Postal *de minimis* | Non-Postal *de minimis* | ET11 | ET01 |
|---|---|---|---|---|
| Health and safety | 41.8 | 7.8 | 29.8 | 15.5 |
| Counterfeit goods | 91.8 | 19.3 | 18.3 | 23.2 |
| Narcotics | 277.8 | 14.5 | 15.8 | 2.6 |
| Prohibited items | 147.6 | 5.7 | 20.4 | 25.0 |
| **Total** | **558.9** | **47.3** | **84.3** | **66.3** |

ET01 = entry type 01 for formal consumption entries not subject to quota, visa or antidumping/countervailing duties (AD/CVD); ET11 = entry type 11 for informal entries not subject to quota, visa or AD/CVD

Consequently, the suspension of the *de minimis* privilege was unequivocally needed to deal with the emergency of clandestine fentanyl shipments in low-value goods.

And the data shows that the suspension of the *de minimis* privilege has been effective, as evidenced by the increase in low-value seizures after the *de minimis* privilege was suspended. The suspension thus enhanced CBP's ability to better target and enforce the customs and trade laws of the United States, which now required low-value shipments to use regular dutiable entry procedures. Indeed, CBP's data shows that between May 2, 2025, and September 30, 2025—a five-month period after the *de minimis* privilege was suspended—CBP seized over 66,000 low-value shipments that would have previously qualified for *de minimis* treatment, as compared to over 82,000 *de minimis* seizures for the entire prior fiscal year. Campbell Decl. ¶5. That is, during these five months while the *de minimis* privilege was suspended, CBP effectuated more *de minimis* seizures than were effectuated during three quarters of the entire prior fiscal year. *Id*. CBP attributes the increase in seizures since the suspension of the *de minimis* privilege to the additional data now required for low-value shipments. *Id*.

Regarding the trade-deficit-related emergency, for at least the last five fiscal years, the majority of *de minimis* shipments have originated from China. Campbell Decl. ¶6. In FY 2024, 76% of all *de minimis* shipments originated from China. *Id*. And China sets its *de minimis*

17

threshold for low-value goods at approximately $10, compared to the threshold of $800 in the United States, one of the highest in the world. *See* De Minimis Value – Express Shipment Exemptions, Department of Commerce, International Trade Administration, https://www.trade.gov/de-minimis-value (last visited April 7, 2026) (referring to Global Express Ass'n, *De Minimis Thresholds*, https://global-express.org/index.php?id=271&act=101&profile_id=-1&countries%5B%5D=-2&search_terms=&question-filter=&qid_34=1&qid_34_optid=1&qid_35=1&qid_36=1&qid_92=1 (last visited April 7, 2026)). Suspending the *de minimis* privilege has therefore leveled the playing field and dealt with the imbalance in how low-value shipments are treated globally and created leverage in negotiating the resolution of the declared emergency.

**Fourth**, Axle suggests that the suspension of the *de minimis* privilege triggers the major-questions doctrine because it is akin to "impos[ing] tariffs of unlimited amount and duration." *Learning Resources*, 146 S. Ct. at 638. But the major-questions doctrine does not apply here, and in any event, is satisfied. For starters, Axle is wrong that the suspension of the *de minimis* privilege is akin to imposing tariffs of unlimited amount and duration. Hardly an exercise of extraordinary power, the *de minimis* suspension applies only to those goods valued at $800 or less, which would be dutiable but for a statutorily authorized regulatory exemption intended "to avoid expense and inconvenience to the Government disproportionate to the amount of revenue that would otherwise be collected." 19 U.S.C. § 1321(a). And the suspension is in effect under IEEPA only until the exemption is fully repealed, effective July 1, 2027, as per the One Big Beautiful Bill Act of 2025, Pub. L. No. 119-21, 139 Stat. 72 (July 4, 2025) (OBBB), if not sooner by regulatory action, pursuant to the authority in 19 U.S.C. § 1321(b) to prescribe

18

exceptions to the exemption.  By its nature and effect, the suspension is inherently more limited in scope, application, and duration than the tariffs imposed and challenged in *Learning Resources*.  *See Learning Resources*, 146 S. Ct. at 676 (Kagan, J., concurring) ("The President has the ability to regulate, but not to impose taxes on, imports.").

