# IN THE UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| AXLE OF DEARBORN, INC. D/B/A DETROIT AXLE, <br><br> *Plaintiff*, <br><br> v. <br><br> DEPARTMENT OF COMMERCE; HOWARD LUTNICK, *in his official capacity as Secretary of Commerce*; DEPARTMENT OF HOMELAND SECURITY; KRISTI NOEM, *in her official capacity as Secretary of Homeland Security*; DEPARTMENT OF THE TREASURY; SCOTT BESSENT, *in his official capacity as Secretary of the Treasury*; UNITED STATES CUSTOMS AND BORDER PROTECTION; RODNEY S. SCOTT, *in his official capacity as Commissioner for U.S. Customs and Border Protection*; and the UNITED STATES, <br><br> *Defendants.* | Case No. 1:25-cv-00091 |

**PLAINTIFF DETROIT AXLE'S REPLY IN SUPPORT OF ITS
RENEWED MOTION FOR PARTIAL SUMMARY JUDGMENT AND
IN OPPOSITION TO DEFENDANTS' PARTIAL MOTION TO DISMISS
AND CROSS-MOTION FOR SUMMARY JUDGMENT**

**TABLE OF CONTENTS**

INTRODUCTION ........................................................................................................... 1

ARGUMENT ................................................................................................................. 2

    I.    The Government's Rescission of the De Minimis Exemption Was Unlawful. ...... 2

        A.    *Learning Resources* Confirms that IEEPA Does Not Authorize the Elimination of a Statutory Tariff Exemption. ........................................... 2

        B.    Even if IEEPA Could Be Interpreted to Authorize Rescission of the De Minimis Exemption, the Rescission Was Still Unlawful. .................. 11

    II.    The One Big Beautiful Bill Act Reinforces the Urgency of Granting Relief. ...... 17

    III.    The Agency Actions Rescinding the Exemption Were Arbitrary and Capricious. .................................................................................................... 19

CONCLUSION ............................................................................................................ 23

i

# TABLE OF AUTHORITIES

**Cases**                                                                 **Page(s)**

*Ala. Ass'n of Realtors v. Dep't of Health and Hum. Servs.*,
   594 U.S. 758 (2021)......................................................................................................15

*Ali v. Fed. Bureau of Prisons*,
   552 U.S. 214 (2008).......................................................................................................9

*Biden v. Nebraska*,
   600 U.S. 477 (2023)................................................................................................13, 15

*Boos v. Barry*, 485 U.S. 312 (1988)........................................................................................17

*Botany Worsted Mills v. United States*,
   278 U.S. 282 (1929)......................................................................................................12

*Bradford v. U.S. Department of Labor*,
   101 F.4th 707 (10th Cir. 2024) .....................................................................................21

*Chamber of Com. v. Reich*,
   74 F.3d 1322 (D.C. Cir. 1996)................................................................................19, 20

*Clinton v. City of New York*,
   524 U.S. 417 (1998)................................................................................................16, 17

*FCC v. Consumers' Research*,
   606 U.S. 656 (2025)......................................................................................................17

*Fourco Glass Co. v. Transmirra Prods. Corp.*,
   353 U.S. 222 (1957)......................................................................................................11

*Franklin v. Massachusetts*,
   505 U.S. 788 (1992)......................................................................................................20

*Harrington v. Purdue Pharma L. P.*,
   603 U.S. 204 (2024)........................................................................................................7

*HMTX Industries LLC v. United States*,
   156 F.4th 1236 (Fed. Cir. 2025) ...................................................................................20

*J.W. Hampton Jr. & Co. v. United States*,
   276 U.S. 394 (1928)......................................................................................................15

*Learning Resources, Inc. v. Trump*,
   146 S. Ct. 628 (2026)................................................1, 2, 3, 4, 5, 6, 7, 10, 12, 14, 17

*Marshall Field & Co. v. Clark*,
   143 U.S. 649 (1892)................................................................................................16, 17

*Nebraska v. Su*,
   121 F.4th 1 (9th Cir. 2024) ...............................................................................19, 20, 21

*RadLAX Gateway Hotel, LLC v. Amalgamated Bank*,
    566 U.S. 639 (2012)..................................................................................................11

*Rodriguez v. Compass Shipping Co.*,
    451 U.S. 596 (1981)..................................................................................................11

*SEC v. Chenery Corp.*,
    318 U.S. 80 (1943)...................................................................................................22

*Seminole Tribe of Fla. v. Florida*,
    517 U.S. 44 (1996)......................................................................................................3

*Small v. United States*,
    544 U.S. 385 (2005)....................................................................................................9

*Trump v. Orr*,
    146 S. Ct. 44 (2026)..................................................................................................21

*United States v. Palmer*,
    16 U.S. 610 (1818)................................................................................................9, 10

*USP Holdings, Inc. v. United States*,
    36 F.4th 1359 (Fed. Cir. 2022) ...............................................................................20

*V.O.S. Selections, Inc. v. Trump*,
    149 F.4th 1312 (Fed. Cir. 2025) .............................................................................14

*West Virginia v. EPA*,
    597 U.S. 697 (2022)..................................................................................................14

*Whitman v. Am. Trucking Ass'ns*,
    531 U.S. 457 (2001)....................................................................................................7

**Statutes**

5 U.S.C. § 553.................................................................................................................13

5 U.S.C. § 704.................................................................................................................21

19 U.S.C. § 1321 ....................................................................................................8, 11, 12

19 U.S.C. § 2132(a) ..........................................................................................................7

21 U.S.C. § 360bbb-3(b)(1)(B)........................................................................................16

46 U.S.C. § 3101...............................................................................................................5

50 U.S.C. § 1701(b) ........................................................................................................15

50 U.S.C. § 1702.........................................................................................8, 9, 10, 12, 23

Act of Oct. 1, 1890, § 3, 26 Stat. 612 ..............................................................................5

**Regulations and Executive Orders**

19 C.F.R. § 10.151 ................................................................................................8, 10

19 C.F.R. § 143.23(j)(3)................................................................................................8

Exec. Order 14324, 90 Fed. Reg. 37,775 (Aug. 5, 2025) ...................................8, 10, 21

