**UNITED STATES COURT OF INTERNATIONAL TRADE**

BEFORE:    THE HONORABLE GARY S. KATZMANN, JUDGE
THE HONORABLE TIMOTHY M. REIF, JUDGE
THE HONORABLE JANE A. RESTANI, JUDGE

| | |
|---|---|
| AXLE OF DEARBORN, INC. D/B/A DETROIT AXLE,<br><br>Plaintiff,<br><br>v.<br><br>DEPARTMENT OF COMMERCE;<br>HOWARD LUTNICK, in his official capacity as Secretary<br>of Commerce; DEPARTMENT OF HOMELAND<br>SECURITY; KRISTI NOEM, in her official capacity as<br>Secretary of Homeland Security; DEPARTMENT OF THE<br>TREASURY; SCOTT BESSENT, in his official capacity<br>as Secretary of the Treasury; UNITED STATES<br>CUSTOMS AND BORDER PROTECTION; PETE R.<br>FLORES, in his official capacity as Acting Commissioner<br>for U.S. Customs and Border Protection; and the<br>UNITED STATES,<br><br>Defendants. | Court No. 25-cv-00091 |

**DEFENDANTS' REPLY IN SUPPORT OF THEIR PARTIAL MOTION TO DISMISS
AND CROSS-MOTION FOR SUMMARY JUDGMENT**

BRETT A. SHUMATE
Assistant Attorney General
Civil Division

ERIC J. HAMILTON
Deputy Assistant Attorney General

By:    PATRICIA M. McCARTHY
Director

CLAUDIA BURKE
Deputy Director

/s/ Justin R. Miller
JUSTIN R. MILLER

Attorney-In-Charge
International Trade Field Office

/s/ Alexander Vanderweide
ALEXANDER VANDERWEIDE
Senior Trial Counsel

/s/ Mathias Rabinovitch
MATHIAS RABINOVITCH
Trial Attorney
International Trade Field Office
Department of Justice, Civil Division
Commercial Litigation Branch
26 Federal Plaza, Room 346
New York, New York 10278

*Attorneys for Defendants*

May 14, 2026

# TABLE OF CONTENTS

I.    *Learning Resources* Does Not Affect the *De Minimis* Privilege Suspension ........................... 1

II.    IEEPA's Text Clearly Authorizes the Suspension of the *De Minimis* Privilege ....................... 4

III.    Section 1321 Does Not Mandate a Statutory *De Minimis* Exemption That Forecloses the President from Suspending the Privilege Under IEEPA ...................................................... 8

IV.    Axle Is Not Entitled to Relief ................................................................................ 13

CONCLUSION ................................................................................................ 17

# TABLE OF AUTHORITIES

**Cases**

*Agile Def., Inc. v. United States*,
959 F.3d 1379 (Fed. Cir. 2020) .................................................................... 16

*Ali v. Fed. Bureau of Prisons*,
552 U.S. 214 (2008) ................................................................................. 6, 7

*Associated Builders & Contractors Fla. First Coast Chapter v. Gen. Servs. Admin.*,
No. 25-11375, 2026 WL 1075264 (11th Cir. Apr. 21, 2026) ................................. 15, 16

*Bond v. United States*,
572 U.S. 844 (2014) ...................................................................................... 6

*Dames & Moore v. Regan*,
453 U.S. 654 (1981) ..................................................................................... 5, 7

*HMTX Indus. LLC v. United States*,
156 F.4th 1236 (Fed. Cir. 2025) ...................................................................... 16

*Lamie v. United States Trustee*,
540 U.S. 526 (2004) ...................................................................................... 11

*Learning Resources, Inc. v. Trump*,
146 S. Ct. 628 (2026) ........................................................................... 1, 2, 3, 4

*Nat'l Pork Producers Council v. Ross*,
598 U.S. 356 (2023) ........................................................................................ 4

*Nebraska v. Su*,
121 F.4th 1 (9th Cir. 2024)...................................................................................... 15, 16

*United States v. Gonzale*s,
520 U.S. 1 (1997)..................................................................................................... 6, 7

*United States v. Palmer*,
16 U.S. 610 (1818)................................................................................................... 6, 7

**Statutes**

19 U.S.C. § 1321 ............................................................................................ 8, 9, 10, 11

19 U.S.C. § 1321(a) ............................................................................................... 5, 9, 10

19 U.S.C. § 1321(b) ......................................................................................................... 10

50 U.S.C. § 1702(a)(1)(B) ........................................................................................... 4,5,9

28 U.S.C. § 2680(c) ....................................................................................................... 7

Section 122 of the Trade Act of 1974 ...................................................................... 2, 13

Section 301 of the Trade Act of 1974 ....................................................................... 2, 13

Section 232 of the Trade Expansion Act of 1962 ................................................... 2, 13

Section 502(d)(1) of the Trade Act of 1974 .................................................................. 3

