Slip Op. 26-94

## UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| AXLE OF DEARBORN, INC. D/B/A/ DETROIT AXLE,<br><br>**Plaintiff,**<br><br>v.<br><br>DEPARTMENT OF COMMERCE; HOWARD LUTNICK in his official capacity as Secretary of Commerce; DEPARTMENT OF HOMELAND SECURITY; MARKWAYNE MULLIN in his official capacity as Secretary of Homeland Security; DEPARTMENT OF THE TREASURY; SCOTT BESSENT in his official capacity as Secretary of the Treasury; UNITED STATES CUSTOMS AND BORDER PROTECTION; RODNEY SCOTT in his official capacity as Commissioner for U.S. Customs and Border Protection; and the UNITED STATES,<br><br>**Defendants.** | Before: Gary S. Katzmann, Judge<br>Timothy M. Reif, Judge<br>Jane A. Restani, Judge<br><br>Court No. 25-00091 |

## OPINION

[ The court denies Plaintiff's motion for partial summary judgment as to Counts I and II of its Amended Complaint, grants summary judgment in favor of Defendants on Counts I and II of Plaintiff's Amended Complaint, denies Defendants' motion to dismiss Count II of Plaintiff's Amended Complaint as moot, and denies Defendants' motion for summary judgment as to Count III of Plaintiff's Amended Complaint. ]

Dated: <u>August 13, 2026</u>

<u>Thomas H. Dupree, Jr.</u>, Gibson, Dunn & Crutcher, LLP, of Washington, D.C., argued for Plaintiff Axle of Dearborn, Inc.  Also on the briefs were <u>Samantha Sewall</u>, <u>Nick Harper</u>, <u>Connor P. Mui</u>, and <u>Luke J.P. Wearden</u>.

<u>Eric J. Hamilton</u>, Deputy Assistant Attorney General, Federal Programs Branch, Civil Division, U.S. Department of Justice, of Washington, D.C., argued for Defendants Department of Commerce, Howard Lutnick in his official capacity as Secretary of Commerce, Department of

Homeland Security, Markwayne Mullin in his official capacity as Secretary of Homeland Security, Department of the Treasury, Scott Bessent in his official capacity as Secretary of the Treasury, United States Customs and Border Protection, Rodney Scott in his official capacity as Commissioner for U.S. Customs and Border Protection, and the United States.[1] Also on the briefs were Brett A. Shumate, Assistant Attorney General, Patricia M. McCarthy, Director, Claudia Burke, Deputy Director, Justin R. Miller, Attorney-In-Charge, Alexander Vanderweide, Senior Trial Counsel, and Mathias Rabinovitch, Trial Attorney.

Per Curiam:  Beginning on February 1, 2025, the President issued a series of Executive Orders invoking the International Emergency Economic Powers Act of 1977 ("IEEPA") to impose tariffs on goods from every nation in the world and to rescind the de minimis exemption, which allows the Secretary of the Treasury ("the Secretary") to admit duty-free goods whose value does not exceed $800.  See 19 U.S.C. § 1321.  On February 20, 2026, the Supreme Court held in Learning Resources, Inc. v. Trump that "IEEPA does not authorize the President to impose tariffs[,]" invalidating the tariffs imposed by the President's executive orders.  607 U.S. 229, 255 (2026).[2]  The President's more limited rescission of the de minimis exemption was not at issue in that case.  Plaintiff Detroit Axle ("Axle"), a family-run auto-parts distributor, brings the present and separate action against Defendants the United States and certain agencies and officials (collectively, "the Government") challenging the President's rescission of the de minimis exemption.  See First Am. Compl. ¶¶ 1, 12, Mar. 5, 2026, ECF No. 55 ("Am. Compl.").  Specifically, Axle argues that the President lacks the authority to rescind the de minimis exemption

---

[1] Per USCIT Rule 25(d), named officials have been substituted to reflect the current officeholders.

[2] The Supreme Court granted certiorari and then consolidated two separate cases: V.O.S. Selections, Inc. v. United States (emanating from the United States Court of International Trade) and Learning Resources, Inc. v. Trump (emanating from the U.S. District Court for the District of Columbia).  See Trump v. V.O.S. Selections, Inc., 146 S. Ct. 73 (2025).  The Supreme Court's holding in Learning Resources affirmed this court's determination in V.O.S. that "IEEPA does not authorize" any of the tariffs in the relevant Executive Orders.  V.O.S. Selections, Inc. v. United States, 49 CIT __, __, 772 F. Supp. 3d 1350, 1383 (2025); aff'd in part and vacated in part sub nom., V.O.S. Selections, Inc. v. Trump, 149 F.4th 1312 (Fed. Cir. 2025); aff'd sub nom., Learning Res., 607 U.S. 229.

under IEEPA and that agency actions implementing the rescission of the <u>de minimis</u> exemption are arbitrary and capricious under the Administrative Procedure Act ("APA"). <u>See id.</u> ¶¶ 79–93; Pl. Detroit Axle's Mot. to Dissolve the Stay and Renewed Mot. for Partial Summ. J. at 13–14, Feb. 26, 2026, ECF No. 53 ("Pl.'s Br.").

Before the court are Axle's motion for partial summary judgment, <u>see generally</u> Pl.'s Br., the Government's cross-motion for partial summary judgment, and the Government's partial motion to dismiss, <u>see</u> Defs.' Resp. in Opp'n to Pl.'s Renewed Mot. for Partial Summ. J. and Renewal of Partial Mot. to Dismiss and Cross-Mot. for Summ. J., Apr. 9, 2026, ECF No. 59 ("Gov't Br."). Following the Supreme Court's decision in <u>Learning Resources</u>, the legal questions at issue in this case involve only the <u>de minimis</u> exemption: (1) whether IEEPA, which authorizes the President to "nullify [or] void . . . exercising any right, power, or privilege with respect to . . . any property in which any foreign country or a national thereof has any interest[,]" 50 U.S.C. § 1702(a)(1)(B), authorizes his rescission of the <u>de minimis</u> exemption and (2) whether agency action implementing the President's rescission of the <u>de minimis</u> exemption is arbitrary and capricious under the APA. We conclude first that IEEPA's provision providing that the President may "nullify [or] void . . . exercising any . . . privilege" authorizes the President's rescission of the <u>de minimis</u> exemption here because the <u>de minimis</u> exemption, by its own terms, creates a "privilege." In reaching this conclusion, we find that the President's power to "nullify [or] void . . . exercising any . . . privilege" does not run afoul of separation of powers principles because the President's rescission of the <u>de minimis</u> exemption is not an exercise of the power of the purse, as was the case in <u>Learning Resources</u>, and is not an exercise of the power to legislate, as was the case in <u>Clinton v. City of New York</u>, 524 U.S. 417, 444 (1998). Second, we conclude that, pursuant to the Supreme Court's controlling holding in <u>Franklin v. Massachusetts</u>, 505 U.S. 788, 800–01

Court No. 25-00091                                                                     Page 4

(1992), the APA does not apply to the ministerial agency actions here implementing the President's

directive.

## LEGAL BACKGROUND

### I.        *International Emergency Economic Powers Act*

In 1977, Congress enacted IEEPA, granting the President authority over international trade

for use in time of national emergency.  In full, the relevant provision of IEEPA provides that the

President may:

> (A)  investigate, regulate, or prohibit—
>
>> (i)       any transactions in foreign exchange,
>>
>> (ii)      transfers of credit or payments between, by, through, or to any banking institution, to the extent that such transfers or payments involve any interest of any foreign country or a national thereof,
>>
>> (iii)     the importing or exporting of currency or securities,
>
> by any person, or with respect to any property, subject to the jurisdiction of the United States;
>
> (B)  investigate, block during the pendency of an investigation, regulate, direct and compel, nullify, void, prevent or prohibit, any acquisition, holding, withholding, use, transfer, withdrawal, transportation, importation or exportation of, or dealing in, or exercising any right, power, or privilege with respect to, or transactions involving, any property in which any foreign country or a national thereof has any interest by any person, or with respect to any property, subject to the jurisdiction of the United States . . . .