Nor does the major-questions doctrine plausibly apply to the disputed and time-limited legal authority here.  As an initial matter, *Learning Resources*' discussion of the major-questions doctrine is not controlling or binding.  *See Learning Res.*, 146 S. Ct. at 720 n.24 (Kavanaugh, J., dissenting); *Marks*, 430 U.S. at 193.  Instead, it is still binding Federal Circuit precedent to "broadly construe[]" "statutes granting the President authority to act in matters touching on foreign affairs."  *B-W. Imports, Inc. v. United States*, 75 F.3d 633, 636 (Fed. Cir. 1996); *see, e.g.*, *Humane Soc. of U.S. v. Clinton*, 236 F.3d 1320, 1329 (Fed. Cir. 2001) ("Congress does not set out to tie the President's hands" in matters where "international relations are concerned," and to do so, it "must say so in clear language."); *Am. Ass'n of Exporters & Importers-Textile & Apparel Grp. v. United States*, 751 F.2d 1239, 1247 (Fed. Cir. 1985) ("[C]ongressional delegations [to the President] are normally given a broad construction" in the "international field."); *Florsheim Shoe Co., Div. of Interco v. United States*, 744 F.2d 787, 793 (Fed. Cir. 1984) (Section 504(a) of the Trade Act of 1974 "is intimately involved with foreign affairs, an area in which congressional authorizations of presidential power should be given a broad construction and not hemmed in or cabined, cribbed, confined by anxious judicial blinders." (cleaned up)).  Indeed, the major-questions doctrine does not apply in the foreign-policy context, "because the canon does not reflect ordinary congressional intent in those areas" where Congress and the President enjoy concurrent constitutional authority.  *FCC v. Consumers' Research*, 145 S. Ct. 2482, 2516 (2025) (Kavanaugh, J., concurring).

Plus, Axle's insistence on the major-questions doctrine's application here hinges on the incorrect premise that the suspension of the *de minimis* privilege is an exercise of the "'core congressional power of the purse.'" ECF No. 53 at 8. It is not, so the brunt of the three justices' discussion of the doctrine does not apply.

Moreover, section 1321 does not mandate the existence of the *de minimis* privilege. Instead, it "authorize[s]" the Secretary of the Treasury to create a *de minimis* privilege by regulation, subject to any "exceptions" he finds to be consistent with the statute or necessary to "protect the revenue or to prevent unlawful importations." 19 U.S.C. § 1321(a), (b); *see also* ECF Nos. 27, 28 at 20, 28-32. The question whether the Secretary must take action under § 1321, or whether the President may also act under IEEPA, in no way resembles anything determined to be a major question by the Supreme Court. Whether in § 1321 or in IEEPA, Congress plainly permitted actions just like this one. For another thing, the disputed question is salient for little more than a year from now; the President's ability under IEEPA to suspend the *de minimis* privilege before the effective date of Congress's repeal of the exemption has a sharply time-limited legal and practical lifespan given that repeal.

Again, suspending the *de minimis* privilege can in no way be construed as imposing any new tariffs under IEEPA. Rather, the suspension merely subjects goods valued at $800 or less to the same congressionally imposed tariffs as any similar good valued at more than $800, which has the second-order effect of preventing revenue loss, not of raising revenue. This fact alone is fatal to Count III of Axle's Amended Complaint, which involves a challenge to the President's authority under IEEPA to *impose* tariffs (which the Supreme Court held invalid). The act of suspending the *de minimis* privilege is functionally equivalent to "blocking imports, for example, or prohibiting transactions," *Learning Resources*, 146 S. Ct. at 643—Presidential actions that the

20

Supreme Court acknowledged IEEPA permits—insofar as it prohibits the importation of goods valued at $800 or less unless the required estimated duties are first deposited and the required entry data is provided.  Indeed, Presidents have often used IEEPA to prohibit, restrict, or block certain imports.  *See*, *e.g.*, EO 14068, Prohibiting Certain Imports, Exports, and New Investment With Respect to Continued Russian Federation Aggression, 87 Fed. Reg. 14,381 (Mar. 11, 2022); EO 13651, Prohibiting Certain Imports of Burmese Jadeite and Rubies, 78 Fed. Reg. 48,793 (Aug. 6, 2013); EO 13348, Blocking Property of Certain Persons and Prohibiting the Importation of Certain Goods from Liberia, 69 Fed. Reg. 44,885 (July 22, 2004); EO 13194, Prohibiting the Importation of Rough Diamonds From Sierra Leone, 66 Fed. Reg. 7389 (Jan. 18, 2001).