*Express Consignments; Formal and Informal Entries of Merchandise; Administrative Exemptions*, 59 Fed. Reg. 30,289 (June 13, 1994) ...................................................13

**Other Authorities**

*CBP Collects $1 Billion Since End of de minimis Loophole*, CBP (Dec. 17, 2025), https://tinyurl.com/4afm57sa ..........................................................................................3

*Fact Sheet*, White House (July 20, 2025), https://tinyurl.com/2t82th82 .......................18

*FY 2023 CBP Trade Sheet*, CBP, https://tinyurl.com/37ye93km (June 2024).............................................................14

H.R. Rep. 77-1507 (1942)..............................................................................................9

*Report to the President on the America First Trade Policy-Executive Summary*, White House (Apr. 3, 2025), https://tinyurl.com/nh8xrv9v......................................3

S. Rep. 77-911 (1941)....................................................................................................8

S. Rep. 103-189 (1993)................................................................................................12

**INTRODUCTION**

In *Learning Resources, Inc. v. Trump*, 146 S. Ct. 628 (2026), the Supreme Court held that IEEPA does not authorize the President to impose tariffs because nothing in that statute grants the President the power to raise revenue. The government invites this Court to disregard that straight-forward holding by permitting the President to invoke IEEPA to impose tariffs by rescinding a statutory tariff exemption. Moreover, the government purports to find in IEEPA's general text the distinct and extraordinary power to suspend indefinitely *any* federal trade statute—even where the effect is to impose a tariff—despite Congress's consistent practice of granting such power expressly and the fact that no President has ever asserted similar authority under IEEPA. The government thus ignores *Learning Resources'* holding as well as the contextual evidence the Supreme Court found dispositive when rejecting the government's assertion of tariff power under IEEPA.

But even if IEEPA's text did grant the President the extraordinary power to blue pencil federal statutes, the more specific requirements of 19 U.S.C. § 1321(b), the major questions doctrine, and the nondelegation doctrine each would independently bar the President's attempt to unilaterally and immediately abrogate the de minimis exemption. The government passingly repeats its improbable claim that IEEPA is more specific than Section 1321, but Section 1321 elaborates precisely how the de minimis exemption may be altered—through rulemaking; IEEPA, by contrast, says nothing about tariffs or suspending trade statutes, much less the de minimis exemption. And the government's assertion that the major questions and nondelegation doctrines do not apply because the exemption implicates foreign affairs runs headlong into *Learning Resources'* conclusion that tariffs are "a branch of the taxing power" and "operate directly on domestic importers." 146 S. Ct. at 644.

Over the past year, the government's unlawful rescission of the exemption has inflicted tens of millions of dollars of damages on Detroit Axle, as it has been forced to pay tariffs on

1

millions of shipments it would have sent tariff-free to U.S. customers. That injury grows every day. This Court should reject the President's assertion of unchecked authority over trade statutes and grant Detroit Axle relief.

## ARGUMENT

## I.    The Government's Rescission of the De Minimis Exemption Was Unlawful.

IEEPA does not authorize the President to impose tariffs by unilaterally eliminating a statutory tariff exemption—and even if IEEPA's text could be stretched to encompass such a power, the more specific limitations of 19 U.S.C. § 1321(b), as well as the major questions and nondelegation doctrines, would nonetheless render unlawful the President's attempt to eliminate the de minimis exemption by fiat. The government's arguments to the contrary repeat the same interpretive mistakes—with respect to the same statute—that *Learning Resources* rejected.

### A.    *Learning Resources* Confirms that IEEPA Does Not Authorize the Elimination of a Statutory Tariff Exemption.

Both the holding and reasoning of *Learning Resources* confirm that the government cannot cherry-pick combinations of verbs and nouns in IEEPA to find the weighty power to impose tariffs by eliminating a statutory tariff exemption. The government trivializes *Learning Resources* by artificially narrowing its holding while ignoring its reasoning and the considerations the Supreme Court found dispositive.

**1.**    Start with *Learning Resources*' holding. The six-Justice majority held that "the terms of IEEPA do not authorize tariffs" because "[n]one of IEEPA's authorities includes the distinct and extraordinary power to raise revenue." 146 S. Ct. at 643, 646. The government claims that *Learning Resources* means only "that any *new additional* duties or tariffs imposed under IEEPA are invalid." ECF 59 at 8. But *Learning Resources*' holding is not so limited: The Court

2

held the IEEPA tariffs unlawful because "[n]one of IEEPA's authorities includes the … power to raise revenue."  146 S. Ct. at 643.

That principle is binding and dispositive here.  *See Seminole Tribe of Fla. v. Florida*, 517 U.S. 44, 67 (1996) (both "the result" and "those portions of the opinion necessary to that result" are binding).  It is indisputable that eliminating a tariff exemption is functionally identical to imposing a tariff on previously exempted goods:  As a result of the rescission of the de minimis exemption, the government now imposes and collects massive tariffs—currently 52.5% on Detroit Axle's imports—on goods importers previously shipped to customers duty-free.  The government itself has repeatedly asserted that it sought to "end this duty-free *de minimis* exemption" because "it is imperative that [the Department of Commerce] and CBP recover our rightful tariff revenue," including "approximately $10.8 billion in foregone tariff revenue in 2024 alone."  *Report to the President on the America First Trade Policy—Executive Summary*, White House (Apr. 3, 2025), https://tinyurl.com/nh8xrv9v; *see, e.g.*, *CBP Collects $1 Billion Since End of De Minimis Loophole*, CBP (Dec. 17, 2025), https://tinyurl.com/4afm57sa (CBP Commissioner: "Reaching the $1 billion milestone so quickly shows just how much revenue was slipping away under the old rules").

The government quibbles that suspending the exemption "imposes no *new* duties."  ECF 59 at 15 (emphasis added).  But regardless how the action is described, the government collects duties on goods it otherwise would not have tariffed; it invokes IEEPA to impose those tariffs in contravention of *Learning Resources*.  The government's claim that suspending the exemption only has the effect of "preventing revenue loss, not of raising revenue" is empty semantics.  *Id.* at 20.  Nor can the government escape the revenue-raising nature of its action by claiming that it *also* prevents trafficking.  That is incompatible with *Learning Resources*' conclusion that a tariff's "regulatory ends" do not make it any less of an unauthorized tax.  146 S. Ct. at 643.