Customs Admnistrative Act of 1938,
Pub. L. 75-721, 52 Stat. 1081 (1938)......................................................................... 12

Homeland Security Act of 2002,
Pub. L. 107–296, 116 Stat. 2142 (2002)…………………………………………………..8

**Regulations**

19 C.F.R. § 143.23(j)(3)............................................................................................... 14

**Other Authorities**

*Proclamation 9887, To Modify the List of Beneficiary Developing Countries Under
the Trade Act of 1974,*
84 Fed. Reg. 23,425 (May 21, 2016) .......................................................................... 3

*Executive Order 13357, Termination of Emergency Declared in Executive Order 12543 With
Respect to the Policies and Actions of the Government of Libya and Revocation of*

*Related Executive Orders,*
69 Fed. Reg. 56,665 (Sep. 22, 2004) ...................................................................................... 3

*Executive Order 14118, Termination of Emergency with Respect to the Situation in Zimbabwe,*
89 Fed. Reg. 15,945 (Mar. 5, 2024) ....................................................................................... 3

*Executive Order 13067, Blocking Sudanese Government Property and Prohibiting Transactions With Sudan,*
62 Fed. Reg. 59,989 (Nov. 3, 1997) ....................................................................................... 8

*Test Concerning Entry of Section 321 Low-Value Shipments Through the Automated Commercial Environment (ACE) (Also Known as Entry Type 86); Republication With Modifications,*
89 Fed. Reg. 2630, 2631 (Jan. 16, 2024) ............................................................................. 14

*Executive Order 14324, Suspending Duty-Free De Minimis Treatment for All Countries,*
90 Fed. Reg. 37,775 (Aug. 5, 2023) ...................................................................................... 16

*Executive Order 14388, Continuing the Suspension of Duty-Free De Minimis Treatment for All Countries,*
91 Fed. Reg. 9433 (Feb. 25, 2026) ........................................................................................ 16

S. Rep. 77-911 (1941) ............................................................................................................. 6

H.R. Rep. 77-1507 (1941) ....................................................................................................... 6

S. Rep. 103-189 (1993) ......................................................................................................... 11

S. Rep. No. 75-1465 (1938) ................................................................................................... 12

Treasury Order 100-20,
(Oct. 30, 2024) ........................................................................................................................ 8

**IN THE UNITED STATES COURT OF INTERNATIONAL TRADE**

BEFORE:    THE HONORABLE GARY S. KATZMANN, JUDGE
THE HONORABLE TIMOTHY M. REIF, JUDGE
THE HONORABLE JANE A. RESTANI, JUDGE

|  |  |
|---|---|
| AXLE OF DEARBORN, INC. D/B/A DETROIT AXLE,<br><br>Plaintiff,<br><br>v.<br><br>DEPARTMENT OF COMMERCE;<br>HOWARD LUTNICK, in his official capacity as Secretary<br>of Commerce; DEPARTMENT OF HOMELAND<br>SECURITY; KRISTI NOEM, in her official capacity as<br>Secretary of Homeland Security; DEPARTMENT OF THE<br>TREASURY; SCOTT BESSENT, in his official capacity<br>as Secretary of the Treasury; UNITED STATES<br>CUSTOMS AND BORDER PROTECTION; PETE R.<br>FLORES, in his official capacity as Acting Commissioner<br>for U.S. Customs and Border Protection; and the<br>UNITED STATES,<br><br>Defendants. | Court No. 25-cv-00091 |

**DEFENDANTS' REPLY IN SUPPORT OF THEIR PARTIAL MOTION TO DISMISS AND CROSS-MOTION FOR SUMMARY JUDGMENT**

As ordered by the Panel, ECF 62, Defendants respectfully file this reply in support of their partial motion to dismiss and cross-motion for summary judgment, ECF 27, 28, and in response to the Court's Order dated April 27, 2026.  ECF 62.

## I.    *Learning Resources* Does Not Affect the *De Minimis* Privilege Suspension

In *Learning Resources, Inc. v. Trump*, 146 S. Ct. 628, 642, 646 (2026), the Supreme Court held that the International Emergency Economic Powers Act (IEEPA) cannot be used to *impose* new additional tariffs because imposing tariffs is a "distinct and extraordinary power." But suspending the *de minimis* privilege does not impose new additional tariffs.  Instead, it

removes an administrative regulatory waiver of otherwise statutorily applicable and duly imposed duties.  In other words, the suspension of the administrative exemption (which applies only for importations by one person on one day valued at or under $800) permits *already-enacted tariffs*—unchallenged here—to apply to the importations.  That is no merely formal difference: suspending the exemption involves no control over the products that will be tariffed, the tariff rates that will be imposed, or the duration of the tariffs.  Suspending an exemption categorically differs from the action at issue in *Learning Resources*, where the President *did* impose new additional duties, selecting the products, rates, and duration for each duty, that were to apply in addition to those imposed by Congress or under congressional authority (*e.g.*, Section 301).  *See Learning Resources*, 146 S. Ct. at 646 ("The President asserts the extraordinary power to unilaterally impose tariffs of unlimited amount, duration, and scope.").