50 U.S.C. § 1702(a)(1).  IEEPA further provides that these authorities "may only be exercised to

deal with an unusual and extraordinary threat with respect to which a national emergency has been

declared for purposes of this chapter and may not be exercised for any other purpose."  Id.

§ 1701(b).

### II.        The *De Minimis* Exemption

In 1938, Congress amended the Tariff Act of 1930 to provide the Secretary two specific

authorities: (1) "to disregard a difference of less than $1 between the total estimated duties or taxes

deposited, or the total duties of taxes tentatively assessed" and (2) "to admit articles free of duty when the expense and inconvenience of collecting the duty . . . would be disproportionate to the amount of such duty."  Customs Administrative Act of 1938, Pub. L. No. 75-721, § 7, 52 Stat. 1077, 1081 (1938) (codified at 19 U.S.C. § 1321).  In 1953, Congress amended this provision to provide the Secretary with the authority to admit duty-free certain goods whose value did not exceed $1.[3]  See Customs Simplification Act of 1953, Pub. L. No. 83-243, ch. 397, § 13, 67 Stat. 507, 515–16 (1953) ("Customs Simplification Act").

Congress subsequently amended the provision several times to increase the value of goods that can be admitted duty-free.  See Customs Procedural Reform and Simplification Act of 1978, Pub. L. No. 95-410, § 205(b)(3), 92 Stat. 888, 900 (1978) (from $1 to $5); North American Free Trade Agreement Implementation Act, Pub. L. No. 103-182, § 651(2)(D), 107 Stat. 2057, 2209 (1993) (from $5 to $200); Trade Facilitation and Trade Enforcement Act of 2015 ("TFTEA"), Pub. L. No. 114-125, § 901(c), 130 Stat. 122, 223 (2016) (from $200 to $800).  While initially Congress designed the provision for the benefit of the Government, see Customs Simplification Act: Hearings on H.R. 5106 Before the H. Comm. on Ways and Means, 83rd Cong. 46 (1953) (noting that the "principle" of the exemption applies "in situations where we are spending a dollar to collect 50 cents"), these expansions reflect an additional goal of facilitating trade.  See Christopher A. Casey, Cong. Rsch. Serv., R48380, Imports and the Section 321 (De Minimis) Exemption: Origins, Evolution, and Use 1 (2025).  For example, in 2015, when Congress raised the value of "all other" goods that could qualify for de minimis treatment from $200 to $800, it found that "[m]odernizing

---

[3] The statute originally allowed the Secretary to admit as duty-free goods whose value did not exceed: (1) $10 for gifts sent from abroad, (2) $10 for goods accompanying persons arriving in the United States for personal or household use, and (3) $1 for all other goods.  Pub. L. No. 83-243, ch. 397, § 13.  This "all other" provision makes up the "de minimis exemption" at issue in this case.

international customs is critical for United States businesses of all sizes, consumers in the United States, and the economic growth of the United States." TFTEA, Pub. L. No. 114-125, § 901(a)(1). Congress noted that the newly expanded provision would "provide significant economic benefits to businesses and consumers in the United States and the economy of the United States." Id. § 901(a)(2).

Today, the de minimis exemption allows the Secretary to "admit . . . free of duty and any other tax imposed on or by reason of importation" goods valued at less than $800 "imported by one person on one day." 19 U.S.C. § 1321(a)(2)(C).[4]

## FACTUAL BACKGROUND

The President's Executive Orders invoking IEEPA to impose tariffs on goods from Mexico, China, and Canada state that "duty-free de minimis treatment under 19 U.S.C. [§] 1321 shall not be available for the articles described" therein. Executive Order 14193, Imposing Duties To Address the Flow of Illicit Drugs Across Our Northern Border, 90 Fed. Reg. 9113, 9115 (Feb. 1, 2025); Executive Order 14194, Imposing Duties To Address the Situation at Our Southern Border, 90 Fed. Reg. 9117, 9119 (Feb. 1, 2025); Executive Order 14195, Imposing Duties To Address the Synthetic Opioid Supply Chain in the People's Republic of China, 90 Fed. Reg. 9121, 9123 (Feb. 1, 2025). Shortly thereafter, the President suspended his rescission of the de minimis exemption and later reinstated it for products from China. See Executive Order 14200, Amendment to Duties Addressing the Synthetic Opioid Supply Chain in the People's Republic of China, 90 Fed. Reg. 9277, 9277 (Feb. 5, 2025); Executive Order 14226, Amendment to Duties To Address the Flow of Illicit Drugs Across Our Northern Border, 90 Fed. Reg. 11369, 11369 (Mar.

---

[4] The provision currently allows the Secretary to admit duty free goods whose value does not exceed: (1) $100 for gifts sent from abroad (2) $200 for goods accompanying persons arriving in the United States for personal or household use, and (3) $800 for all other goods. 19 U.S.C. § 1321(a)(2).

2, 2025); Executive Order 14227, Amendment to Duties To Address the Situation at Our Southern Border, 90 Fed. Reg. 11371, 11371 (Mar. 2, 2025); Executive Order 14256, Further Amendment to Duties Addressing the Synthetic Opioid Supply Chain in the People's Republic of China as Applied to Low-Value Imports, 90 Fed. Reg. 14899, 14899 (Apr. 2, 2025). On July 30, 2025, the President issued an executive order invoking IEEPA to eliminate the de minimis exemption worldwide, effective August 29, 2025. See Executive Order 14324, Suspending Duty-Free De Minimis Treatment for All Countries, 90 Fed. Reg. 37775, 37777 (July 30, 2025).

The President declared two national emergencies as the basis for the Executive Orders at issue here: one involving the use of fentanyl and other illicit drugs, see, e.g., Proclamation 10886, Declaring a National Emergency at the Southern Border of the United States, 90 Fed. Reg. 8327 (Jan. 20, 2025); Executive Order 14195, 90 Fed. Reg. at 9121 (expanding emergency "to cover . . . the [People's Republic of China]"), and another involving "a lack of reciprocity in our bilateral trade relationships," Executive Order 14257, Regulating Imports With a Reciprocal Tariff to Rectify Trade Practices That Contribute to Large and Persistent Annual United States Goods Trade Deficits, 90 Fed. Reg. 15041, 15041 (Apr. 2, 2025).

As noted, on February 20, 2026, the Supreme Court held that "IEEPA does not authorize the President to impose tariffs." Learning Res., 607 U.S. at 255. The Court found that, "had Congress intended to convey the distinct and extraordinary power to impose tariffs, it would have done so expressly—as it consistently has in other tariff statutes." Id. at 248–49. The Court went on to conclude that "[t]he power to 'regulate . . . importation' does not fill that void." Id. at 249. Later that day, the President issued an executive order stating that the tariffs imposed pursuant to IEEPA "shall no longer be in effect and, as soon as practicable, shall no longer be collected." Executive Order 14389, Ending Certain Tariff Actions, 91 Fed. Reg. 9437, 9437 (Feb. 20, 2026).

In a separate Executive Order issued the same day, the President clarified that "the suspension of, or continued suspension of, duty-free de minimis treatment, as detailed in Executive Order 14324" was not affected by the invalidation of "the additional duties imposed under [other Executive Orders]." Executive Order 14388, Continuing the Suspension of Duty-Free De Minimis Treatment for All Countries, 91 Fed. Reg. 17839, 17839 (Feb. 20, 2026).