In any event, Congress spoke clearly when it delegated to the Executive the power to modify or reduce the *de minimis* privilege:

> Reduction or modification of exemption.  The Secretary of the Treasury is authorized by regulations to prescribe exceptions to any exemption provided for in subsection (a) whenever he finds that such action is consistent with the purpose of subsection (a) or is necessary for any reason to protect the revenue or to prevent unlawful importations.

19 U.S.C. § 1321(b).  Although section 1321(b) contemplates agency rulemaking to reduce or modify the exemption, IEEPA's operative language specifically provides the President with the independent means to void or nullify the duty-free privilege, and moreover, section 1321's delegation to Treasury (redelegated to the Secretary of Homeland Security) is clear indication that Congress provided the Executive with the power to take action with respect to the *de minimis* privilege "for any reason to protect the revenue or to prevent unlawful importations."

Regardless, the major-question doctrine's clear-authorization standard is easily satisfied here.  IEEPA clearly authorizes the President to suspend the *de minimis* privilege.  *See Biden v.*

*Nebraska*, 600 U.S. 477, 511 (2023) (Barrett, J., concurring) (unlike true "clear-statement" rules, major-questions doctrine does not require "an 'unequivocal declaration' from Congress authorizing the precise agency action under review"); *West Virginia*, 597 U.S. at 723 ("something more than a merely *plausible* textual basis for the agency action is necessary" (emphasis added)).

**Finally,** Congress's delegation to the President in IEEPA does not violate the nondelegation principle. "The nondelegation doctrine bars Congress from transferring its legislative power to another branch of Government" without supplying "an intelligible principle to guide the delegee's use of discretion." *Gundy v. United States*, 588 U.S. 128, 132, 135 (2019). That standard is "not demanding." *Id.* at 146. "Only twice in this country's history (and that in a single year)" has the Supreme Court "found a delegation excessive." *Id.* Courts, including the Supreme Court, have "over and over upheld even very broad delegations." *Id.* It is thus unsurprising that circuit courts have uniformly rejected nondelegation challenges to the President's IEEPA powers. *See, e.g.*, *United States v. Shih*, 73 F.4th 1077, 1092 (9th Cir. 2023) (collecting cases). This Court should similarly reject Axle's nondelegation challenge. *See* ECF 28 at 25-28.

To start, "in the national security and foreign policy realms, the nondelegation doctrine ... appropriately has played an even more limited role in light of the President's constitutional responsibility and independent Article II authority." *Consumers' Rsch.*, 145 S. Ct. at 2516 (Kavanaugh, J., concurring) (citations omitted); *see United States v. Curtiss-Wright Export Corp.*, 299 U.S. 304, 320 (1936) (greater delegation permissible in areas implicating "the very delicate, plenary and exclusive power of the President as the sole organ of the federal government in the field of international relations"). Relevant here, Article II gives the President the "lead role in foreign policy." *American Insurance Association v. Garamendi*, 539 U.S. 396, 415 (2003) (cleaned up). When Congress delegates "authority over matters of foreign affairs,"

22

therefore, it "must of necessity paint with a brush broader than that it customarily wields in domestic areas." *Zemel v. Rusk*, 381 U.S. 1, 17 (1965). Accordingly, Congress may, without running afoul of the Constitution, "invest the President with large discretion in matters arising out of the execution of statutes relating to trade and commerce with other nations." *Marshall Field & Co. v. Clark*, 143 U.S. 649, 691 (1892).

Even if the domestic version of the nondelegation doctrine were applicable, IEEPA would easily pass muster. Congress at most "commit[ted] something to the discretion" of the Executive, *Wayman v. Southard*, 10 Wheat. 1, 46 (1825), which is permissible so long as Congress sets forth "an intelligible principle to which the person or body authorized to [act] is directed to conform," *J.W. Hampton*, 276 U.S. at 409. Congress must delineate both "'the general policy'" and "'the boundaries of [the] delegated authority,'" so that "both 'the courts and the public'" can "'ascertain whether the [executive]' has followed the law." *Consumers' Research*, 145 S. Ct. at 2497 (citations omitted).