The government's strained argument that the de minimis rescission "is functionally equivalent to a quota or embargo" rather than a tariff only underscores that *Learning Resources* squarely applies here.  ECF 59 at 6, 10-11.  *Learning Resources* rejected the government's asserted authority to collect tariffs under IEEPA even though the government and the principal dissent tried to equate tariffs with IEEPA's authorization for the President "to impose quotas and embargoes." 146 S. Ct. at 704 (Kavanaugh, J., dissenting); Reply Brief of Donald J. Trump 8-9, 22-23, *Learning Resources, Inc. v. Trump*, Nos. 24-1287 & 25-250 (U.S. Oct. 30, 2025).

The government's analogies are also implausible on their face.  The government says the rescission is "effectively a qualified embargo on" imports unless "estimated duties are deposited" by the importer.  ECF 59 at 11.  But on that view, *every* tariff could be reconceptualized as a conditional embargo:  The tariffed goods are "embargoed" unless the importer pays the tariffs. The quota analogy is even more puzzling.  The government claims it *could* have achieved a similar result through quotas, because goods subject to quotas are not eligible for the exemption under current regulations.  *Id.* at 10-11.  But the government did *not* impose quotas here, and the fact that there is a regulation eliminating the exemption for quota-subjected goods does not make elimination of the exemption equivalent to a quota.  Eliminating a tariff exemption *necessarily* exercises the "distinct" and "extraordinary" power to impose tariffs and collect revenue, *Learning Resources*, 146 S. Ct. at 643; imposing a quota may have similar effects indirectly only because of a separately promulgated regulation.  The correct understanding here is therefore the obvious one: Rescinding a tariff exemption is functionally identical not to a quota or an embargo, but to imposing a tariff—and *Learning Resources* holds that IEEPA does not authorize such revenue-raising measures.

**2.**      Even beyond its core holding, *Learning Resources* made clear how IEEPA's general text must be interpreted—and limited—in light of its context.  The government focuses myopically on particular combinations of verbs and nouns in IEEPA, cherry-picks broad definitions, and concludes that IEEPA must grant the President power to abrogate statutory tariff exemptions at will—despite IEEPA never mentioning tariffs or tariff exemptions.  ECF 59 at 9-10.  That is the same approach the Supreme Court definitively rejected in *Learning Resources* when the government argued that the words "regulate … importation" grant the power to impose tariffs.  146 S. Ct. at 643-44.  Instead, the Court relied on two types of contextual evidence to interpret IEEPA more narrowly.  Both demonstrate that the government's rescission of the *de minimis* exemption is unlawful.  ECF 53 at 17-18.

*Learning Resources* first considered what Congress "consistently has [done] in other tariff statutes" to conclude that "had Congress intended to convey the distinct and extraordinary power to impose tariffs, it would have done so expressly."  146 S. Ct. at 642; *accord id.* at 675-76 (Kagan, J., concurring).  The government does not dispute that this principle applies to the power to suspend or rescind a statutory tariff exemption.  Nor does it refute Detroit Axle's examples of laws where Congress granted the President the power to rescind or suspend a statute "separately and expressly."  *Learning Resources*, 146 S. Ct. at 643; *see, e.g.*, 46 U.S.C. § 3101 (granting President power to "suspend a provision of this part" related to ship inspections when "the needs of foreign commerce require").  In fact, the government cites *another* example—the Tariff Act of 1890, which expressly authorized the President to "suspend, by proclamation" the duty-free entry of "sugar, molasses, coffee, tea, and hides" if he determined other countries were imposing "reciprocally unequal and unreasonable" duties.  ECF 59 at 25 (quoting Act of Oct. 1, 1890, § 3, 26 Stat. 612).  Congress therefore knows how to authorize the President to suspend the operation of a

statute, *including a tariff statute*, and consistently has done so expressly by specifying which statute and under what conditions. As *Learning Resources* put it, "[w]hen Congress grants th[is] power," "it does so clearly and with careful constraints"—yet "[i]t did neither" under IEEPA. 146 S. Ct. at 644. The government has no response.

*Learning Resources* also reasoned that "the fact that no President has ever found [the tariff] power in IEEPA is strong evidence that it does not exist." 146 S. Ct. at 643; *accord id.* at 677 (Kagan, J., concurring). As Detroit Axle has pointed out, the President has never invoked IEEPA to rescind a statutory tariff exemption and collect tariffs on otherwise statutorily exempt imports, and under *Learning Resources* the lack of such historical precedent casts doubt on the existence of such a power. ECF 53 at 18. The government has no answer here either; it does not offer a single example of a President using IEEPA to rescind a statutory tariff exemption—or to suspend the operation of *any* statute. The government thus has completely failed to address the contextual considerations *Learning Resources* found essential in rejecting the government's sweeping interpretation of IEEPA.

3.     The government's refusal to heed *Learning Resources*' instruction to consider IEEPA's context dooms its boundless interpretation of that statute here. The government instead homes in on a few combinations of verbs and nouns in the statute—"nullify, void, prevent or prohibit exercising any … privilege with respect to any property." ECF 59 at 10 (quotation marks omitted). As the government has previously explained and confirms here, its position is that these words give the President sweeping authority to "override privileges, like the *de minimis* exemption, that are created by other statutes and regulations" so long as he makes an (allegedly unreviewable) declaration of a national emergency. ECF 28 at 13; *see* ECF 59 at 24 (claiming IEEPA authorizes the President to "void a privilege … set forth in another law"); Opening Brief of Donald

6

J. Trump 41-42, *Learning Resources, Inc. v. Trump*, Nos. 24-1287 & 25-250 (U.S. Oct. 30, 2025). As Detroit Axle previously argued (and the government does not deny), that power would extend beyond the de minimis exemption to rights and privileges in other trade statutes, like Section 122's 15%, 150-day limits on tariffs. 19 U.S.C. § 2132(a). No trade statute would be safe from the President's statutory eraser.