Here, Axle claims that the Government collects a 52.5 percent duty on its imports.  ECF 61 at 3.  But such duties, other than the now-invalidated IEEPA duties, are not being imposed pursuant to the challenged Executive Orders, but rather under provisions in Chapters 1 through 97 of the Harmonized Tariff Schedule of the United States (HTSUS) and provisions under Chapter 99, HTSUS, promulgated pursuant to Sections 122 and 301 of the Trade Act of 1974 and Section 232 of the Trade Expansion Act of 1962.  The lawfulness of these underlying tariffs is not challenged here and the tariffs exist independently of the *de minimis* privilege; the suspension of the exemption simply allowed *the existing law* to operate on all imports valued at or below $800.  Just as exercising the statutory discretion to create the *de minimis* privilege did not *eliminate* other tariffs or rewrite the tariff schedule, suspending the *de minimis* privilege does not impose new tariffs.

Axle's argument that the nullification of the *de minimis* privilege is functionally equivalent to the exercise of the power to raise revenue proves too much. By Axle's logic, any deregulatory rollback that causes payments to the Government—or merely increases payments to the Government—would be prohibited under *Learning Resources* as an improper exercise of the taxing power. That cannot be the proper reading of *Learning Resources*.

Take, for example, the President removal of Turkey's status as a "developing country" for purposes of the Generalized System of Preferences. *See, e.g.*, Proclamation 9887, 84 Fed. Reg. 23,425 (May 21, 2019). That change in status, authorized by section 502(d)(1) of the Trade Act of 1974, had the effect of increasing revenue on all importations of merchandise from Turkey, but no one would reasonably say that the change in status was a revenue-raising measure or an improper exercise of the taxing power. Even in the IEEPA context, the President's removal of import restrictions on certain nations has the effect of causing duty payments to the United States from previously prohibited imports. *See, e.g.*, Executive Order 13357, Termination of Emergency Declared in Executive Order 12543 With Respect to the Policies and Actions of the Government of Libya and Revocation of Related Executive Orders, 69 Fed. Reg. 56,665 (Sept. 22, 2004) (revoking a prohibition on imports from Libya); Executive Order 14118, Termination of Emergency with Respect to the Situation in Zimbabwe, 89 Fed. Reg. 15,945 (Mar. 5, 2024) (revoking a prohibition on imports from Zimbabwe in Executive Order 13391 of November 22, 2005). But again, no one would reasonably say that the allowance of certain previously prohibited imports (which would now pay duties upon import) was a revenue-raising measure or an improper exercise of the taxing power. Yet under Axle's reading of *Learning Resources*, changing Turkey's designated status or permitting certain previously prohibited importations would be an impermissible foray into Congress' power to impose additional tariffs.

Throughout its brief, Axle misreads the breadth of *Learning Resources*, even though the Court repeatedly emphasized that it was answering a discrete, limited statutory question. *See Learning Resources,* 146 S. Ct. at 643 (stating that the Court "do[es] not attempt to set forth the metes and bounds" of the President's authority in IEEPA), 643-44 ("Our task today is to decide only whether the power to 'regulate ... importation,' as granted to the President in IEEPA, embraces the power to impose tariffs."), 644 ("The question is not . . . whether tariffs can ever be a means of regulating commerce.  It is instead whether Congress . . . gave the President the power to impose tariffs at his sole discretion."); *see also Nat'l Pork Producers Council v. Ross*, 598 U.S. 356, 373-74 (2023) ("opinions dispose of discrete cases and controversies and they must be read with a careful eye to context").  Indeed, the Court in *Learning Resources* limited its review to the terms "regulate . . . importation" within IEEPA.  In so doing, the Court held that the terms "regulate . . . importation" do not authorize the imposition of new additional tariffs. 146 S. Ct. at 646.  But this holding does not stand for the extraordinary proposition that any Presidential action otherwise authorized by the plain text of IEEPA is an unauthorized tax because it has the effect of increasing duty payments to the United States.