During the pendency of litigation over the President's Executive Orders rescinding the de minimis exemption, Congress enacted the One Big Beautiful Bill Act ("OBBB") statutorily repealing the de minimis exemption effective July 1, 2027.  See One Big Beautiful Bill Act, Pub. L. No. 119–21, § 70531(b), 139 Stat. 72, 283 (2025).  In enacting the OBBB, the Committee on the Budget commented that

> [n]o section of this provision should be interpreted to diminish existing authorities of the President to enforce U.S. laws by limiting the availability of the [de minimis exemption], including to protect the revenue or to prevent unlawful importation. By repealing the statute providing this exemption in 2027, the Committee is in no way modifying or undermining actions the President has already taken or may take in the future to restrict the availability of the [de minimis] exemption prior to the repeal date.

Comm. on the Budget, H.R. Rep. No. 119-106, at 1768 (2025).

U.S. Customs and Border Protection ("CBP") separately released a pair of rules on June 24, 2026, indefinitely suspending the de minimis exemption.  See Indefinite Suspension of the De Minimis Exemption for Mail Shipments and New Postal Informal Entry Process, 91 Fed. Reg. 37801 (June 24, 2026) (codified at 19 C.F.R. pt. 145) ("Postal Suspension Rule"); Indefinite Suspension of the De Minimis Exemption for Merchandise Arriving Through All Modes Other Than the International Postal Network, 91 Fed. Reg. 37789 (June 24, 2026) (codified at 19 C.F.R. pt. 10) ("Non-Postal Suspension Rule").  CBP noted that the "rule[s] do[] not, in practice, change the existing suspension of de minimis . . . rather [they] match[] the existing suspension to a regulatory suspension implemented in th[ese] rule[s]."  Postal Suspension Rule, 91 Fed. Reg. at

37814; Non-Postal Suspension Rule, 91 Fed. Reg. at 37800. Additionally, CBP "considers the effects of the suspension of de minimis . . . to belong to the Executive Order (from August 29, 2025[,] until July 1, 2027) and the statutory repeal of the basis for the de minimis exemption (from July 1, 2027, on)." Postal Suspension Rule, 91 Fed. Reg. at 37814; Non-Postal Suspension Rule, 91 Fed. Reg. at 37800.

## PROCEDURAL HISTORY

Axle filed its complaint on May 16, 2025, originally challenging the President's Executive Orders imposing tariffs on, and rescinding the de minimis exemption for, goods from China.[5] See Compl., May 16, 2025, ECF No. 2. On May 21, 2025, Axle filed a motion for preliminary injunction asking the court to "preliminarily enjoin the [G]overnment from imposing tariffs on imports that otherwise would be protected by the de minimis exemption," and moved for summary judgment on Counts I and II. Mot. for Prelim. Inj. and Expedited Partial Summ. J. at 3, May 21, 2025, ECF No. 9. On May 28, 2025, this court held in a separate action challenging the President's use of IEEPA to impose tariffs that "IEEPA does not authorize" any of the tariffs in the relevant Executive Orders. V.O.S. Selections, Inc. v. United States, 49 CIT __, __, 772 F. Supp. 3d 1350, 1383 (2025); aff'd in part and vacated in part sub nom., V.O.S. Selections, Inc. v. Trump, 149 F.4th 1312 (Fed. Cir. 2025); aff'd sub nom., Learning Res., 607 U.S. 229. After holding oral argument on July 10, 2025, the court denied Axle's motion for a preliminary injunction and stayed the remainder of the case pending a final resolution of V.O.S. Axle of Dearborn, Inc. v. Dep't of Com., 49 CIT __, __, 791 F. Supp. 3d 1363, 1366 (2025). The court held that, "[e]ven assuming

---

[5] Axle also challenges Executive Order 14194—rescinding the de minimis exemption for goods from Mexico—in its Amended Complaint, but has not presented a related argument in its motion for partial summary judgment. See Am. Compl. at 33. Regardless, Axle states that its products "are tariffed as though they are Chinese goods because they are not 'substantially transformed' in Mexico," suggesting that the Mexico-specific Executive Orders are not impacting Axle's business in any way. Am. Compl. ¶ 47 n.1 (quoting 19 C.F.R. § 134.1(b)).

arguendo that Axle is suffering irreparable harm, it cannot succeed in obtaining the relief it seeks," because "[t]his court has already granted, and the Federal Circuit subsequently stayed, all relief Axle requests." Id. at 1365.

After the Supreme Court resolved V.O.S. in its decision in Learning Resources, Axle moved to amend its complaint to add challenges to Executive Order 14324 (suspending the de minimis exemption worldwide) and Executive Order 14388 (continuing the suspension of the de minimis exemption worldwide). See Mot. for Leave to Amend Compl., Feb. 26, 2026, ECF No. 52; Am. Compl. In its amended complaint, Axle advances three Counts: (I) the President lacks the authority to rescind the de minimis exemption under IEEPA and the Constitution, (II) agency actions implementing the rescission of the de minimis exemption are arbitrary and capricious under the APA, and (III) the President lacks the authority to impose tariffs under IEEPA and the Constitution. See Am. Compl. ¶¶ 79–98.

Axle now moves for partial summary judgment on Counts I and II. See generally Pl.'s Br. The Government filed its response to Axle's motion, moved to dismiss Count II, and cross-moved for summary judgment on Counts I and III. See generally Gov't Br. Axle and the Government filed replies in support of their respective motions. See Pl. Detroit Axle's Reply in Supp. of Its Renewed Mot. for Partial Summ. J. and in Opp'n to Defs.' Partial Mot. to Dismiss and Cross-Mot. for Summ. J., Apr. 23, 2026, ECF No. 61 ("Pl.'s Reply"); Defs.' Reply in Supp. of their Partial Mot. to Dismiss and Cross-Mot. for Summ. J., May 14, 2026, ECF No. 63. We heard oral argument on June 23, 2026. See Appearance Sheet, June 23, 2026, ECF No. 70. In sum, currently before the court are Axle's motion for partial summary judgment on Counts I and II, the Government's motion for partial summary judgment on Counts I and III, and the Government's motion to dismiss Count II.

## STANDING

Article III of the Constitution requires plaintiffs in federal court to have standing to sue.[6] "[T]he plaintiff must have suffered an injury in fact—a concrete and imminent harm to a legally protected interest, like property or money—that is fairly traceable to the challenged conduct and likely to be redressed by the lawsuit." Biden v. Nebraska, 600 U.S. 477, 489 (2023) (citing Lujan v. Defs. of Wildlife, 504 U.S. 555, 560–61 (1992)). "[A] plaintiff may establish its injury-in-fact 'in the same way as any other matter on which the plaintiff bears the burden of proof.' " Canadian Lumber Trade All. v. United States, 517 F.3d 1319, 1333 (Fed. Cir. 2008) (quoting Lujan, 504 U.S. at 561).

A non-importer plaintiff may "fairly employ economic logic" to establish a concrete and particularized injury-in-fact that is fairly traceable to a challenged tariff. Id. A plaintiff that takes that route must show that the challenged tariff is "likely to cause [the plaintiff] an economic injury," and that "this injury would be prevented by a declaratory judgment and injunction" setting that tariff aside. Id. at 1334. Axle has done so here.

Axle alleges that it has suffered (and will continue to suffer) economic injuries as a result of the rescission of the de minimis exemption. See Am. Compl. ¶¶ 49–50. Axle avers that its "business model relies on the company's ability to ship some of its products tariff-free to customers in the United States, so the elimination of the de minimis exemption seriously threatens the company's profitability, reputation, and operating model." Id. ¶ 49.