IEEPA satisfies those standards. It prescribes a general policy for Presidents to pursue: "to deal with any unusual and extraordinary [foreign] threat … to the national security, foreign policy, or economy of the United States" during a declared "national emergency" by "nullify[ing]," "void[ing]," "prevent[ing]," or "prohibit[ing]" "exercising any … privilege" with respect to property and "regulat[ing] … importation" of certain property, among other options. 50 U.S.C. §§1701(a), 1702(a)(1)(B). IEEPA also erects sufficient boundaries: the President may exercise his authorities only "to deal with an unusual and extraordinary threat with respect to which a national emergency has been declared," and may not exercise those authorities to "regulate or prohibit, directly or indirectly," an enumerated list of items, such as "informational materials." *Id.* §§1701(b), 1702(b). In addition, national emergencies have a one-year time limit

23

and other boundaries.  *Id.* §1622.  Congress itself extensively oversees the President's exercise of authority in this area.  *Id.* §§1622, 1641, 1703.

Axle argues that "the President's asserted authority under IEEPA to 'practical[ly] … repeal[]' statutory tariff exemptions is tantamount to the line-item veto that the Supreme Court held unconstitutional in *Clinton*: Both undermine the Constitution's finely wrought lawmaking procedures."  ECF No. 53 at 25 (citing *Clinton v. City of New York*, 524 U.S. 417 (1998)).  But the Line Item Veto Act was held to be an impermissible violation of the Presentment Clause in the normal course of passing and then vetoing or executing acts of Congress, whereas IEEPA specifically authorizes the President to void a privilege, whether that privilege is set forth in another law or not, *not* in the normal course, but in times of declared national emergencies in order to deal with such emergencies.[4]  Axle's offhanded presentation of this argument belies that it would take a wrecking ball to emergency powers far beyond IEEPA, which commonly permit the President or another executive branch decisionmaker to suspend the operation of a statute. Take just one example: Key emergency statutes permit the Secretary of Health and Human Services to suspend the statutory and regulatory requirements for approval of certain medical products in an emergency, permitting emergency use of an anthrax vaccine in 2005 and emergency use of vaccines for COVID-19.  *See* 70 Fed. Reg. 5,450 (Feb. 2, 2005) (citing 21 U.S.C. § 360bbb–3(b)(1)(B)); 86 Fed. Reg. 5,200 (Jan. 19, 2021) (same).  Axle's theory would upend that statute and many other important statutes like it.

---

[4]  Likewise, as explained in our prior briefing, ECF No. 27, 28 at 33-34, and contrary to Axle's arguments otherwise, ECF No. 53 at 23-24, IEEPA is the more specific grant of power, as it authorizes the President to void a privilege only in the event of a national emergency, as opposed to 19 U.S.C. § 1321, which generally applies to low-value imports in regular circumstances.

Notably, the Supreme Court in *Clinton* took pains to distinguish its holding from the Court's much earlier holding in *Marshall Field & Co. v. Clark*, 143 U.S. 649 (1892), a case with an historical echo to the present litigation.  In *Marshall Field*, the Supreme Court rejected a constitutional challenge to the Tariff Act of 1890, which authorized the President to "suspend, by proclamation to that effect, the provisions of the act relating to the free introduction of sugar, molasses, coffee, tea, and hides … for such time as he shall deem just" if the President determined that other countries were imposing "reciprocally unequal and unreasonable" duties on such goods.  *Id*. at 680-81 (quoting Act of Oct. 1, 1890, § 3, 26 Stat. 612).  In so deciding, the Supreme Court looked to its precedent and reasoned that:

> in the judgment of the legislative branch of the government, it is often desirable, if not essential, for the protection of the interests of our people against the unfriendly or discriminating regulations established by foreign governments, in the interest of their people, to invest the president with large discretion in matters arising out of the execution of statutes relating to trade and commerce with other nations.

*Id*. at 691.  These same considerations apply with full force here: as in 1890, so too in the present day, the President is empowered by Congress to suspend duty-free provisions for "such time as he shall deem just" to deal with "reciprocally unequal and unreasonable" trade practices.