The government does not come close to meeting its heavy burden of showing that IEEPA's text grants the "distinct and extraordinary power" to override a federal tariff statute. *Learning Resources*, 146 S. Ct. at 642. To meet that burden, it would have to show not merely that overriding a federal statute "can *ever*" constitute the nullifying of a privilege, but that Congress in fact "gave the President the power" to override statutes "at his sole discretion." *Id.* at 644 (emphasis added). *Learning Resources* demonstrates that even if there is some linguistic sense in which IEEPA's text might encompass a power, courts should reject that interpretation if contextual evidence renders it implausible. *See id.* at 643-44. That is simply an application of the familiar interpretive principle, separate from the major questions doctrine and routinely articulated by the Supreme Court, that courts should reject expansive interpretations of general grants of authority when context renders a narrower interpretation more plausible; Congress does not "hide elephants in" "vague terms." *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 468 (2001); *see, e.g.*, *Harrington v. Purdue Pharma L. P.*, 603 U.S. 204, 216, 221-23 (2024) (rejecting broad interpretation of "any other appropriate provision" given context of other statutes in the Bankruptcy Code). The government cannot satisfy its heavy burden.

To begin, despite the government's suggestion to the contrary (ECF 59 at 12), the President's rescission of the de minimis exemption invoked IEEPA to "override" the de minimis statute,

19 U.S.C. § 1321—as the government's prior briefing and President's own executive orders recognized. *See, e.g.*, ECF 28 at 31-32 (IEEPA authorizes President "to override otherwise applicable statutory exemptions"); Exec. Order 14324 § 1, 90 Fed. Reg. 37,775 (Aug. 5, 2025) ("suspend[ing] duty free *de minimis* treatment *under 19 U.S.C. 1321(a)(2)(C)*" (emphasis added)). As Detroit Axle has explained, Section 1321(a) *requires* the Secretary of the Treasury to prescribe regulations creating a de minimis exemption of at least $800 per day: Congress amended Section 1321 in 1953 to change the statute's "may prescribe" language to "shall prescribe," ECF 29 at 2-3, and amended it again in 1993 to create a floor "not less than" $800 for the exemption, ECF 9 at 14-16. At a minimum, Section 1321(b) requires any changes to the exemption—which has already been implemented by regulation, *see, e.g.*, 19 C.F.R. §§ 10.151, 143.23(j)(3)—to be made through "regulations" "prescribe[d]" by the Secretary of the Treasury, not the President's fiat, ECF 9 at 16-18 (quoting 19 U.S.C. § 1321(b)). The government therefore has attempted to use IEEPA to override both Section 1321(a) *and* Section 1321(b), denying duty-free treatment to entries that Section 1321(a) requires to be tariff-exempt and circumventing Section 1321(b)'s requirements for how the exemption may be changed.

As discussed, IEEPA's language does not expressly authorize the President to override Section 1321 or other federal statutes. *Supra* at 5-6. And historical context makes it implausible that IEEPA's language confers such extraordinary power. When Congress authorized the President to "nullify" or "void" the exercising of rights and privileges "with respect to … property" through IEEPA, 50 U.S.C. § 1702(a)(1)(B), it drew from language in a 1941 amendment to the Trading With the Enemy Act that was intended to enable the government "to affirmatively compel the use and application of foreign property in a manner consistent with the interests of the United States," S. Rep. 77-911, at 2 (1941); *see* ECF 53 at 19-20. The government does not contest that

8

this language was understood to authorize the President to "take, administer, control, use, liquidate, etc. such foreign-owned property." H.R. Rep. 77-1507, at 3 (1942). The "nullify … privileges" language therefore must be understood in this historical context as applying to the state- and common-law property rights that otherwise might shield foreign property from U.S. control—not the ability to suspend other federal statutes. The government notes that Section 1321 refers to the de minimis exemption as a "privilege," ECF 59 at 10, but it draws no connection between the use of "privilege" in IEEPA and Section 1321, which were enacted decades apart, and none is apparent.

Instead of refuting the historical purpose of IEEPA's language, the government stakes its argument on the word "any." ECF 59 at 12 (quoting 50 U.S.C. § 1702(a)(1)(B)). But the Supreme Court has long and repeatedly held that even "general words" preceded by "any" must "be limited … to those objects to which the legislature intended to apply them." *United States v. Palmer*, 16 U.S. 610, 631 (1818) (Marshall, C.J.); *see Small v. United States*, 544 U.S. 385, 388 (2005). And "other circumstances may counteract the effect of expansive modifiers." *Ali v. Fed. Bureau of Prisons*, 552 U.S. 214, 220 n.4 (2008). For example, the Supreme Court has "construed an 'any' phrase narrowly when," among other reasons, the phrase "included a term of art" or "when a broad reading would have implicated sovereignty concerns." *Id.* Here, the phrase that "any" modifies in IEEPA—"right, power, or privilege with respect to … any property in which any foreign country or a national thereof has any interest," 50 U.S.C. § 1702(a)(1)(B)—is akin to a term of art given the phrase's statutory lineage. And the fact that Congress consistently speaks with specificity when it authorizes the President to override federal statutes, plus the separation-of-powers concerns that arise from the government's "broad" reading of IEEPA (*see infra* at 13-17), require interpreting "any" more "narrowly" here; *Ali*, 552 U.S. at 220 n.4; federal statutory privileges are

9

not among the "objects to which the legislature intended to apply" IEEPA's "general words," *Palmer*, 16 U.S. at 631.

Moreover, IEEPA only authorizes nullification of the "exercising" of a privilege with respect to foreign property, not the wholesale elimination of a general statutory command to exempt certain imports from tariffs. 50 U.S.C. § 1702(a)(1)(B). The government fixates on the various actions Detroit Axle took to avail itself of the de minimis exemption as purported proof that the company was "exercising" the privilege. ECF 59 at 12-15. But a company's compliance with special procedures the government created for importing de-minimis-eligible entries, *see, e.g.*, 19 C.F.R. § 10.151, does not mean that the rescission of the exemption nullified the *exercising of* a privilege rather than *the privilege itself.* The exemption's now-nullified implementing regulation operated as a general command that customs officials must follow regardless of any importers' actions: Officials "*shall pass* free of duty and tax any shipment of merchandise … not exceeding $800." 19 C.F.R. § 10.151 (emphasis added). When the President ordered the exemption's rescission, he did not prohibit any importer from *exercising* the de minimis privilege; he purported to "suspend duty-free *de minimis* treatment" generally. Exec. Order 14324 § 1. The President's wholesale abrogation of the de minimis exemption's general, government-facing command is thus fundamentally different from typical IEEPA sanctions—which operate on *individual exercises* of rights or privileges in specific property.