## II.      IEEPA's Text Clearly Authorizes the Suspension of the *De Minimis* Privilege

The President's authority under IEEPA to "nullify, void, prevent, or prohibit . . . exercising any . . . privilege with respect to . . . any property" is broad and unambiguous.  50 U.S.C. § 1702(a)(1)(B).  In reviewing IEEPA, the Court must pay "close attention to IEEPA's text."  *Learning Resources*, 146 S. Ct. at 646, 643 (focusing its review on the terms "regulate . . . importation" in IEEPA), 646 (holding that the terms "regulate . . . importation" do not include the "power to unilaterally impose tariffs of unlimited amount, duration, and scope").  As we explained in our prior briefing, ECF 59, consistent with the textual analysis undertaken in

4

*Learning Resources*, the President's suspension of *de minimis* treatment is an exercise of his authority to "nullify, void, prevent, or prohibit" the exercise of a "privilege."  50 U.S.C. § 1702(a)(1)(B); *see also* ECF 27, 28 at 21-25 (also discussing authority to regulate, prevent, or prohibit importation of any property).  Axle does not deny this; nor can it.  Section 321 of the Trade Act of 1930 explicitly identifies the "administrative exemption" as a "privilege."  19 U.S.C. § 1321(a).  And nothing in IEEPA indicates a limitation on the kinds of privileges that may be voided or nullified.  Nor does Axle contend that the suspension of the *de minimis* privilege fails to meet the plain meaning of "nullifying" or "voiding."  IEEPA's text thus authorizes the President's suspension of the *de minimis* privilege.

Axle's challenge to the Government's textual reading of IEEPA is unavailing.  First, Axle claims that the Government cherry-picks a "few combinations" of "verbs and nouns" from the statute in support of its plain reading of the statute.  ECF 61 at 6-7.  That is the only possible way to read IEEPA.  Section 1702(a)(1)(B) is a list of verbs and nouns.  No verb in § 1702(a)(1)(B) is expressly paired with a corresponding noun.  As a result, *any* action pursuant to Section 1702(a)(1)(B) *necessarily* requires the combination of such nouns and verbs in the statute.  *See, e.g., Dames & Moore v. Regan*, 453 U.S. 654 (1981) (authorizing the "nullification" of certain "rights" and "privileges" acquired in previously blocked property).  Congress broadly identified many circumstances involving property (the acquisition, holding, withholding, use, transfer, withdrawal, transportation, importation or exportation of, exercising of privileges with respect to, or transactions involving property) regarding which the President may take action (investigate, regulate, direct and compel, nullify, void, prevent or prohibit) during a national emergency.  That the Government has combined "verbs and nouns" merely means that Government has invoked § 1702(a)(1)(B); this critique goes nowhere.

Second, Axle takes issue with the Government's reliance on the word "any" in IEEPA and argues that "any" must be read narrowly. ECF 61 at 9. To be clear, Axle does not dispute that "'[r]ead naturally, the word 'any' has an expansive meaning, that is, 'one or some indiscriminately of whatever kind.'" *Ali v. Fed. Bureau of Prisons*, 552 U.S. 214, 219 (2008) (quoting *United States v. Gonzales*, 520 U.S. 1, 5 (1997)). Instead, Axle argues that "any" means "state and common-law." ECF 61 at 9-10. That is a perplexing reading, when Congress could simply have said "state and common-law" instead of "any." The evident statutory purpose and legislative history also suggest no atextual limits on the terms "any . . . privilege." Such a limitation would have been inconsistent with IEEPA's principal objective, which was to give the President greater flexibility to deal with national emergencies that threaten the national security, foreign policy, or economy of the United States. *See* S. Rep. 77-911 at 2 (explaining that the law would give the President "flexible powers" to "deal comprehensively with the many problems that surround alien property or its ownership or control in the manner most effective in each particular case"); H.R. Rep. 77-1507 at 3 (reiterating the same and noting that the amendments eliminated a limitation in the law to "permit the establishment of a complete system of alien property treatment" beyond just prohibiting or licensing transactions). Axle's interpretation would be particularly surprising because it gets the federalism canon backwards by permitting nullification of only state and common-law property rights. *Cf. Bond v. United States*, 572 U.S. 844, 858 (2014).

Axle cites *United States v. Palmer*, 16 U.S. 610 (1818), in purported support of this argument. ECF 61 at 9-10. In *Palmer*, the Court interpreted the statutory terms "any person or persons" to refer to citizens of the United States, reasoning that the Act of 1790 punishing piracy and felonies committed on the high seas evidenced an intent to criminalize "offences against the

6

United States, not offences against the human race." *Id.* at 631. *Palmer*'s limitation of the term "any" does not apply here because the statutory context and legislative history do not suggest a similar conclusion.