Neither Congress's statutory repeal of the de minimis exemption nor CBP's regulatory suspension of the de minimis exemption affects Axle's alleged entitlement to refunds of the tariffs

---

[6] The Government does not appear to contest statutory or "prudential" standing, which unlike Article III standing, can be waived. See Brooklyn Brewery Corp. v. Brooklyn Brew Shop, 17 F.4th 129, 140 (Fed. Cir. 2021) (citing June Med. Servs. LLC v. Russo, 591 U.S. 299, 317 (2020)).

paid before the effective date of these actions.  Axle notes that Congress's elimination of the <u>de minimis</u> exemption in the OBBB "provided two years for businesses to adjust their operations by making that change effective only starting in July 2027."  <u>Id.</u> ¶ 34; <u>see also</u> Pl.'s Reply at 18. Similarly, CBP's recent rules indefinitely suspending the <u>de minimis</u> exemption became effective only June 24, 2026, and July 24, 2026, respectively, and neither rule eliminated the harm that Axle has allegedly already experienced.  Further, CBP provided a period for parties to submit "comments that relate to the economic, environmental, or federalism effects that might result from th[ese] rule[s]," suggesting that the interim rules may be modified based on public participation. <u>Postal Suspension Rule</u>, 91 Fed. Reg. at 37801; <u>Non-Postal Suspension Rule</u>, 91 Fed. Reg. at 37789.  CBP stated that it "considers the effects of the suspension of <u>de minimis</u> to belong to the Executive Orders (from August 29, 2025[,] until July 1, 2027) and the statutory repeal of the basis for the <u>de minimis</u> exemption (from July 1, 2027[,] on)."  <u>Non-Postal Suspension Rule</u>, 91 Fed. Reg. at 37800; <u>see also</u> <u>Postal Suspension Rule</u>, 91 Fed. Reg. at 37814.  Thus, any injury that Axle is allegedly experiencing as a result of the rescission of the <u>de minimis</u> exemption is fairly traceable to the President's Executive Orders, at least until July 1, 2027.

<strong>JURISDICTION AND STANDARD OF REVIEW</strong>

The Court of International Trade has exclusive jurisdiction to hear this action under 28 U.S.C. § 1581(i), which gives the court "exclusive jurisdiction of any civil action commenced against the United States, its agencies, or its officers, that arises out of any law of the United States providing for . . . revenue from imports or tonnage; . . . tariffs, duties, fees, or other taxes on the importation of merchandise for reasons other than the raising of revenue, . . . [or] administrative and enforcement with respect to" those matters.  28 U.S.C. § 1581(i)(1); <u>see also</u> <u>id.</u> § 1337(c) ("The district courts shall not have jurisdiction under this section of any matter within the exclusive jurisdiction of the Court of International Trade . . . .").  The challenged Executive Orders invoke

IEEPA to impose tariffs and to rescind duty-free treatment for low-value imports thereby subjecting those goods to the duties set out in the U.S. Harmonized Tariff Schedule.  See, e.g., Executive Order 14195, 90 Fed. Reg. 9121.  For the purpose of locating jurisdiction under 28 U.S.C. § 1581(i), a challenge to a presidential action that imposes tariffs and that rescinds duty-free treatment is one that arises from a "law providing for . . . revenue from imports . . . [and] tariffs, duties, fees, or other taxes."  50 U.S.C. § 1581(i); see also Learning Res., 607 U.S. at 240 n.1 (agreeing that "the V.O.S. Selections case falls within the exclusive jurisdiction of the [Court of International Trade]"); 28 U.S.C. § 255 (contemplating "civil action[s]" falling under this court's jurisdiction that "raise[] . . . issue[s] of the constitutionality of . . . a proclamation of the President or an [e]xecutive order").

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  USCIT R. 56(a).

28 U.S.C. § 2640(e) provides that "[i]n any civil action not specified in this section," which includes actions under 28 U.S.C. § 1581(i), "the Court of International Trade shall review the matter as provided in section 706 of title 5."  This references the "[s]cope of review" section of the APA, codified at 5 U.S.C. § 706, which provides that "[t]he reviewing court shall . . . hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right."  5 U.S.C. § 706(2)(A), (C).

As it undertakes this review function, "[t]he Court of International Trade shall possess all the powers in law and equity of, or as conferred by statute upon, a district court of the United

States."  28 U.S.C. § 1585.  Our role here is not to make a policy judgment but to determine the

bounds of the President's authority under IEEPA.  See Zivotofsky ex rel. Zivotofsky v. Clinton,

566 U.S. 189, 196 (2012).  In doing so we do not pass upon the wisdom or likely effectiveness of

the President's rescission of the de minimis exemption.  See id. at 208 (Sotomayor, J., concurring

in part) ("In no fashion does the question require a court to review the wisdom of the President's

policy . . . or any other decision committed to the discretion of a coordinate department.").

**DISCUSSION**

I.       ***The President's Authority to "Void . . . Exercising Any . . . Privilege" Under IEEPA Includes the Power to Void the <u>De Minimis</u> Privilege***

As previously set forth, IEEPA provides the President with the authority to "nullify, void,

prevent or prohibit . . . exercising any right, power, or privilege with respect to . . . any property in

which any foreign country or a national thereof has any interest by any person[.]"  50 U.S.C.

§ 1702(a)(1)(B).  The de minimis exemption, by its own terms, creates a privilege:  The provision

describes duty-free treatment as "the <u>privilege</u> of this subdivision," and refers to "[a]ny person

who enters, introduces, facilitates, or attempts to introduce an article into the United States using

the <u>privilege</u> of this section."  19 U.S.C. § 1321(a)(2), (c) (emphasis added).  Congress recently

affirmed this interpretation when enacting the OBBB.  See Pub. L. 119–21, § 70531(b), 139 Stat.

72, 283 (2025).  In a report section entitled "Modifications to De Minimis Entry Privilege For

Commercial Shipments" and describing the exemption as "the de minimis privilege," the

Committee on the Budget commented that "the provision [as modified] aligns closely with

President Trump's Executive Order 14256 . . . , which on an emergency basis eliminated duty-free

de minimis treatment on articles of $800 or less sent to the United States from the People'[s]

Republic of China."  Comm. on the Budget, H.R. Rep. No. 119-106, at 1767–68 (2025).

Axle argues that the President's authority to "nullify [or] void . . . exercising any

. . . privilege" does not empower the President to rescind the de minimis privilege because (A) the term "privilege" should be read to include only common-law property rights, (B) the rescission of the de minimis exemption runs afoul of separation of powers principles, and (C) the de minimis exemption is not a privilege to be exercised by individual importers.  We address each of the arguments in turn below, finding that IEEPA authorizes the President's rescission of the de minimis exemption.  Accordingly, we deny Axle's motion for summary judgment on Count I and grant summary judgment in favor of the Government.

### A. The Term "Any . . . Privilege" Is Not Limited to Common-Law Property Rights

Axle argues that the "nullify" or "void" language in IEEPA "is best understood to refer to rights and privileges governing the ownership and control of property, which is generally governed by common law and state statutes, not federal statutory rights and privileges."  Am. Compl. ¶ 62; see also Pl.'s Br. at 19; Pl.'s Reply at 9.