## II.     The OBBB Has No Impact on the Panel's Interpretation of IEEPA

The second issue that the Panel ordered the parties to brief is "whether the Congressionally specified effective date for termination of the de minimis exemption, One Big Beautiful Bill Act of 2025, Pub. L. No. 119-21, 139 Stat. 72 (to be codified at 19 U.S.C. § 1321(c)), has any impact on the Panels interpretation of IEEPA in relation to the Executive Orders at issue."  ECF No. 54. The OBBB has no impact on the interpretive question here, but it does undermine Axle's request for injunctive relief.

The OBBB's repeal of the *de minimis* privilege does not affect the principal statutory question whether IEEPA authorizes the President to suspend the privilege. Nor does the effective date of the OBBB repeal somehow operate to prevent the exercise of existing authority regarding the privilege. The effective date establishes the date on which the text of § 1321(c) is amended to eliminate the *de minimis* privilege; the amendment does not have legal effect before that date, so it cannot affect the merits of the legal questions before the Court. *See Landgraf v. USI Film Prods.*, 511 U.S. 244, 257 (1994) ("A statement that a statute will become effective on a certain date does not even arguably suggest that it has any application to conduct that occurred at an earlier date.").

The repeal of the *de minimis* privilege does, however, affect the practical realities and the equities. Given the repeal, Axle's arguments that it has had to change the way it imports and has lost business opportunities amount to the complaint that it is unable to wring a few more months of higher profits out of the previous system before transitioning to the congressionally mandated post-*de minimis* world that will arrive in July of next year regardless of how this Court rules. *See* ECF No. 53 at 28-30.

## III.    Axle's Challenge to CBP's Implementation of the President's Action Fails

The third issue that the Panel ordered the parties to brief is "the implementation of the special procedures for collection of duties as specified in the Executive Orders at issue." ECF No. 54. Those details are immaterial here, as Axle does not challenge the specific procedures but only the fact that CBP ministerially implemented the President's suspension of the *de minimis* privilege under the President's own statutory authority. In any event, CBP's procedures are reasonable.

26

**A.**     **CBP's implementation of the suspension of the *de minimis* privilege is not reviewable under the APA and in any event, is not arbitrary or capricious.**

As an initial matter, the specific procedures for collection are not at issue in this case. In its APA claim, Axle does not challenge any specific procedures specified in the challenged Executive Orders or issued by CBP to implement the President's orders. Instead, Axle contests only CBP's implementation of the President's suspension of the *de minimis* privilege. In other words, Axle does not contest *how* CBP implemented the President's decision to suspend the privilege but contests the fact that CBP implemented the President's decision under the President's own statutory authority to suspend the privilege.

That narrow challenge fails for two independent reasons. *See also, e.g.*, ECF 28 at 14-19. **First,** CBP's implementation of the President's decision to suspend the *de minimis* privilege is unreviewable under the APA. Indeed, Axle tries to challenge the President's decision to suspend the *de minimis* privilege under the APA by pointing to CBP's ministerial implementation of the President's action issued under the President's own statutory authority. Axle's challenge to CBP's implementation is thus a challenge to the *de minimis* EOs themselves.

But decisions in EOs are not reviewable under the APA. The APA provides for judicial review of "final agency action for which there is no other adequate remedy in a court." 5 U.S.C. §704. The President is not an "agency" under the APA. *Id.* §701(b)(1); *see Franklin v. Massachusetts*, 505 U.S. 788, 800-01 (1992). So the President's actions "are not subject to [the APA's] requirements" and "are not reviewable" under the APA. *Franklin*, 505 U.S. at 801.

Axle cannot evade that conclusion by purporting to challenge ministerial agency actions taken under the *de minimis* EOs. The suspension of the *de minimis* privilege is "the outcome of the President's discretionary decisions, not agency action." *HMTX Indus. LLC v. United States*, 156 F.4th 1236, 1249 (Fed. Cir. 2025). This is not a case where the challenged agency action is

the exercise of discretion "delegated to an agency head but directed by the President."  Elena Kagan, Presidential Administration, 114 Harv. L. Rev. 2245, 2351 (2001).  Rather, this is a case where the exercise of discretion is "committed to … the President" himself, and the challenged agency action just ministerially carries out the President's decision.  *Id.*; *see HMTX Indus.*, 156 F.4th at 1250 ("We affirm the trial court's well-reasoned conclusion that actions involving discretionary authority delegated by Congress to the President are distinct from those involving authority delegated by Congress to an agency." (cleaned up)).