In sum, Congress's consistent practice of expressly authorizing the suspension of statutes under particular conditions and the unprecedented nature of the President's invocation of IEEPA to rescind a statutory tariff exemption should make this Court "skeptical that Congress enacted IEEPA with an eye toward granting" the power to abrogate statutory requirements unilaterally. *Learning Resources*, 146 S. Ct. at 645. As in *Learning Resources*, this Court should reject that

10

interpretation in favor of the more plausible, narrower reading that does not give the President carte blanche to override statutory privileges like the de minimis exemption.

**B.** **Even if IEEPA Could Be Interpreted to Authorize Rescission of the De Minimis Exemption, the Rescission Was Still Unlawful.**

Even if IEEPA could somehow be interpreted to allow the President to impose tariffs by suspending the de minimis exemption, the rescission of the exemption would still exceed the Executive Branch's authority for three independent reasons.

**1.** Section 1321(b)'s more specific requirements for altering the de minimis exemption control regardless of the scope of IEEPA's more general language. *See* ECF 9 at 16-19, 20; ECF 29 at 4-8; ECF 53 at 23-24. It is a "commonplace of statutory construction that the specific governs the general" "in the same or another statute which otherwise might be controlling." *RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 566 U.S. 639, 645 (2012); *Fourco Glass Co. v. Transmirra Prods. Corp.*, 353 U.S. 222, 228-29 (1957); *see* ECF 29 at 11-15 (collecting cases). Just so here.

Section 1321(b) authorizes changes to the de minimis exemption *only* through notice-and-comment rulemaking by the Secretary of the Treasury—even when modifications are "necessary … to protect the revenue or to prevent unlawful importations." 19 U.S.C. § 1321(b). The government recognizes that Section 1321(b) contemplates modifications to the exemption for just these reasons, yet it draws precisely the wrong conclusion—that *the President* can use IEEPA to nullify the exemption for the same reasons, *without* rulemaking. ECF 59 at 21. But the "comprehensive character of the procedures outlined in [Section 1321] precludes the fashioning of" other ways "to deal with" the "problem that Congress expressly addressed." *Rodriguez v. Compass Shipping Co.*, 451 U.S. 596, 614 (1981). Because Section 1321(b) accounts for the exigencies the government now invokes ("unlawful importations" and "protect[ing] the revenue"), yet still authorizes changes

11

to the exemption only through rulemaking by the Secretary, the statute prohibits "any other" manner of altering the exemption. *Botany Worsted Mills v. United States*, 278 U.S. 282, 288-89 (1929).

The government halfheartedly repeats its claim that "IEEPA is the more specific grant of power" here. ECF 59 at 24 n.4. Detroit Axle has comprehensively refuted that claim, *see* ECF 29 at 11-15, and the statutes' plain text demonstrates why. IEEPA broadly lists *seven* categories of action ("regulate," "direct," etc.) that the President may perform with respect to *eleven* categories of activity ("acquisition," "withdrawal," etc.). 50 U.S.C. § 1702. "Absent from this lengthy list of powers is any mention of tariffs or duties"—much less tariff exemptions or the de minimis exemption in particular. *Learning Resources*, 146 S. Ct. at 642. Section 1321, by contrast, specifically creates the de minimis exemption, and Section 1321(b) specifically elaborates how the exemption may be changed, for precisely the reasons (unlawful importation and revenue protection) the government invokes here. There can be no doubt that Section 1321(b) is the more specific, controlling provision.

The government also asserts that the APA's notice-and-comment requirements are "irrelevant" here because they would not apply to any rule issued by the Secretary rescinding the de minimis exemption. ECF 59 at 30-31. That is beside the point because the rescission was *not* accomplished through any "regulations" "prescribe[d]" by the Secretary, as Section 1321(b) requires. In any event, notice-and-comment rulemaking *is* necessary to change the de minimis exemption. Congress's choice to require the Secretary to "prescribe" "regulations" manifested its intent to bar the government from "unilaterally chang[ing] the [de minimis] rules without providing importers proper notice and an opportunity for comment." S. Rep. 103-189, at 64 (1993). Reflecting that understanding, the government's 1994 regulation incorporating the new $800 stat-

12

utory floor for the exemption was first issued as an interim final rule and "solicit[ed] … comments." *Express Consignments; Formal and Informal Entries of Merchandise; Administrative Exemptions*, 59 Fed. Reg. 30,289 (June 13, 1994).  The APA's foreign-affairs exception to notice-and-comment rulemaking does not apply here, because the imposition of tariffs is not a "foreign affairs function of the United States," 5 U.S.C. § 553(a)(1); it is an exercise of Congress's "right to levy taxes," *Learning Resources*, 146 S. Ct. at 643 (quotation marks omitted).  Nor does the "good cause" exception apply, because the government never made the findings that 5 U.S.C. § 553(b)(B) requires.

Thus, even if IEEPA generally authorized the President to suspend the operation of tariff-related statutes, Section 1321(b)'s more specific limitations would control—prohibiting the government's attempt to end-run that provision's requirement for notice-and-comment rulemaking by the Secretary.  Because it is undisputed that the government has not satisfied Section 1321(b)'s requirements, the rescission is unlawful.  *See* ECF 59 at 21.

**2.**    The major questions doctrine independently forecloses the government's interpretation.  Even if IEEPA's text could encompass the power to rescind the de minimis exemption, the major questions doctrine requires "clear congressional authorization to justify" the "extraordinary assertion of the power" to unilaterally override any tariff-related statute.  *Biden v. Nebraska*, 600 U.S. 477, 506 (2023) (citation modified); *Learning Resources*, 146 S. Ct. at 642 (op. of Roberts, C.J.).  IEEPA contains no such clear statement.