Nor does anything about "any … privilege" in IEEPA suggest that the phrase is a term of art that may be given more limited meaning. *See Ali*, 552 U.S. at 220 n.4. In *Ali*, the Court refused to interpret the phrase "any other law enforcement officer" in 28 U.S.C. § 2680(c) as limited to federal officers given the "expansive language Congress employed" in the statute. *Id.* at 220. Rather the Court held that the statute was "most naturally read to mean law enforcement officers of whatever kind." *Id.* at 220, 219 (noting that "'[r]ead naturally, the word 'any' has an expansive meaning, that is, 'one or some indiscriminately of whatever kind.'") (quoting *Gonzale*s, 520 U.S. at 5). Despite Axle's effort, the legislative and statutory history do not suggest that "any . . . privilege" is limited to state or common-law property rights. ECF 61 at 9. Indeed, the statute refers to "rights" and "privileges" separately, and Axle makes no attempt to identify the sorts of "state-" or "common-law" *privileges* that it suggests IEEPA addresses. Moreover, the Court already considered and rejected an attempt to cloak a narrow reading of IEEPA in legislative history. *See Dames & Moore*, 453 U.S. at 672 ("Petitioner contends that we should ignore the plain language of [IEEPA] because an examination of its legislative history as well as the history of [its predecessor statute TWEA] reveals that the statute was not intended to give the President such extensive power . . . . We do not agree and refuse to read out of [IEEPA] all meaning to the words 'transfer,' 'compel,' and 'nullify.' Nothing in the legislative histor[ies] requires such a result.").

Finally, IEEPA's limitation to the "exercise" of a privilege has no effect on the outcome here. Axle creates a distinction without a difference. As we explained in our prior briefing, ECF

7

59, the President prohibited importers from availing themselves of entry procedures that allowed duty-free entry of *de minimis* shipments. This is plainly prohibiting the *exercise* of such a privilege by any importer. *See, e.g.*, 62 Fed. Reg. 59,989 (blocking "all property and interests in property of the Government of Sudan" and prohibiting any "importation into the United States of any goods or services of Sudanese origin," among other actions); *cf.* ECF 61 at 10 (arguing that IEEPA actions "operate on *individual exercises* of rights or privileges in specific property"). Axle even suggests that, if the Executive Orders were phrased to prohibit importers from *exercising* the privilege, the Presidential action would be interpreted differently. ECF 61 at 10. *That* is "empty semantics." ECF 61 at 3. By suspending *de minimis* treatment to all importers, the President prohibited any exercise of this privilege.

### III. Section 1321 Does Not Mandate a Statutory *De Minimis* Exemption That Forecloses the President from Suspending the Privilege Under IEEPA

Throughout its reply, Axle describes 19 U.S.C. § 1321 as a statutory exemption that the President seeks to abrogate under IEEPA—one that commands the Secretary, in Axle's framing, to exempt low-value imports from tariffs through rulemaking. ECF 61 at 5, 6, 8, 10. This is wrong. The exemption is regulatory, not statutory. And it is discretionary, not compulsory.

Section 1321 authorizes but does not require the Secretary of Homeland Security to provide for the *de minimis* privilege by regulation.[1] *See* ECF 26, 27 at 7-8, 20, 28-35 (discussing the discretionary nature of 19 U.S.C. § 1321). Specifically, the statute provides that "[t]he Secretary of the Treasury, in order to avoid expense and inconvenience to the Government

---

[1] The Secretary of the Treasury has delegated this authority to the Secretary of Homeland Security pursuant to the Homeland Security Act of 2002. *See* Pub. L. 107–296, 116 Stat. 2142 and Treasury Order 100-20 (Oct. 30, 2024), https://home.treasury.gov/about/general-information/orders-and-directives/treasury-order-100-20.

disproportionate to the amount of revenue that would otherwise be collected, *is authorized, under such regulations as he shall prescribe*, to…."  19 U.S.C. § 1321(a) (emphasis added).

The statute does not directly exempt any class or value of goods, but it authorizes the Secretary to do so at the Secretary's discretion.  And if the Secretary decides to grant such an exemption, "he shall" do so by regulation.  *Id*.  Contrary to Axle's framing, ECF 61 at 8, 10, the word "shall" in the phrase "under such regulations as he shall prescribe" does not command the Secretary to exempt low-value goods from tariffs, but rather describes the specified means by which the Secretary exempts such goods (*i.e.*, by regulation), should he choose to do so at all.

Nothing, then, in section 1321 forecloses the President from directing the Secretary—the President's subordinate within the Executive Branch—to effectuate the President's suspension of the *de minimis* privilege, so that when dealing with a national emergency, the President may "nullify, void, prevent[,] or prohibit … exercising any right, power, or privilege with respect to … any property."  50 U.S.C. § 1702(a)(1)(B).  Despite Axle's characterization otherwise, ECF 61 at 7-8, when the President suspends the *de minimis* privilege to deal with a national emergency, the statute itself is not nullified or rendered inoperative.  Rather, section 1321's exemption-conferring authority remains available for the Secretary to exercise at his discretion when the emergency ends.  *See* ECF 26, 27 at 20, 31-32, 34-35 (explaining that section 1321 operates under ordinary circumstances).  In nullifying importers' exercise of the *de minimis* privilege during the declared emergency, however, the President directed the Secretary to implement the suspension, and to thus enforce the otherwise applicable HTSUS tariffs without allowing the administrative convenience waiver that is permitted but not required by section 1321(a).  *See* 19 U.S.C. § 1321(a) (authorization intended "to avoid expense and inconvenience to the Government").