Contrary to Axle's argument, nothing in the text of IEEPA limits the President's power to "nullify [or] void . . . exercising any . . . privilege" to non-federal statutory privileges.  Even in the trade context, it is conceivable that Congress might, through one statutory provision, empower the President to suspend the operation of another upon a finding that certain conditions pertain.  See Marshall Field & Co. v. Clark, 143 U.S. 649, 680, 692–93 (1892) (upholding the constitutionality of Section 3 of the Tariff Act of 1890 which grants the President the authority to "suspend" provisions of the Tariff Act "whenever and so often as the [P]resident shall be satisfied that the government of any country producing and exporting [the goods] imposes duties . . . he may deem to be reciprocally unequal and unreasonable." (quoting Act of Oct. 1, 1890, 26 Stat. 567 at 612)); Clinton, 524 U.S. at 444 ("[W]henever the President suspended an exemption under the Tariff Act, he was executing the policy that Congress had embodied in the statute.").  IEEPA explicitly

provides such authority, allowing the President to "nullify [or] void . . . exercising <u>any</u> . . . privilege."  50 U.S.C. § 1702(a)(1)(B) (emphasis added).  We do not read the word "any" out of IEEPA to find that the President's authority to "void [or] nullify" a privilege is limited to common-law property rights.  See <u>TRW Inc. v. Andrews</u>, 534 U.S. 19, 31 (2001) ("It is 'a cardinal principle of statutory construction' that 'a statute ought, upon the whole, to be so constructed that, if it can be prevented, no clause, sentence, or word shall be superfluous, void, or insignificant.' " (quoting <u>Duncan v. Walker</u>, 533 U.S. 167, 174 (2001))); <u>United States v. Menasche</u>, 348 U.S. 528, 538–39 (1955) ("It is our duty 'to give effect, if possible, to every clause and word of a statute.' " (quoting <u>Inhabitants of Montclair v. Ramsdell Twp.</u>, 107 U.S. 147, 152 (1883))).

With no limitation in the plain text of IEEPA, Axle turns to legislative history—pointing to a Senate report containing discussion of the 1941 amendment that added the relevant text to the Trading with the Enemy Act ("TWEA"), the precursor to IEEPA—to argue for a more limited reading of the statute.[7]  <u>See</u> Pl.'s Br. at 20; <u>see also</u> <u>Learning Res.</u>, 607 U.S. at 310–11 (2026) (Jackson, J., concurring in part and concurring in judgment) (finding "Senate and House Reports [to be] among the best evidence of what Congress sought to accomplish with its enactments").  In that report, the Senate indicated that while

> [t]he existing foreign property control regulations . . . have permitted the

---

[7] The text at issue was originally part of TWEA, and the legislative history Axle cites relates to TWEA.  Congress passed TWEA in 1917 to regulate international transactions with enemy powers following the entry of the United States into World War I.  <u>See</u> Trading with the Enemy Act, Pub. L. No. 65-91, 40 Stat. 411 (1917) (codified as amended at 50 U.S.C. §§ 4301–41); <u>see also</u> Christopher A. Casey & Jennifer K. Elsea, Cong. Rsch. Serv., R45618, <u>The International Emergency Economic Powers Act: Origins, Evolution, and Use</u> at 2–3 (2024).  Congress later reformed the President's emergency powers by cabining the President's powers under TWEA to wartime, and enacting a new statute, IEEPA, to "confer[] upon the President . . . authorities for use in time of national emergency[.]"  Comm. on Int'l Rels., Trading with the Enemy Act Reform Legislation, H.R. Rep. No. 95-459, at 2 (1977); <u>see also</u> IEEPA, Pub. L. No. 95-223, §§ 201–08 (codified as amended at 50 U.S.C. §§ 1701–10).  Congress drew much of the relevant language in IEEPA from TWEA, including the language at issue in this case.

> Government to prevent and regulate transactions relating to foreign property . . . [,]
> it is now necessary for the Government to be able to affirmatively compel the use
> and application of foreign property in a manner consistent with the interests of the
> United States.

Comm. on the Judiciary, S. Rep. 77-911, at 2 (1941). According to Axle, this amendment broadened the President's authority to "authorize [him] to seize (not just freeze, as he could before) alien property." Pl.'s Br. at 20 (emphasis in original). To do so, Axle suggests, "the [G]overnment might need to 'nullify' or 'void' the common-law 'rights' or 'privileges' that property owners otherwise might assert to defend their property from U.S. [G]overnment seizure and use." Id. Thus, according to Axle, Congress intended that the President's power to "void . . . exercising any . . . privilege" be limited to common-law privileges.

The legislative history Axle cites makes clear that the 1941 amendment added language to the statute allowing the President to "affirmatively compel the use and application of foreign property," S. Rep. 77-911 at 2, which may indeed include the power to seize, as Axle suggests. However, neither the text of the statute nor the legislative history indicates that the relevant language in IEEPA should be read to provide only the limited authority to seize property. To the contrary, the legislative history explains that the new text would "add[] to the existing freezing control, in substance, the powers contained in [the statute] with respect to alien property, extending those powers and adding a flexibility of control." Comm. on the Whole, H.R. Rep. No. 77-1507, at 3 (1941). The legislative history states that the new text "vests flexible powers in the President, operating through such agency or agencies as he might choose, to deal with the problems that surround alien property or its ownership or control in the manner deemed most effective in each particular case." Id. In short, the legislative history Axle cites indicates that Congress intended to grant the President extremely broad, "flexible powers" to create a "complete system" of "control" over property in which a foreign national has any interest. Id. Though seizing property may be

one such form of control, the legislative history surrounding the relevant text does not suggest that the text limits the President's authority to any single means of control.

As Axle separately notes, IEEPA includes a "long list of verbs" all providing the President with distinct means of control over property in which a foreign country or national has any interest. See Pl.'s Br. at 16. If Congress intended to grant the President the authority only to seize property, Congress could have included just one verb: seize. Similarly, if Congress intended to limit the President's authority to only common-law privileges, it could have included that qualification in the text of the statute. Congress did not do so, and we do not read such a limitation into the text based on Axle's interpretation of the limited legislative history that Axle provides. See M & K Emp. Sols., LLC v. Trs. of IAM Nat'l Pension Fund, 608 U.S. __, __, 146 S. Ct. 1224, 1231 (2026) ("We generally do not read limitations into statutes that do not appear in their text, and we discern no basis for doing so here." (citation omitted)).

### B.    The Rescission of the *De Minimis* Exemption Does Not Run Afoul of Separation of Powers Principles

Although the Constitution does not have an explicit provision recognizing the separation of powers, the Constitution does identify three distinct types of governmental power—legislative, executive, and judicial—each committed to a different branch of government by the Vesting Clauses. Those clauses provide that "[a]ll legislative Powers herein granted shall be vested in a Congress of the United States," U.S. Const. art. I, § 1, "[t]he executive Power shall be vested in a President of the United States," U.S. Const. art. II, § 1, cl. 1, and "[t]he judicial Power of the United States[] shall be vested in one supreme Court, and in such inferior Courts as the Congress may from time to time ordain and establish," U.S. Const. art. III, § 1. These distinct types of governmental power outlined in the Constitution reflect that "the powers properly belonging to one of the departments ought not to be directly and completely administered by either of the other

departments." The Federalist No. 48, at 308 (James Madison) (Clinton Rossiter ed., 1961). "The accumulation of all powers, legislative, executive[,] and judiciary, in the same hands . . . may justly be pronounced the very definition of tyranny." The Federalist No. 47, at 301 (James Madison) (Clinton Rossiter ed., 1961). The legislative powers assigned to Congress in the Constitution include the powers to "lay and collect Taxes, Duties, Imposts and Excises," and to "regulate Commerce with foreign Nations." U.S. Const. art. I, § 8, cls. 1, 3. Axle argues that "the President, by exercising unconstrained authority with respect to statutory tariff exemptions, would wield the quintessential legislative power to determine when, where, and in what amounts tariffs should be levied." Pl.'s Br. at 25. According to Axle, this power "is tantamount to the line-item veto that the Supreme Court held unconstitutional in Clinton[.]" Id. at 25 (citing Clinton, 524 U.S. at 437–39). Axle's argument falls short for two reasons: (1) the power in IEEPA to void the exercising of a privilege is not tantamount to the power to impose tariffs, and (2) the power in IEEPA to void the exercising of a privilege is not equivalent to the line-item veto at issue in Clinton.