Because the President is not an "agency" under the APA, 5 U.S.C. §705, the President's exercise of discretion committed to him is "not subject to [the APA's] requirements," and the action is "not reviewable" under the APA.  *Franklin*, 505 U.S. at 801; *see, e.g.*, *Detroit Int'l Bridge Co. v. Gov't of Canada*, 189 F. Supp. 3d 85, 100 (D.D.C. 2016) ("an agency's action on behalf of the President, involving discretionary authority committed to the President, is 'presidential' and unreviewable under the APA").  Axle cannot force the APA's strictures on the President's discretionary decision under his own delegated authority to suspend the *de minimis* privilege by pointing to CBP's ministerial implementation that overlaps with the President's decision.  *See, e.g.*, *USP Holdings, Inc. v. United States*, 36 F.4th 1359, 1369 (Fed. Cir. 2022) (concluding for section 232 that the Commerce "Secretary's threat determination is not reviewable under the APA arbitrary and capricious standard" because the determination overlaps with the President's determination made via the President's delegated authority).

It is no answer to say, as Axle has done before, that *Franklin* is limited to "cases in which the President has final constitutional or statutory responsibility for the final step necessary for the agency action directly to affect the parties."  ECF 29 at 17 (cleaned up).  The dispositive point is that presidential actions are unreviewable when the President's "duties [we]re not merely

28

ceremonial or ministerial," *Franklin*, 505 U.S. at 800, but dictated the substance of the challenged agency action. Here, the President made the critical determination that the *de minimis* privilege should be suspended; CBP had no authority to disagree. *See also, e.g.*, ECF 28 at 18-19. To find reviewability under the APA here would mean that every exercise of IEEPA action by the President will always result in an APA arbitrary-and-capricious challenge to the President's own decisions. That cannot be right.

**Second**, even if CBP's ministerial implementation is reviewable under the APA, Axle is wrong that CBP acted arbitrarily and capriciously when it implemented the suspension of the *de minimis* privilege. Indeed, CBP cannot act arbitrarily or capriciously by implementing the President's policy decision in exercise of statutory authority delegated to the President by Congress. Just as an agency does not "act[] arbitrarily and capriciously by declining to depart from Presidential rules that Congress expressly required it to follow," *Trump v. Orr*, 146 S. Ct. 44, 46 (2025), so too does an agency not act arbitrarily and capriciously by declining to depart from the President's orders of his own authority, *see, e.g.*, *Bradford v. U.S. Dep't of Labor*, 101 F.4th 707, 731 (10th Cir. 2024) (agency action "could not have been an arbitrary and capricious exercise of agency discretion because the agency had no discretion to act otherwise"); *cf. HMTX Indus.*, 156 F.4th at 1250 ("We affirm the trial court's well-reasoned conclusion that actions involving discretionary authority delegated by Congress to the President are distinct from those involving authority delegated by Congress to an agency." (cleaned up)).[5]

---

[5]  If anything, it could be a violation of the APA for CBP to not ministerially implement the President's decision to suspend the *de minimis* privilege. *See* 5 U.S.C. § 706(2)(A) ("not [be] in accordance with law"). And to the extent Axle attempts to broaden its APA challenge, the arguments in this section apply equally to any ministerial implementation of a decision the President made in the *de minimis* EOs.

29

Moreover, it is clear that Axle is challenging only the fact that CBP ministerially followed the President's suspension of the *de minimis* privilege under the President's own statutory authority. For example, Axle complains that CBP "failed to consider the serious reliance interests that the *de minimis* [privilege] created, the significant costs to U.S. consumers, and businesses of eliminating the [privilege], and obvious, reasonable alternatives, like inspecting low-value packages without levying tariffs on them." ECF 53 at 25-26. But each of those matters are relevant only to the decision to suspend the *de minimis* privilege—a decision made by *the President* pursuant to *the President's* own statutory authority. And Presidents are neither agencies nor required to provide detailed reasons for their decisions. *Cf. Trump v. Hawaii*, 585 U.S. 667, 685-86 (2018); *Franklin*, 505 U.S. at 827 (Scalia, J., concurring in part and in the judgment).