The government argues that the major questions doctrine is inapplicable because tariffs implicate foreign affairs, not the "core congressional power of the purse."  ECF 59 at 19-20 (quoting ECF 53 at 8).  The *Learning Resources* Court—the majority, not just a plurality—rejected that

13

understanding of the tariff power:  "[T]ariffs operate directly on domestic importers to raise reve-nue for the Treasury" and therefore are "very clearly a branch of the taxing power."  146 S. Ct. at 644 (citation modified).  Moreover, the en banc Federal Circuit held in *V.O.S. Selections, Inc. v. Trump* that the "Government's interpretation of IEEPA" ran "afoul of the major questions doc-trine."  149 F.4th 1312, 1334 (2025).  And the en banc Federal Circuit was "unpersuaded" by the very argument the government presses here—that it is "'particularly inappropriate to construe nar-rowly a delegation of power in the arena of foreign affairs and national security.'"  *Id.* at 1336 (citation modified).  *V.O.S.* is binding precedent holding that the major questions doctrine applies to government assertions of tariff-related power under IEEPA.  And it renders irrelevant the earlier Federal Circuit panel decisions the government cites for the proposition that foreign-affairs dele-gations should be construed broadly.  ECF 59 at 19.

The government also contends that the "question" here is not "major," narrowly framing the question as whether the Secretary must act under Section 1321 or the President may act under IEEPA.  ECF 59 at 20.  But the applicability of the major questions doctrine turns on the "economic and political significance" of the "authority" the Executive Branch has asserted—whether Con-gress in fact "confer[red]" such significant authority in "the statute at issue."  *West Virginia v. EPA*, 597 U.S. 697, 721 (2022) (quotation marks omitted).  On that front, the government trivial-izes the power here as one to "subject[] goods valued at $800 or less to the same" tariffs as goods valued more than $800.  ECF 59 at 20.  But it does not contest that the de minimis exemption alone affects more than a billion shipments per year, totaling over $50 billion annually.  ECF 53 at 21-22; *FY 2023 CBP Trade Sheet*, CBP, https://tinyurl.com/37ye93km (June 2024).  More generally, the government does not disclaim that its interpretation of IEEPA would enable the President uni-

14

laterally to override *any* tariff-related statute—with the potential to impact *every* imported shipment. And the allegedly "time-limited" nature of the authority here (ECF 59 at 30) does not prevent it from being major, *see, e.g.*, *Ala. Ass'n of Realtors v. Dep't of Health and Hum. Servs.*, 594 U.S. 758, 760, 764-65 (2021) (temporary eviction moratorium).

The government asserts that IEEPA *does* clearly authorize the President to rescind the de minimis exemption. ECF 59 at 21-22. As explained, however, IEEPA's general terms—which do not mention tariffs, tariff exemptions, or statutory privileges—do no such thing. IEEPA comes nowhere close to the level of clarity the Supreme Court has required in its recent major questions cases. *See, e.g.*, *West Virginia*, 597 U.S. at 706 ("best system of emission reduction" does not clearly authorize requirement to reduce electricity production); *Biden*, 600 U.S. at 494-95 ("waive or modify any statutory or regulatory provision applicable to the student financial assistance programs" does not authorize debt cancellation).

**3.** Finally, if IEEPA truly authorized the President to override any trade-related federal statute at whim, with no guidance as to *which* statutes to suspend and *under what circumstances*, it would violate the nondelegation doctrine because there would be no intelligible principle to cabin the President's authority. *See J.W. Hampton Jr. & Co. v. United States*, 276 U.S. 394, 409 (1928). The government argues that IEEPA contains an intelligible principle mainly because "the President may exercise his authorities only 'to deal with an unusual and extraordinary threat with respect to which a national emergency has been declared.'" ECF 59 at 23 (quoting 50 U.S.C. § 1701(b)). But the government has consistently argued elsewhere that the President's emergency declaration and determination that there is an "unusual and extraordinary threat" are unreviewable. Trump Opening Br. 41-42, *Learning Resources*, *supra*. By the government's own lights, those are not meaningful constraints on the President's authority.

15

Tellingly, the government cites no other statute giving the President sweeping authority to override whatever federal statutes he wants, for any reason. Other laws specifically authorize the President to suspend the operation of *particular* statutes *when certain congressionally enacted conditions are met*. *Supra* at 5-6. The government points to 21 U.S.C. § 360bbb-3(b)(1)(B), ECF 59 at 24, but that statute (unlike IEEPA) specifies which requirements may be suspended (certain provisions restricting unauthorized drug sales) and precisely elaborates particular circumstances (*e.g.*, a "domestic emergency … involving a heightened risk of attack with a biological, chemical, radiological, or nuclear agent"). Same with the Tariff Act of 1890, which authorized the President to suspend the tariff-free entry of particular goods ("sugar, molasses, coffee, tea, and hides") in narrow circumstances (when he determined other countries were imposing unequal and unreasonable duties). 26 Stat. 612. IEEPA, construed as the government suggests, would contain no similar intelligible principle.

The President's asserted power to override any federal statute unilaterally and indefinitely so long as it relates to foreign trade also would disrupt the Constitution's "finely wrought" law-making procedures. *Clinton v. City of New York*, 524 U.S. 417, 440 (1998). Just like the line-item veto, the President's discretionary suspensions of federal statutes would be "the functional equivalent of partial repeals of Acts of Congress that fail to satisfy Article I, § 7." *Id.* at 444. The government claims *Clinton* is inapposite because it held the Line Item Veto Act unconstitutional "in the normal course," whereas IEEPA authorizes the President "to void" statutory privileges "*not in the normal course*" but during "emergencies." ECF 59 at 24. But *Clinton* in no way suggested that an emergency-only line-item veto authority would have been constitutional.