Just as section 1321(a) authorizes the Secretary to provide for a *de minimis* privilege by regulation, section 1321(b) authorizes the Secretary to limit such exemptions, again by promulgating regulations.  "The Secretary of [Homeland Security] *is authorized by regulations to prescribe* exceptions to any exemption provided for in subsection (a) whenever he finds that such action is consistent with the purpose of subsection (a) or is necessary for any reason to protect the revenue or to prevent unlawful importations."  19 U.S.C. § 1321(b) (emphasis added).

As with section 1321(a), whether the Secretary exercises his authority to bestow or restrict *de minimis* exemptions through regulation remains inherently discretionary under section 1321(b).  Moreover, like section 1321(a), section 1321(b) pertains to the Secretary's ordinary, independent rulemaking authority, not the President's separate authority under IEEPA to suspend an administrative exemption in response to a declared national emergency.  *See* ECF 26, 27 at 29, 31 (explaining that section 1321(b) does not curtail the President's emergency powers under IEEPA).

Axle nonetheless contends that section 1321(b) requires that changes to the *de minimis* privilege be made only through notice-and-comment rulemaking, ECF 61 at 11, and that "[t]here can be no doubt that Section 1321(b) is the more specific, controlling provision."  *Id*. at 12.  As explained in our prior briefing, ECF 27, 28 at 33-34, ECF 59 at 24, n. 4, IEEPA is the more specific grant of power, as it authorizes the President to void a privilege only in the event of a national emergency, as opposed to 19 U.S.C. § 1321, which generally applies to regulating low-value duty exemptions in regular circumstances.  Section 1321(b) was not drafted to address national emergencies; rather, it authorizes the Secretary to regulate unlawful *de minimis* imports and to protect the revenue in the normal course.

At bottom, Axle's argument, ECF 61 at 8, 11, leads to the untenable conclusion that no emergency action bearing on a trade statute would be permissible without agency rulemaking. This interpretation is contradicted by the statute. Congress granted powers to the President under IEEPA, and concomitantly, it granted discretion to the Secretary under section 1321 to promulgate rules concerning the same or similar action in the normal course. *See* ECF 26, 27 at 31-33 (explaining same). If Congress intended to limit the President's powers in the manner suggested by Axle, it would have expressly done so. *See Lamie v. United States Trustee*, 540 U.S. 526, 538 (2004) (explaining that courts are not to "read an absent word" into a statute and that "[t]here is a basic difference between filling a gap left by Congress' silence and rewriting rules that Congress has affirmatively and specifically enacted") (citations omitted).

Undeterred, Axle suggests that legislative history somehow requires notice-and-comment rulemaking to change the *de minimis* exemption. *See* ECF 61 at 12 ("Congress's choice to require the Secretary to 'prescribe' 'regulations' manifested its intent to bar the government from 'unilaterally chang[ing] the [*de minimis*] rules without providing importers proper notice and an opportunity for comment.' S. Rep. 103-189, at 64 (1993)"). This quote is wrenched entirely from its context and completely misses the mark. That sentence explains "the concept of 'informed compliance,'" implemented by Title VI of the Customs Modernization Act, "which is premised on the belief that importers have a right to be informed about customs rules and regulations, as well as interpretive rulings, and to expect certainty that the Customs Service will not unilaterally change the rules without providing importers proper notice and an opportunity for comment." S. Rep. 103-189, at 64 (1993). Here, CBP did not "unilaterally change the rules" under the Secretary's discretionary authority; rather, the President exercised his authority under

11

IEEPA to deal with a national emergency by suspending the *de minimis* privilege and directing CBP to effectuate the suspension.

In any event, the actual legislative history of the privilege can be traced back to the Customs Administrative Act of 1938. Pub. L. 75-721, 52 Stat. 1081 (June 25, 1938), c. 679, § 7 (amending the Tariff Act of 1930 to add at the end of part I of title III a new section 321 on administrative exemptions). The primary intent of the administrative exemptions has always been for the convenience of the Government:

> As stated, the primary purpose of H. R. 8099 is to facilitate efficient administration of the customs laws. It cannot be termed an importers' bill nor can it be characterized as a domestic manufacturers' bill. Such benefits as will accrue to either group are purely incidental to an increase in administrative efficiency. Besides the primary purpose of facilitating more efficient administration of the customs laws. . . .

S. Rep. No. 75-1465, at 6 (1938). Moreover, the amendments sought to codify agency practice and confer discretionary authority upon Customs collectors:

> Section 7: This section authorizes existing practices under which collectors of customs disregard differences of less than $1 between the total duties or taxes deposited or tentatively assessed and the amount of duties actually accruing.
>
> It also gives collectors discretionary authority to admit articles free when the expense and inconvenience of collecting duty would be disproportionate to the amount of such duty, but not exceeding $5 worth of goods in any one day in the case of articles accompanying, and for the personal or household use of, persons arriving in the United States or $1 in any other case. This is in accord with the present practice.