### 1. The Authority to "Void . . . Exercising Any . . . Privilege" is Not the Power of the Purse

First, Axle's argument that "eliminating a tariff exemption is functionally identical to imposing a tariff on previously exempted goods" is unavailing. Pl.'s Reply at 3; see also Pl.'s Br. at 21. Axle argues that Learning Resources should guide our analysis of the separation of powers here. See Pl.'s Br. at 21. However, key to the Court's reasoning in Learning Resources were several aspects of the President's unlawful power exerted there that do not apply here, including: (1) that "the purported delegation involve[d] the core congressional power of the purse," 607 U.S. at 243, and (2) that the Government's reading of IEEPA would "give the President power to unilaterally impose unbounded tariffs," id. at 244.

Unlike in Learning Resources, the delegation here does not involve the core congressional power of the purse nor the power to rewrite the Harmonized Tariff Schedule of tariff rates for all merchandise imported into the United States.  The President's rescission of the de minimis exemption is not tantamount to the imposition of tariffs because suspending the de minimis exemption imposes no new duties; it merely renders goods valued at $800 or less subject to the same duties that would apply to those goods if they were valued at more than $800.  The duties that goods valued at $800 or less become subject to absent the de minimis exemption are duties Congress imposed and whose imposition Congress otherwise authorized.  Allowing the President to rescind the de minimis exemption does not authorize him to impose any tariffs.

Additionally, reading IEEPA to allow the President to rescind the de minimis exemption does not provide him with unbounded authority, like the power to "unilaterally impose tariffs of unlimited amount, duration, and scope," at issue in Learning Resources.  607 U.S. at 255.  Axle argues that "if IEEPA truly authorized the President to override any trade-related federal statute at whim, with no guidance as to which statutes to suspend and under what circumstances, it would violate the nondelegation doctrine because there would be no intelligible principle to cabin the President's authority."  Pl.'s Reply at 15 (emphasis omitted) (citing J.W. Hampton Jr. & Co. v. United States, 276 U.S. 394, 409 (1928)).  "The nondelegation doctrine is rooted in the principle of separation of powers," and reflects that "Congress generally cannot delegate its legislative power to another Branch."  Mistretta v. United States, 488 U.S. 361, 371–72 (1989).  However, "[i]f Congress shall lay down by legislative act an intelligible principle to which the (President) is directed to conform, such legislative action is not a forbidden delegation of legislative power."  Fed. Energy Admin. v. Algonquin SNG, Inc., 426 U.S. 548, 559 (1976) (quoting Hampton, 276 U.S. at 409); see also Gundy v. United States, 588 U.S. 128, 135 (2019); Fed. Commc'ns Comm'n

Court No. 25-00091                                                                    Page 21

v. Consumers' Rsch., 606 U.S. 656, 673 (2025).

Here, IEEPA contains such an intelligible principle: the President's power is restricted to voiding the exercising of a "privilege."[8]  Axle suggests that the Government's interpretation of the word "privilege" is so broad as to render this restriction meaningless.  See Pl.'s Br. at 22.  According to Axle, if IEEPA authorizes the President to rescind the de minimis exemption, it would also authorize him to " 'override' the rights and privileges granted by other tariff-related statutes beyond the de minimis exemption, like Section 122's 15 [percent], 150-day limit on tariffs."  Id. (citing 19 U.S.C. § 2132(a)); see also Pl.'s Reply at 7.  Axle argues that "[n]o trade statute would be safe from the President's statutory eraser."  Pl.'s Reply at 7.

Axle's argument falls short because Congress has twice explicitly identified the de minimis exemption as a "privilege."  19 U.S.C. § 1321(a)(2), (c).  Thus, finding that IEEPA allows the President to rescind the de minimis exemption has no implication for other tariff-related statutes that are not explicitly designated by Congress as "privileges," including Section 122's 15 percent, 150-day limit on tariffs.  Indeed, the 15 percent, 150-day limits on tariffs are restrictions on the President's authority, not privileges granted to importers.  See 19 U.S.C. § 2132(a).  The power to rescind the exercising of a "privilege," applied here to an exemption Congress has explicitly described as a "privilege," does not equate to the authority to impose unbounded and unlimited tariffs at issue in Learning Resources nor to the unlimited power to override any trade-related statute as Axle implies.

---

[8] IEEPA includes other limitations on the President's power, including that he must first declare a national emergency and that the action he takes must "only be exercised to deal with an unusual and extraordinary threat with respect to which a national emergency has been declared for purposes of this chapter and may not be exercised for any other purpose."  50 U.S.C. § 1701(b).

### 2. The Authority to "Nullify [or] Void . . . Exercising Any . . . Privilege" Is Not the Power to Legislate

Axle's argument that the President's power here is equivalent to the impermissible Presidential actions under the Line Item Veto Act at issue in Clinton is similarly unpersuasive. See Pl.'s Br. at 25 (citing Clinton, 524 U.S. at 437–39). The Line Item Veto Act allowed the President to cancel in whole three very broad types of provisions within a bill passed by Congress before it became a law. See Clinton, 524 U.S. at 436–37. In Clinton, the Court found that the Line Item Veto Act allowed the President to effectively "amend[] . . . Acts of Congress by repealing a portion" of the bill, id. at 438, and instructed him to essentially legislate in doing so by considering the history, purpose, and other relevant information about those provisions. Id. at 436–39. Here, in contrast, the President's discretion is limited to declaring an emergency and then choosing among the specifically enumerated powers granted to him, which include "nullify[ing] [or] void[ing] . . . exercising any . . . privilege." 50 U.S.C. 1702(a)(1). The President does not legislate by exercising this discretion under IEEPA.

IEEPA's grant of authority to "nullify [or] void . . . exercising any . . . privilege" is not inconsistent with the principle that "[a]ll legislative Powers herein granted shall be vested in a Congress of the United States." U.S. Const. art. I, § 1. According to the Supreme Court, "[t]he true distinction . . . is between the delegation of power to make the law, which necessarily involves a discretion as to what it shall be, and conferring authority or discretion as to its execution, to be exercised under and in pursuance of the law. The first cannot be done; to the latter no valid objection can be made." Field, 143 U.S. at 693–94 (quoting Cincinnati, Wilmington & Zanesville R.R. Co. v. Comm'rs of Clinton Cnty., 1 Ohio St. 77, 88–89 (1852)).

The President's actions here are more like those the Court upheld in Field than the line-item veto struck down in Clinton. The statute at issue in Field listed almost 300 specific articles that

were exempted from import duties and directed the President to suspend that exemption for five articles if he found that duties were reciprocally unequal and unreasonable. See Clinton, 534 U.S. at 442–43 (quoting and discussing Field, 143 U.S. at 692–93). The Court found that, by authorizing the suspension of an exemption, the statute "does not, in any real sense, invest the [P]resident with the power of legislation," because "[w]hat the [P]resident was required to do was simply in execution of the act of [C]ongress." Field, 143 U.S. at 692–93. The Court noted that "it cannot be said that . . . he exercised the function of making laws." Id. at 693. That logic applies here. Just as in Field, the President did not legislate when he rescinded the de minimis exemption under IEEPA. See id. Instead, by declaring a national emergency, he "determine[d] some fact or state of things upon which the law makes, or intends to make, its own action depend." Id. at 694 (citation omitted).[9] Then, by taking one of the enumerated actions to deal with that emergency, the President executed the "policy that Congress . . . embodied in" IEEPA. Clinton, 524 U.S. at 444 (discussing Field). The President's rescission of the de minimis exemption is thus the exercise of a lawful delegation of discretion to execute the law, not the exercise of an unlawful delegation of power to make the law.