Axle also asserts that "[t]he government has had ample time in which it could have undertaken notice-and-comment rulemaking" to "rescind the *de minimis* [privilege]." ECF 53 at 26. But even if true, that assertion is irrelevant: The APA's notice-and-comment requirement does not apply to the President. Nor does it apply to an agency's implementation of the President's action issued pursuant to IEEPA, especially in the trade and national-security context, when the United States is in ongoing negotiations with countries on the emergencies, and when delay via notice-and-comment would result in undesirable international consequences, such as incentivizing dumping products into the United States. *See, e.g.*, ECF 28 at 32-33; 5 U.S.C. §553(a)(1) ("This section applies, according to the provisions thereof, except to the extent that there is involved … a military or foreign affairs function of the United States"); *id.* §553(b) ("good cause"); *United States v. Quinn*, 401 F. Supp. 2d 80, 94, fn. 12 (D.D.C. 2005) ("Contrary to the assertions of defense counsel, IEEPA-based regulations are likely to be exempt from the

30

notice-and-comment requirements of the Administrative Procedure Act as relating to the 'foreign affairs function of the United States,' within the meaning of 5 U.S.C. § 553(a)(1).").

**B.**  **The implementing procedures for collecting duties pursuant to the challenged Executive Orders are irrelevant here but in any event, are reasonable.**

Again, the specific procedures to implement the President's suspension of the *de minimis* privilege are irrelevant here because Axle does not challenge anything that did not merely ministerially implement the President's decisions. In any event, Defendants explain the reasonable procedures that CBP implemented.

The challenged Executive Orders specified special procedures for the collection of duties on (1) shipments other than those sent to the United States through the international postal network, that would otherwise qualify for the *de minimis* privilege; and (2) shipments sent through the international postal network that would otherwise qualify for the *de minimis* privilege, until the effective date for the new entry process for postal shipments that CBP was directed to establish and publish in the *Federal Register*. EO 14324 § 2(a) and 2(b), respectively, as modified by EO 14388 § 2. Again, Axle does not challenge these specific procedures, *i.e.*, Axle does not challenge how CBP implemented the President's suspension of the *de minimis* privilege. Nor does Axle claim to have made any importations through the international postal network that would otherwise qualify for the *de minimis* privilege.

Specifically, for shipments other than those sent to the United States through the international postal network, the challenged Executive Orders ordered that, apart from articles encompassed by 50 U.S.C. § 1702(b), shipments that would otherwise qualify for the *de minimis* privilege shall be entered by a party qualified to make entry under an appropriate entry type in the Automated Commercial Environment, subject to all applicable duties, taxes, fees, exactions,

31

and charges, with payment in accordance with applicable entry and payment procedures.  *See* 90 Fed. Reg. at 14,899-900; 90 Fed. Reg. at 37,777; 91 Fed. Reg. at 9,434.

Thus, in accordance with these EOs, non-postal shipments that previously qualified for *de minimis* clearance were redirected to existing clearance mechanisms, mainly, the existing informal entry process (generally for merchandise valued below $2,500) and existing formal entry process (generally for merchandise valued at or over $2,500).  *See* 19 C.F.R. Parts 141, 142, & 143; *see also Notice of Implementation of the President's Executive Order 14324, Suspending Duty-Free De Minimis Treatment for All Countries*, 90 Fed. Reg. 42,418, 42,420 (Sep. 2, 2025).  Accordingly, no special procedures for the collection of duties were needed for non-postal shipments that may have previously qualified for the *de minimis* privilege because such shipments are now merely required to use the same entry and duty payment procedures that are otherwise applicable to all dutiable merchandise.  CBP has not implemented any "special" procedures for the collection of duties for such shipments, as the existing entry procedures were already in place and well-established.

As to shipments sent through the international postal network that would otherwise qualify for the *de minimis* privilege, and that are imported before the effective date for the new entry process for postal shipments that CBP was directed to establish and publish in the *Federal Register*, the Executive Orders did require special procedures for the collection of duties.  But as noted above, the special interim procedures for shipments sent through the international postal network are not implicated in this case.  Axle has not claimed that it imports merchandise through the international postal network; nor has Axle remitted any duties to CBP for any mail shipments.  Campbell Decl. ¶9.

But to address the issue in full, for shipments sent through the international postal network that would otherwise qualify for the *de minimis* privilege, the Executive Orders created an interim duty collection process, until a new entry process is established and published in the *Federal Register*, whereby transportation carriers, or qualified parties approved by CBP, collect duties on postal shipments and periodically remit those duties to CBP. After the new entry process is established, which DHS is currently finalizing for OMB's approval to publish in the *Federal Register*, shipments sent to the United States through the international postal network will no longer be subject to the interim special duty collection procedures.