The government also errs in relying on *Marshall Field & Co. v. Clark*, 143 U.S. 649 (1892), a case that *Clinton* distinguished. ECF 59 at 25. *Marshall Field* upheld a constitutional challenge

16

to a presidential suspension under the Tariff Act of 1890. *Clinton* identified "critical differences" between the President's authority under the Line Item Veto Act and the Tariff Act of 1890, which confirm the *parallels* between IEEPA and the Line Item Veto Act. 524 U.S. at 443. *Clinton* explained that "under the Tariff Act, when the President determined that the contingency had arisen, he had a duty to suspend," but under the Line Item Veto Act (as under IEEPA), the President retained "discretion to cancel or not to cancel." *Id.* at 443-44. Moreover, when the President "suspended an exemption under the Tariff Act, he was executing the policy that Congress had embodied in the statute"—whereas canceling a statute under the Line Item Veto Act (like overriding a statute under IEEPA) "reject[s] the policy judgment made by Congress and rel[ies] on [the President's] own policy judgment." *Id.* at 444. Thus, if the President's asserted statutory override under IEEPA has any historical analogue, it is the unconstitutional Line Item Veto Act, not the Tariff Act of 1890.

The government's contention that the nondelegation doctrine is more limited in the foreign-affairs context is irrelevant. As noted above, *Learning Resources* held that tariffs are "a branch of the taxing power" and "operate directly on domestic importers." 146 S. Ct. at 644. And *J.W. Hampton*, itself a tariff case, set forth the "'intelligible principle' standard as the universal method for assessing delegations." *FCC v. Consumers' Research*, 606 U.S. 656, 674 (2025). The government's interpretation of IEEPA fails that standard. At a minimum, IEEPA should be narrowly construed to "avoid" these "constitutional questions." *Boos v. Barry*, 485 U.S. 312, 333 (1988).

## II.    The One Big Beautiful Bill Act Reinforces the Urgency of Granting Relief.

Congress's elimination of the de minimis exemption starting in July 2027 in the One Big Beautiful Bill Act (OBBB) creates yet another conflict between the President's actions and Congress's policy judgments. Congress decided that the exemption should remain until July 2027—giving importers time to adjust their operations—yet the President chose to "ac[t] more quickly to

17

suspend the *de minimis* exemption than the [statute] requires." *Fact Sheet*, White House (July 20, 2025), https://tinyurl.com/2t82th82.

The OBBB also makes Detroit Axle's need for equitable relief in this case even more urgent. Detroit Axle filed this suit almost a year ago and now has only about a year left to recoup the significant investments it made in its Mexico facilities before the de minimis exemption is eliminated by statute in July 2027. And the government's argument that Detroit Axle will not be entitled to full refunds even if it prevails in this case, ECF 59 at 14-15—although incorrect, as discussed below—heightens Detroit Axle's need for vacatur and an injunction *now*.

In all events, the OBBB's elimination of the de minimis exemption in July 2027 will not affect Detroit Axle's entitlement to refunds of the tariffs it paid "as a result of the unlawful orders" on goods that otherwise would have been eligible for the exemption. ECF 55 ¶ 15. The government claims that if the rescission of the exemption is held unlawful, Detroit Axle could claim refunds only for tariffs it paid on imports of up to $800 per day for which it was the importer of record. ECF 59 at 14-15. But the government recognizes that before the rescission, Detroit Axle's business model depended on shipping small, de-minimis-eligible shipments directly from its Mexico facility to individual U.S. customers tariff-free. *Id.* at 14; *see* ECF 29 at 20-22. As a result of the rescission, Detroit Axle has been forced to become the importer of record for all its shipments from Mexico and pay more than $44 million in tariffs on those shipments, which would have entered the country tariff-free under the de minimis exemption. *See* Musheinesh Decl. ¶ 5. The company could not feasibly or economically continue shipping directly to U.S. customers when each of those small-value shipments would require each individual customer to pay significant tariffs. *See id.* ¶ 4.

While this Court need not decide Detroit Axle's entitlement to refunds to grant vacatur and injunctive relief, Detroit Axle is entitled to refunds totaling about $44 million for tariffs it paid on goods that would have shipped tariff-free to U.S. customers but for the government's unlawful invocation of IEEPA to rescind the de minimis exemption. *Id.* ¶ 5. Of that figure, the company is already owed about $9 million for the specific IEEPA tariffs that *Learning Resources* held unlawful. Prevailing here, however, would entitle Detroit Axle to refunds of other tariffs the government originally levied under different authorities and then imposed on the company's de-minimis-eligible shipments through IEEPA—nearly $35 million. *Id.*; *see* ECF 55 ¶¶ 47-48. This case therefore will remain critically important for Detroit Axle regardless of the OBBB.

### III.    The Agency Actions Rescinding the Exemption Were Arbitrary and Capricious.

The government's actions rescinding the de minimis exemption are independently unlawful because they are arbitrary and capricious in violation of the APA. The rescission was neither reasonable nor reasonably explained because the government failed to consider investment-backed reliance interests like Detroit Axle's, ignored the economic burdens the rescission would impose on U.S. businesses and consumers, and failed to consider obvious alternatives—like inspecting packages without levying tariffs, or implementing the rescission through notice-and-comment rulemaking. ECF 9 at 23-25.

The government principally argues that the APA does not apply to agency actions implementing presidential directives. But as Detroit Axle has explained (ECF 29 at 17-19), although the APA does not apply directly to the President, "[n]o language in the APA prevents or excepts review of an agency action that implements a presidential action." *Nebraska v. Su*, 121 F.4th 1, 15 (9th Cir. 2024). Thus, APA review is unavailable only in "cases in which the President has final constitutional or statutory responsibility for the *final step* necessary for the agency action directly to affect the parties." *Chamber of Com. v. Reich*, 74 F.3d 1322, 1327 (D.C. Cir. 1996).

19

And "[r]eview of the legality of Presidential action can ordinarily be obtained in a suit seeking to enjoin the officers who attempt to enforce the President's directive." *Franklin v. Massachusetts*, 505 U.S. 788, 828 (1992) (Scalia, J., concurring in part and concurring in the judgment). Indeed, any contrary rule "would shockingly allow Presidents to insulate any desired rulemaking from judicial review" merely through an order directing an agency to adopt a rule. *Su*, 121 F.4th at 15.

The government argues that the agency actions here are unreviewable because they merely "ministerially carrie[d] out the President's decision." ECF 59 at 28. But it points to no precedent holding that "ministerial" actions are somehow exempt from APA review. Nor could it; it is well established that the APA applies to "'final agency action'" without restriction—so "as a textual matter, final agency actions, even if implementing an executive order, are subject to judicial review under the APA." *Su*, 121 F.4th at 15 (emphasis added) (quoting 5 U.S.C. § 704).