*Id.* at 8.

The purpose of the *de minimis* privilege is thus as it has always been: to confer discretionary agency authority for ease of Government administration. The privilege has never

12

been a statutory command for the Government to exempt all low-value merchandise or to frustrate the President's independent authority to deal with national emergencies.

### IV.    Axle Is Not Entitled to Relief

Axle maintains that the future elimination of the *de minimis* privilege in the One Big Beautiful Bill Act (OBBB) reinforces its need for immediate relief.  ECF 61 at 17.  In particular, Axle maintains that "[a]s a result of the rescission, Detroit Axle has been forced to become the importer of record for all its shipments from Mexico and pay more than $44 million in tariffs on those shipments, which would have entered the country tariff-free under the de minimis exemption," and that "[t]he company could not feasibly or economically continue shipping directly to U.S. customers when each of those small-value shipments would require each individual customer to pay significant tariffs."  ECF 61 at 18.

Axle's choice to become the importer of record and assume the duty liability on its imports is not compensable.  The point of the *de minimis* privilege has always been to avoid expense and inconvenience to the Government, not to benefit end-use purchasers like Axle's customers.  Despite that, Axle set up its business to take advantage of that indirect benefit, one that was always susceptible to modification or recission at the discretion of the Secretary in the normal course or by the President's emergency powers.  After the privilege was suspended, Axle chose to pay the duties itself.  But it could have chosen for its customers to pay all duties that otherwise applied to the imported purchases, save for an administrative privilege intended for the benefit of the Government alone, which the President suspended.  These non-IEEPA duties are imposed on Axle's entries of auto parts pursuant to the HTSUS and, where applicable, sections 122, 232, or 301—none of which provide for any *de minimis* value exemptions.

13

More importantly, even if it were available, Axle should never have been able to claim *de minimis* treatment for its auto parts.  As explained in our prior briefing, ECF 59 at 13-16, the *de minimis* shipments from Axle's warehouse in Mexico to its U.S. customers were released from CBP custody based solely on the information provided on the manifest or bill of lading.  But because the release from manifest entry process did not permit the submission of any additional entry documentation, importations subject to requirements imposed by agencies other than CBP (called "Partner Government Agencies" or "PGAs") were unable to use the release from manifest entry process to enter duty-free imports under the *de minimis* exemption.  As CBP explained in a general notice:

> A Section 321 low-value shipment is not exempt from PGA requirements. Many agencies do not have *de minimis* exemptions for their PGA reporting requirements and require strict accountability of imported goods for national security, health and safety reasons, and to identify specific shipments of potentially violative products for reporting or enforcement targeting purposes. Low-value shipments may also require the payment of applicable PGA duties, fees or applicable excise taxes collected by other agencies. Shipments that have PGA data reporting requirements, or require the payment of any duties, fees, or taxes, may not benefit from the use of a less complex Section 321 entry process like the "release from manifest" process, and must be entered using the appropriate informal or formal entry process to ensure that the PGA requirements are met. All shipments subject to PGA requirements are currently ineligible for entry under the "release from manifest" process.

U.S. Customs and Border Protection, *Test Concerning Entry of Section 321 Low-Value Shipments Through the Automated Commercial Environment (ACE) (Also Known as Entry Type 86); Republication With Modifications*, 89 Fed. Reg. 2630, 2631 (Jan. 16, 2024).

Axle's imported auto parts are subject to PGA regulations, as they are regulated by the National Highway Traffic Safety Administration (NHTSA) within the Department of Transportation.  Axle's Mexican shipments of auto parts thus should never have been eligible for

14

the release from manifest process under 19 C.F.R. § 143.23(j)(3) to claim the *de minimis* privilege.

If Axle were to prevail on its legal argument, at most the relief awarded to Axle should be limited to a declaratory judgment and prospective injunction limited to Axle itself. Axle cannot be refunded duties that it elected to pay on behalf of its customers. If it were able to do so, then presumably other importers could claim that they too would have exercised the *de minimis* privilege were it available, even if those importers entered merchandise that would not have otherwise been eligible for the exemption or decided not to import any merchandise at all once the exemption was suspended.

Axle's *de minimis* challenge presents no basis to refund any duties that were lawfully assessed on imports for which Axle chose to act as the importer of record. And as discussed in our prior brief, ECF 59 at 14-15, even if the *de minimis* exemption were reinstated, Axle, as importer of record, would be limited to duty-free treatment on only $800 worth of merchandise that it imported per day. Any imports that it made on the same day above that amount would not have been eligible for the *de minimis* privilege.