While it is true that the President's discretion in Field was more limited than the discretion granted to the President here, the breadth of IEEPA does not transform permissible discretion into impermissible power to legislate. The logic of Field applies here because, as in Field, "Congress

---

[9] The Parties do not dispute, and thus the court does not consider here, whether the actions taken by the President "deal with an unusual and extraordinary threat with respect to which [the] national emergenc[ies] [he] declared." 50 U.S.C. § 1701(b); see also Gov't Br. at 3 ("Axle does not dispute that those emergencies are valid. Nor does Axle dispute that the suspension of the de minimis privilege deals with those emergencies."); Pl.'s Reply at 15 (noting only that "the [G]overnment has consistently argued elsewhere that the President's emergency declaration and determination that there is an 'unusual and extraordinary threat' are unreviewable" (citation omitted)); Tr. of Oral Arg. at 21:3–22:9, July 16, 2026, ECF No. 73 ("Tr.").

itself made the decision" to allow the President to void any privilege with respect to any property in which any foreign country or a national thereof has any interest "upon the occurrence of particular events," namely the declaration of a national emergency.  Clinton, 524 U.S. at 445 (discussing Field); see also 50 U.S.C. § 1702(a)(1)(B).  Therefore, just as in Field, the President's rescission of the de minimis exemption "does not, in any real sense, invest the [P]resident with the power of legislation."  Field, 143 U.S. at 692.

In short, the President's rescission of the de minimis exemption does not run afoul of separation of powers principles because the President's power does not reflect the wholesale power to impose tariffs at issue in Learning Resources, nor the wholesale power to legislate at issue in Clinton.  Instead, by rescinding the de minimis exemption, the President found the existence of an underlying condition—the national emergency—and executed the policy of Congress by taking an action specifically enumerated in IEEPA purportedly to deal with that emergency.

### C.    The Term "Exercising" Does Not Limit the President's Authority Here

Axle argues that "IEEPA does not allow the [G]overnment to nullify or void rights, powers, or privileges simpliciter, as though the [G]overnment could erase a privilege from the statute books . . . .  Rather, IEEPA authorizes the [G]overnment to nullify or void the 'exercising' of a privilege[.]"  Pl.'s Br. at 19 (citing 50 U.S.C. § 1702(a)(1)(B)) (emphasis in original); see also Pl.'s Reply at 10.  Axle argues that the de minimis exemption is not a privilege to be exercised, but a "general command to the [G]overnment that applies regardless of any importer's choice to invoke the exemption."  Pl.'s Br. at 19.

Contrary to Axle's position, the de minimis exemption is a privilege to be "exercised" through the optional use of special entry procedures permitted for eligible merchandise qualifying for the privilege.  See 19 C.F.R. § 10.151.  The Deputy Executive Director of Cargo and Conveyance Security with the Office of Field Operations at CBP notes that "importers were not

required to claim the de minimis exemption by using this special entry procedure, and nothing

prevented them from choosing to pay duties on their low-value imports by utilizing the regular

formal or informal entry procedures for dutiable merchandise, and many importers did so."  Decl.

of Carl S. Campbell ¶ 7, Gov't Br. at Attach. 1, Apr. 9, 2026, ECF No. 59-1.

Axle itself suggests that it specifically organized its business to exercise the de minimis

exemption.  Axle explains that, to "utilize this exemption," it "opened a distribution center in

Juarez, Mexico, just across the U.S.-Mexico border," where it imports and repackages auto parts

from China and ships "orders of less than $800" addressed to individual customers in the United

States.  See Am. Compl. ¶ 36; see also id. ¶ 6.  Each of Axle's individual shipments from its

Mexico facility could then be treated as an "article[] imported by one person on one day" for which

"the aggregate fair retail value in the country of shipment" does not exceed $800, as required for

de minimis eligibility under 19 U.S.C. § 1321(a)(2)(C).  By structuring its business in this way,

Axle has historically "utilize[d] [the de minimis] exemption," making "all of [Axle's] sales from

[the Mexico] facility . . . exempt from tariffs."  Am. Compl. ¶ 36  Axle thus cannot claim that the

use of the de minimis exemption is not the "exercising" of a "privilege."  50 U.S.C.

§ 1702(a)(1)(B).  The President's action here, rescinding the de minimis exemption, effectively

nullifies or voids all importers' ability to exercise the de minimis privilege writ large.  There is no

reason to find that the term "exercising" limits the President's authority here in any meaningful

way.[10]

---

[10] Axle notes in a footnote that it "reserves the right to argue that IEEPA cannot authorize the rescission of the de minimis exemption and imposition of tariffs on [Axle] because IEEPA's grant of authority only extends to 'property in which any foreign country or a national thereof has any interest.' "  Pl.'s Br. at 20 n.1 (quoting 50 U.S.C. § 1702(a)(1)(B)).  Axle suggests that "[n]o foreign country or national has any interest in the property that [Axle] imports from China through its Mexico facilities."  Id.; see also Amended Compl. ¶ 66.  A note in a footnote "reserv[ing] the right to argue" is not an adequately developed argument and need not be addressed by the court.

>   **II.**     ***Agency Actions Implementing the President's Lawful Directive to Rescind the De Minimis Exemption Here Are Not Subject to APA Review***

Axle argues that "[t]he agency actions implementing the [Executive Orders rescinding the de minimis exemption] should also be set aside for the independent reason that they were arbitrary and capricious" under the APA. Pl.'s Br. at 25. We find that agency implementation of the President's rescission of the de minimis exemption is ministerial in nature and therefore unreviewable under the APA pursuant to the Supreme Court's holding in Franklin, 505 U.S. at 800–01. So bound, we deny Axle's motion for summary judgment on Count II and grant summary judgment in favor of the Government.

"Out of respect for the separation of powers and the unique constitutional position of the President, . . . textual silence is not enough to subject the President to the provisions of the APA. We would require an express statement by Congress before assuming it intended to subject the President to the provisions of the APA." Id. "As the APA does not expressly allow review of the President's actions, we must presume that his actions are not subject to its requirements." Id. at 801.

Where an agency's action merely implements a lawful Presidential exercise of discretion, that action is also not subject to the APA. Invenergy Renewables LLC v. United States, 44 CIT

---

See Kao Corp. v. Unilever U.S., Inc., 441 F.3d 963, 973 n.4 (Fed. Cir. 2006) (declining to consider an argument made only in "glancing references"); cf. Agile Defense, Inc. v. United States, 959 F.3d 1379, 1384 n.* (Fed. Cir. 2020) (declining to consider an argument that "the government fails to adequately develop"). Regardless, Axle's argument is unavailing because any import coming from a foreign country—here China and Mexico—implicates the interests of those foreign countries.

Axle's additional suggestion at oral argument that "IEEPA confines its Presidential authority to foreign-owned property," Tr. at 13:17–18, is similarly unpersuasive. IEEPA specifies that the President can "nullify [or] void . . . exercising any . . . privilege with respect to any property in which any foreign country or a national thereof has any interest," 50 U.S.C. § 1702(a)(1)(B) (emphasis added). A foreign nation or national can have an interest in property without owning that property.