Initially, carriers or qualified parties either elected to pay an *ad valorem* duty or specific duty for all postal shipments. *See* 90 Fed. Reg. at 14,900; 90 Fed. Reg. 37,778.[6] Pursuant to the China and Global *De Minimis* Orders, CBP published notices in the *Federal Register* and issued separate guidance via its Cargo Systems Messaging Service (CSMS). *See Notice of Implementation of Additional Duties on Products of the People's Republic of China Pursuant to the President's Executive Order 14256, Further Amendment to Duties Addressing the Synthetic Opioid Supply Chain in the People's Republic of China As Applied to Low-Value Imports*, 90 Fed. Reg. 17,608 (Apr. 28, 2025); 90 Fed. Reg. 42,418; CSMS # 65934463 – GUIDANCE: Payment of Duty on International Mail Shipments pursuant to Executive Order 14324 "Suspending Duty-Free De Minimis Treatment for All Countries" (Aug. 15, 2025); CSMS #

---

[6] The *ad valorem* duty consisted of "[a] duty equal to the effective IEEPA tariff rate applicable to the country of origin of the product … on the value of each dutiable postal item (package) containing goods entered for consumption," and the "specific duty" consisted of a "duty … on each package containing goods entered for consumption, based on the effective IEEPA tariff rate applicable to the country of origin of the product" as follows: $80 per item for products of countries with an effective IEEPA tariff rate of less than 16 percent; $160 per item for products of countries with an effective IEEPA tariff rate between 16 and 25 percent (inclusive); or $200 per item for products of countries with an effective IEEPA tariff rate above 25 percent. 90 Fed. Reg. at 37,778.

65990231 - Parties Qualified for the Payment of Duty on International Mail Shipments pursuant to Executive Order 14324 "Suspending Duty-Free De Minimis Treatment for All Countries" (Aug. 21, 2025); CSMS # 66311990 - UPDATED GUIDANCE: Payment of Duty on International Mail Shipments pursuant to Executive Order 14324 "Suspending Duty-Free De Minimis Treatment for All Countries" (Sep. 22, 2025).

The Continuing *De Minimis* Order made clear that the suspension of the *de minimis* privilege continued after the Supreme Court's decision in *Learning Resources*.  It also amended the interim special duty collection procedures for shipments sent through the international postal network, specifically to revise the rate of duty that carriers or qualified parties must collect and remit to CBP for such shipments.  *See* 91 Fed. Reg. at 9,434.  In all other respects, the interim procedures set forth in the Global *De Minimis* Order and in CBP's notice and guidance remain in effect.

## CONCLUSION

The Court should deny Axle's renewed partial motion for summary judgment, grant Defendant's partial motion to dismiss and partial summary judgment motion, and enter judgment accordingly.

DATED: April 9, 2026                          Respectfully submitted,

                                             BRETT A. SHUMATE
                                             Assistant Attorney General
                                             Civil Division

                                             ERIC J. HAMILTON
                                             Deputy Assistant Attorney General

                        By:                  PATRICIA M. McCARTHY
                                             Director

                                             CLAUDIA BURKE
                                             Deputy Director

34

/s/ Justin R. Miller
JUSTIN R. MILLER
Attorney-In-Charge
International Trade Field Office

/s/ Alexander Vanderweide
ALEXANDER VANDERWEIDE
Senior Trial Counsel

/s/ Mathias Rabinovitch
MATHIAS RABINOVITCH
Trial Attorney
International Trade Field Office
Department of Justice, Civil Division
Commercial Litigation Branch
26 Federal Plaza, Room 346
New York, New York 10278

*Attorneys for Defendants*

## CERTIFICATE OF COMPLIANCE

I hereby certify, pursuant to section 2(B)(1) of the Standard Chambers Procedures of this Court, that this response contains 10,527 words, excluding the table of contents, table of authorities, any addendum containing statutes, rules or regulations, any certificates of counsel, and counsel's signature, as calculated by the word processing system used to prepare this brief (Microsoft Word).

/s/ Alexander Vanderweide
ALEXANDER VANDERWEIDE