The government's authorities underscore that arbitrary-or-capricious review is precluded only when the President takes the "*final step* necessary … to affect the parties." *Reich*, 74 F.3d at 1327. In *USP Holdings*, *Inc. v. United States*, the Federal Circuit reasoned that APA review did not apply to threat determinations made by the President and the Secretary of Commerce because those actions should be "reviewed together as a single step." 36 F.4th 1359, 1369 (Fed. Cir. 2022). And in *HMTX Industries LLC v. United States*, the Federal Circuit concluded that APA review *applied* to the challenged agency actions precisely because the President's action was "antecedent" and "lack[ed] any direct effect on relevant parties." 156 F.4th 1236, 1249 (Fed. Cir. 2025) (citation modified). *HMTX* distinguished *USP Holdings* because the agency in *HMTX did* "take [the] final action." *Id.* at 1250.

The government's fallback argument that agency action implementing an executive order categorically cannot be arbitrary and capricious fares no better. ECF 59 at 29. As the Ninth Circuit

has explained, "there is … nothing untenable about analyzing the impacts, costs, and benefits of alternative policy options when issuing a rule" to provide the President "with a better understanding of the policy outcomes" and "encourage reasoned and informed policymaking." *Su,* 121 F.4th at 16.  And again, the government's cases do not hold that agency actions implementing presidential orders are categorically non-arbitrary.  In *Trump v. Orr*, the Supreme Court granted a stay (on the interim docket) because the plaintiffs were "[un]likely to prevail in arguing that the State Department acted arbitrarily and capriciously by declining to depart from Presidential rules that Congress expressly required it to follow."  146 S. Ct. 44, 46 (2026).  The Court did not hold that an agency *cannot* act arbitrarily and capriciously in implementing a presidential order; regardless, IEEPA does not "expressly requir[e]" an agency to follow presidential orders without complying with the APA's procedural and substantive requirements.  *Id.*  And in *Bradford v. U.S. Department of Labor*, the court held only that the agency *did* provide a reasoned explanation for its action despite complying with a presidential directive.  101 F.4th 707, 732 (10th Cir. 2024).  That is precisely what is lacking here.

Nor is Detroit Axle challenging "only the fact that CBP ministerially followed the President's" directions, as the government suggests.  ECF 59 at 30.  The relevant executive order charged DHS to take "all necessary actions to implement and effectuate this order, including … *through notices in the Federal Register and by adopting rules, regulations, or guidance*."  Exec. Order 14324, § 4 (emphasis added).  DHS thus *could have* complied with Section 1321 by conducting notice-and-comment rulemaking before suspending the exemption.  Indeed, the government says it is in the process of issuing a notice-and-comment rule on just this issue.  ECF 59 at 3.  In choosing not to do so *before* eliminating the de minimis exemption, the government violated

21

the APA's notice-and-comment requirement, *supra* at 12-13, as well as its arbitrary-or-capricious requirement by entirely failing to justify that choice.

Finally, the Court asked the parties to address "the implementation of the special procedures for collection of duties as specified in the Executive Orders at issue." ECF 54.  The government says the procedures for postal duties are irrelevant because Detroit Axle is not challenging those procedures.  ECF 59 at 27.  But one of Detroit Axle's arbitrary-or-capricious arguments has always been that the government failed to reasonably explain why it imposed lower tariff rates on postal-network shipments than on non-postal shipments like Detroit Axle's.  *See* ECF 9 at 24; ECF 55 ¶ 72.  The government offers no response.

Instead, the government seeks to backfill its unreasoned decisions by relying on new drug-seizure data in a declaration attached to its opposition.  That new data cannot cure the APA defect under *SEC v. Chenery Corp.*, 318 U.S. 80, 87 (1943).  And it only confirms the arbitrariness of the government's actions.  The data reveals that non-postal de minimis shipments, like Detroit Axle's, have similar rates of narcotics seizures as non-de-minimis informal entries.  ECF 59 at 17.  Meanwhile, the postal de minimis shipments subject to lower tariffs have the *highest* rates of narcotics seizures—nearly *twenty times* higher than for non-postal de minimis entries.  *Id*.  *Postal* shipments are the problem, not de minimis shipments.  Had the government engaged in the required notice-and-comment rulemaking, parties like Detroit Axle could have ventilated these issues, and the government would have been forced to provide reasoned responses.  By short-circuiting that process, the government violated the APA.

**CONCLUSION**

The Court should grant Detroit Axle's renewed motion for summary judgment.[1]

April 23, 2026                                        Respectfully submitted,


                                                     /s/ Thomas H. Dupree Jr.

                                                     Thomas H. Dupree Jr.
                                                     Samantha Sewall
                                                     Nick Harper
                                                     Connor P. Mui
                                                     Luke J.P. Wearden
                                                     GIBSON, DUNN & CRUTCHER LLP
                                                     1700 M Street, N.W.
                                                     Washington, D.C. 20036-4504
                                                     (202) 955-8500
                                                     TDupree@gibsondunn.com
                                                     SSewall@gibsondunn.com
                                                     NHarper@gibsondunn.com
                                                     CMui@gibsondunn.com
                                                     LWearden@gibsondunn.com

                                                     *Counsel for Plaintiff Detroit Axle*

---

[1] At minimum, the Court should deny the government's cross-motion for summary judgment because there is at least a genuine dispute of material fact as to whether "any foreign country or a national thereof has any interest" in the property that Detroit Axle imports such that the government cannot rely on IEEPA to suspend the de minimis exemption with respect to Detroit Axle's property. 50 U.S.C. § 1702(a)(1)(B); *see* ECF 53 at 20 n.1.

**CERTIFICATE OF COMPLIANCE WITH WORD LIMIT**

Pursuant to CIT Standard Chambers Procedure 2(B), I certify that this brief, including headings, footnotes, and quotations (but excluding the table of contents, table of authorities, signature blocks, and this certificate) contains 7,000 words.

/s/ *Thomas H. Dupree Jr.*

*Counsel for Plaintiff Detroit Axle*