*          *          *

Finally, with respect to the Administrative Procedure Act (APA), Axle argues that agency actions implementing the President's directives, no matter how ministerial, are nevertheless subject to APA review. ECF 61 at 19-21. Axle largely relies upon *Nebraska v. Su*, 121 F.4th 1 (9th Cir. 2024), for this position. But *Su* is not binding on this Court or the Federal Circuit. Indeed, in its decision, the Ninth Circuit notes disagreement between the circuits as to whether the APA applies to the executive actions under consideration. 121 F.4th at 15 n.7; *see also Associated Builders & Contractors Fla. First Coast Chapter v. Gen. Servs. Admin.*, No. 25-

15

11375, 2026 WL 1075264, at *10 (11th Cir. Apr. 21, 2026) (holding counter to the Ninth Circuit in a similar challenge).  In any event, *Su* has no direct bearing on this action: *Su* considered agency rulemaking implementing an Executive Order, but here, the President acted directly to suspend a regulatory privilege, and no agency rulemaking was undertaken.

Similarly, *HMTX Indus. LLC v. United States*, 156 F.4th 1236 (Fed. Cir. 2025), cited by Axle, ECF 61 at 20, is distinguishable from the instant matter.  In *HMTX*, the USTR's statutorily delegated actions imposing tariffs, held to be reviewable under the APA, were its own and were informed not only by the "specific direction of the President," but also by statutory factors and public comments and testimony.  156 F.4th at 1250.  Here, IEEPA authorized the President to directly suspend a regulatory privilege, and no agency exercised separate statutorily conferred authority to effectuate that decision.

Lastly, Axle maintains that one of its "arbitrary-or-capricious arguments has always been that the government failed to reasonably explain why it imposed lower tariff rates on postal-network shipments than on non-postal shipments like Detroit Axle's."  ECF 61 at 22.  Setting aside that this "argument" is limited to virtually the same sentence tucked in away in only two of Axle's filings, *see* ECF 9 at 24, ECF 55 ¶ 72; *Agile Def., Inc. v. United States*, 959 F.3d 1379, 1384 n.* (Fed. Cir. 2020) ("cursory argument[s]" are forfeited), the differential treatment between postal and non-postal shipments was a decision by *the President* under *his* statutory authority, which was implemented by CBP.  *See* Executive Order 14324, Suspending Duty-Free De Minimis Treatment for All Countries, 90 Fed. Reg. 37,775, 37,777-78, §§2-3 (Aug. 5, 2023) (making the postal distinction); Executive Order 14388, Continuing the Suspension of Duty-Free De Minimis Treatment for All Countries, 91 Fed. Reg. 9433, 9435, §§2-3 (Feb. 25, 2026) (same);

16

*see also* ECF 27, 28 at 14-19 (explaining that the President's Executive Orders and CBP's ministerial implementation of such are not subject to APA review).

In any event, we discussed in our prior briefing the respective procedures for the collection of duties for postal and non-postal *de minimis* shipments.  ECF 59 at 31-34. Specifically, no special duty procedures were required for low-value non-postal shipments because these imports could easily use existing informal or formal entry procedures.  *De minimis* postal shipments, however, required interim special duty procedures because HTSUS classification-based duties could not be applied to these imports until a new entry process has been established.  These interim procedures required transportation carriers, or qualified parties approved by CBP, to collect duties on postal shipments and periodically remit those duties to CBP.  But these procedures were only ever temporary, and forthcoming rulemaking will establish the new entry process for mail shipments, which will eliminate these special considerations, as the President directed in the challenged Executive Orders.

## CONCLUSION

The Court should deny Axle's renewed partial motion for summary judgment, grant Defendant's partial motion to dismiss and partial summary judgment motion, and enter judgment accordingly.

DATED: May 14, 2026

Respectfully submitted,

BRETT A. SHUMATE
Assistant Attorney General
Civil Division

ERIC J. HAMILTON
Deputy Assistant Attorney General

By:      PATRICIA M. McCARTHY
Director

CLAUDIA BURKE
Deputy Director

/s/ Justin R. Miller
JUSTIN R. MILLER
Attorney-In-Charge
International Trade Field Office

/s/ Alexander Vanderweide
ALEXANDER VANDERWEIDE
Senior Trial Counsel

/s/ Mathias Rabinovitch
MATHIAS RABINOVITCH
Trial Attorney
International Trade Field Office
Department of Justice, Civil Division
Commercial Litigation Branch
26 Federal Plaza, Room 346
New York, New York 10278

*Attorneys for Defendants*

18

**CERTIFICATE OF COMPLIANCE**

I hereby certify, pursuant to section 2(B)(1) of the Standard Chambers Procedures of this Court, that this reply contains 5422 words, excluding the table of contents, table of authorities, any addendum containing statutes, rules or regulations, any certificates of counsel, and counsel's signature, as calculated by the word processing system used to prepare this brief (Microsoft Word).

/s/ Alexander Vanderweide
ALEXANDER VANDERWEIDE