__, __, 482 F. Supp. 3d 1344, 1354 (2020) (holding that an "attempt to formulate claims under the APA regarding [a Presidential directive] [to be] too tenuous a connection"); Ancient Coin Collectors Guild v. Customs & Border Prot., 801 F. Supp. 2d 383, 402–403 (D. Md. 2011), aff'd, 698 F.3d 171, 184 (4th Cir. 2012); cf. HMTX Indus. LLC v. United States, 156 F.4th 1236, 1249–50 (Fed. Cir. 2025) (distinguishing between "actions involving discretionary authority delegated by Congress to the President" and "those involving authority delegated by Congress to an agency" (internal quotation marks and citation omitted)).  Ministerial agency actions—like those implementing the President's rescission of the de minimis exemption here—involve no agency discretion and are thus mere "extension[s] of the President's action."  Detroit Int'l Bridge Co. v. Gov't of Canada, 189 F. Supp. 3d 85, 102 (D.D.C. 2016) (quoting Tulare Cnty. v. Bush, 185 F. Supp. 2d 18, 29 (D.D.C. 2001), aff'd on other grounds, 306 F.3d 1138 (D.C. Cir. 2002)). Such ministerial agency actions are reviewable as Presidential actions for whether they violate the Constitution or exceed the statutory powers granted to the President by Congress, see Dalton v. Specter, 511 U.S. 462, 471–74 (1994); see also Severstal Export GMBH v. United States, 42 CIT __, __, 2018 WL 1705298, at *7–8 (Apr. 5, 2018), but are not reviewable under the APA pursuant to Franklin, 505 U.S. at 801.

These ministerial actions stand in contrast to agency actions that courts have found to be reviewable under the APA, including actions that are prerequisite to the President's exercise of discretion, see, e.g., Corus Grp. PLC v. Int'l Trade Comm'n, 352 F.3d 1351, 1359 (Fed. Cir. 2003) ("The statute only gives the President authority to impose a duty if the Commission makes an affirmative finding regarding serious injury." (internal quotation marks and citation omitted)), and actions that allow the agency to exercise some level of discretion, see, e.g., HMTX Indus., 156 F.4th at 1250 (noting that the agency "stated that the President's specific direction was one of the

three factors it considered" in exercising its discretion (emphasis omitted)).[11]

Agency ministerial actions implementing lawful exercises of Presidential authority cannot be struck down under the APA because "an agency under the direction of the executive branch . . . must implement the President's policy directives to the extent permitted by law." Sherley v. Sebelius, 689 F.3d 776, 784 (D.C. Cir. 2012). Where an agency is tasked with "implementing a legally permissible presidential directive," it "[has] no other course of action: . . . an agency 'may not simply disregard' a binding presidential directive." Chamber of Com. of the U.S. v. U.S. Dep't of Homeland Sec., 815 F. Supp. 3d 73, 110 (D.D.C. 2025) (quoting Sherley, 689 F.3d at 784–85). "[T]o consider and adopt any . . . alternatives [to implementing an executive order] would require [the agency] to defy an executive order—which would clearly constitute an arbitrary and capricious agency action." Bradford v. U.S. Dep't of Labor, 101 F.4th 707, 731 (10th Cir. 2024).

In sum, where an agency exercises no discretion in implementing the President's lawful directive, it cannot act arbitrarily or capriciously. See id. (finding that an agency action "could not have been an arbitrary and capricious exercise of agency discretion because the agency had no

---

[11] The cases Axle cites involve agency actions that allow the agency to exercise some discretion and are therefore consistent with this principle. In Chamber of Com. of the U.S. v. Reich, the D.C. Circuit noted that the Government's claim that "the Secretary's regulations were necessary to 'flesh out' the Executive Order" contradicted its position that APA review was not available. 74 F.3d 1322, 1327 (D.C. Cir. 1996). The Executive Order there provided, for example, that "the Secretary may make a finding that it is appropriate to terminate [a Government] contract for convenience." Id. at 1324 . Similarly, in Nebraska v. Su, the Ninth Circuit noted that the Executive Order there gave the agency "considerable discretion." 121 F.4th 1, 17 (9th Cir. 2024). Contrary to Axle's suggestion that the agencies here should have "consider[ed] the serious reliance interests that the de minimis exemption created, the significant costs to U.S. consumers and businesses of eliminating the exemption, and obvious, reasonable alternatives," Pl.'s Br. at 25–26, the Executive Orders at issue here do not provide the relevant agencies with any discretion in rescinding the de minimis exemption. See, e.g., Executive Order 14388, 91 Fed. Reg. at 17840 ("The duty-free de minimis exemption . . . shall not apply to any shipment of articles . . . regardless of value, country of origin, mode of transportation, or method of entry."). Instead, they require that the agencies merely implement ministerially the President's lawful directive.

discretion to act otherwise" where "the agency was compelled by [an] executive order" (emphasis in original)).  The agencies here—the Department of Commerce, the Department of the Treasury, and CBP—could not have defied the President's directive to suspend the de minimis exemption, and they exercised no discretion in implementing that directive.  Their actions implementing the rescission of the de minimis exemption were thus ministerial and are not subject to APA review pursuant to Franklin.

## CONCLUSION

Because the President's power here is limited to "nullify[ing] [or] void[ing] . . . exercising any . . . privilege," 50 U.S.C. § 1702(a)(1)(B) (emphasis added), and does not run afoul of separation of powers principles, we hold that IEEPA authorizes the President's rescission of the de minimis exemption.  We further hold that, pursuant to controlling Supreme Court precedent, any agency actions here implementing the President's directive are ministerial in nature and therefore not reviewable under the APA.  Accordingly, we deny Axle's motion for summary judgment on Counts I and II and grant summary judgment in favor of the Government on Counts I and II of Axle's amended complaint.  The Government's motion to dismiss Count II is denied as moot.

Regarding the Government's cross-motion for summary judgment on Count III of Axle's amended complaint, the Supreme Court has already held that "IEEPA does not authorize the President to impose tariffs."  Learning Res., 607 U.S. at 255.  Accordingly, we deny the Government's cross-motion for summary judgment on Count III and defer judgment as to that Count.[12]

---

[12] We note that Axle has already received much of what it seeks under Count III.  See Am. Compl. ¶ 98; Learning Res., 146 S. Ct. at 646; Executive Order 14389, Ending Certain Tariff Actions, 91 Fed. Reg. 9437, 9437 (Feb. 20, 2026) (stating that the tariffs imposed pursuant to IEEPA "shall no longer be in effect and, as soon as practicable, shall no longer be collected").  In addition, Axle

**SO ORDERED.**

<u>By the Panel.</u>

Dated: <u>August 13, 2026</u>
       New York, New York

---

asks the court to "order the government to refund IEEPA tariffs collected from [Axle]." Am. Compl. ¶ 98. This court has separately ordered that "with respect to any and all unliquidated entries that were entered subject to IEEPA duties, [CBP] is hereby directed to liquidate those entries without regard to the IEEPA duties," that "[a]ny liquidated entries for which liquidation is not final shall be reliquidated without regard to those duties," and that "[a]ny liquidated entries for which liquidation is final shall be reliquidated without regard to the IEEPA duties." Order Directing Liquidation, <u>V.O.S. Selections, Inc. v. United States</u>, No. 25-cv-00066 (Ct. Int'l Trade filed Apr. 14, 2025), Apr. 17, 2026, ECF No. 82. The Government's appeal of that Order is pending at the Federal Circuit. <u>See</u> <u>V.O.S. Selections, Inc. v. Trump</u>, No. 26-1895 (Fed. Cir. filed June 3, 2026); <u>see also</u> Order Granting Consolidation, <u>V.O.S. Selections, Inc. v. Trump</u>, No. 26-1895 (Fed. Cir. filed June 3, 2026), June 26, 2026, ECF No. 13 (consolidating four appeals of identical Orders Directing Liquidation).